CITY OF AURORA v. NAVAR

Ill. **981**

Cite as 568 N.E.2d 978 (Ill.App.2 Dist. 1991)

threatening that anyone would be arrested but acknowledged that he had indicated that "the police could be contacted and have him closed down." Anderson testified that, on the occasions he contacted Navar, he had received complaints that Navar's garage was open in the evening. In response to questioning by the court, Anderson admitted that the complaints that had prompted both him and the police to go to Navar's garage had all come from a single complainant.

It was undisputed that the particular ordinance Anderson sought to enforce in September and October had not yet been adopted by the City council. Anderson testified that he thought the ordinance was in effect on the occasions he contacted Navar prior to November 7, 1989.

Navar also testified regarding incidents which occurred *after* the nuisance ordinance was amended. On November 29 a police officer came to the garage and told Navar he had received complaints of noise. The officer indicated that he himself had been standing outside but had not heard any noise. Around December 9 or 10, at about 9:30 p.m., Navar again was contacted by police. According to Navar, he was changing the oil in his own van inside his garage, which had been closed for the night, when four squad cars pulled into the garage parking lot. Two of the officers called him outside and told him they had received complaints of noise coming from his garage. Navar explained that he was merely changing the oil in his vehicle and not making noise. The officers gave him a warning regarding noise and left. It was not contested that Navar was never sent a notice to abate after the ordinance went into effect.

At the conclusion of the hearing the trial court granted Navar's motion and permanently enjoined Aurora from enforcing its noise ordinance against Navar. The judge's oral remarks indicate that he granted injunctive relief on the basis that Aurora had selectively enforced its noise ordinance against Navar. While the court indicated its belief that the constitutional issues were well raised, it did not render a

judgment as to the constitutionality of the challenged ordinance.

Navar subsequently filed a petition for attorney fees and costs which was initially denied. Navar then filed a post-trial motion asking the court to reconsider its decision and resolve the important constitutional issue which had been raised. The court granted the motion and ultimately found, among other things, that the City's noise ordinance was unconstitutional in that it improperly deprived Navar of a protected property interest in his business, denied him equal protection of the law, and was vague and overly broad. The ordinance was declared unconstitutional on both State and Federal constitutional grounds. The City was enjoined from any enforcement of the ordinance and Navar was awarded attorney fees and costs. Aurora then filed this appeal.

**[1]** Initially, Aurora asserts that the trial court erroneously ignored the presumption of validity enjoyed by the City's ordinance. (See *City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill.2d 40, 66, 349 N.E.2d 399; *Village of Glenview v. Velasquez* (1984), 123 Ill.App.3d 806, 809, 79 Ill.Dec. 319, 463 N.E.2d 873.) We note, however, that the City does not cite to any portions of the record to support its assertion that the trial court ignored these principles. Rather, it cites to the locations in the record where it raised this issue in the lower court. Evidently, since the trial judge did not specifically mention it in his oral or written rulings, the City assumes that he ignored the rule regarding presumptive validity altogether. The record does not support such an assumption.

In its written order holding the order unconstitutional the trial court stated: "The court has carefully reviewed the memoranda and pleadings as well as its own notes relating to the hearing held. The court has also considered the arguments presented." The City had first pointed out the presumption of validity due its ordinance in its response to Navar's motion for a temporary restraining order. It again raised the issue in the memorandum of law it submitted to the court in

opposition to Navar's motion for a permanent injunction. The trial court explicitly stated that it had reviewed the memoranda and pleadings. On these facts we are confident the lower court took into consideration the presumption set forth by the City.

[2] The City next challenges the trial court's findings that the noise ordinance is unconstitutionally vague and overly broad. As a preliminary matter we note that in his counterclaim Navar alleged and sought relief specifically in relation to Aurora's ordinance 89–108. The trial court's declaration of unconstitutionality was precisely limited to ordinance 89–108. In this court the parties' arguments focus on ordinance 89–108. The ordinance in question amended a section of the City's nuisance ordinance by adding, in pertinent part, the following language: "Any commercial activity audible from adjacent premises, or conducted out-of-doors, after 9 p.m. is declared a nuisance." The complaint charging Navar indicates that the offense was an "unlawful Nuisance Noise" and was brought pursuant to section 21–20 of the City's Code of Ordinances (Aurora, Ill., Code of Ordinances ch. 21, § 21–20 (1969)). Section 20–21 is the section that was amended by ordinance 89–108. According to the complaint, Navar "unlawfully allowed a repair garage to operate * * * in such a manner as to be a noise nuisance after the hour of 9 p.m." It is apparent from the record that the only portion of Aurora's Code of Ordinances that is in real controversy is the language regarding noise from commercial activity, which was added by ordinance 89–108 and which the parties refer to as the "noise ordinance." Nevertheless, Navar also attacks, and the trial court addressed, the language of section 21–20 which declares as a nuisance, conditions "offensive to the neighborhood." This language, however, was part of section 21–20 prior to amendment and was not altered by ordinance 89–108. Accordingly, we will limit our inquiry to the "noise ordinance" as added by ordinance 89–108.

[3] As we have already mentioned, there is no question, and Navar does not dispute, that a municipal ordinance is enti-

tled to a presumption of validity (*City of Evanston v. Ridgeview House* (1976), 64 Ill.2d 40, 66, 349 N.E.2d 399) and the party challenging an ordinance has the burden of showing its invalidity. (*Village of Glenview v. Velasquez* (1984), 123 Ill.App.3d 806, 809, 79 Ill.Dec. 319, 463 N.E.2d 873.) Navar attacks the validity of the ordinance on the ground that its provisions do not establish any objective standards for determining what is denoted by the word "audible." He points out that, under this word, *any* noise resulting from commercial activity after 9 p.m. could become a nuisance, as long as the noise could be heard by a next-door neighbor. He further asserts that the ordinance lacks any standards or guidelines as to what constitutes a violation and thereby encourages enforcement officers to make arbitrary decisions as to when a violation has occurred. In short, Navar suggests that under his noise ordinance Aurora could, for whatever reasons it chose, find a nuisance where, in fact, there was none. We think Navar has met his burden of showing the invalidity of ordinance 89–108.

In finding Aurora's noise ordinance to be vague and overly broad, the trial court singled out the failure of the ordinance to define or delineate any sort of measurement as to when commercial activity is or becomes "audible." The City brushes aside the lower court's vagueness objections by reciting dictionary definitions of the challenged terms and asserting, with little further support or argument, that the terms can be easily comprehended by a reasonable person of average intelligence and, therefore, are not unduly vague. We think the City misses the thrust of a constitutional due process inquiry.

[4, 5] Due process is violated if a law is so vague and devoid of standards as to leave the public unsure of what is and is not prohibited (*Bastian v. Personnel Board* (1982), 108 Ill.App.3d 672, 676, 64 Ill.Dec. 213, 439 N.E.2d 142) or if it fails to supply adequate guidelines to the administrative body which must enforce it. (*People ex rel. Stamos v. Public Building Comm'n* (1968), 40 Ill.2d 164, 174, 238

N.E.2d 390; *Bastian*, 108 Ill.App.3d at 676, 64 Ill.Dec. 213, 439 N.E.2d 142.) The language of an ordinance must convey sufficiently definite warning and fair notice of what conduct is proscribed, and whether notice is adequate is measured by common understanding and practices. (*City of Collinsville v. Seiber* (1980), 82 Ill.App.3d 719, 725, 38 Ill.Dec. 75, 403 N.E.2d 90.) While we agree with Aurora that "we can never expect mathematical certainty from our language" (*Grayned v. City of Rockford* (1972), 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222, 228–29), we are of the opinion that those to be regulated by it are entitled to far more certainty than is now provided by the City's noise ordinance, which provides neither the notice nor the standards required by due process guarantees.

The ordinance prohibits commercial activity which is "audible" from "adjacent premises." As the City points out, it is commonly understood that sound is audible if it is loud enough to be heard and adjacent premises are those which share a common border with the premises in question. The City concludes that the ordinary, everyday meanings of these words adequately convey to a reasonable person of average intelligence what is prohibited by the ordinance. We do not agree. The problem here is not with the meaning of the individual words that are used but, rather, that the words used do not set forth a nuisance as that term is commonly understood.

[6] A nuisance at common law is something which unlawfully annoys or does damage to another. (*Belmar Drive-In Theatre v. Illinois State Toll Highway Comm'n* (1966), 34 Ill.2d 544, 546, 216 N.E.2d 788; *City of Chicago v. Reuter Brothers Iron Works, Inc.* (1947), 398 Ill. 202, 206, 75 N.E.2d 355). Also, "[a] nuisance is something that is offensive, physically, to the senses and by such offensiveness makes life uncomfortable." (*Rosehill Cemetery Co. v. City of Chicago* (1933), 352 Ill. 11, 30, 185 N.E. 170.) It is patently unreasonable to suppose that the City intended that any and all commercial activity which creates noise after 9 p.m. should be declared annoying or offensive and, therefore, a nuisance merely because the noise can be heard nearby. Conversely, it is obvious the City meant to prohibit those commercial activities that create a kind or volume of noise which amounts to a nuisance when imposed upon neighbors after 9 p.m. However, because of the way the ordinance is drafted, *all* commercial activity which is audible from adjacent property after 9 p.m. is a nuisance and thus subject to prosecution. As suggested by the trial court, examples of unlikely commercial activity that might trigger enforcement of ordinance 89–108 are tow trucks driving on City streets between all-night garages and accident scenes; car doors being closed after 9 p.m. in the parking lots of all-night or late-night convenient stores such as 7-Eleven; and even the talking and laughter which often occurs near the entrances to various late-night establishments. This dichotomy between the actual wording of the ordinance and what might be reasonably expected by a person subject to the ordinance vividly illuminates the ordinance's weakness.

