## BEFORE THE ZONING BOARD OF APPEALS
## AURORA, ILLINOIS

| | |
|---|---|
| Kim Frachey, Nancy Maloney,<br>*et al.,* and Fox Valley Families<br>Against Planned Parenthood,<br><br>Appellants,<br><br>vs.<br><br>City of Aurora,<br>A Municipal Corporation,<br><br>Appellee. | )<br>)<br>)<br>)<br>)<br>)    07 ZBA 001<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## NOTICE OF FILING

TO:    Alayne M. Weingartz, Attorney for Appellee
       City of Aurora Law Department
       44 East Downer Place
       Aurora, Illinois 60507

       Christopher B. Wilson, Attorney for Applicant
       Perkins Coie LLP
       131 South Dearborn Street – Suite 1700
       Chicago, Illinois 60603

       Peter K. Wilson, Attorney for Zoning Board of Appeals
       Mickey, Wilson, Weiler, Renzi & Andersson, PC
       2111 Plum Street – Suite 201
       Aurora, Illinois 60506

**PLEASE TAKE NOTICE** that on December 7, 2007, I mailed via overnight mail to each of the above parties, Appellants' Reply to Appellee's Response to Motion to Complete the Record as Required by 65 ILCS 5/11-13-12 and the Rules and Regulations of the Aurora Zoning Board of Appeals for the above recited appeal, a copy of which is attached.

On behalf of the Appellants,

Peter C. Breen

Of Counsel
Thomas More Society,
A public interest law firm
29 S LaSalle St, Ste 440
Chicago, IL 60603

000686

## BEFORE THE ZONING BOARD OF APPEALS
## AURORA, ILLINOIS

Kim Frachey, Nancy Maloney,       )
*et al.,* and Fox Valley Families     )
Against Planned Parenthood,       )
                                  )
Appellants,                       )
                                  )          07 ZBA 001
vs.                               )
                                  )
City of Aurora,                   )
A Municipal Corporation,          )
                                  )
Appellee.                         )

## APPELLANTS' REPLY TO APPELLEE'S RESPONSE TO MOTION TO COMPLETE THE RECORD AS REQUIRED BY 65 ILCS 5/11-13-12 AND THE RULES AND REGULATIONS OF THE AURORA ZONING BOARD OF APPEALS

Now come Kim Frachey, Nancy Maloney, Socorro Nieto, Chad and Natalie Fiolo, and Fox Valley Families Against Planned Parenthood (hereinafter "Appellants"), by their undersigned counsel, and move that the City of Aurora be required, pursuant to law as set forth in their Motion to Complete the Record and as set forth below, to complete the record herein. In support whereof, Appellants state the following:

### I. SCOPE OF APPEAL

The City of Aurora states that Appellants appeal from:

(1) the decisions, orders, and/or determinations to approve every relevant permit application—particularly the zoning permit and the occupancy certificate applications—submitted by Gemini/Planned Parenthood, along with relevant decisions, orders, and/or determinations to approve plans, applications, or other intermediate actions predicate to obtaining permit application approval, and (2) the decisions, orders, and/or determinations to issue every relevant permit—particularly the zoning permit and the occupancy certificate-obtained for the subject property, along with relevant decisions, orders, and/or determinations to approve plans, applications, or other intermediate actions predicate to issuing the relevant permits. (Motion to Dismiss, pg 1, citing Notice of Appeal, pg 1)

000687

Appellants also note that, in addition to appealing from the orders, requirements, decisions and determinations of the Zoning Administrator,

> this appeal is taken as well from the orders, requirements, decisions and determinations of such other persons working under the authority of the Zoning Administrator or purporting to exercise in his stead the authority and responsibility for enforcing the Aurora Zoning Ordinance ("AZO"). (Notice of Appeal, pg 1)

## II. STATUS OF MOTION

Yesterday morning, the City delivered a Response to the Appellants' Motion, along with a CD-ROM containing images of certain additional documents, and an Amended Motion to Dismiss. The City based its determination of relevant documents as those the Zoning Administrator "relied upon in making the Zoning recommendation to the Plan Commission of the City of Aurora for their meeting on November 1, 2006 and that was ultimately approved by the Planning and Development Committee of the Aurora City Council at their meeting of November 16, 2006 relative to the Subject Property." (Notice of Certification of Record on Appeal, pg 1)

Appellants do not intend to argue the City's Motion to Dismiss prematurely and without the benefit of a full zoning record. However, for the sake of arguing this motion, Appellants will address the scope of the present appeal, the role of the Zoning Administrator and the Zoning Board of Appeals under the law, and a sampling of zoning orders, requirements, decisions and determinations made or required to be made in this matter.

The City claims that, throughout the approval and permitting process for the subject property, only one decision or determination was made by or under the authority of the Zoning Administrator: a "recommendation" made via a Staff Report to the Plan Commission in November 2006. (City's Response, pg 1) The City also claims that "the Zoning Board of Appeals does not have jurisdiction over permits applied for, granted or denied by the Building and Permits division of the City," even when these permits are required to be issued by authority of the Zoning Administrator. (City's Response, pg 1) The City is incorrect on both counts.

This action extends to orders, requirements, decisions and determinations beyond the lone decision made by the Zoning Administrator in October 2006. The requirement of the law is clear—"forthwith transmit to the board all the papers constituting the record upon which the action appealed from was taken." (65 ILCS 5/11-13-12) The law does not allow the City to pick and choose which action appealed from to respond to. The law requires "all the papers."

C00688

## III. IN THE CITY OF AURORA, THE ZONING ADMINISTRATOR ENFORCES THE ZONING ORDINANCE AND ZONING DETERMINATIONS FLOW FROM HIS AUTHORITY

First, according to AZO 10.1-1:

The zoning administrator of the City of Aurora shall be responsible for the enforcing of this zoning ordinance. Said zoning administrator shall have the power and shall see that the provisions of this ordinance are properly enforced.

A city official must be given authority by some ordinance or statute to perform a particular duty, and in Aurora, the Zoning Administrator is the only official specifically charged by law with enforcement of the AZO.

Therefore, while the City contends that sections of the AZO are "of no legal consequence or authority," the clear fact remains that any zoning determination or decision made in the City of Aurora is an exercise of the Zoning Administrator's clear legal authority. (Amended Motion to Dismiss, pg 7) The Zoning Ordinance links the jurisdiction of the Zoning Board of Appeals to the Zoning Administrator's orders, requirements, decisions or determinations, because the AZO declares the Zoning Administrator enforcer of that ordinance. The AZO does not contemplate anyone else making a zoning determination or decision without doing so under the authority of the Zoning Administrator.

The City argues essentially that the Building Official may make zoning determinations without invoking the authority of the Zoning Administrator. (Amended Motion to Dismiss, pp 6-7) Appellants note that, when the City Council amended large sections of Chapter 12 of the Municipal Code, entitled "Buildings and Building Regulation," the Council stripped all provisions but one from "Article I. In General." The one provision left standing was Municipal Code Section 12-1: "There is created the position of zoning administrator. The zoning administrator shall enforce the city's zoning ordinance." That provision comprises the entirety of Article I of Chapter 12, while the City Building Code comprises Article II of Chapter 12. The same Chapter 12 that recognizes the authority of the Building Official over the Building Code, recognizes the authority of the Zoning Administrator over the Zoning Ordinance. (Municipal Code 12-1, 12-16; cf. Building Code 104.1; cf. Building Code 101.1)

Moreover, while one should attempt to give effect to all provisions of the Code, if there is a direct conflict between the provisions of the Building Code and the Zoning Ordinance, those of the Zoning Ordinance prevail. The Municipal Code of Ordinances of the City of Aurora, Illinois, Sec. 12-16, adopted the 2000 International Building Code on June 5, 2001. However, according to the same Municipal Code of Ordinances, the Aurora Zoning Ordinance was amended "in its entirety" on April 25, 2006. (App. A) Thus, in determining the applicability of any directly conflicting requirements of the law, the later amended Zoning Ordinance takes precedence over the Building Code.

C00689

Indeed, the Building Code itself states that:

The provisions of this code shall not be deemed to nullify any provisions
of local, state or federal law. (Building Code 102.2)

Therefore, there is no merit in the City's argument that "Since approximately April of
1999, only the Building Official has been responsible for, and authorized to, issue
certificates of occupancy..." (Amended Motion to Dismiss, pg 6)

If in fact the policy was as the City is now arguing it, given the requirements of
the AZO, every time the Building Official or his staff—or any administrative official of
the City besides the Zoning Administrator—made zoning determinations or issued zoning
permits or occupancy certificates, all of those determinations would have to be declared
illegal as against the AZO. Instead of discarding clear provisions of Aurora law and
creating a code crisis, the simple answer is that the Building Official and his staff
exercise the delegated authority of the Zoning Administrator when making
determinations under the AZO.

Appellants' interpretation allows the whole of Aurora law to be respected and
affirmed. It also preserves the rights of all applicants and neighbors aggrieved under the
Zoning Ordinance and Illinois state law to appeal zoning determinations and decisions to
the Zoning Board of Appeals.