[7] There is no language in ordinance 89–108 by which a commercial activity can judge whether the noise it generates is of a kind or volume to constitute a nuisance. There is not even an indication of whether a nuisance in a commercial area is to be differentiated from a nuisance in a residential area. Absent guidelines, the business owner or operator, who is subject to the ordinance, is forced to decide for himself whether noise from the business is sufficient to be a nuisance and thus to trigger enforcement of the ordinance. The owners/operators then face a dilemma because, if they gauge incorrectly and the City determines they are in violation, they may be prosecuted despite their best efforts to comply. The language of the ordinance, even when considered in its everyday context, fails to convey what constitutes a nuisance and what, therefore, is prohibited. Like statutes, an ordinance violates due process guarantees when its terms "are so incomplete, vague, indefinite and uncertain that men of ordinary intelligence must necessarily guess at their

meaning and differ as to their application." (*Krebs v. Thompson* (1944), 387 Ill. 471, 477, 56 N.E.2d 761; see also *Spinelli v. Immanuel Evangelical Lutheran Congregation, Inc.* (1986), 144 Ill.App.3d 325, 331, 98 Ill.Dec. 269, 494 N.E.2d 196.) The trial court correctly found ordinance 89–108 to be impermissibly vague.

Just as the ordinance leaves those to be regulated without fair warning of what they may or may not do, so also it leaves those charged with its enforcement with no direction as to when a violation occurs. Absent guidelines within the ordinance itself as to when or what kind of noise amounts to an actionable nuisance, an enforcement officer is free to decide, strictly on his own, whether the noise complained of in a given situation constitutes a breach of the ordinance. Since he need not adhere to any standards, it is clear that the officer might find a violation where there exists no nuisance in fact. Reliance on the unbridled discretion of administrative officials fosters the arbitrary and discriminatory enforcement which is prohibited by both the State and Federal Constitutions. *Grayned v. City of Rockford* (1972), 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222, 227–28.

The conclusion we reach is consistent with prior decisions regarding similar noise ordinances. In *City of Chicago v. Reuter Brothers Iron Works, Inc.* (1947), 398 Ill. 202, 206, 75 N.E.2d 355, a zoning ordinance restricting noise of a "disagreeable or annoying nature" withstood a due process vagueness challenge. The court found that the words "disagreeable" and "annoying" had a well-established meaning in the definition of a common-law nuisance (*Reuter*, 398 Ill. at 206–07, 75 N.E.2d 355), thereby sufficiently setting forth the duty of those to be regulated. *Reuter* was determinative in upholding an ordinance against a constitutional challenge in *Dube v. City of Chicago* (1955), 7 Ill.2d 313, 131 N.E.2d 9. The *Dube* ordinance was very similar to the one in *Reuter*, except that the noises to be prohibited in *Dube* were those "disturbing the peace and comfort of occupants of adjacent premises." (*Dube*, 7 Ill.2d at 324, 131 N.E.2d 9.) The court in *Mister Softee of*

*Illinois, Inc. v. City of Chicago* (1963), 42 Ill.App.2d 414, 192 N.E.2d 424, discussed a vagueness challenge to an ordinance which prohibited making noise which was "distinctly and loudly audible" on public streets. While the court noted that it had no authority to pass on constitutional questions, it found that there was no debatable constitutional question as to the validity of the ordinance and dissolved an injunction which had enjoined the City from enforcing the ordinance as applied to the plaintiffs. An ordinance which prohibited "loud and raucous sounds" was challenged on the ground that the word "raucous" was impermissibly vague in *Town of Normal v. Stelzel* (1982), 109 Ill.App.3d 836, 65 Ill. Dec. 378, 441 N.E.2d 170. The court, in upholding the ordinance, relied on *Kovacs v. Cooper* (1949), 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513, where the court had rejected a vagueness challenge to an ordinance prohibiting "loud and raucous noises." While it had characterized the phrase "loud and raucous" as abstract, the *Kovacs* court found that these words had acquired an everyday meaning which sufficiently conveyed what conduct was prescribed by the ordinance.

**[8]** The key difference between the ordinances discussed above and Aurora's ordinance 89–108 is that every one of the cited ordinances includes language which limits broad and general words like "sound," "noise," or "audible" in such a way that a nuisance is delineated. The limiting words make it possible to discern when the "audible" sound amounts to a nuisance in fact. As we have pointed out, although not *all* noise which can be heard from commercial activity after 9 p.m. constitutes an actual nuisance, under Aurora's ordinance all audible noise created by commercial activity after 9 o'clock at night may be subject to prosecution. Under its ordinance as it is drafted, Aurora is far too free to find a nuisance when, in fact, there is none. A city has no power to declare that to be a nuisance which is not a nuisance in fact. (*Dube*, 7 Ill.2d at 325, 131 N.E.2d 9; see also *Rosehill Cemetery Co. v. City of Chicago* (1933), 352 Ill. 11, 185

N.E. 170.)  The failure of ordinance 89–108 to provide guidance to either those charged with compliance or those charged with its enforcement draws us to the inevitable conclusion that the ordinance is unconstitutional on its face.

The trial court also found ordinance 89–108 to be overly broad.  While both parties address this issue, both also agree that there is considerable doubt as to the applicability of the overbreadth doctrine to the commercial activity addressed by the ordinance.  (See *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* (1982), 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362.)  Moreover, we note that the City gives the issue only cursory treatment, and Navar's argument goes more to vagueness than to overbreadth.  In any event, we need not address this issue since we have already found the language of the ordinance to be so vague and uncertain as to be offensive to due process.

[9]  The City makes a lengthy argument that error occurred at the trial level because the court below granted injunctive relief to Navar as a result of the court's own bias and prejudice rather than as a result of careful consideration of the evidence and law introduced at the hearing.  In light of this serious charge, we have carefully reviewed all pertinent parts of the record and conclude that there is no basis for the City's claim.  First of all, we reiterate and expand upon what we said earlier:  despite the City's insistence to the contrary, there is absolutely no indication that the trial court ignored any of the evidence or law which was presented to it.  On the contrary, both the court's oral comments and its written findings indicate that it considered very carefully both the facts presented to it and the law relied upon by counsel.

We recognize, and it is readily apparent from the report of proceedings, that the trial court was disturbed by this case.  It can be inferred from his comments that the judge was disturbed by the City's attempt to enforce a nonexistent ordinance and by what appeared to him to be personal motivation for selective and vigorous enforcement against Navar.  However, it is also clear from his own remarks that by the time of the hearing on the post-trial motion the judge had become keenly aware of his own reactions to the testimony he had previously heard, had reviewed the file on the case in considerable depth, and had given the matter serious thought.  Only after all of this did he conclude that it was necessary to decide the constitutional question raised by Navar.  At the conclusion of the hearing itself the court again mentioned the way Mr. Navar's situation had been handled but then made a clear transition to his discussion of the constitutional problems with the ordinance.  On these facts we cannot say the trial court's decision sprang from his personal feelings regarding this case.  The City's assertions in this regard are not justified.

We turn now to the City's contention that the award of attorney fees to Navar, in the amount of $2,365, was improper.  In his prayer for relief Navar asked for fees and cited section 1988 of the Civil Rights Attorney's Fees Awards Act of 1976 (section 1988) (42 U.S.C. § 1988 (1988)), which provides for fee awards in civil rights cases.  Aurora first attacks the award on the ground that section 1988 is not applicable because Navar did not plead a cause of action under either section 1983 of the Civil Rights Act (section 1983) (42 U.S.C. § 1983 (1988)) or any of the other Federal statutes, as specifically set forth in section 1988, whose enforcement may merit a fee award.  Aurora further asserts that attorney fees are not available in declaratory judgment actions such as this one.  Navar responds that he never sought fees under either the declaratory judgment statute (Ill.Rev.Stat. 1987, ch. 110, par. 2–701 *et seq.*) or section 1983.  Rather he contends that he is entitled to fees under a provision of the Illinois Municipal Code (Ill.Rev.Stat.1987, ch. 24, par. 1–1–1 *et seq.*) or, alternatively, directly under section 1988.  We disagree with Navar on both counts.

[10]  The section of the Illinois Municipal Code invoked by Navar, section 11–13–15 (Ill.Rev.Stat.1987, ch. 24, par. 11–13–15), permits adversely affected owners or ten-

ants of real property to bring an action attacking zoning and building violations on neighboring real property. The cause of action extends also to the proper municipal officials. Among other things, such an action may be brought "to prevent illegal activity on the property involved." Successful plaintiffs in these actions are to be awarded attorney fees. Navar attempts to bootstrap himself into the position of a plaintiff under this statute by asserting that he brought a successful suit to prevent illegal activity by the City directed at his property. He contends that his suit revealed, and secured a remedy against, the City's illegal attempts to enforce a nonexistent ordinance and its unlawful attempt to prosecute him under its ordinance without giving prior notice to abate the alleged nuisance. Navar's argument asserts a tortured and insupportable reading of the statute.