## IV. THERE ARE MANY ZONING ORDERS, REQUIREMENTS, DECISIONS AND DETERMINATIONS THAT PROVIDE GROUNDS FOR THIS APPEAL

The City claimed in its Motion to Dismiss that a "staff report" of October 26,
2006, was the last—and apparently only—zoning determination made by the Zoning
Administrator that could be appealed by Aurora citizens. In its Amended Motion to
Dismiss, the City apparently now contends that there were **no decisions** that could be
appealed anywhere in this process. In the Amended Motion, the City states that "with
regard to the recommendation of the Zoning Administrator to the Plan Commission, this
recommendation is not appealable to the Zoning Board of Appeals as it is not a final
decision." (Amended Motion to Dismiss, pp 4-5) A review of the Zoning Ordinance, the
ZBA Rules and Regulations, the incomplete record, and other documents indicate that
there are many zoning determinations and decisions that provide support for Appellants'
timely filing with the ZBA.

### A. Zoning Determinations and Decisions Are Involved In the Issuance of Every Permit In the City of Aurora.

The October 27, 2006, staff report was not the last zoning "order, requirement,
decision or determination" to be made in this matter or from which the Appellants may
appeal. As stated in the introduction, the Appellants appeal from all of the relevant
orders, determinations, decisions and permits pertaining to the zoning and permitting of
the subject property. (AZO 10.4-2.1; 65 ILCS 5/11-13-12)

4

000690

While the City contends that the Zoning Administrator was not involved in the process after October 2006, its Amended Motion To Dismiss belies this contention. There, the City acknowledges that "The Building Official seeks input from the land use and zoning and engineering divisions of the City prior to his issuance of **any** permit..." (Amended Motion to Dismiss, pg 7, emphasis added)

The procedure actually followed in this case demonstrates the ongoing involvement of the Zoning Administrator in this process. "Any permit," under the City's acknowledgement, includes the Certificates of Occupancy the City issued on or about October 1, 2007. The Temporary Certificate of Occupancy (TCO) issued on August 16, 2007, to Gemini/Planned Parenthood notes, under Special Conditions, "ZONING; OK FOR TCO UNTIL SITE IMPROVEMENTS INSPECTED AND APPROVED." (Exhibit A1, Bates 000017) These conditions indicate that there were still zoning determinations to be made after the issuance of the August 16, 2007, TCO. Clearly, a zoning determination was made here, as even the incomplete record reflects, since the two TCO's issued October 1, 2007, do not include the previous conditional zoning requirement from August 16, 2007. (Exhibits A2 & A3, Bates 000018 & 000019) The earliest the Appellants had notice of this zoning determination was October 1, 2007, and thus, their appeal on October 2, 2007, would be timely filed.

Moreover, the clear language of Aurora law holds that "A certificate of occupancy to be issued by the **zoning administrator** shall be required for ... Occupancy and use of a building thereafter erected or enlarged." (AZO 10.3-1.1) And, "a temporary certificate of occupancy may be issued by the **zoning administrator**." (AZO 10.3-2) These clear requirements of law may not be ignored. Again, while for convenience, these certificates may have issued from the Buildings and Permits Division, their issuance remains an exercise of the authority of the Zoning Administrator. Otherwise, the certificates of occupancy issued in the present matter are null and void, since they would contravene AZO 10.3-2.

Finally, the Zoning Ordinance specifically requires that:

No building or structure shall be erected, reconstructed, enlarged, or moved until a zoning permit shall have been applied for in writing and issued by the zoning administrator. Said permit shall be posted in a prominent place on the premises prior to and during the period of erection, reconstruction, enlargement or moving. (AZO 10.2-1)

Surely, the City cannot be arguing that the issuance of a **zoning** permit is not a **zoning** determination proper to the **Zoning** Administrator. However, evidence of a zoning permit has not been provided in the record for this matter, and no evidence has been provided that a zoning permit was posted in a prominent place during the construction of the facility on the subject property.

000691

**B.  The Review of the Development Process and the Conclusions Generated By the Review, Along with the Zoning Decision on "Major Surgery," Were All Clear Zoning Orders, Requirements, Decisions and Determinations of the Zoning Administrator.**

Further evidence of subsequent zoning determinations after 2006 is shown by the recently released *Aurora borealis* newsletter distributed by the City to the people of Aurora. There, the Hon. Thomas Weisner, Mayor of Aurora, wrote about the City's most recent review of the development process involving the Gemini/Planned Parenthood project. The Mayor stated:

> Once it became apparent that Gemini Office Development, a sub-agent of Planned Parenthood, had been less than forthcoming during the City's approval process, I felt I had a responsibility to **determine** if there was any wrongdoing before Planned Parenthood opened for business." (Exhibit B, *Aurora borealis*, Autumn 2007, pg 2, emphasis added)

The Mayor continued:

> The City hired two outside **zoning** attorneys to review the process, plus asked the State's Attorney to review the issue. The City's Corporation Counsel, our contracted legal firm, and our planning and development staff **thoroughly researched and reviewed the process**, as well.  In the end, none of the parties found sufficient legal grounds for refusing an occupancy certificate. (Exhibit B, *Aurora borealis*, pg 2, emphasis added)

The City has failed to mention in its Amended Motion and its Response that "The City's Corporation Counsel, our contracted legal firm, and our planning and development staff thoroughly researched and reviewed the process, as well." (Exhibit B, *Aurora borealis*, pg 2) Nor are there any documents in the zoning record to allow the Appellants, the ZBA, or the public to test the City's claim that:

> ...**all that resulted** from said investigation **was decisions by outside attorneys** that the Zoning Administrator's original determination in 2006 and the Ordinance adopted in 1993 were in fact correct zoning interpretations of the City Zoning requirements as applied to the subject property." (Amended Motion To Dismiss, p. 3, emphasis added)

Moreover, from the Mayor's comments about the "planning and development staff," it is also clear that the Zoning Administrator and his staff played a direct role in this review.  Some questions that must have arisen and been answered during the review include the following:  What are the permitted zoning uses of the property?  What was the intended use at the time of permitting?  What is the intended use now?  Does the intended use fall within one of the permitted use categories, a special use category, or a prohibited use category?  What types of abortions constitute "major surgery"?  Was the process followed proper or improper?  Were the issued permits legal or illegal?  Did

C00692

Gemini lie or didn't they? Were the lies "material" or not? Were the zoning standards followed? (Exhibit C, Leutkehans Report; Exhibit D, Martens Report)

As this "thorough" review focused mainly on zoning matters, it was properly an exercise of the authority of the Zoning Administrator, no matter which City official actually initiated the review. (cf., AZO 10.1-1; Mun. Code, Chapter 12, Sec. 12-1.)

At the conclusion of the City's review process, a press conference was held on October 1, 2007, to explain the decisions and determinations of the City, the large majority of which related to questions about Gemini/Planned Parenthood's violations of the Aurora Zoning Ordinance. At the press conference, Mayor Weisner and Ms. Alayne Weingartz, Corporate Counsel of Aurora, conveyed the City's conclusions and the decision that Planned Parenthood would not be granted a Certificate of Occupancy until it signed an agreement to restrict its use of "major surgery," as defined by Attorney Leutkehans, on the property to comport with the permitted uses purportedly allowed under the Aurora Zoning Ordinance. (Leutkehans Report, pg 6) While it was not noted at the press conference which administrative official was making the zoning determination announced on October 1, 2007, this is evidence of a clear zoning order, requirement, decision and determination by the City. (AZO 10.4-2.4) The City has admitted that the outside attorneys "determined" and made "decisions"—by adopting their reports with regard to this zoning matter, the Zoning Administrator under the AZO has made a further determination or decision.

Finally, the *Aurora borealis* also presented "5 common questions about planned parenthood," in addition to the Mayor's personal remarks on the topic. Question 3 reads, "Why didn't the City Council debate and vote on opening of the facility?" Answer, "As a matter of law and practice, **the issuance of occupancy permits is done through an objective, administrative zoning process.** It would be unlawful for the city to suddenly change its practice…" (Exhibit B, *Aurora borealis*, Autumn 2007, pg 3, emphasis added) While the City contends to the Zoning Board of Appeals that no zoning determinations or decisions were made after October 2006, the City appears to be telling the residents of Aurora otherwise. Whether actually administered through the Buildings and Permits Division or the Land Use and Planning Division, according to the City, issuance of certificates of occupancy is "an objective, administrative **zoning** process," subject to the Aurora Zoning Ordinance.

## V. DECIDED INACTION IN THE FACE OF A ZONING VIOLATION IS A DECISION THAT CONTINUES UNTIL REMEDIED

According to AZO 14.1-2, the Zoning Administrator:

…immediately upon any such violation [of the Aurora Zoning Ordinance] having been called to his attention, [shall] institute injunction, abatement or any other appropriate action to prevent, enjoin, abate or remove such violation.

C00693

The "shall" and the "immediately" in this provision indicate mandatory commands. The numerous zoning violations in this matter have been called to the attention of the Zoning Administrator by the Appellants in this case. Each day that the Zoning Administrator decides to do nothing to remedy these zoning violations is a continuing decision that may be, and is being, appealed in this action.

Moreover, according to state law, the ZBA has the same powers as the officer from whom the appeal is taken with regard to orders to be made in the premises. (65 ILCS 5/11-13-12) At this very moment, the Zoning Administrator is commanded by law to remedy the zoning violations on this property, and he has full powers to do so. Appellants urge the ZBA to exercise those proper powers and uphold the laws of the City of Aurora.