**[11]**   Under section 11–13–15 municipalities have the power to enforce zoning and building ordinances in order to promote public health, welfare and safety. (*Launius v. Najman* (1984), 129 Ill.App.3d 498, 502, 84 Ill.Dec. 420, 472 N.E.2d 170.) The statute extends this enforcement authority to adjacent landowners or tenants for the purpose of affording relief to private citizens whose municipal authorities are slow or reluctant to act (*Launius*, 129 Ill.App.3d at 502, 84 Ill.Dec. 420, 472 N.E.2d 170), or where the interests of the municipality and general public differ from the interests of the private citizens (*City of Chicago v. Westphalen* (1981), 93 Ill.App.3d 1110, 1130, 49 Ill.Dec. 419, 418 N.E.2d 63), and it gives an adjacent landowner a private right of action against a private violator. (*Heerey v. Berke* (1989), 179 Ill.App.3d 927, 934, 128 Ill.Dec. 672, 534 N.E.2d 1277.) The award of attorney fees under section 11–13–15 is a permissible sanction imposed by the statute to secure compliance with local building and zoning ordinances. (*Pasfield v. Donovan* (1956), 7 Ill.2d 563, 568, 131 N.E.2d 504; *Launius*, 129 Ill.App.3d at 502, 84 Ill.Dec. 420, 472 N.E.2d 170.) Clearly, the statute is intended to give property owners a legal tool to attack detri-

mental neighborhood ordinance violators when the municipality has not done so. Navar, however, is not attempting to secure compliance with any building or zoning ordinance by a private violator. Absent an ordinance violation, there is no purpose for imposing the sanction of an attorney fee award.

**[12]**   In addition, the statute does not attempt to enable property owners to reach the kinds of violations which Navar attributes to the City. Plaintiff in *Heerey* invoked section 11–13–15 in an attempt to enjoin the City of Chicago from issuing building permits. The complaint, which was dismissed for failure to state a cause of action, alleged that the City had allowed unlawful construction due to its failure to enforce the conditions and requirements in its own municipal permits. In affirming the dismissal of the complaint the court recognized that the statute allows either the city or an adjacent landowner to proceed against zoning ordinance violators but added that it does not provide a cause of action against the city by a landowner. Plaintiff argued that section 11–13–15 permits a cause of action against the city since it does not preclude such an action. The court responded that this argument was "contrary both to the language of the statute and to the rules of statutory construction, which provide that the plain and obvious meaning of a statute may not be enlarged by the court. *Certain Taxpayers v. Sheahen* (1970), 45 Ill.2d 75, 84, 256 N.E.2d 758." (*Heerey v. Berke* (1989), 179 Ill.App.3d 927, 934, 128 Ill.Dec. 672, 534 N.E.2d 1277.) In our view the meaning of section 11–13–15 is as plain and obvious now as it was when considered by the *Heerey* court. It did not then provide a cause of action to ensure a city's compliance with its own ordinances, such as that proposed by Navar, and we decline to enlarge its meaning now. Navar's recourse to section 11–13–15 is of no avail.

Navar's reliance on *City of Champaign v. Roseman* (1958), 15 Ill.2d 363, 155 N.E.2d 34, is misplaced. As Navar notes, in *Roseman* the city was awarded attorney fees under a predecessor statute of section

11-13-15. However, the former law, section 73-9 of the Revised Cities and Villages Act (Ill.Rev.Stat.1957, ch. 24, sec. 73-9), provided that if relief was granted under the section the court could allow "the plaintiff" an attorney fee award. No distinction was made between plaintiff local authorities and plaintiff owners or tenants. In contrast, section 11-13-15 (Ill.Rev.Stat. 1987, ch. 24, par. 11-13-15), while it still provides the local municipality with a cause of action, also states that the plaintiff shall be awarded attorney fees "[i]f an owner or tenant files suit" pursuant to the section and the court finds in plaintiff's favor. Since owners and tenants are specifically named while municipalities are not, it appears the present statute is designed to provide attorney fee awards to plaintiff property owners or tenants but not to municipal plaintiffs. Thus, regardless of what was awarded to the city in *Roseman*, a plaintiff municipality would not be likely to collect a fee award under the statute as relied upon by Navar.

[13] Navar also claims he is entitled to attorney fees under section 1988, which provides in pertinent part:

"In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 [20 U.S.C. 1681 et seq.], or title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d *et seq.*], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." (42 U.S.C. § 1988 (1988).)

Navar states that he never pleaded or argued in the trial court that he was seeking relief under section 1983, nor does his counterclaim reveal that he pleaded any of the other civil rights statutes mentioned in section 1988. Plaintiff appears to argue that section 1988 is applicable merely because he prevailed on his constitutional challenge and that invocation of the Federal statutes mentioned within section 1988 is not necessary. We do not agree.

[14] The fee award portion of section 1988 does not in any way create a cause of action. Nor does it imply that it awards fees for actions brought to enforce specific constitutional provisions. Rather, it relates directly to the causes of action which arise under the statutory sections named within itself. Accordingly, we believe that plaintiffs seeking section 1988 fees must in some way invoke the statutes whose enforcement is encouraged by section 1988.

It may be that plaintiffs are not required to specifically identify in their pleadings, or specifically rely upon, one of the provisions set forth in section 1988 in order to prevail on a motion for section 1988 attorney fees. (*Americans United for Separation of Church & State v. School District of City of Grand Rapids* (6th Cir.1987), 835 F.2d 627, 631.) It does not follow, however, that plaintiffs' pleadings and arguments need have no connection at all to the statutory provisions named in section 1988. In *Americans United* the court held that attorney fee awards are proper under section 1988, despite the absence of explicit pleading of, or reliance on, or even reference to one of the statutes named in the section, as long as the pleadings and evidence present a substantial fourteenth amendment claim which is related to the prevailing party's ultimate success and for which section 1983 provides a remedy. (*Americans United*, 835 F.2d at 631.) Although the complaint in *Americans United* did not refer to any of the civil rights statutes listed in section 1988, it pleaded a jurisdictional statute which closely tracked the language of section 1983 and had been described by the United States Supreme Court as the " 'jurisdictional counterpart' " of section 1983. (*Americans United*, 835 F.2d at 632, quoting *Lynch v. Household Finance Corp.* (1972), 405 U.S. 538, 543, 92 S.Ct. 1113, 1117, 31 L.Ed.2d 424, 429.) Too, plaintiffs' complaint, while it did not specifically rely on section 1983, made the allegations essential to state a cause of action under section 1983. The court concluded that plaintiffs had prevailed in what was essentially an action to enforce a provision of section 1983 and thus had sufficiently satisfied the requirements of section 1988 to warrant a fee award.

Like the complaint in *Americans United*, Navar's complaint fails to specifically allege reliance on any of the statutes listed in section 1988. Unlike the *Americans United* plaintiffs, however, who strove to fit their complaint into the parameters of a section 1983 action, Navar appears to disclaim such an action when he declares to this court that he "never pleaded or argued in the trial court that he was seeking relief under 42 U.S.C. § 1983." Nowhere does counterplaintiff attempt to show that his complaint substantially states a cause of action under any of the statutes named in section 1988. Nor does his complaint on its face track the statutory language in order to reflect a section 1983 action and, thus, merit the fees awarded him by the trial court. In short, Navar has offered no basis for sustaining his fee award.

Navar is not aided by his citation of *Florida Pawnbrokers & Secondhand Dealers Association, Inc. v. City of Fort Lauderdale* (S.D.Fla.1989), 711 F.Supp. 1084, since there was no issue raised there as to whether any of the section 1988 statutory provisions had been relied on. Indeed, the opinion makes no mention of the basis on which fees were requested. On the other hand the court discussed section 1983 liability and applied it to the City. Thus, we think it likely that section 1983 had been raised by plaintiffs. Since Navar has shown no basis for the fees granted to him by the trial court, we conclude that the fee award was improper and must be reversed.

Based on the reasons stated above, we affirm that part of the order of the circuit court of Kane County which granted a permanent injunction against enforcement of ordinance No. 89–108 by the City of Aurora. We reverse the portion of the order which granted attorney fees to the counterplaintiff.

Affirmed in part; reversed in part.

McLAREN and GEIGER, JJ., concur.



209 Ill.App.3d 983
154 Ill.Dec. 767

The PEOPLE of the State of Illinois, Plaintiff-Appellee,

v.

Louis JORDAN, Defendant-Appellant.

No. 3–90–0503.

Appellate Court of Illinois, Third District.

March 8, 1991.

Defendant pled guilty to forgery and was convicted and sentenced by the Circuit Court, Rock Island County, Edward Keefe and Clarence Darrow, JJ., to five years imprisonment. Defendant appealed. The Appellate Court, McCuskey, J., held that: (1) elderly individual in whose name credit card was fraudulently obtained, not credit card company, was properly considered victim of offense so trial court could consider as aggravating factor in sentencing that victim was 60 years of age or older; (2) in filing motion to reconsider sentence, defense counsel did not have to file accompanying certificate stating that he had examined record and consulted with defendant to determine his contentions of error; and (3) trial counsel was not ineffective for reasons asserted.

Affirmed.

**1. Criminal Law ⟜986.2(1)**
In forgery prosecution, trial court could properly consider elderly person in whose name defendant obtained credit card, not credit card company, to be the victim of offense and could accordingly consider fact that victim was 60 years of age or older as aggravating factor in sentencing. S.H.A. ch. 38, ¶¶ 17–3(a)(2), 1005–5–3.2(a)(8).

**2. Criminal Law ⟜274(1), 996(1.1)**
Motion to reconsider sentence is fundamentally different from motion to withdraw guilty plea; former seeks review of sentence imposed, while latter raises issues relating to validity of guilty plea.