## VI. EVEN IF ANOTHER CITY OFFICIAL ENFORCES THE AURORA ZONING ORDINANCE, ILLINOIS STATUTE VESTS JURISDICTION IN THE ZONING BOARD OF APPEALS TO HEAR AN APPEAL FROM THAT OFFICIAL

The City has contended that the Zoning Board of Appeals "...has been empowered to review only the decisions of the Zoning Administrator." (City's Response, pg 2) According to AZO 10.4-2:

> The zoning board of appeals is hereby vested with the following jurisdiction and authority: ...10.4-2.3. To hear and decide all matters referred to it or upon which it is required to pass under this zoning ordinance **as prescribed by statute**. (emphasis added)

In this instance, 65 ILCS 5/11-13-3(f) provides:

> In all municipalities the board of appeals shall hear and decide appeals from and review any order, requirement, decision, or determination made by an **administrative official** charged with the enforcement of any ordinance adopted under this Division 13. (emphasis added)

Therefore, if the City contends that another administrative official, such as the Building Official or the Mayor is lawfully charged with enforcement of the AZO, and makes an order, requirement, decision, or determination under that lawful enforcement authority, such order, requirement, decision, or determination is appealable to the ZBA.

Moreover, the AZO specifically prevents other City officials from issuing permits outside the approval of the Zoning Administrator. These AZO restrictions place such actions under the enforcement authority of the Zoning Administrator and, thus, within the scope of authority of the ZBA. First:

> No application for a building permit or other permit or license, or for a certificate of occupancy, shall be approved by the zoning administrator, and **no permit or license shall be issued by any other city department**,

000694

which would authorize the use or change in use of any land or building contrary to the provisions of this ordinance, or the erection, moving, alteration, enlargement or occupancy of any building designed or intended to be used for a purpose or in a manner contrary to the provisions of this ordinance. (AZO 3.2-6.1)

This provision shows that the Zoning Administrator—and the ZBA—have the authority to enforce the AZO against all permits, whether or not issued by the Zoning Administrator or under his authority, as defined in the AZO.

Next, the AZO provides:

Before a permit is issued for the erection, moving, alteration, enlargement or occupancy of any building, or structure or use of premises, the plans and intended use shall indicate conformity in all respects to the provisions of this ordinance. (AZO 10.2-1, paragraph 3)

Again, this provision is a general requirement, not restricted to permits issued solely by the Zoning Administrator. The Zoning Administrator's authority and duty is to enforce the AZO against these illegal permits.

Further, the AZO declares that:

The erection, construction, enlargement, conversion, moving or maintenance of any building or structure and the use of any land or building which is continued, operated or maintained, contrary to any of the provisions of this ordinance is hereby declared to be a violation of this ordinance and unlawful. (AZO 14.1-2)

This provision applies no matter what entity issued a permit, certificate, or approval for a particular property or structure. This provision extends the power of the Zoning Administrator and the ZBA to the erection of the building on the premises at 3051 E. New York St., which continues contrary to the provisions of the AZO.

In sum, Appellants' interpretation and application of the Building Code and Zoning Ordinance, as applied to the authority of the Zoning Administrator and the ZBA, allow the whole of Aurora law to be respected and affirmed. Appellants respectfully request that the ZBA uphold the spirit and letter of the Zoning Ordinance and Illinois state law and allow the aggrieved Appellants relief in this matter.

## Request for Relief

1. In particular, Appellants request that the following records be made part of the official record in this matter and, then, that the City affirm that it has produced a complete and total response to these requested records in compliance with 65 ILCS 5/11-13-12 and Section (e) of the Rules and Regulations of the Aurora Zoning Board of Appeals:

000695

A.  All related notes, plans, surveys, applications, and all other records as the basis by which the Staff Report dated October 27, 2006, was prepared, the Planning Commission recommended approval of the Final Plan, and the Planning & Development Committee approved the Final Plan, as cited in the City's Motion to Dismiss.

B.  All records related to the property located at 3051 E. New York St., Aurora, IL ("the property") in connection to the submission and approval of plans, submission and approval of permits, and improvement of the property—including but not limited to petition and permit applications with all attachments, permits issued, petitions, plans, drawings, surveys, corrections reports, correspondence issued by the City, notes made by inspectors and staff, along with any record submitted to the City by N.Y. Oakhurst, LLC; Thomas Lehman; David Dastur; Kristos Tsogas; Theresa Huyck; Gemini Office Development, LLC; Gemini Office Management, LLC; Planned Parenthood/Chicago Area; or anyone acting on any behalf of any of these individuals and entities.

In particular, none of the issued construction-related permits—the actual documents which purportedly authorized the improvement of the property—have been made of record. Moreover, while three temporary certificates of occupancy were provided in the record, a fourth—the certificate under whose authority Planned Parenthood is currently operating—was inexplicably withheld. Also, the A.T.L.A. Survey-Petition Submittal, the Floor/Site Plan-Petition Submittal, and other plans by which the decision to permit the property was made, are not of record. Some of these plans are listed on the "File Contents for Casefile Number" document submitted by the City, but the plans themselves are missing. (Appellants have been disallowed from copying any plans by the City.) The resubmittal/corrections reports and other intermediate or final reports sent to the applicants by the City are also not of record.

C.  All records relating to the approval by the City of the Preliminary Plan for the property. No records have been provided related to this necessary approval.

D.  All records relating to the determination of the appropriate zoning for the property—including but not limited to reports, all correspondence between the City and the applicant or anyone acting for the applicant, meeting details and notes, phone logs, and emails.

In particular, Mr. Lehman and Mr. Dastur apparently filed a Development Services Team application, No. 06-0012, for the property on January 5, 2006, but no record of this transaction or any follow-up has been released by the City. Including the Staff Report dated October 27, 2006, at least three different reports appear to have been prepared by the Planning Division regarding the zoning of the property—none are of record. Part of the alarm permit application is of record, but the required emergency contact submission—apparently the first

000696

public document acknowledging Planned Parenthood's ownership of the property—received August 20, 2007, is not of record.

E.  The reports of the outside counsels hired by the City to review the process, along with all records cited or reviewed by the outside counsels—whether provided by the City, the applicant, or any other person or entity—in their reviews, as the final zoning decision announced by Mayor Weisner at his press conference on October 1, 2007, imposing a new condition on Planned Parenthood's right to occupy the property, was premised on those reports. The Leutkehans report concludes that Planned Parenthood was the intended user of the property from February 2007 onward based on "a review of the emails I received from Planned Parenthood's attorney," but these emails are not of record. The Leutkehans and Martens reports both cite proceedings before the Illinois Finance Authority featuring Theresa Huyck, who serves as both President of Gemini Office Development and Chief Operating Officer of Planned Parenthood / Chicago Area, but these proceedings are not of record. Leutkehans further cites the emails and "opinion letters from attorneys for Planned Parenthood" to support his conclusion that "the intended use for the development was always Planned Parenthood." These and all other records reviewed by the attorneys should be made part of the record.

F.  All statements released or made by City officials in reference to the property, as these statements indicate the mindset of the City throughout the permitting process, in ordering the outside attorney review, and in imposing the new condition on Planned Parenthood's right to occupy, including but not limited to the City press release issued October 1, 2007, at the conclusion of the attorney review; the prepared statement of Ms. Alayne Weingartz read at the City Council meeting on October 9, 2007; the statements made by the City in the Autumn 2007 *Aurora borealis*; and any statements from City Spokeswoman, Ms. Carie Ergo, to the media or public on this matter.

G.  And any other documents pertinent or related to the claims made by the Appellants in this appeal proceeding.

2.  Without these items in the official record, the Board will be unable to make a fully informed decision in this matter, as mandated by 65 ILCS 5/11-13-12. That the administrative record be as complete as possible is especially important where, as here, it is both clear and conceded that the zoning and permit process was tainted by misrepresentation.

WHEREFORE, the Appellant Objectors respectfully request that this Board grant them the requested relief and order the City to complete the record and for all other relief warranted on the premises in accordance with the law.

On behalf of the Appellants,

11

C 0 0 6 9 7

Peter C. Breen

Of Counsel
Thomas More Society,
A public interest law firm
29 S LaSalle St, Ste 440
Chicago, IL 60603
December 7, 2007

C00698



# City of Aurora

Division of Building and Permits - 65 Water Street - Aurora, Illinois 60505-3305 - Phone: (630) 892-8088 - Fax: (630) 892-8112

## DEPARTMENT OF COMMUNITY DEVELOPMENT
### DIVISION OF BUILDING AND PERMITS

## CERTIFICATE OF OCCUPANCY AND COMPLIANCE
### T E M P O R A R Y

Issue Date  . . . . . .     8/16/07
Expiration Date  . . . .    9/17/07

Parcel Number . . . . .    07-20-302-081
Property Address  . . .    3051 E NEW YORK ST
                           AURORA                  IL 60504
Subdivision Name  . . .
Legal Description  . . .    OLD ADDRESS WAS
                           240 N OAKHURST DR
                           VACANT LOT ON THE WEST SIDE OF
                           N OAKHURST DR SOUTH OF
Property Zoning . . . .     PLANNED DEVELOP DIST

Owner . . . . . . . . .     GEMINI OFFICE DEVELOPMENT

Contractor  . . . . . .     KRAHL CONSTRUCTION
                           31 264-8980