# NOTICE OF APPEAL &
# AMENDMENT OF APPEAL

C00042

October 9, 2007

**VIA FACSIMILE 630-844-4737**
Ms. Alayne M. Weingartz
City of Aurora
Law Department
5 E. Downer Place, Suite F
Aurora, Illinois 60507

> RE:  Notice of Appeal in the matter of Gemini/Planned Parenthood facility
>         at 3051 E New York St

Dear Alayne:

It has come to my attention that the city has just today found the rules of procedure for
the Zoning Board of Appeals.  Upon review of the copy of the rules sent to me, I notice
that the rules state the following:

- "(a) A written appeal shall be filed…upon forms prepared and supplied by the City of Aurora."
- "(c) Upon receipt of any such communication purporting to be an appeal, the applicant shall be supplied with the proper forms before placing his appeal."
- "(d) Said appeal shall be accompanied by a fee, which is established by the City Council, which amount shall be used to defray the cost of the required notices and other expenses."
- "(e) The Zoning Administrator shall make all papers constituting the records upon which the action appealed form (sic) was taken a matter of public record."

Last Tuesday, October 2, at 9:55AM, I filed an appeal on behalf of appellants with the
City Clerk, to whom I was referred by the Zoning Administrator's office and who
purported to act on behalf of the Zoning Board of Appeals, and with the Zoning
Administrator.

Neither at the time I filed the appeal—nor in the over one week afterward—have I been
"supplied with the proper forms before placing [the] appeal," notified of a required fee, or
notified of any other requirements before the Board.  In fact, when I inquired with the
city clerk's office whether a fee was required, I was told that they would "get back to
me."  I have still not heard back.

Appellants stand ready, willing, and able to meet any requirements for proceedings
before the Board of Appeals, but they cannot do so if the city itself cannot provide
substance for those requirements.

Now that the rules have been found, there are two instant issues that must be addressed: 1) if the city would like a different format to be used for the appeal, appellants respectfully request that format be provided immediately, and 2) if a fee is required to initiate an appeal, appellants respectfully request that the amount of such fee be provided immediately.

You have instructed me to contact you with any needs that I may have in prosecuting this appeal, so I will come to your office tomorrow—Wednesday, October 10—morning to receive from you either 1) a written assurance that appellants' filing meets all the requirements of the Rules and Regulations for the Board of Appeals or 2) "forms prepared and supplied by the City of Aurora," the required fee amount, and instructions on whatever other actions are necessary to meet the requirements of the Rules and Regulations. Please contact me via telephone at 630-544-4455 to inform me when I should arrive on Wednesday.

Further, by operation of state law 65 ILCS 5/11-13-12, the Zoning Administrator was to "forthwith transmit to the board all the papers constituting the record upon which the action appealed from was taken." As it has been a week since the appeal was filed, I assume that the papers have been collected and transmitted. Under section (e) of the Rules and Regulations, the Zoning Administrator "shall make all papers constituting the records...a matter of public record." I would like to review those records tomorrow, if possible, or to receive from you a date certain when those records will be available.

Thank you for your attention to these matters.

Regards,

Peter C. Breen
Thomas More Society,
    A public interest law firm
29 S LaSalle St, Ste 440
Chicago, IL 60603
(630) 544-4455 Direct
(312) 782-1680 Office
(312) 782-1887 Facsimile



**City of Aurora Law Department**
**Alayne Weingartz, Corporation Counsel**
**44 East Downer Place**
**Aurora, Illinois 60507**
**Phone:      (630) 844-4777**
**Fax:           (630) 844-4737**

# FAX TRANSMISSION

The materials enclosed with this facsimile transmission are private and confidential and are the property of the sender. The information contained in the material is privileged and is intended only for the use of the individual(s) or entity(ies) named above. If you are not the intended recipient, be advised that any unauthorized disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this facsimile transmission in error, please immediately notify us by telephone (collect calls will be accepted) to arrange for return of the forwarded documents to us at our expense.

| To: | Peter C. Breen | Fax No: | (312) 782-1887 |
|---|---|---|---|
| Date: | October 12, 2007 | Pages: | _2_ <br> Including cover sheet |
| From: | Alayne Weingartz | Tel. No.: | (630) 844-4777 |

| Subject: | |
|---|---|

**Comments:**



# City of Aurora

Law Department • 44 East Downer Place • Aurora, Illinois 60507-2067 • (630) 844-4777 • Fax (630) 844-4737

**Corporation Counsel:**
Alayne M. Weingartz

**Assistant Corp. Counsel:**
John C. Banbury

Mr. Peter C. Breen
Thomas More Society
29 S. LaSalle Street
Suite 440
Chicago, Illinois 60603

October 12, 2007

Re:     Notice of Appeal

Dear Mr. Breen:

I am advised by the Land Use and Zoning Division that they do not have forms prepared for the filing of an appeal before the Zoning Board of Appeals. Your letter dated October 2, 2007 will stand as your appeal application, and the City will not object based on the failure to utilize a particular form. Likewise, I am informed that there has not been a fee set by Council for such an appeal, you will therefore not be required to pay a fee for your appeal before the Zoning Board of Appeals.

According to the rules, the Board has 60 days within which to hear your appeal. I am aware that the Zoning Administrator has contacted the Chair of the Zoning Board of Appeals and they are working on setting a date. When that decision is made, I am certain you will be contacted.

Sincerely,

Alayne M. Weingartz
Corporation Counsel

C00046

\* \* \* Transmission Result Report(MemoryTX) ( Oct. 12. 2007  3:34PM ) \* \* \*

1) COA LAW
2)

Date/Time: Oct. 12. 2007  3:33PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|----------|------|-------------|-------|--------|---------------|
| 1380 | Memory TX | 913127821887 | P.  2 | OK | |

--------------------------------------------------------------------------

Reason for error
E. 1) Hang up or line fail          E. 2) Busy
E. 3) No answer                     E. 4) No facsimile connection



**City of Aurora Law Department**
**Alayne Weingartz, Corporation Counsel**
**44 East Downer Place**
**Aurora, Illinois 60507**
**Phone:    (630) 844-4777**
**Fax:       (630) 844-4737**

## FAX TRANSMISSION

The materials enclosed with this facsimile transmission are private and confidential and are the property of the sender. The information contained in the material is privileged and is intended only for the use of the individual(s) or entity(ies) named above. If you are not the intended recipient, be advised that any unauthorized disclosure, copying, distribution, or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this facsimile transmission in error, please immediately notify us by telephone (collect calls will be accepted) to arrange for return of the forwarded documents to us at our expense.

| To: | Peter C. Breen | Fax No: | (312) 782-1887 |
|-----|----------------|---------|----------------|
| Date: | October 12, 2007 | Pages: | 2 Including cover sheet |
| From: | Alayne Weingartz | Tel. No.: | (630) 844-4777 |

| Subject: | |
|----------|--|

| Comments: |
|-----------|

000047

October 19, 2007



OCT 1 9 2007

CITY OF AURORA
PLANNING DIVISION

Zoning Board of Appeals
City of Aurora
1 South Broadway
Aurora, Illinois 60507

**RE:    Notice of Amendment of Appeal in the matter of Gemini/Planned Parenthood facility at 3051 E New York St**

Ladies and Gentlemen:

By this letter the undersigned hereby amend their appeal to the Zoning Board of Appeals ("the Board") on behalf of the parties listed below ("Appellants").

Respectfully, Appellants renew their request that the Zoning Board of Appeals review and reverse the orders, requirements, decisions and determinations reached below, and in the proper exercise of the powers reposed in said body by the laws of the State of Illinois and the ordinances of the City of Aurora, restore and uphold the rule of law in the City of Aurora. At stake is nothing less than whether the provisions of the AZO apply equally to all Aurora's citizens or whether the AZO's requirements may be dispensed with at the behest of special interests.

## I. Current state of the appeal
Appellants call the attention of the Board of Appeals to the fact that additional aggrieved persons have been added to the group of appellants in this matter.

The Rules and Regulations of the Board of Appeals state that "Upon receipt of the properly filed appeal application form, the Secretary to the Board shall assign a case number and place it on the calendar of the Board for hearing within sixty (60) days." The appeal was filed in this case almost three weeks ago, and appellants have not been assigned a case number or given a date for hearing. In open session of the Board last Wednesday, counsel for appellants was told that the appeal was properly filed but that it has been referred to the Law Department. The word, "shall", indicates a mandatory command by the law. However, the appellants in this action have not even been accorded the courtesy of a case number, much less a hearing date.

The Rules and Regulations also state that "(e) The Zoning Administrator shall make all papers constituting the records upon which the action appealed form (sic) was taken a matter of public record." Moreover, 65 ILCS 511 1 - 13 - 12 commands the Zoning Administrator to "<u>forthwith</u> transmit to the board all the papers constituting the record upon which the action appealed from was taken." On Wednesday, the Board of Appeals confirmed that Ms. Weingartz was the appropriate party to contact regarding this matter.

Multiple demands for these papers have been made to Ms. Weingartz, with silence as the only reply.

The external attorney reports in this matter were returned to the city three weeks ago. No other documents have been presented to the public to justify the city's action in this matter. Moreover, the Zoning Administrator has still never publicly stated or explained his position on this matter. Unless the city is waiting to see what points the appellants raise and then *ex post facto* construct a paper trail against these points, the Administrator's papers should have been available immediately upon the filing of this appeal.