Application number  . .    06-00003529 000 000
Description of Work  . .    COM - BUSINESS OFFICES
Construction type . . .     NONCOMBUSTIBLE 1 HOUR
Occupancy type  . . . .     BUSINESS OFFICE
Flood Zone  . . . . . .     PLS. VERIFY W/ FEMA MAP
Special conditions  . .
            GEMINI OFFICE DEVELOPMENT, 3051 E. NEW YORK ST.
            TEMP. C.O. IS CONTINGENT UPON THE FOLLOWING ITEMS:
            ENGINEERING; OK FOR TCO UNTIL COMPLETION OF ALL ENGINEERING
               FINAL APPROVAL REQUIREMENTS.
            ZONING; OK FOR TCO UNTIL SITE IMPROVEMENTS INSPECTED AND
               APPROVED.
            BUILDING; COMPLETE THE FOLLOWING: 1) INSTALL PERMANENT EXIT
               DIRECTIONAL SIGNAGE AND ADD EXIT SIGN AT CONFERENCE ROOM
               110 WEST EXIT DOOR, 2) INSTALL GLASS AT SERVICE COUNTERS
               OR PROVIDE ARCHITECT REVISION TO DELETE GLASS PARTITIONS

Approved  . . . . . . .    _____
                                Building Official

           VOID UNLESS SIGNED BY BUILDING OFFICIAL

EXHIBIT
A 1

000699

☐002/003



# City of Aurora

Division of Building and Permits - 65 Water Street - Aurora, Illinois 60505-3305 - Phone: (630) 892-8088 - Fax: (630) 892-8112

## DEPARTMENT OF COMMUNITY DEVELOPMENT
### DIVISION OF BUILDING AND PERMITS

## CERTIFICATE OF OCCUPANCY AND COMPLIANCE
### T E M P O R A R Y

```
Issue Date  . . . . .      10/01/07
Expiration Date  . . . .   10/08/07

Parcel Number  . . . . .   07-20-302-081
Property Address  . . . .  3051 E NEW YORK ST
                           AURORA                IL 60504
Subdivision Name
Legal Description  . . .   OLD ADDRESS WAS
                           240 N OAKHURST DR
                           VACANT LOT ON THE WEST SIDE OF
Property Zoning  . . . .   N OAKHURST DR SOUTH OF
                           PLANNED DEVELOP DIST
Owner . . . . . . . . .    GEMINI OFFICE DEVELOPMENT
Contractor  . . . . . .    KRAHL CONSTRUCTION
                           312 735-6397

Application number  . .    06-00003529 000 000
Description of Work  . .   COM - BUSINESS OFFICES
Construction type  . . .   NONCOMBUSTIBLE 1 HOUR
Occupancy type  . . . .    BUSINESS OFFICE
Flood Zone . . . . . .     PLS. VERIFY W/ FEMA MAP
Special conditions . . .
```

TEMP. C.O. IS CONTINGENT UPON THE FOLLOWING ITEMS:
ENGINEERING; OK FOR TCO UNTIL COMPLETION OF ALL ENGINEERING
FINAL APPROVAL REQUIREMENTS.
Plan Examiner; complete the following:
Complete the installation of emergency lighting per NEC.
Areas required to have this lighting shall not be used
until the emergency lighting is installed, inspected and
approved by the City of Aurora.

Approved  . . . . . . .

Building Official

VOID UNLESS SIGNED BY BUILDING OFFICIAL

*EXHIBIT*

*A2*

AURCO

000700



# City of Aurora

Division of Building and Permits - 65 Water Street - Aurora, Illinois 60505-3305 - Phone: (630) 892-8088 - Fax: (630) 892-8112

## DEPARTMENT OF COMMUNITY DEVELOPMENT
### DIVISION OF BUILDING AND PERMITS

### CERTIFICATE OF OCCUPANCY AND COMPLIANCE

#### T E M P O R A R Y

```
Issue Date  . . . . . .   10/01/07
Expiration Date . . . .   11/02/07

Parcel Number . . . .     07-20-302-081
Property Address  . . .   3051 E NEW YORK ST
                          AURORA          IL 60504
Subdivision Name  . . .
Legal Description . . .   OLD ADDRESS WAS
                          240 N OAKHURST DR
                          VACANT LOT ON THE WEST SIDE OF
                          N OAKHURST DR SOUTH OF
Property Zoning . . . .   PLANNED DEVELOP DIST

Owner . . . . . . . .     GEMINI OFFICE DEVELOPMENT

Contractor  . . . . . .   KRAHL CONSTRUCTION
                          312 735-6397

Application number  . .   06-00003529 000 000
Description of Work  . .  COM - BUSINESS OFFICES
Construction type . . .   NONCOMBUSTIBLE 1 HOUR
Occupancy type  . . . .   BUSINESS OFFICE
Flood Zone  . . . . . .   PLS. VERIFY W/ FEMA MAP
Special conditions  . .
          TEMP. C.O. IS CONTINGENT UPON THE FOLLOWING ITEMS:
          ENGINEERING; OK FOR TCO UNTIL COMPLETION OF ALL ENGINEERING
          FINAL APPROVAL REQUIREMENTS.

Approved  . . . . . . .   _____
                                Building official
```

**VOID UNLESS SIGNED BY BUILDING OFFICIAL**

*Exhibit
A3*

000701

AURCO

000018



WHAT'S INSIDE:

Discover how the 2008 budget keeps the city moving along a path of success. **PAGE 3**

Get the details on Holiday Magic and other upcoming local events. **PAGE 4 & 5**

With leaves falling later than usual, here are the details on this year's leaf pick-up and yard waste programs **PAGE 8**

the city of aurora, illinois · www.aurora-il.org

# aurora
## *borealis*

AUTUMN 2007

# new far east fire station & customer service center open house on november 10

The City of Aurora is just days away from unveiling the latest improvements that expand its public safety facilities and enhance its customer responsiveness. That's because on Saturday, November 10, the new home of both Fire Station 8 and the Customer Service Center will open its doors for a public grand opening.



"Whether the city is introducing new technology or increasing the availability of critical services, putting residents first is our top priority," said Mayor Tom Weisner. "This new facility enhances our fire protection capabilities and expands our customer service to a higher level."

On Saturday, November 10, Station 8 and the new Customer Service Center will both be open for tours from 1 - 4 p.m. There will be several give-aways throughout the day, as well as fire prevention programs for children.

**Facility Details**

The new, 19,000 square-foot facility is located at the intersection of McCoy Drive and Gregory Street on the city's far east side. The $6 million facility replaces an aging fire station and provides a permanent home for the city's Customer Service Center, 630-264-INFO, which was operating out of an old storefront.

## CITY EXPANDS SERVICE HOURS
most requested services now available longer

For many citizens, it is difficult to find time to contact the city between 8 a.m. and 5 p.m. To make it more convenient to communicate with city staff, Aurora is offering expanded hours for some of our most requested services.

**The Customer Service Division** (630-264-INFO) is now open from 7:00 a.m. to 7:00 p.m., Monday through Friday, allowing citizens more of an opportunity to place inquiries, register complaints and follow up on reported issues.

Thanks to the opening of the new Customer Service Center at McCoy Drive and Gregory Street, residents can now walk in to pay their water bills and purchase recycling bins or waste stickers. Other walk-in services include voter registration,

continued on page 2

continued on page 6

EXHIBIT
B C00702

*Fire Station/Customer Service Center*
*continued from page 1*

Residents will benefit from enhanced service at the Customer Service Center. The new Service Center will be open from 7 a.m. to 7 p.m. Monday through Friday, and will be able to handle up to 200 additional calls per day.

Residents on Aurora's far east side can now pay bills and take advantage of a number of walk-in services offered at the facility rather than driving downtown

---

*Whether the city is introducing new technology or increasing the availability of critical services, putting residents first is our top priority. This new facility enhances our fire protection capabilities and expands our customer service to a higher level.*

Mayor Tom Weisner

to city hall (see "City Expands" page 1). A convenient drop box has also been added for bill payment 24 hours a day, seven days a week.



Fire Station 8 resumes its normal functions with a little extra elbow room. The station will house a fire truck, an ambulance, a ladder truck and one of the three existing water rescue vehicles the Fire Department has at its disposal.

---



# TRANSFORMING AURORA

### a message from Mayor Tom Weisner

Autumn is upon us and the warm fall colors on display throughout town make the weather seem less chilly. I have just a few items to talk about, but hope you will find the time to read the newsletter cover to cover and discover the many exciting things happening in Aurora.

**Fire Station 8 and Customer Service Center**
The Grand Opening Celebration for the new Fire Station 8 and Customer Service Center is right around the corner (page 1). The new facility replaces an aging fire station. It also makes permanent the city's customer information hotline, 630-264-INFO, that was launched in 2003. Expanding our customer service capabilities is just one example of how the city of Aurora is putting residents first!

**2008 City Budget**
As proposed, the 2008 city budget focuses on infrastructure upgrades that improve neighborhoods, as well as commercial corridors. Our efforts to clean up polluted riverfront areas and recreate downtown as a place to live, work and play will strengthen our city's tax base for years to come. We are also increasing funds used for neighborhood street resurfacing by 20%, while sustaining our effort to reduce basement flooding by separating antiquated combined sewer systems in older neighborhoods. The budget reflects a city that moves boldly and responsibly into the future (page 3).