There have been internal city reviews and three external attorney reviews, along with many FOIA requests from the public—unless these reviews and requests were undertaken and answered with less than complete information, the papers are available. We are almost 20 days into the 60 days required for a hearing on this appeal. Without the required papers, appellants—who are citizens and taxpayers of Aurora—watch as their right to present an effective appeal are frittered away. For this reason, until otherwise notified, appellants assume that the Leutkehans Report provides the operative grounds for the decision of the city that all applications for permits and all permits are valid. The Martens Report is relevant for factual background, but the scope of Mr. Martens review, by his own admission, was heavily restricted. The Martens Report was also filed well prior to the discovery of pertinent information regarding the connection between Planned Parenthood and Gemini.

Finally, according to the Rules and Regulations, "Filing of the appeal application form with the Zoning Administrator and the Board shall stay all proceedings in furtherance of the action appealed from". Appellants requested that this stay be enforced almost three weeks ago. In reply, they have received silence and inaction from their government.

**II. The 1973 Plan Description and 1993 Plan Description Modification define the current zoning regulation of the subject property**
Based on documents that have come to the attention of the appellants, the correct zoning for this property is a Planned Development District, as ruled by the terms of the Plan Description, enacted in 1973 by Aurora City Council Ordinance 4330, and the Plan Description Modification, enacted in 1993 by Aurora City Council Ordinance O93-124. Barring some additional ordinances not released to the public by the City of Aurora, the Plan Description, as amended by the Modification, govern the subject property today. As purchasers of a $1 million property and constructors of a $7.5 million facility, Gemini/Planned Parenthood knew or should have known that these documents applied to their property and facility.

**III. The zoning permitted uses and standards that should be applied to the property are those of a "Business Boulevard" District**
At page 5, the Modification states that "Only the uses that are permitted uses on December 7, 1993 or which subsequently become permitted uses in a B-B Business Boulevard District of the Zoning Ordinance shall be permitted uses in the Business Areas

C00049

of the Region to which this Modification applies, e.g. those Business Areas of the Region which have not yet been Final Planned and Final Platted." The subject property is within those Business Areas and was not Final Planned and Final Platted at the time the Modification was adopted in 1993.

At page 8, the Modification states that "1. The standards applicable from time to time to lands in B-B Business Boulevard Districts shall apply in such "Business Areas" of the Region".

## IV. The Planned Parenthood use is not a permitted use under the 1973 Plan Description and the 1993 Modification

Prior to public disclosure of the use of the subject property, Planned Parenthood applied to the Illinois Finance Authority for $8.05 million in 501(c)(3) bonds, whose proceeds may only be used in furtherance of a 501(c)(3) charitable organization purpose. Attachment 7 of their Application for the bonds, Planned Parenthood noted that they intended to build a "full service center....This new site will give us an opportunity to truly become a *regional* presence".

This "full service center" would be a center that provides medical care; "serve[s] as a voice in the community...and engage[s] the public in dialogue that will further the rights of women;" and "expand[s] our community education presence in the suburbs for teen, parents, and clergy."

According to the Aurora Zoning Ordinance, "8.6-4.1. Permitted Uses: The use of land or buildings in the B-B district shall be limited to the following:...LLL. Offices, business and professional, including medical clinics."

As noted in appellants' Notice of Appeal, the Aurora Zoning Ordinance has always recognized that "Social service agencies, charitable organizations, health related facilities, and similar uses when not operated for pecuniary profit" is a separate use category from "Offices, business and professional, including medical clinics". The arguments made in appellants' Notice of Appeal are even stronger now: in a B-B district, the not for pecuniary profit use category is not even included in the "special use" category—it is not a permitted use category at all.

Considering that two of Planned Parenthood's major uses for the facility do not involve the provisioning of medical care, this "regional" facility fits well in any one or more than one of "social service agencies", "charitable organizations", "health related facilities", "and similar uses when not operated for pecuniary profit". Planned Parenthood cannot hide from who it is:  it is registered as an "Illinois Not-for-Profit Corporation".  It is registered as a "charitable organization" under federal law.  It engages in political advocacy, community organizing, and public outreach and education, along with its provisioning of health care.

## V. Gemini/Planned Parenthood's deception frustrated legitimate city action to protect the public, unrelated to abortion rights

Page 1 of the Leutkehans Report states,

> Given the fact that the building contained bullet-proof glass and walls in the entryway, the Planned Parenthood emails I have received and the ties between Gemini and Planned Parenthood, it is my opinion that the facility was always intended to be utilized to terminate pregnancies....there can be no doubt that the intended user for the development was always Planned Parenthood.

Planned Parenthood confirmed that it was the driving force behind this facility in its filings in federal court:

> "13. In 2002, PPCA began planning for a new medical facility to provide services in Chicago's western suburbs. The nearest PPCA facility is in downtown Chicago, more than 35 miles away. Ultimately, PPCA obtained a parcel of land at 3051 E. New York Street in Aurora and designed a $7.5 million, 22,000 square foot outpatient medical office facility for that site (the "Facility")." Verified Complaint of Planned Parenthood Chicago Area and Gemini Office Development, filed September 13, 2007, United States District Court for the Northern District of Illinois.

As has been discussed, multiple false permit applications were filed for the property and facility at issue by Gemini/Planned Parenthood, and the legally authorized representative of Gemini lied to an alderman in an open hearing, in response to a legitimate direct question.

The argument that has been forwarded by Leutkehans and Gemini/Planned Parenthood is not that there was no deceit but that the deceit was not "material". The Leutkehans report cites Illinois case law to define "material misrepresentation": "A misrepresentation is material if it would be likely to affect the conduct of a reasonable man with reference to the transaction in question." Leutkehans also cites case law to hold that "The authority to deny an occupancy permit based upon a material misrepresentation is inherent in the governing body."

Where Leutkehans went awry was in citing the *Oak Grove Jubilee Center* case, where a pastor—without intent to lie or deceive—filed a special use permit application for his church. There was never any doubt that he was a pastor filing for the use of a property as a church. The pastor was an active local pastor and never lied, deceived, or obfuscated that he was the pastor of a particular church.

The Leutkehans Report acknowledges that tenant information is legitimate for a government to request, but he misunderstands why it is legitimate and important. As shown in this particular case, the name of the tenant is important because it indicates the true use of a property. It is the city's responsibility and authority to evaluate the true use versus the use categories set up in the Zoning Ordinance. Lying in response to legitimate requests by the city undermine this responsibility and authority. Leutkehans, however, apparently didn't even know that Alderman Elmore was lied to at the November 16, 2006

Planning & Development Committee Meeting as he never referred to this fact in his report.

Particularly, here are some of the city's rights that were trampled by Gemini/Planned Parenthood's deceit: 1) the right to make an accurate determination of the use of a property; 2) the right to raise and address supposed ambiguities in city ordinances, as applied to the use of a property; 3) the right to demand clarification of a use and to restrict a property to permitted uses; 4) the right to alter final plans to protect legitimate public interests; 5) the right to declare legitimate special uses, to declare legitimate special use approval procedures, and to have those procedures followed; and 6) the right to do all of these things in accord with all city ordinances, in front of the legally specified committees and commissions, and prior to issuing any permits or allowing any improvement to a property.

The discussion of appropriate use category should have been had prior to the first brick being laid for this facility. Gemini/Planned Parenthood's deception prevented this discussion, and they must bear the responsibility for their misdeeds.

**A. Specific actions that could have been taken by the city in response to learning that a regional Planned Parenthood presence was the true use, without impacting abortion rights**

In the normal building construction process of the City of Aurora, many different individuals and committees have a chance to impact the design and presentation of the facility seeking to be built, without restricting the actual permitted use of the building. Leaving behind the issue of whether or not the use in this matter falls into a permitted use category, the deception of Gemini/Planned Parenthood prevented the city from exercising its legitimate authority to protect the public. To get a sample of some of the city's legitimate purposes and interests in zoning, one can look to Aurora Zoning Ordinance, Section 2.1. "Intent and Purpose." Just in this one section, there are a host of legitimate government purposes frustrated through Gemini/Planned Parenthood's deceit.

Had Gemini/Planned Parenthood answered honestly and forthrightly to the city's legitimate requests, the city could have asked for modifications from the proposed plan. For instance, knowing that the country's largest abortion facility would generate significant public presence, along with foot and vehicle traffic—from supporters and opponents—the city could have requested that the building be sited differently, that the building have a separate driveway from the already heavily-trafficked Dominick's shopping center, that more extensive landscape and other screening be provided, along with many other plan modifications.

Moreover, any argument that modifications should not have been made in this instance contradict the lived experience of the city and people of Aurora. Thousands of people have protested the facility, media trucks and police cars have been there regularly, foot traffic has increased significantly, vehicle traffic has increased significantly, press

conferences are had by both sides at the site, multiple acts of violence against protestors have already occurred, and a host of other issues have surrounded this facility.

Gemini/Planned Parenthood itself knew about the potential for problems. It used bullet-proof glass and drywall in the entranceway. In an open letter in the Aurora Beacon News on September 6, 2007, the CEO of Planned Parenthood Chicago Area stated that "Anti-abortion activists with a history of advocating illegal and sometimes violent behavior are trying to…stop this health center from opening." Knowing there had been a history of violence at their facilities, Planned Parenthood made sure to protect their facility and their staff with bulletproof glass.

This elicits the question, who is supposed to protect everyone else?

The answer is, the City of Aurora.