**Planned Parenthood**
As you are probably aware, the location of a Planned Parenthood facility on Aurora's far east side has created much controversy. Two opposing national organizations, each with local supporters, have expressed differing opinions and raised issues. I thought it best to use this opportunity to set the record straight and provide answers to some commonly asked questions (page 3).

First, the location of the clinic near a residential neighborhood affects many families. The city will continue to do everything it can, under the law, to protect our citizens' right to a peaceful neighborhood while balancing First Amendment rights.

Once it became apparent that Gemini Office Development, a sub-agent of Planned Parenthood, had been less than forthcoming during the city's approval process, I felt I had a responsibility to

determine if there was any wrongdoing before Planned Parenthood opened for business.

The city hired two outside zoning attorneys to review the process, plus asked the State's Attorney to review the issue. The city's Corporation Counsel, our contracted legal firm, and our planning and development staff thoroughly researched and reviewed the process, as well. In the end, none of the parties found sufficient legal grounds for refusing an occupancy certificate. Further delay or refusal to allow occupancy would have likely resulted in a costly and indefensible lawsuit, as well as leaving the city liable for substantial monetary damages each day the facility remained closed.

The reality is that abortion is legal in our nation and neither I, as Mayor, nor the City Council can change that, or act in an arbitrary or emotional manner with regard to the laws governing the zoning and development of a property.

Since Planned Parenthood received their occupancy permit, some people have accused myself and city officials of "siding" with Planned Parenthood or conspiring with Planned Parenthood officials to bring the clinic here. The fact is, I have never spoken to officials or staff of Gemini Office Development or Planned Parenthood. To my knowledge, nobody advised the city that Planned Parenthood intended to occupy the entire building and offer abortion services until it became public knowledge in late July.

Let me say clearly that I stand on the side of neither Planned Parenthood nor those who oppose them. I stand simply on the side of the law as I can best understand it, in accordance with our Constitution and the oath of office I took as Mayor.

C00703

# )08 budget moves
# irora further down
# e path of success

id-September, Mayor Tom Weisner presented the City
ncil, residents and the business community with the 2008
of Aurora Budget. Two years ago, the city reprioritzed
urces and capital in order to upgrade the delivery of city
ices, enhance public safety, strengthen our economic
and establish Aurora as a regional technology and
ronmental leader. Progress toward these goals was
mplished this year, and the 2008 Budget reaffirms this
mitment. Here are a few of the highlights.

### icing Neighborhoods

8, Mayor Weisner proposed a
icrease in the money set aside for
orhood improvements through
/'s ward funds. Plus, for the first
n additional $1 million has been
ed to fix seriously deteriorated
that cannot be addressed through
inds.



ien or ward committees prioritize
inds to make improvements
: most important to the residents
wards. Simple, but important
s like street and sidewalk
es, community education
ves, and neighborhood clean-up
lp make our neighborhoods
vable.

, the city will increase the
of Community Oriented
nen by two as part of our
ment to safe neighborhoods.
this year, Aurora broke ground
w state-of-the-art Police
iarters. This coming year, we will
struction of support buildings, as
the early stages of construction
nain building.

e years, flooding has plagued
f our older areas. In 2007,
spent more than $5.8 million
iate or improve our storm and
sewer systems, and we have
d another $13.8 million
8.

**Increasing Downtown Development**
Ideally positioned along the banks
of the Fox River and close to public
transportation, downtown Aurora
provides a unique urban environment
to live, work and play. Earlier this
year, the city announced plans to
begin construction of the multi-phased
River's Edge Park. The 35-acre park,
just north of downtown, will offer
music, garden and natural areas, and not
unlike Millennium Park in downtown
Chicago, will have a strong impact in
attracting mixed-use development into
the vicinity.

With more than a half billion dollars
already committed downtown, the city
will continue to aggressively pursue new
mixed-use developments in 2008. Mixed-
use developments can significantly
diversify the tax base, easing the burden
on residential taxpayers.

continued on page 6

---

# 5 common questions
### about planned parenthood

## Why did the City of Aurora launch an outside review of this development process?

The city became aware that Planned Parenthood had
utilized a sub-agent to construct the facility (Gemini
Office Development) and that Gemini had been less than
forthcoming during the approval process.

## What were the results of the review?

Two zoning attorneys indicated that although Gemini
Office Development had not been straightforward during
the development process, there were insufficient grounds
for refusing an occupancy permit. The State's Attorney
indicated nothing criminal had taken place.

## Why didn't the City Council debate and vote on opening of the facility?

As a matter of law and practice, the issuance of occupancy
permits is done through an objective, administrative zoning
process. It would be unlawful for the city to suddenly
change its practice and require a vote based on the personal
beliefs of the Mayor, City Council members or citizens.

## Why weren't city officials aware Planned Parenthood was opening in August?

Gemini Office Development did not reveal that Planned
Parenthood would be the tenant during the development
process. Medical buildings are often built by development
corporations and suites leased out to many different tenants,
such as doctors and dentists. City staff determined that a
medical office or clinic was a permitted use for the property;
therefore any business or organization fitting that description
would be permitted as a tenant.

## How can I discourage people from coming to my home to discuss this issue?

The city's peddler and solicitor ordinance prohibits visitors
from remaining on private property when the occupant has
a no-solicitor or no trespassing sign displayed in a visible
area near the entrance. If an unwelcome guest remains on
your property after seeing this sign or being informed to
leave, you may contact the Aurora Police Department non-
emergency number of (630) 859-1700 in order to report this
unlawful activity.

000704

# LEAF, YARD-WASTE COLLECTION CONTINUES THROUGH DECEMBER 7
## leaf collection is free; bagged yard waste requires sticker

As the leaves continue to drop during this late, arriving fall season, Aurora residents still have five more weeks of curbside leaf collection as the FREE service lasts through December 7. Residents should gather leaves in 30 gallon Kraft paper yard waste bags and place the bags near the curb on their regularly scheduled garbage day. Leaves in other types of bags will not be collected. A waste sticker will not be required for yard waste bags containing only leaves.

Collection of bagged yard waste, such as grass clippings, twigs and garden debris will continue through December 7. Yard waste can be placed in a 30 gallon Kraft paper bag. The bag should not exceed 60 pounds in weight and must have a waste sticker attached. Additionally, the unbundled brush program ended on November 2 and will resume next year on April 7. Please refrain from placing brush on parkways until next spring.

Questions can be directed to Aurora's Customer Service Center at (630) 264-INFO (4636)

## your elected officials

**Mayor Thomas J. Weisner**
(630) 844-3612
mayorsoffice@aurora-il.org

**Aldermen's Office**
(630) 844-3619
At-Large: Robert O'Connor
At-Large: Richard Irvin
Ward 1: Abby Schuler
Ward 2: Juany Garza
Ward 3: Stephanie Kifowit
Ward 4: Rick Lawrence
Ward 5: John "Whitey" Peters
Ward 6: Mike Saville
Ward 7: Scheketa Hart-Burns
Ward 8: Chris Beykirch
Ward 9: Leroy Keith
Ward 10: Lynda Elmore



A City Second to None
**AURORA**
City of Lights
Mayor Thomas J. Weisner

44 E. Downer Place
Aurora, IL 60507

PRESORT STD
U.S. POSTAGE
**PAID**
AURORA, IL
PERMIT NO. 2

## Postal Customer

000705

## MEMORANDUM

**TO:**        City Council of Aurora, IL

**FROM:**      Phillip A. Luetkehans
               SCHIROTT & LUETKEHANS, P.C.

**SUBJECT:**   Gemini/Planned Parenthood Facility

**DATE:**      October 1, 2007

**FILE:**      Planned Parenthood.3594

### CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGED COMMUNICATION

### I.    FACTUAL BACKGROUND[1]

After at least two meetings with the City of Aurora's staff, Gemini Office Development ("Gemini") filed a Land Use Petition on July 27, 2006 with the City of Aurora listing Theresa Huyck as President of Gemini. The Land Use Petition, later filed documents and statements made by the applicant at the Planning Commission meeting stated that the "intended use" was "a Medical Office Building" but that no tenant had been determined.

In July, 2006, plans and specifications for the facility were filed showing bullet-proof glass and walls in the entryway. On October 22, 2006, Gemini also filed an application for a foundation permit listing "Teri" Huyck as the contact person for the tenant, Gemini Medical Office. On March 22, 2007, Gemini requested a sign permit, again stating they did not know who would be the tenant. However, from a review of the emails I received from Planned Parenthood's attorney, it is clear that at least by February, 2007, Planned Parenthood was intending to be the user of the subject property. Not until the alarm permit was requested on August 20, 2007 were any documents found listing Planned Parenthood Association of Chicago as the tenant or user of the facility. However, at an Illinois Finance Authority meeting on May 8, 2007, "Terry" Huyck was already listed as Chief Operating Officer of Planned Parenthood Association of Chicago. My review has found no documents filed with the City stating that abortion procedures were to be performed at the facility.

---

[1] ~~Given the expedited time-frame within which a report was due because of the federal court litigation,~~ tThis report is a summary of our findings and research. We have no~~w yet~~ received almost all the information requested from City staff, ~~and the research on abortion procedures may not be completely exhaustive.~~ It should also be noted that this author is not overly familiar with abortion terminology, and our use of medical terms may not be the correct technical terms used by the medical profession.