Here are a few activities that either are known, are claimed, or reasonably could be concluded may occur at Planned Parenthood facilities and/or large suburban abortion facilities:
-Picketing on public sidewalks
-Sidewalk counseling pre-abortion
-Sidewalk counseling post-abortion
-Pamphleteering of vehicles and persons in or near the facility entering shopping center
-Large graphic signs showing aborted babies
-Jericho marches around a facility
-Shots fired at the physical facility
-Shots fired at protesters
-Shots fired at clients
-Shots fired at staff
-Stray shots entering residential or shopping areas
-Bombings at facility leading to damage of facility, along with shrapnel harming protesters, clients, staff, and those in surrounding residential or shopping areas
-Increased police complaints and police reports
-Assault & Battery on protesters
-Assault & Battery on clients
-Assault & Battery on staff
-Heavy foot traffic by protestors and gawkers
-Large numbers of abortion clients arriving over very short periods of time
-Noise generated by protesters and counterprotestors, day and night
-Round-the-clock prayer and candlelight vigils
-Community outreach meetings for or against the facility bringing large numbers of people at unpredictable times
-Media trucks regularly on site for press conferences at the new headquarters for Planned Parenthood and for press conferences against the facility
-Increased foot traffic for and against the facility from those who will walk to the facility or arrive via public transportation

Here are a few plan modifications the city might have requested of the facility, without restricting the right of the facility to perform abortions:
-That a private sidewalk be built leading down to the Dominick's
-That a private sidewalk be built leading to front door of facility
-That a private sidewalk be built at the rear of the facility
-That these sidewalks be public right-of-ways
-Increased landscape shielding from light and visual disturbance for homes that back up to the facility
-Bullet shielding or blast shielding to protect residences in area and shoppers
-Noise shielding for homes near facility
-Change in entrance locations, parking lot configuration, and siting of facility on lot to protect public, to facilitate safety of those exercising their First Amendment rights of expression and protest, to facilitate the offering of alternatives to abortion information, to facilitate the offering of after-abortion recovery information

However, because of Gemini/Planned Parenthood's fraud, the city was prevented from protecting its citizens. Leutkehans recounted Illinois law as saying that "A misrepresentation is material if it would be likely to affect the conduct of a reasonable man with reference to the transaction in question." In this transaction, reasonable city officials would have at least considered modifications to the plans of Gemini/Planned Parenthood. Reasonable city officials would have made a careful evaluation of which use category the Planned Parenthood use fit into. Obviously, if city officials had decided that the use was not allowed, they would have required variance or special use proceedings.

The action of the City of Aurora on October 1, as reported at the press conferece, supports this contention. After investigating the use that Planned Parenthood was intending, the city required Planned Parenthood to sign a letter limiting their use of the facility. What the city's action says is that, if not for the misrepresentation of Gemini/Planned Parenthood, the "reasonable" city official would have required a signed statement limiting the use—prior to the laying of the first brick. The city's action is another ground that proves materiality.[1]

Since Gemini/Planned Parenthood's deception was material and a fraud on the city, appellants renew their request for the Board of Appeals to deny all applications for permits, revoke all permits, and declare all actions pendent to such permits to be null and void.

## VI. The facility appears to have been designed and built in violation of the standards of the 1973 Plan Description, the 1993 Modification, and the Aurora Zoning Ordinance

---

[1] The city's action may not have fully remedied the issue of "major surgery"—one definition of which is a surgery performed under general anesthesia. According to Planned Parenthood Chicago Area's website, they perform some abortions under general anesthesia. Without attacking the Leutkehans Report's antediluvian abortion jurisprudence, that Report did not address such a condition. This would have been yet another consideration for a "reasonable" city official— prior to the laying of the first brick..

As noted above, according to the 1993 Modification, the "standards applicable from time to time to lands in B-B Business Boulevard Districts shall apply" to the subject property.

**A. The plans for this property and facility and the facility as-built do not appear to meet the standards of a B-B district**

Below are a few examples of difficulties with the subject property and facility:

First, according to Zoning Ordinance Section 8.6-5.1.B.i.,

> a. There shall be a front yard having a depth of not less than thirty-five (35) feet.
> …
> c. No parking or loading shall be permitted in the front yard.

Based on the plans made public in this matter, the parking lot of the facility appears to violate this setback requirement.

Second, according to Zoning Ordinance Section 8.6-5.1.G.,

> ii. An off-street parking space shall be a usable area of not less than one hundred ninety (190) square feet no less than ten (10) feet wide by nineteen (19) feet long…. Backup space shall not be less than…twenty-five (25) feet in width when serving automobiles parked perpendicular to the aisles.

Based on the plans made public in this matter, the parking lot spaces appear to violate both the width requirement for the individual space and the backup space requirement.

Third, according to Zoning Ordinance Section 8.6-5.2.E.,

> ix. For medical or dental clinics--Six (6) parking spaces per doctor engaged at clinic.
> …
> xvi. For banks, business or professional offices or public administration buildings--One (1) parking space for each three hundred (300) square feet of floor area.

According to the Final Plan of Gemini/Planned Parenthood, the number of required parking spaces was calculated as follows: "No. of Parking Spaces Required by Ordinance: Professional Offices 21750 / 400 = 54, 4 Doctors w/3 Employees Each = 16".

However, according to 8.6-5.2.E., the number of parking spaces would properly be calculated as follows:

> Professional Offices:  21750 / 300 = 72
> 4 Doctors:             4 x 6 = 24
> Total                  96 Required Parking Spots

000055

If appellants are correct on these points, both the plans for this property and facility and the currently as-built property and facility require multiple variances. Appellants are unaware of any variances requested by Gemini/Planned Parenthood.

**B. The plans were improperly submitted and approved according to the 1993 Modification and the Aurora Zoning Ordinance**

Page 15 of the 1993 Modification, V.3., states that

> Preliminary Plans shall be submitted for approval prior to December 7, 2000. Final Plans for all portions of the Region shall be submitted for approval prior to December 7, 2003.

While timing for plan submission may usually be extended by approval of the City Council, appellants know of no such action. Moreover, Preliminary Plans in a Planned Development District generally require approval of the City Council. Appellants know of no Preliminary Plans filed in this matter, and without City Council approval, the submitted plans are null and void. If a Preliminary Plan was submitted, and the Final Plan includes major changes from that Preliminary Plan, a public hearing is mandated under Section 10.7-12.2 of the AZO. The Plan Description, Modification, and Zoning Ordinance require that Final Plans be submitted within a period of time after a Preliminary Plan in order to be valid—or that the Final Plan be submitted to meet both Preliminary and Final Plan requirements. Appellants know of no such action.

Moreover, appellants do not know if the Final Plan was compared to the Land Use Plan or Development Plan of the area, as required by the 1973 Plan Description. If the clear requirements of the 1973 Plan Description and the 1993 Modification were not followed, Gemini/Planned Parenthood has only itself to blame.

Based on all of these factors, the Board of Appeals is requested to declare the Final Plan null and void and to declare any actions pursuant to the approval of such Final Plans null and void.

**VII.    Conclusion**

The rule of law obtains in the City of Aurora, as elsewhere. Laws must be followed. They cannot be thrust aside when inconvenient or at odds with political expediency. Here, the Appellants were clearly deprived of their rights to notice and hearing and are being harmed by the construction and use of this facility. Respectfully, the Appellants renew their request that the Zoning Board of Appeals provide relief in this matter. The Zoning Administrator and other Aurora officials who were involved in this flawed process must be held to enforce the law.

Respectfully submitted,

Peter C. Breen

Thomas Brejcha
Thomas More Society,
    A public interest law firm
29 S LaSalle St, Ste 440
Chicago, IL 60603
On behalf of

Fox Valley Families Against Planned Parenthood
c/o Eric Scheidler
Volunteer Coordinator
c/o eric@prolifeaction.org
Aurora, Illinois

Kim Frachey
Autumn Lake Drive
Aurora, Illinois 60504

Nancy Maloney
3036 Waters Edge Cir
Aurora, IL 60504-3297

Socorro Nieto
3139 Autumn Lake Drive
Aurora, Illinois 60504

Chad and Natalie Flolo
3141 Autumn Lake Dr
Aurora, IL 60504

000057

# LAND USE PETITION &
# PROPERTY PERMIT APPLICATIONS
# & FINAL PLAN DOCUMENT

( 000058



# CITY OF AURORA

Case File Number: _____

(Office Use Only)

**1-3**

Department of Community Development
44 E. Downer Place
Aurora, Illinois 60507

# LAND USE PETITION

Subject Property Owner's Name: _THOMAS LEHMAN_

Company: _GEMINI OFFICE DEVELOPMENT_

Address: _6301 S. CASS AVE.   STE. 301_

R E C E I V E D

JUL 27 2006

CITY OF AURORA
PLANNING DIVISION

City: _WESTMONT_   State: _IL_  Zip: _60559_  Non-profit Corp. Number: _____

Phone: _630-963-8184_  Fax: _630-963-4475_  E-mail: _TWLEHMAN@AMERITECH.N_

The Contact Person, listed below, may act as the authorized agent on behalf of the subject property owner only if a letter is attached to this petition granting such authority to the Contact Person and said letter is signed by the subject property owner.