Given the fact that the building contained bullet-proof glass and walls in the entryway, the Planned Parenthood emails I have received and the ties between Gemini and Planned Parenthood, it is my opinion that the facility was always intended to be utilized to terminate pregnancies. Further, we were recently given opinion letters from attorneys for Planned Parenthood showing that the sole member of Gemini is 21st Century Office Development LLC ("21st Century") and that the sole member of 21st Century is Planned Parenthood/Chicago Area. Accordingly, there can be no doubt that the intended user for the development was always Planned Parenthood.

## II.    CITY OF AURORA ZONING ORDINANCE

The subject property originally was annexed into the City of Aurora in 1972 as part of a Planned Development District and was zoned B-2 under that Annexation Agreement. In 1993, the Annexation Agreement was amended and restated pursuant to Ordinance No. 093-123. The amendment and restatement expired in 2003 pursuant to its terms. However, the zoning for the area was enacted as a Planned Development District ("PDD") by zoning ordinance and runs with the land. Further, tThe underlying zoning of the subject property has remained B-2 Business district since that time. The PDD allows sets forth both "Clinics and medical centers" and "Hospitals or sanitariums, public or private" as permitted uses along with any other "uses that become permitted uses in said B-1, B-2, B-3 and O districts of the Zoning Ordinance subsequent" to the passage of the PDD ordinance.

The City's zoning ordinance in effect at the time of Gemini's application (July 27, 2006) provided that properties used for offices, including medical clinics, are permitted uses in the B-2 Business district. *See* City of Aurora Zoning Ordinance (the "Ordinance"), §§ 12.2-1.34 and 12.3-1.1. Thus, a medical clinic is a permitted use in the B-2 Business district, and no special use permit or public hearing is required for such use. *Id.* Under the Zoning Ordinance in effect at the time of the Application, hHospitals, however, require a special use permit. Ordinance, § 7.1. In order to obtain a special use permit, a public hearing and ordinance granting the special use permit are required.

The Ordinance contains the following definitions:

> Clinic, medical or dental: A building containing an individual practitioner or an association or group of licensed physicians; surgeons, dentists, clinical psychologists, or similar professional health-care practitioners, including assistants. The clinic may include apothecary, dental and medical laboratories and/or x-ray facilities, but shall not include in-patient care or operating rooms for major surgery.
>
> Clinical or medical center: A "medical center" or "medical clinic" is an establishment where three (3) or more licensed physicians, surgeons or dentists engage in the practice of medicine or dentistry, operating on a group or individual basis with pooled facilities, which need not, but may, include coordinated laboratory, x-ray and allied departments, and a diagnosis and treatment of

humans, a drug prescription counter (not a drug store), for the dispensing of drugs and pharmaceutical products, orthopedic or optical devices to the patients of said physicians, surgeons and dentists; but not including any exterior display or advertising sign.

Hospital or Sanitarium: An institution open to the public in which patients or injured persons are given medical or surgical care; or for the care of contagious diseases or incurable patients.

If the PDD Zoning Ordinance is still in effect, which it appears it may be. Whether the proposed use is a Hospital or a Medical Clinic, the use would be permitted,

However, if one is to proceed under the Zoning Ordinance in effect at the time of the Application~~Based upon the above referenced definitions~~, if Gemini's facility does not include in-patient care or operating rooms for major surgery, it is a permitted use in the B-2 zoning category and does not require a special use permit. On the other hand, if the facility includes in-patient care or operating rooms for major surgery, the facility would require a special use permit. Accordingly, the decision to grant or deny the occupancy permit without a special use permit having been granted after a public hearing may depends, at least in part, on whether the types of procedures performed at the facility are considered to be in-patient care or major surgery. If in-patient care or major surgery is not being performed at the facility, the use is a permitted one and should be allowed under either scenario - PPD or Zoning Ordinance in effect at the time of the Zoning Application..

It has recently come to my attention that some property owners believe that the Special Use requirement for "Social service agencies, charitable organizations, health-related facilities, meeting halls and similar uses when not operated for pecuniary profit in and use district" (hereinafter "Social Service Agency") should require a Special Use hearing. This Special Use is not defined anywhere in the Zoning Ordinance and, hence, is not as specific as the Medical Clinic and Medical Center definitions. Any ambiguity in zoning ordinances must be found in favor of the applicant. Given the lack of definition for Social Service Agency and the definitions for Medical Clinic, Medical Center and Hospital, the ambiguity would have to be looked at as stating that the planned use is akin to either a Hospital or Medical Clinic.

## III.    APPLICABLE LAW

### A.    Land Use Decisions Regarding Abortion Clinics[2]

"When a zoning law infringes on a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest." *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 335 (5th Cir. 1981). Because the instant matter involves a fundamental right, the City's decision on this matter will be subject to strict scrutiny. *See, e.g., Deerfield Medical Center*, 661 F.2d at 335; *P.L.S. Partners, Women's Medical Center of Rhode Island, Inc.*

---

[2]This Memorandum addresses the rights and obligations of the City in connection with the issuance of the occupancy permit requested by Planned Parenthood in the context of land use. In addition to land use, there may be other issues relating to the regulation of this facility by the State of Illinois and its agencies. ~~However, at present we have been unable to make any determination as to the jurisdiction or requirements of any such regulatory bodies.~~

000708

*v. City of Cranston*, 696 F. Supp. 788, 797 (D. R.I. 1988). A zoning decision that prevents the establishment of an abortion clinic in a particular locality constitutes affirmative governmental interference with the abortion decision rather than merely a determination not to remove restrictions on access to an abortion that already exist. *Deerfield Medical Center*, 661 F.2d at 335.

Our research has not disclosed a court-sanctioned zoning definition of "major surgery." With respect to abortion procedures, however, the weight of authority indicates that at least some abortion procedures are not major surgery. *P.L.S. Partners*, 696 F. Supp. at 797-98 (rejecting the argument that abortion is "major surgery" that cannot be performed in outpatient clinics and citing *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 438, 103 S. Ct. 2481, 2497 (1983), *rev'd on other grounds*); *Evans v. Kelley*, 977 F. Supp. 1283, 1294, 1296 (E.D. Mich. 1997) (only hysterotomy and hysterectomy described as major surgery); *Friendship Medical Center, Ltd. v. Chicago Bd. of Health*, 505 F.2d 1141, 1153 (7th Cir. 1974) ("Under *Roe* and *Doe*, if North Carolina my regulate the performance of abortions at all, it may do so only to the extent that it regulates tonsillectomies and other relatively minor operations* * *. Doctors may perform other medical procedures - including minor surgery and obstetrical delivery, which is considered more dangerous than first trimester abortion - away from hospitals with neither a transfer agreement nor active staff privileges" *quoting Hallmark Clinic v. Dep't of Human Resources*, 380 F. Supp. 1153 (E.D. N. Cal. 1974)); *Margaret S. v. Edwards*, 488 F. Supp. 181, 210 (E.D. La. 1980) (finding that "in the overwhelming number of cases, abortion is a minor surgical procedure, not a major surgical procedure.").

In *Evans*, the court examined abortion procedures, including vacuum aspiration, dilatation (or dilation) and evacuation, intact dilation and evacuation,[3] induction/installation and hysterotomy and hysterectomy. *Id.* at 1292-97. The court characterized only hysterotomy and hysterectomy as "major surgical procedures." *Id.* at 1294, 1296. *See also Gonzales v. Carhart*, 127 S. Ct. 1610, 1623 (2007). However, at least one case has held the classification of first trimester abortion as major or minor surgery for zoning purposes is a decision for the legislative body. *Bossier City Medical Suite, Inc. v. City of Bossier City*, 483 F. Supp. 633, 649 (W.D. La. 1980). The cases cited above and decided after *Bossier*, however, tend to indicate that the trend among courts is to find that at least several common abortion procedures are not major surgery. Abortion procedures that the courts have held not to be major surgery are as follows:

        1)    Vacuum Aspirations;

        2)    Dilatation (or dilation) and Evacuations (as opposed to intact dilatation and evacuation);

        3)    Induction/Installations.

Given this case law, it appears that other more extensive abortion procedures would be considered major surgery. In fact, the following types of abortion procedures have been held to be major surgery:

        1)    Medical Inductions;[4]

        2)    Hysterotomies; and

---

[3] Intact dilation and evacuation has since been banned under federal law. 18 U.S.C. § 1531.

[4] *Gonzales*, 127 S. Ct. at 1623 (2007).

000709

3)    Hysterectomies.

In this matter, however, the City and its zoning authority have never been informed as to what types of abortion procedures will be performed at the facility[5] and, therefore, cannot make an informed decision as to whether "major surgery" will be conducted. Thus, the zoning authority at the City has insufficient information to determine whether the facility will provide in-patient care or perform major surgery. *See, e.g., Long v. Elk Grove Village*, 64 Ill. App. 3d 1006, 1010, 382 N.E. 79, 82 (1st Dist. 1978) (lack of sufficient information regarding types of surgery provided precluded making determination of whether a facility was an ambulatory surgical treatment center or a hospital).

Notwithstanding the lack of information available to the City, it is my opinion that the following non-major surgeries would be allowed at the facility:

1)    Vacuum Aspirations;
2)    Dilatation (or dilation) and Evacuations (as opposed to intact dilatation and evacuation);
3)    Induction/Installations.

If the applicant wishes to perform other types of abortion procedures at the facility, then it would have to seek a special use permit, text amendment or a zoning determination from the City as to whether a specific type of surgery was major surgery, all of which would be subject to the normal judicial review procedures.