Contact Person:
Name: _SAME AS ABOVE_

Company: _____

Address: _____

City: _____ State: _____ Zip: _____

Phone: _____ Fax: _____ E-mail: _____

## SUBJECT PROPERTY LOCATION INFORMATION

Tax Parcel Number(s): _07-20-302081_   Size of Property (Acres): _3.24_

Address or General Location: _OAKHURST & NEW YORK_

For Informational Purposes only, attached Legal Description defines Subject Property which may change through review process

## TYPE OF REQUESTED ACTION

**Required submittal documents and fees are listed on reverse side of this petition form**

| Annexation Related | Zoning Related | Variations | Development Related | Misc. Petitions |
|---|---|---|---|---|
| ____Annexation Petition | ____Special Use Petition | Aurora Code Section to | Prelim ___Plat ___Plan | Specify_____ |
| ____Annexation Agreement | ____Rezoning Petition | be Varied:_____ | Final ___Plat _✓_Plan | |

**Brief Description of Requested Action (ie: zoning requested; dimensions of variation; number of dwelling units; type of dwelling unit; size of building; etc.)** _____

YES  NO  Electors Reside on Subject Property       YES  NO  Greater than 51% of said Electors have joined this petition

## AUTHORIZATION

I hereby affirm that I have full legal capacity to authorize the filing of this Petition and that all information and exhibits herewith submitted are true and correct to the best of my knowledge. The Authorized Signatory invites City representatives to make all reasonable inspections and investigations of the subject property during the period of processing this Petition.
**The Subject Property Owner must sign this form unless the Contact Person has been authorized to do so per a letter that is attached hereto.**

Authorized Signature: _____   Date _27 Jul 06_

I, the undersigned, a Notary Public in and for the said County and State aforesaid do hereby certify that the authorized signer is personally known to me to be the same person whose name is subscribed to the foregoing instrument and that said person signed sealed and delivered the above petition as a free and voluntary act for the uses and purposes set forth.

Given under my hand and notary seal this _27_ day of _July 2006_

County of _Kane_ )SS   _Dawn M Metzger_
Notary Signature

NOTARY PUBLIC SEAL

**OFFICIAL SEAL**
**DAWN M. METZGER**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-2-2009

My Commission expires _2_ day of _Aug 2009_

RECEIVED
DATE: _7/27/06_   RECEIPT NO: _193980_   AMOUNT: _$150.00_   REC'D BY: _DST_

000059



**Gemini Office Development LLC**

One South Wacker Drive          Phone: 708 642-4754
Suite 800                       Fax: 312 634-5525
Chicago, IL  60606              Email: geminimgtllc@yahoo.com

July 27, 2006

RECEIVED
JUL 2 7 2006
CITY OF AURORA
PLANNING DIVISION

City of Aurora
65 Water Street
Aurora, Illinois 60505

Dear Sir or Madam:

Please be informed that Mr. Thomas Lehman is acting as our authorized agent with regards
to obtaining a building permit for the Medical Office Building on Oakhurst at New York.

Sincerely,

Teresa Huyck, President

File Item No. _____
Case File Number
N A 20/3 . 06 . 390 - Fpn

TH/mm

000060

UNOFFICIAL COPY



**WARRANTY DEED**
Statutory (Illinois)
(Corporation to Corporation)

**FRED BUCHOLZ**
DUPAGE COUNTY RECORDER
APR.10,2006        RHSP      11:01 AM
DEED                       07-20-302-081
**004 PAGES    R2006-064928**

THE GRANTOR, N. Y. OAKHURST,
LLC,

_____ (the above space for Recorder's use only)

a limited liability company created and existing under and by virtue of the laws of the State of Illinois and duly authorized to transact business in the State of Illinois, for and in consideration of the sum of TEN and 00/100 ($10.00) Dollars, and other good and valuable consideration in hand paid, CONVEYS and WARRANTS to **GEMINI OFFICE DEVELOPMENT, LLC**, a limited liability company organized and existing under and by virtue of the laws of the State of Illinois having its principal office at the following address:  One South Wacker Drive, Suite 800, Chicago, Illinois 60606, the following described Real Estate situated in DuPage County, in the State of Illinois, to wit:

**Parcel 1:   Lot 2 in PDA Resubdivision of Lot 2 in Fox Valley East, Region II Unit No. 52-Oakhurst 1st Resubdivision, being part of the Southwest 1/4 of Section 20, Township 38 North, Range 9, East of the Third Principal Meridian, according to the plat of said PDA Resubdivision recorded December 18, 2002 as Document No. R2002-351500, in DuPage County, Illinois.**

**Parcel 2:   Non-exclusive easement upon Lot 39 in Fox Valley East Region II Unit No. 52-Oakhurst, a Subdivision of part of the Southwest 1/4 of Section 20, Township 38 North, Range 9, East of the Third Principal Meridian, in DuPage County, Illinois, for the benefit and burden of Parcel 1 as created by the storm water retention and detention and cost share obligations agreement dated December 1, 1996 and recorded January 3, 1997 as Document R97-000974.**

**Parcel 3:   Non-exclusive easement upon Lot 1 in Fox Valley East Region II Unit No. 52-Oakhurst, a Subdivision of part of the Southwest 1/4 of Section 20, Township 38 North, Range 9, East of the Third Principal Meridian, in DuPage County, Illinois, for the benefit and burden of Parcel 1 as created by the agreement of easements for ingress and egress and covenants for maintenance of easement premises dated December 1, 1996 and recorded January 3, 1997 as Document 97-000976.**                                              heret

as described on Exhibit A attache

SUBJECT TO:   Covenants, conditions and restrictions of record; public and utility easements and roads and x xighways if any; and taxes for 2005 and subsequent years.

Permanent Index Number (PIN): 07-20-302-081
Address of Real Estate: **Vacant parcel South of Southwest corner of New York and Oakhurst, Aurora , IL**

IN WITNESS WHEREOF, said Grantor has caused its name to be signed to these presents by its Members this **23**
day of _____, 2006.

N.Y. OAKHURST, LLC

By:_____                    By:_____
MICHAEL BUTLER, Member                        MARK BUTLER, Member

000061

UNOFFICIAL COPY

State of Illinois        )
County of Cook       )

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, do hereby certify that **MICHAEL BUTLER and MARK BUTLER**, personally known to me to be Members of **N. Y. OAKHURST, LLC**, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that as such Members they signed and delivered the said instrument, as their free and voluntary act, and as the free and voluntary act and deed of said limited liability company, for the uses and purposes therein set forth.

GIVEN under my hand and official seal this **23** day of **March**, 2006.

Commission expires _____, 20___        _____
                                                                                    NOTARY PUBLIC

OFFICIAL SEAL
KURT HEERWAGEN
Notary Public, State of Illinois
My Commision Expires 07/09/2009


This instrument was prepared by        Kurt Heerwagen
                                                          BOEGER, HEERWAGEN, LUSTHOFF & BRENDEMUHL, P.C.
                                                          2914 S. Harlem Avenue
                                                          Riverside, IL 60546

STATE OF ILLINOIS        REAL ESTATE TRANSFER TAX

APR.-7.86        0147750

DUPAGE COUNTY        FP326686

Send tax
bills to:

Gemini Office
Development

*Mail To* ~~and send o bills to:~~

Mindy W. Sherman
Perkins Coie
131 South Dearborn Street, Suite 1700
Chicago, IL  60603-5559

Gemini Office Development, LLC
One South Wacker Drive
Suite 800
Chicago, IL  60606

1 S. Wacker Dr
#800
Chicago, IL
60606

OR        RECORDER'S OFFICE BOX NO.

CITY OF AURORA        REAL ESTATE TRANSFER TAX

MAR. 22.06        0295500

REAL ESTATE TRANSACTION TAX
DEPARTMENT OF REVENUE        FP351000

Page 2

000062

UNOFFICIAL COPY

**Exhibit A**

**PERMITTED EXCEPTIONS**

1.   TAXES FOR THE YEAR 2005.

2.   EASEMENT IN FAVOR OF COMMONWEALTH EDISON
     COMPANY, AMERITECH AN NICOR GAS, AND ITS/THEIR
     RESPECTIVE SUCCESSORS AND ASSIGNS, TO INSTALL,
     OPERATE AND MAINTAIN ALL EQUIPMENT NECESSARY FOR
     THE PURPOSE OF SERVING THE LAND AND OTHER
     PROPERTY, TOGETHER WITH THE RIGHT OF ACCESS TO SAID
     EQUIPMENT, AND THE PROVISIONS RELATING THERETO
     CONTAINED IN THE GRANT RECORDED AUGUST 9, 2001 AS
     DOCUMENT NO. R2001-166186, AFFECTING: THE EAST 10.00
     FEET OF SAID LOT, EXCEPT THE SOUTH 40.00 FEET THEREOF;
     THE EAST 20.00 FEET OF THE SOUTH 40.00 FEET; AND THE
     NORTH 10.00 FEET OF THE SOUTH 40.00 FEET, EXCEPT THE
     EAST 20.00 FEET THEREOF.

3.   TERMS, PROVISIONS, CONDITIONS AND OBLIGATIONS
     INCLUDING PROVISION FOR LIEN FOR NONPAYMENT,
     CONTAINED IN STORM WATER RETENTION AND DETENTION
     AND COST SHARING OBLIGATIONS DATED DECEMBER 1,
     1996 AND RECORDED JANUARY 3, 1997 AS DOCUMENT R97-
     000974, RE THE COST AND MAINTENANCE OF STORM WATER
     FACILITIES, AS AMENDED BY AGREEMENT DATED MARCH
     17, 2006 BY AND BETWEEN SAFEWAY, INC., A DELAWARE
     CORPORATION AND N.Y. OAKHURST, LLC, AN ILLINOIS
     LIMITED LIABILITY COMPANY, AND RECORDED AS
     DOCUMENT NO. [R06-          ].

4.   MATTERS SHOWN ON THE PLAT OF FOX VALLEY EAST,
     REGION II UNIT NO. 52-OAKHURST 1ST RESUBDIVISION
     AFORESAID, AS FOLLOWS: 30.00 FEET ALONG THE EAST LINE
     OF THE UNDERLYING LAND.