## B.    Misrepresentation

Given the history of this project and my subsequent investigation, it is my strong opinion that Gemini always knew that abortions would be performed at the facility in question. If true, Gemini misrepresented that fact in at least some of its permit applications when it stated it did not know who would be the tenant. The identification of the tenant would have given the City the ability to analyze the law on these types of facilities in a more detailed and complete fashion. However, Gemini's failure to identify the tenant or to elaborate on the use of the facility is likely insufficient to provide a reasonable basis for denying the occupancy permit. The authority to deny an occupancy permit based upon a <u>material</u> misrepresentation is inherent in the governing body. *See O'Connell Home Builders, Inc. v. City of Chicago*, 99 Ill. App. 3d 1054, 1058, 425 N.E.2d 1339, 1342 (1st. Dist. 1981). "A misrepresentation is material if it would be likely to affect the conduct of a reasonable man with reference to the transaction in question." *Id.* However, in *Oak Grove Jubilee Center, Inc. v. City of Genoa*, 347 Ill. App. 3d 973, 985, 808 N.E.2d 576, 588 (2d Dist. 2004), the appellate court held that it was error to deny a building permit where a pastor filed a special use application and failed to identify that the application was on behalf of an incorporated church. Thus, Planned Parenthood's use of the name Gemini likely is not a material misrepresentation.

Further, if Gemini knew Planned Parenthood would be the tenant and would be performing abortions, it omitted this information from its application materials. However, neither the

---

[5] I have also sought this information directly from Planned Parenthood's attorney but have not yet received the requested information.

000710

Planning Commission nor the City Council inquired about the services to be performed at the facility. Had Gemini identified the tenant, then the question would probably have been raised in the minds of staff and the Planning Commission. We could not find any section in the Ordinance requiring an applicant to state the name of the end-user. Accordingly, Gemini's failure to state the user or elaborate on the intended use of the facility cannot be seen as a <u>material</u> misrepresentation that can be used as a basis to refuse an occupancy permit.

Moreover, Gemini indicated it sought an occupancy permit for a medical clinic. To the extent Gemini failed to specify that it would perform abortions at the facility, such omission would not be a material misrepresentation in light of Gemini's right to perform vacuum aspirations, dilatation (or dilation) and evacuation and induction/installation procedures without a special use permit.

The quantum of missing information necessary to justify a refusal to issue a permit is illustrated in *Archview Investments, Inc. v. City of Collinsville*, 223 Ill. App. 3d 24, 30, 584 N.E.2d 821, 825 (5th Dist. 1991). In *Archview*, a physician attempted to obtain a building permit for an abortion clinic which was denied by the City because, among other things, the City was unable to discover pertinent information missing from the face of the application and, upon request, the applicant repeatedly refused to provide the information. 23 Ill. App. 3d at 26, 584 N.E.2d at 823. The deficiencies in *Archview* included failure to provide a filing fee, the names of the corporate officers, an adequate description of the use and occupancy of all parts of the building, failure to include specifications and plans with sufficient clarity and failure to include detailed dimensions to show the nature and character of the work to be performed, failure to include a site plan scaled to show boundary lines and distances from lot lines and failure to contain adequate plans for electrical, ventilation and plumbing systems. This myriad of failures, coupled with the applicants repeated refusals to provide the information, warranted denial of the permit.

In my opinion, the facts herein are more analogous to the *Oak Grove* decision than to the *Archview* decision. Accordingly, based upon the facts presented to date and the law as set forth above, it does not appear that Gemini made a misrepresentation material enough to allow the permanent certificate of occupancy to be denied.

## IV.    CONCLUSION

In sum, under either zoning scenario, it is my opinion that the following types of abortion procedures are permitted to occur as of right in the B-2 Business district and, hence, at the Gemini facility:

1)    Vacuum Aspirations;

2)    Dilatation (or dilation) and Evacuations (as opposed to intact dilation and evacuation);

3)    Induction/Installations.

Any other abortion procedures which Planned Parenthood or any other user wishes to perform should require the property owner to seek either a zoning determination or zoning relief from the City of Aurora prior to being undertaken.

Given the fact that not enough information was provided to the Zoning Department to make a proper determination, there is another option. The other option, but one that brings with it a significant risk of a lawsuit under the Civil Rights Act, is to require Gemini to provide further information regarding the services to be provided at the facility to determine whether the facility is a permitted or a special use depending upon whether major surgery will be performed at the facility. To that end, the City could require the submission of that information so it can make a zoning determination as to whether the precise procedures to be performed and services to be provided at the facility are more consistent with either a "medical clinic" or a "hospital."

LAW OFFICES

# RICHARD A. MARTENS

SUITE 1660
20 NORTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
martensatty@aol.com

September 13, 2007

FACSIMILE
(708) 386-4539

TELEPHONE
(708) 715-4400



Confidential – Attorney/Client Privileged Communication

Ms. Alayne M. Weingartz
Corporation Counsel
City of Aurora
44 East Downer Place
Aurora, Illinois 60507-2067

Re: 3051 New York Street

Dear Ms. Weingartz:

On August 27, 2007 you called me to ask whether I would review various applications and other records for the construction of a proposed health center at the above location and give my opinion whether the applicant complied with the applicable City Codes. I agreed to undertake this assignment and began my review.

On August 31, 2007, Alderman Irwin called me to express his concern that the public might have concerns about my impartiality in rendering an opinion, because I rent office space from the City's outside counsel, Klein, Thorpe and Jenkins, and because I was a summer law clerk for this firm many years ago. I stated to Alderman Irwin that the City needed to do what was in the best interests of the City and that I was fine with whatever the City decided. That remains my position.

When I called you to inquire how I should proceed, you directed that I complete the assignment for you. Subsequent to that call, I understand that the City retained another attorney to undertake this assignment. I would note parentheically that while I have great respect for the attorneys at Klein, Thorpe and Jenkins, I have not spoken to anyone at this firm about this assignment. What follows is based on my independent investigation.

## Scope of Review

After your initial telephone call to me, you and I met later that day in your office to discuss the assignment. On August 28, 2007, I met with Edward Sieben, Director of the Land Use and Zoning Division of the Community Development Department, and Stephane Phifer, Planning Director of the Planning Division of the Planning and Development Department to discuss the land use process and issues

1

EXHIBIT
D
000713

pertaining to the proposed health center.

The next day I met with John Curley, Assistant Director of Community Development, John Banbury, Assistant Corporation Counsel, and Mr. Sieben to discuss the building permit process and any open issues. On September 5, 2007, I went to the Chicago office of the Illinois Finance Authority and met with the Freedom of Information Officer to discuss the application process at the Authority and inspection of records pertaining to the financing of the proposed health center in Aurora.

Based on the information which I have gathered, I note the following:

<u>Gemini Office Development, LLC</u>

On July 27, 2006, Gemini Office Development, by its authorized agent, Mr. Thomas Lehman, filed a Land Use Petition with the City for approval of a Final Plan for the 3.24 acre parcel at Oakhurst and New York (see Tab 1 for a copy of this Petition). This parcel is now commonly known as 3051 New York Street. Near the bottom of the Land Use Petition, it states:

**AUTHORIZATION**

I hereby affirm that I have full legal capacity to authorize the filing of this Petition and that all information and exhibits herewith submitted are true and correct to the best of my knowledge. The Authorized Signatory invites City representatives to make all reasonable inspections and investigations of the subject property during the period of processing this Petition. **The Subject Property Owner must sign this form unless the Contact Person has been authorized to do so per a letter that is attached hereto.** Authorized Signature:_____ Date:  27 Jul 06

Attached to this Petition is a letter to the City of Aurora from Theresa Huyck, President of Gemini Office Development, LLC ("Gemini") on that company's letterhead. See Tab 1 for a copy of this letter. This was the only document which I found in my review of the City's records which was on Gemini's stationery. The one sentence letter states:

Dear Sir or Madam:
Please be informed that Mr. Thomas Lehman is acting as authorized agent with regards to obtaining a building permit for the Medical Office Building on Oakhurst at New York.

Sincerely,

Teresa Huyck, President

2

000714

Gemini purchased the 3.25 acre parcel at Oakhurst and New York on or about March 23, 2006, and, to the best of my knowledge, remains the owner. See copy of deed in Tab 2.

So far as I can determine, Gemini is a limited liability company in good standing with the Illinois Secretary of State. Gemini was registered with the Secretary of State on May 13, 2005 according to the Secretary of State's LLC File Detail report. See Tab 3. The registered agent is shown as:

>  Kathleen M. Howard
>  131 S. Dearborn – Suite 1700
>  Chicago, IL 60603

This address is the Chicago branch of a Seattle based, international law firm, Perkins, Cole. Ms. Howard, an attorney, is "Of Counsel" to this firm according to Sullivan's Law Directory. See Tab 4.

The current Annual Report of Gemini Office Development, LLC shows the principal place of business as 1 S. Wacker Dr., Ste 800, Chicago, IL 60606, the same address which appears on Gemini's letterhead. This Annual Report, dated March 27, 2007, is signed by Theresa A. Huyck, Manager of Genesis Office Management, LLC, which in turn, is the manager of Genesis Office Development, LLC (emphasis added). See copy of this annual report in Tab 5.