[/CH060810.033]                                              3/22/06

UNOFFICIAL COPY

5.   AGREEMENT OF EASEMENT FOR INGRESS AND EGRESS AND
     COVENANTS FOR MAINTENANCE OF EASEMENT PREMISES
     DATED DECEMBER 1, 1996 AND RECORDED JANUARY 3, 1997
     AS DOCUMENT R97-000976.

6.   SCREEN PLANTING EASEMENT IN FAVOR OF AURORA
     VENTURE, THE OAKHURST COMMUNITY ASSOCIATION, AND
     ITS/THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, TO
     INSTALL, OPERATE AND MAINTAIN ALL EQUIPMENT
     NECESSARY FOR THE PURPOSE OF SERVING THE LAND AND
     OTHER PROPERTY, TOGETHER WITH THE RIGHT OF ACCESS
     TO SAID EQUIPMENT, AND THE PROVISIONS RELATING
     THERETO CONTAINED IN THE PLAT RECORDED/FILED AS
     DOCUMENT NO. R94-128614, AFFECTING THE SOUTHERLY
     40.00 FEET OF THE UNDERLYING LAND.

7.   TERMS, PROVISIONS AND CONDITIONS CONTAINED IN
     AGREEMENT OF EASEMENTS FOR STORM SEWER AND
     DETENTION BASIN RECORDED APRIL 27, 1999 AS DOCUMENT
     R99-094973, RELATING TO EASEMENTS FOR STORM SEWERS,
     DETENTION BASIN AND WATER LINES.

8.   COVENANTS AND RESTRICTIONS (BUT OMITTING ANY SUCH
     COVENANT OR RESTRICTION BASED ON RACE, COLOR,
     RELIGION, SEX, HANDICAP, FAMILIAL STATUS OR
     NATIONAL ORIGIN UNLESS AND ONLY TO THE EXTENT
     THAT SAID COVENANT (A) IS EXEMPT UNDER CHAPTER 42,
     SECTION 3607 OF THE UNITED STATES CODE OR (B) RELATES
     TO HANDICAP BUT DOES NOT DISCRIMINATE AGAINST
     HANDICAPPED PERSONS), RELATING TO THE USE OF THE
     LAND CONTAINED IN THE DOCUMENT KNOWN AS
     "RESTRICTIVE COVENANT" DATED AS OF OCTOBER 1, 2004
     MADE BY N.Y. OAKHURST, LLC, IN FAVOR OR SAFEWAY
     INC., AND RECORDED OCTOBER 20, 2004 AS DOCUMENT NO.
     2004270390.

9.   TERMS AND CONDITIONS CONTAINED IN TRUSTEE'S DEED
     RECORDED AUGUST 9, 2001 AS DOCUMENT NO. R2001-166187
     AND WARRANTY DEED RECORDED AUGUST 9, 2001 AS
     DOCUMENT NO. R2001-166188.

FRED BUCHOLZ     R2006-064928     DUPAGE COUNTY RECORDER

000064



# City of Aurora

Engineering Division • 44 E. Downer Place • Aurora, Illinois 60507-2067 • (630) 844-3620
FAX (630) 892-0322

Kenneth Schroth, P.E.
Director of Public Works
City Engineer

**06.-3529.  C-BU**

**240 N OAKHURST DR**
GEMINI OFFICE
GEMINI OFFICE DEVELOPMENT

January 10, 2007

Thomas W. Lehman, PE
Partners In Development
6301 South Cass Avenue, Suite 301
Westmont, IL  60559

Re:    Project #06.390
       Gemini Outpatient Facility
       240 N. Oakhurst

Dear Mr. Lehman,

Enclosed please find two (2) sets of approved plans for the above referenced project.  In
addition, the following are required:

1.  All contractors working in the public Right of Way must be licensed and bonded
    with the City of Aurora Engineering Department.
2.  Earthwork, underground and paving contractors **must** notify our field inspector,
    Jim Chambers (630-373-2831), a minimum of **72 hours** prior to starting.
    Earthwork contractors **must** notify our erosion control inspector, Kane-DuPage
    Soil and Water Conservation District (630-584-7961), a minimum of **72 hours**
    prior to starting.
3.  **If an IEPA permit is required,** construction may not begin on sanitary sewers
    and watermains until an IEPA permit to construct has been obtained.
4.  Mud, dirt, gravel and debris will not be tolerated on any streets.  An all-weather,
    stabilized construction entrance will be installed and maintained regularly.
5.  All streetlight cables (existing or proposed) that cross-driveways and sidewalks
    must be placed in 2" galvanized steel conduit.  Splices are not allowed for cable
    repairs.
6.  Be advised that building permits will not be issued until all requirements of the
    City of Aurora Code of Ordinances Chapter 43 Article I Section 43-12 have been
    met.

printed on recycled paper

000065

7. Be advised that record drawings (as-builts) and the granting of all necessary easements are **required** as a condition of receiving an occupancy permit. A punch list will be created, based on a review of the as-builts and field inspection, and submitted to the engineer for repairs. When all items have been repaired and approved by the inspector and all required submittals have been made, an occupancy permit will be agreed to by the Engineering Dept.

**Please be sure the above information is supplied to the contractors on site.**

**Please be advised that the Construction Group within the Engineering Division will be involved in this project from the this point forward. Please contact either our field representative listed above or Dan Goewey in the Engineering Division (844-3620) for all construction related items.**

Sincerely,

John H. Spoelma
CITY OF AURORA
Department of Public Works
Engineering Division

cc:
Ken Schroth, City of Aurora Public Works Department
Steve Andras, City of Aurora Engineering Division
Dan Feltman, City of Aurora Engineering Division
Dan Goewey, City of Aurora Engineering Division
Ray Hull, City of Aurora Water and Sewer Maintenance w/Approved Plans
Dave Schumacher, City of Aurora Water Production Division w/Approved Plans
Jim Chambers, CMT w/Approved Plans
Herman Beneke, City of Aurora Building and Permits
Jonas V. Vaznelis, Morris Engineering, Inc.

2

000066

## 07.-805. FRSP

**240 N OAKHURST DR**
GEMINI OFFICE
GEMINI OFFICE DEVELOPMENT

RECEIVED
MAR 23 2007

RESSION - APPLICATION FORM



### FOR OFFICIAL USE ONLY

TOTAL FEE  1257.⁰⁰

PERMIT APPLICATION NO.
07-805

BLDG  1143
PLRV  114

SUBMITTED
2/22/06
NOTIFIED
4/4/07
ZONING

WEB  www.AURORA-il.org
FAX  (630) 892-8112
TELEPHONE  (630) 892-8088

**AURORA**
The City of Lights

**DIVISION OF BUILDING & PERMITS**
65 WATER STREET
AURORA, ILLINOIS 60505

### LAND / PARCEL INFORMATION

**PROPERTY ADDRESS**  240 N OAKHURST DR

**IS THIS WORK ASSOCIATED WITH OTHER CONSTRUCTION WORK?** ☑ YES ☐ NO
**IF YOU ANSWERED YES, PLEASE PROVIDE BUILDING PERMIT NUMBER**  06 - 00003529

| COUNTY | ☐ KANE | ☐ DuPAGE | **TOWNSHIP** | 11 12 04 | **TOWNSHIP SECTION #** |
| (CHECK ONE) | ☐ KENDALL | ☐ WILL | (CIRCLE ONE) | 14 15 07 | |
| | | | | 03 01 | **BLOCK #** (if known) _____ **LOT#** (if known) |

(Call tax assessor's office with questions)

**PROPERTY OWNER &**
Contact Name  Gemini OFFICE

**OWNERS ADDRESS**  15 WACKER SUITE 800
CHICAGO IL 60606

PHONE # (   )
FAX # (   )
E-MAIL

**TENANT &**
Contact Name  Same

**ADDRESS**

PHONE # (   )
FAX # (   )
E-MAIL

### ZONING INFORMATION
### OCCUPANCY CLASSIFICATION

Existing Use / Occupancy _____

Proposed Use / Occupancy  B

θ Single Occupancy (302.1)   ☑ Mixed Occupancy (302.3)
  θ w/ Incidental use (302.1.1)    θ non-separated
  θ w/ Accessory use (302.2)    θ separated attach sum of ratios
  < 10% of area & < allowable for Acc.     calculation per section (504)

Check all Occupancy Classifications that apply below.

| | | | | |
|---|---|---|---|---|
| Assembly | θ A-1 | θ A-2 | θ A-3 | θ A-4 | θ A-5 |
| Business, Education, Factory | θ B | θ E | | θ F-1 | θ F-2 |
| Hazardous | θ H-1 | θ H-2 | θ H-3 | θ H-4 | θ H-5 |
| Institutional | θ I-1 | θ I-2 | θ I-3 | θ I-4 | θ I-5 |
| Mercantile, Residential | θ M | | θ R-1 | θ R-2 | |
| Storage, Utility | θ S-1 | θ S-2 | θ U | |

### PROPOSED WORK

New Sprinkler System      221 Heds θ

Relocate Existing Heads      θ

Additional Sprinkler work      θ

UL 300 Hood Suppression      θ

Clean Agent Suppression System      θ

Other _____      θ

**TOTAL COST OF IMPROVEMENTS $  66,000**

[FOR SUPPRESSION- PERMIT FEES ARE A FUNCTION OF CONSTRUCTION $]

FRSP – Permit Application

Page 1 of 3

000067