## The Various Permit Applications

The property owner of the 3.24 acre parcel, Gemini Office Development, LLC, filed at least six permit applications with the City. At the time these applications were made, the City apparently assigned the address of 240 N. Oakhurst Drive for this property. These applications are:

1. Fire Suppression – Application Form submitted on 3/23/06 and signed by Paul Felch, apparently on behalf of FE Moran Fire Protection, a Northbrook firm.

2. Commercial – New Construction – Application Form submitted on 7/27/06 and signed by Thomas Lehman on behalf of the owner. The general contractor is shown as Krahl Construction.

3. Commercial Foundation Only – Application Form submitted on 11/22/06 and signed by Scott Mousel of Krahl Construction Company.

3

000715

4. Commercial Miscellaneous – Application Form submitted on 12/4/06 by Kevin J. Horn of Krahl Construction for a new temporary construction trailer.

5. Sign Application form submitted on 3/22/07 by Scott (last name unknown, but likely Mousel) of Krahl Construction.

6. Fire Alarm Application Form submitted on 5/17/07 apparently by Ken Grossinger of Commercial Electronics, Inc.

See copies of these applications in Tab 6.

These applications consistently show the Property Owner as Gemini Office Development, LLC, One South Wacker Drive #800, Chicago, IL 60606, with the exception of the Commercial New Construction Application, in which Thomas Lehman, Gemini's agent, shows Gemini's address as 6301 S. Cass Avenue, Suite 301, Westmont, IL 60559. This is the address for Mr. Lehman's limited liability company, Partners in Development, USA, which, according to the Secretary of State's records, was established in 2002; Mr. Lehman serves as it member-manager. See Tab 7.

John Spoelma, who works in the City's Engineering Division, addressed his letter of January 10, 2007, regarding the Gemini Outpatient Facility at 240 Oakhurst, to Thomas W. Lehman, PE, at the Cass Avenue address. See Tab 8 for a copy of this letter. Apparently Mr. Lehman is a professional engineer. A copy of a bio for a Thomas Lehman, PE, which I obtained on-line is in Tab 9. This may or may not be the Thomas Lehman who signed this application.

The information about the Tenant on the six application forms is somewhat inconsistent. Five of the six indicate that the tenant is Gemini Office Development, but the sign application, submitted on March 22, 2007, states that the tenant is "unknown at this time." In the lower left hand corner of the first page of the sign application, under "Signage Information – Verbage on Sign", Mr. Scott Mousel from Krahl Construction, the general contractor, has apparently written "Not known at this time – tenant is not determined." See Tab 10.

<u>Statements Presumably Made by Mr. Lehman</u>

On November 16, 2006, the Planning and Development Committee, a standing committee of the City Council, met to consider Gemini's request for approval of its final plan. The minutes indicate that Mr. Lehman was present on behalf of Gemini. See Tab 11. The transcript of the meeting indicates the following exchange between Alderman Elmore and an Unidentified Gentleman (presumably Mr. Lehman):

\*          \*          \*

4

000716

Alderman Elmore: Is this building being built specifically for a client?

Unidentified Gentleman: We're in negotiations with a tenant; we do not currently have a lease but we still want to move ahead.

&ast;   &ast;   &ast;

Alderman Elmore: It's a nice buffer between them and the retail center, and these usually are pretty quiet because they usually function in the daytime and that makes it nice. I'd be interested to know who your client is, when you can release that.

Gentleman: OK

&ast;   &ast;   &ast;

See Tab 12.

Interviewing Mr. Lehman was beyond my assignment and authority. Further investigation is required to test the credibility of his responses to Alderman Elmore's questions posed last November.

### Financing the Project

The project is apparently being financed by 501(c)(3) tax-exempt bonds issued by the Illinois Finance Authority (IFA), a self-financed state authority, which has offices in Chicago. Googling "Gemini Office Development" discloses a link to IFA's May 8, 2007 Board minutes, wherein the Board approved a project by Planned Parenthood Association (Chicago Area) and Gemini Office Development, LLC; IFA further approved "the issuance of conduit 501(c)(3) Revenue Bonds in an amount not-to-exceed $10,000,000 to finance: a) the acquisition of land, construction and renovation; b) the acquisition of machinery and equipment; c) capitalized interest; and d) costs of issuance for projects located in Aurora and Chicago, Illinois." See minutes in Tab 13; this project in No. 9. The minutes indicate that Mr. (sic) Terry (sic) Huyck, Chief Operating Officer of Planned Parenthood Association Chicago and Ms. Cheryl Harris, Chief Financial Officer of Planned Parenthood Chicago were present at the meeting.

The Official Statement for this project, known as the Planned Parenthood / Chicago Area Project, is available on-line at www.munios.com, which does require a no-fee registration and password. Portions of this 84-page document are attached in Tab 14. In the Introductory Statement (bottom of first numbered page), the Official Statement states:

> The proceeds from the sale of the Bonds will be loaned to Planned Parenthood /Chicago Area, an Illinois not for profit corporation (the "*Corporation*"), and Gemini Office Development LLC, an Illinois limited

5

000717

liability company ("*Gemini*" and together with the Corporation, the "*Borrowers*"), to be used together with other funds, to (i) finance the payment of or the reimbursement of the costs of acquiring, constructing, installing and equipping a new healthcare center located in Aurora, Illinois, (ii) finance various capital costs of the Corporation for use in fits facilities located in Chicago, Illinois and Chicago's suburbs, (iii) refinance certain taxable indebtedness, the proceeds of which were utilized by the Corporation to finance the costs of acquiring, renovating, constructing and equipping certain existing health care centers of the Corporation (clauses (i), (ii) and (iii) are herein referred to as the "*Project*"), (iv)...

On page 6 of the Official Statement, "The Borrowers" are described as follows:

### The Borrowers

The Corporation was incorporated in October of 1946 and is an Illinois not for profit corporation providing family planning and reproductive health services in Chicago and the surrounding communities. The Corporation has been determined by the Internal Revenue Service to be an organization exempt from taxation under Section 501(a) of the Internal Revenue Code of 1986, as amended (the "*Code*"), as an organization described in Section 501(c)(3) of the Code, and currently operates 10 health centers, seven in Chicago and three in the surrounding suburbs. During fiscal year 2006, the Corporation served approximately 54,000 patients for over 122,000 visits for male and female services.

The need for the Corporation's services has been growing and the Corporation is expanding its operations and locations to meet these needs. As part of these efforts, the Corporation has formed several subsidiaries to assist in the acquisition of new land and assets and the development of new facilities to meet needs. The Corporation is the sole member of 21st Century Office Development LLC ("*21st Development*") and 21st Century Office Management LLC ("*21[st] Management*"), Illinois limited liability companies formed for the purpose of developing and managing real estate for the Corporation's mission. 21st Development is the sole member of Gemini and Gemini Office Management LLC ("Gemini Management"), which are also Illinois limited liability companies. 21st Management is the manager of 21st Development and Gemini Management is the manager of Gemini.

As part of the expansion plans, Gemini acquired a parcel of land in Aurora, Illinois which is the site for a new full service clinic to serve the Bolingbrook, Naperville and Aurora area. See "The Plan of Finance" below.

\*          \*          \*

"The Plan of Finance" states, in part, on page 7:

6

000718

The largest component of the Project, for approximately $7,400,000, is the acquisition, construction, installation and equipping of a full service health center to serve the Bolingbrook, Naperville and Aurora area. The new Aurora health center will provide approximately 13,000 visits each year when it is completed and will also provide space for community education. The Aurora health center is currently scheduled to open in September of 2007.

On page 38, the Official Statement is executed by Steven Tromble (sic), President and Chief Executive Officer, on behalf of Planned Parenthood / Chicago, and by Theresa A. Huyck, President, on behalf of Gemini Office Development, LLC.

I understand from a representative of IFA that the bonds were sold on May 24, 2007 and the transaction closed. I have filed a Freedom of Information Request with IFA, asking to inspect the bond transcript, but IFA's FOIA Officer told me that IFA does not now have a copy of the transcript, but has asked the underwriter to provide a copy to IFA. See Tab 15 for a copy of my FOIA request. The transcript should contain copies of the Preliminary Inducement Resolution (first notice to the IFA Board of the Project), the TEFRA (Tax Equity and Fiscal Responsibility Act) public hearing notice which is published in one or more newspapers, and the transcript of the TEFRA public hearing.

Compliance with City Codes

The proposed Health Center is a permitted use under the applicable City Zoning Regulations at the subject site on New York Street. See Tab 16 for a Summary of Land Use History prepared by Stephane Phifer, City Planner, in late August, 2007. I understand from staff that the applicant has provided more parking than is required and has provided an acceptable landscape plan.

A temporary occupancy permit was issued on August 16, 2007, with an expiration date of September 16, 2007, a copy of which is in Tab 17. Section 110.4 entitled "Temporary Occupancy" of the 200 International Building Code ("Building Code"), which the City adopted, sets for the effect of the issuance of a temporary occupancy permit, which is to permit occupancy on a temporary basis. To have issued the temporary occupancy permit, the City's Building Official must have found that the building could be occupied safely during the 30-day period.

The Temporary Certificate of Occupancy and Compliance (Tab 17) sets forth three special conditions, pertaining respectively to engineering, zoning and building issues. I understand that the applicant has satisfied the zoning issue. You would need to check with staff to determine the current status of the engineering and building issues.

7

000719