EXCEPT FOR A VERY LIMITED DESCRIPTION OF THE BORROWERS CONTAINED IN THE FOREPART OF THIS OFFICIAL STATEMENT, NO INFORMATION WITH RESPECT TO THE BORROWERS (FINANCIAL OR OTHERWISE) IS INCLUDED IN THIS OFFICIAL STATEMENT, AND THE BORROWERS MAKE NO REPRESENTATION HEREIN CONCERNING THEIR PRESENT OR FUTURE FINANCIAL CONDITION. POTENTIAL INVESTORS SHOULD BASE THEIR INVESTMENT DECISIONS WITH RESPECT TO THE BONDS *SOLELY* UPON THE CREDIT OF THE PROVIDER OF THE LETTER OF CREDIT SECURING THE BONDS, INITIALLY, CHARTER ONE BANK, N.A.. THIS OFFICIAL STATEMENT SHOULD NOT BE RELIED UPON IN DETERMINING WHETHER TO PURCHASE BONDS THAT ARE NOT IN THE WEEKLY, ONE MONTH, THREE MONTH OR SIX MONTH MODE AND SECURED BY A LETTER OF CREDIT.

These securities have not been recommended by any federal or state securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this document. Any representation to the contrary is a criminal offense.

000788

# TABLE OF CONTENTS

| HEADING | PAGE |
|---|---|
| INTRODUCTORY STATEMENT | 1 |
| THE AUTHORITY | 4 |
| THE BORROWERS | 6 |
| THE PLAN OF FINANCE | 6 |
| THE BONDS | 7 |
| SECURITY AND SOURCES OF PAYMENT FOR THE BONDS | 26 |
| THE LETTER OF CREDIT AND THE CREDIT AGREEMENT | 28 |
| ESTIMATED SOURCES AND USES | 30 |
| LITIGATION | 31 |
| CERTAIN LEGAL MATTERS | 32 |
| TAX EXEMPTION | 32 |
| LEGAL OPINIONS AND ENFORCEABILITY OF RIGHTS AND REMEDIES | 35 |
| CREDIT RATING | 35 |
| UNDERWRITING | 36 |
| SECONDARY MARKET DISCLOSURE | 36 |
| CERTAIN RELATIONSHIPS | 36 |
| MISCELLANEOUS | 36 |
| APPENDIX A - INFORMATION CONCERNING CHARTER ONE BANK, N.A. | A-1 |
| APPENDIX B - FORM OF BOND COUNSEL APPROVING OPINION | B-1 |
| APPENDIX C - DEFINITIONS | C-1 |
| APPENDIX D - SUMMARY OF THE LOAN AGREEMENT AND THE INDENTURE | D-1 |

000789

OFFICIAL STATEMENT

RELATING TO
THE ORIGINAL ISSUANCE OF

$8,050,000
Illinois Finance Authority
Variable Rate Demand Revenue Bonds,
Series 2007A (Planned Parenthood/Chicago Area Project)

INTRODUCTORY STATEMENT

This Official Statement, including the cover page, the Table of Contents page, the Official Statement Summary and the Appendices, is provided to furnish information in connection with the original issuance and sale by the Illinois Finance Authority (the *"Authority"*) of $8,050,000 Illinois Finance Authority Variable Rate Demand Revenue Bonds, Series 2007A (Planned Parenthood/Chicago Area Project) (the *"Bonds"*). The Bonds are being issued pursuant to a Trust Indenture dated as of May 1, 2007 (the *"Indenture"*), between the Authority and Amalgamated Bank of Chicago, as trustee (the *"Trustee"*). The Bonds will be dated as of and bear interest from the date of their initial delivery pursuant to the instructions of RBC Dain Rauscher Inc., doing business under the name RBC Capital Markets (the *"Underwriter"*). The Bonds will mature on January 1, 2037, and will be subject to redemption prior to maturity as described herein under "THE BONDS—Redemption Prior to Maturity."

See APPENDIX C to this Official Statement for the definitions of capitalized terms used but not otherwise defined herein.

The proceeds from the sale of the Bonds will be loaned to Planned Parenthood/Chicago Area, an Illinois not for profit corporation (the *"Corporation"*), and Gemini Office Development LLC, an Illinois limited liability company (*"Gemini"* and together with the Corporation, the *"Borrowers"*), to be used together with other funds, to (i) finance the payment of or the reimbursement of the costs of acquiring, constructing, installing and equipping a new healthcare center located in Aurora, Illinois, (ii) finance various capital costs of the Corporation for use in its facilities located in Chicago, Illinois and Chicago's suburbs, (iii) refinance certain taxable indebtedness, the proceeds of which were utilized by the Corporation to finance the costs of acquiring, renovating, constructing and equipping certain existing health care centers of the Corporation (clauses (i), (ii) and (iii) are herein referred to as the *"Project"*), (iv) pay interest with respect to certain portions of the Project and (v) pay certain costs of issuance of the Bonds and the credit enhancement thereof. The financing of all or a portion of the costs of the Project and the projected use of the proceeds of the Bonds are more particularly described in "THE PLAN OF FINANCE." Pursuant to the Loan Agreement dated as of May 1, 2007 (the *"Loan Agreement"*), the Borrowers will agree to make payments by the times and in the amounts necessary to pay the principal of, premium (if any) and interest on the Bonds when due (the *"Bond Service Charges"*). To evidence such obligation, the Borrowers also will execute and

000790

deliver to the Authority a promissory note (the *"Note"*) in a principal amount equal to the principal amount of the Bonds which Note will be assigned by the Authority to the Trustee.

**The Bonds will constitute special limited obligations of the Authority, payable solely from the revenues assigned and pledged by the Indenture to secure such payment, which will include moneys drawn under the Letter of Credit described below. See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS" herein. Those revenues will also include the loan payments required to be made by the Borrowers under the Loan Agreement and the Note.**

The Bonds will be payable from the proceeds of draws under a Letter of Credit (the *"Letter of Credit"*) initially issued by Charter One Bank, N.A. (the *"Bank"*). The repayment of drawings under the Letter of Credit will be provided pursuant to a Reimbursement Agreement dated as of May 1, 2007 (the *"Credit Agreement"*), between the Bank and the Borrowers. See "THE LETTER OF CREDIT AND THE CREDIT AGREEMENT" herein.

The Bank does not control, either directly or indirectly through one or more intermediaries, the Borrowers. Likewise, the Borrowers do not control, either directly or indirectly through one or more intermediaries, the Bank. "Control" for this purpose has the meaning given to such term in Section 2(a)(9) of the Investment Company Act of 1940. The Borrowers agree to provide written notice to the Trustee, the Remarketing Agent (as hereinafter defined), and the Bondholders thirty days prior to consummation of any transaction that would result in the Borrowers controlling or being controlled by the Bank or any provider of an Alternate Letter of Credit or Supplemental Credit Facility.

*The Bonds are being offered solely on the basis of the Letter of Credit and the financial strength of the Bank and are not being offered on the basis of the financial strength of the Authority, the Borrowers or any other security. Except for a very limited description of the Borrowers contained herein, no information with respect to the Borrowers (financial or otherwise) is included in this Official Statement, and the Borrowers make no representation herein concerning their present or future financial condition. Potential Investors should base their investment decisions with respect to the Bonds SOLELY upon the credit of the Bank. The Bonds are subject to acceleration of maturity upon the occurrence of a default by the Borrowers under the Credit Agreement, but such defaults are not fully described herein and such defaults may be waived by agreement between the Bank and the Borrowers. As a result of the foregoing, prospective investors will not be able to evaluate the likelihood of a default by the Borrowers under the Credit Agreement and resulting acceleration of the Bonds.*

ANY PREMIUM PAYABLE ON THE BONDS UPON THEIR OPTIONAL REDEMPTION WHILE THEY BEAR INTEREST AT THE FIXED INTEREST RATE IS NOT SECURED BY THE LETTER OF CREDIT.

As long as the Bonds bear interest in any of the Adjustable Interest Rate Modes defined under "THE BONDS—Interest" herein, the Bonds will be purchased by the Trustee upon demand by the registered owner thereof (initially, The Depository Trust Company, or its nominee) (the *"Holder"*), and beneficial ownership interests in Bonds (*"Beneficial Ownership Interests"*) will be purchased by the Trustee upon the demand of the owners thereof (*"Beneficial Owners"*).

000791

Any such purchase will be made on the applicable Bond Purchase Date, as defined herein under "THE BONDS—Purchase of Bonds or Beneficial Ownership Interests on Demand of Holders or Beneficial Owners." The Beneficial Owner must provide satisfactory evidence to the Trustee of such Beneficial Owner's Beneficial Ownership Interest and must comply with the remaining requirements of the Indenture applicable to the tender of Beneficial Ownership Interests. See "THE BONDS—Purchase of Bonds or Beneficial Ownership Interests on Demand of Holders or Beneficial Owners." The Indenture provides for the remarketing by the Remarketing Agent, initially, RBC Dain Rauscher Inc., doing business under the name RBC Capital Markets (the "*Remarketing Agent*"), of the Bonds or Beneficial Ownership Interests tendered by the Holders or Beneficial Owners thereof. If the proceeds of remarketing are not sufficient to purchase the Bonds or Beneficial Ownership Interests tendered for purchase, the Trustee is required to draw on the Letter of Credit to pay the necessary purchase price.

The Borrowers may convert the Bonds to a different Adjustable Interest Rate Mode or to a Fixed Interest Rate Mode as of a specified date (the "*Interest Period Reset Date*"). The Bonds or Beneficial Ownership Interests are subject to mandatory purchase on any such Interest Period Reset Date from the proceeds of remarketing or from the proceeds of a drawing on the Letter of Credit, subject to the right of each Holder or Beneficial Owner to affirmatively elect to waive and not be subject to the mandatory tender, and to retain its Bonds or Beneficial Ownership Interests. See "THE BONDS—Mandatory Tender for Purchase of Bonds or Beneficial Ownership Interests Upon Conversion Between Modes" herein.

The Borrowers may provide for the delivery of an Alternate Letter of Credit (as hereinafter defined) to the Trustee. The Bonds or Beneficial Ownership Interests are subject to mandatory tender upon the delivery of an Alternate Letter of Credit to the Trustee, subject to the right of each Holder or Beneficial Owner to affirmatively elect to waive and not be subject to the mandatory tender, and to retain its Bonds or Beneficial Ownership Interests. See "THE BONDS—Mandatory Tender for Purchase of Bonds or Beneficial Ownership Interests Upon Delivery of an Alternate Letter of Credit" herein.

On the Interest Payment Date which next precedes the Termination Date by at least two Business Days (as hereinafter defined) of the Letter of Credit or the expiration date of any Alternate Letter of Credit, the Bonds or Beneficial Ownership Interests are subject to mandatory purchase from the Holders or Beneficial Owners thereof unless, at least 45 days prior to such Interest Payment Date, the Bank will have provided to the Trustee written evidence of an extension of the expiration date of the Letter of Credit to a date not earlier than 364 days from the expiration date of such Letter of Credit. The mandatory purchase of Bonds or Beneficial Ownership Interests upon expiration of the Letter of Credit or any Alternate Letter of Credit may not be waived by the Holders or Beneficial Owners of such Bonds or Beneficial Ownership Interests, and the Holders or Beneficial Owners have no right to elect to retain their Bonds or Beneficial Ownership Interests. See "THE BONDS—Mandatory Tender for Purchase of Bonds or Beneficial Ownership Interests Upon Expiration of the Letter of Credit or Alternate Letter of Credit."

Except for the information contained herein under the captions "THE AUTHORITY" and "LITIGATION—Authority," the Authority has not provided any of the information contained in

000792

this Official Statement. The Authority is not responsible for and does not certify as to the accuracy or sufficiency of the disclosures made herein or any other information provided by the Borrowers, the Bank, the Underwriter or any other person.

This Official Statement should not be relied upon in determining whether to purchase Bonds that are not in the Weekly, One Month, Three Month or Six Month Mode and secured by a Credit Facility.

Herein follow brief descriptions of the Authority, the Borrowers, the financing and refinancing of the Project, together with summaries of the Letter of Credit and the Credit Agreement. Information regarding the Bank is included in APPENDIX A hereto. Summaries of the Loan Agreement and the Indenture are included in APPENDIX D hereto. The descriptions and summaries of the Letter of Credit, the Credit Agreement, the Loan Agreement, the Indenture and other documents contained herein do not purport to be comprehensive or definitive and are qualified in their entirety by reference to those documents, and all references to Bonds are qualified in their entirety by the definitive form thereof included in the Indenture. Copies of such documents will be available at the offices of the Underwriter, at 1211 Avenue of the Americas, New York, New York 10036-8705, Attention: Manager, until the issuance and delivery of the Bonds, and thereafter at the designated corporate trust office of the Trustee, presently Amalgamated Bank of Chicago, One West Monroe Street, Chicago, IL 60603, Attention: Corporate Trust Department.

<b>THE AUTHORITY</b>

**Description of the Authority**

The Authority is a body politic and corporate of the State of Illinois (the *"State"*). The Authority was created under the Illinois Finance Authority Act, 20 ILCS 3501/801-1 et seq., as supplemented and amended (the *"Act"*), which consolidated seven of the State's previously existing financing authorities (the *"Predecessor Authorities"*). All bonds, notes or other evidences of indebtedness of the Predecessor Authorities were assumed by the Authority effective January 1, 2004. Under the Act, the Authority may not have outstanding at any one time bonds for any of its corporate purposes in an aggregate principal amount exceeding $25,200,000,000, excluding bonds issued to refund the bonds of the Authority or bonds of the Predecessor Authorities. Pursuant to the Act, the Authority is governed by a 15-member board appointed by the Governor of the State of Illinois with the advice and consent of the State Senate. Presently, fourteen members have been duly appointed, and one vacancy exists. The members receive no compensation for the performance of their duties but are entitled to reimbursement for all necessary expenses incurred in connection with the performance of such duties.

**Powers**

The Authority has, among other powers, the statutory power (i) to make mortgage loans or other secured or unsecured loans to or for the benefit of any person (as defined in the Act) for

-4-

C00793

the cost of a project in accordance with an agreement between the Authority and such person; (ii) to refund outstanding obligations, loans, indebtedness or advances issued, made, given or incurred by a person for the cost of a project; (iii) to refinance indebtedness incurred by a person for a project undertaken and completed or for other projects acquired prior to or after the enactment of the Act; and (iv) to mortgage all or any portion of a project or other properties and the property on which any such project or other properties are located whether owned or thereafter acquired, and to assign or pledge mortgages, notes and other securities of any person to which or for the benefit of which the Authority has made loans, and the revenues therefrom, for the benefit of the holders of bonds issued to finance such project or issued to refund or refinance outstanding obligations, loans, indebtedness or advances of such person as permitted by the Act.

**Bonds of the Authority**

The Authority may from time to time issue bonds as provided in the Act for the purposes set forth in the Act. Any bonds issued by the Authority (and any interest thereon) shall not be or become an indebtedness or obligation, general or moral, of the State of Illinois or any political subdivision thereof nor be or become a pledge of the full faith and credit of the State of Illinois or any political subdivision thereof, other than the Authority. The Bonds of the Authority as described herein are limited obligations of the Authority payable solely from the specific sources and revenues of the Authority specified in the resolution authorizing the issuance of the Bonds (the *"Resolution"*) and the Indenture. No Owner of any Bond shall have the right to compel any taxing power of the State of Illinois or any political subdivision thereof to pay the principal of, premium, if any, or interest on the Bonds, and the Authority has no taxing power.

The Authority makes no warranty or representation, whether express or implied, with respect to the Project or the use thereof. Further, the Authority has not prepared any material for inclusion in this Official Statement, except that material under the headings "THE AUTHORITY" and "LITIGATION – Authority." The distribution of this Official Statement has been duly approved and authorized by the Authority. Such approval and authorization does not, however, constitute a representation or approval by the Authority of the accuracy or sufficiency of any information contained herein except to the extent of the material under the headings referenced in this paragraph.

The offices of the Authority are located at Two Prudential Plaza, 180 North Stetson Avenue, Suite 2555, Chicago, Illinois 60601 and its telephone number is (312) 651-1300.

**Authority Advisors**

D.A. Davidson & Co. and Scott Balice Strategies, LLC serve as co-senior financial advisors to the Authority. Additionally, certain legal matters with respect to the Bonds will be passed upon for the Authority by its special counsel Kevin M. Cahill, Esq., Chicago, Illinois.

C00794

## THE BORROWERS

The Corporation was incorporated in October of 1946 and is an Illinois not for profit corporation providing family planning and reproductive health services in Chicago and the surrounding communities. The Corporation has been determined by the Internal Revenue Service to be an organization exempt from taxation under Section 501(a) of the Internal Revenue Code of 1986, as amended (the *"Code"*), as an organization described in Section 501(c)(3) of the Code, and currently operates 10 health centers, seven in Chicago and three in the surrounding suburbs. During fiscal year 2006, the Corporation served approximately 54,000 patients for over 122,000 visits for male and female services.

The need for the Corporation's services has been growing and the Corporation is expanding its operations and locations to meet these needs. As part of these efforts, the Corporation has formed several subsidiaries to assist in the acquisition of new land and assets and the development of new facilities to meet needs. The Corporation is the sole member of 21st Century Office Development LLC (*"21st Development"*) and 21st Century Office Management LLC (*"21st Management"*), Illinois limited liability companies formed for the purpose of developing and managing real estate for the Corporation's mission. 21st Development is the sole member of Gemini and Gemini Office Management LLC (*"Gemini Management"*), which are also Illinois limited liability companies. 21st Management is the manager of 21st Development and Gemini Management is the manager of Gemini.

As part of the expansion plans, Gemini acquired a parcel of land in Aurora, Illinois which is the site for a new full service clinic to serve the Bolingbrook, Naperville and Aurora area. See "THE PLAN OF FINANCE" below.

THE BONDS ARE BEING OFFERED ON THE BASIS OF THE LETTER OF CREDIT AND NOT ON THE BASIS OF THE FINANCIAL STRENGTH OF THE BORROWERS. EXCEPT FOR A VERY LIMITED DESCRIPTION OF THE BORROWERS CONTAINED HEREIN, NO INFORMATION WITH RESPECT TO THE BORROWERS (FINANCIAL OR OTHERWISE) IS INCLUDED IN THIS OFFICIAL STATEMENT, AND THE BORROWERS MAKE NO REPRESENTATION HEREIN CONCERNING THEIR PRESENT OR FUTURE FINANCIAL CONDITION. POTENTIAL INVESTORS SHOULD BASE THEIR INVESTMENT DECISIONS WITH RESPECT TO THE BONDS *SOLELY* UPON THE CREDIT OF THE BANK.

ALTHOUGH THE CREDIT AGREEMENT CONTAINS CERTAIN FINANCIAL COVENANTS WHICH COULD LIMIT THE BORROWERS' ABILITY TO INCUR ADDITIONAL INDEBTEDNESS (WHICH MAY BE WAIVED BY AGREEMENT BETWEEN THE BANK AND THE BORROWERS), NEITHER THE INDENTURE NOR THE LOAN AGREEMENT RESTRICTS THE ABILITY OF THE BORROWERS TO INCUR ADDITIONAL INDEBTEDNESS.

## THE PLAN OF FINANCE

The proceeds of the Bonds will be loaned to the Borrowers and used to finance and refinance all or a portion of the costs of the Project, to pay interest with respect to certain portion of the Project, and to pay certain costs of issuance of the Bonds and credit enhancement thereof.

000795

The Borrowers will utilize certain of the proceeds of the Bonds, together with other funds, to finance, reimburse and refinance the costs of acquisition, construction, renovation, improvement, furnishing and equipping of certain capital improvements to the Borrower's health centers. The Project has several components. The first is the acquisition, renovation, construction and equipping of a new replacement clinic on the west side of Chicago (just three blocks from the Corporation's health center it replaced). This Austin health center opened in 2004 and is a two-story building with elevator access, an expanded 1500 square foot operating space and an expansive community education office and meeting space. The second component of the Project is the acquisition, renovation, construction and equipping of a new replacement clinic on the south side of Chicago (just blocks from the Corporation's health center it replaced). This Roseland health center opened in 2003 with an improved floor plan and continues to serve a growing client base.

The largest component of the Project, for approximately $7,400,000, is the acquisition, construction, installation and equipping of a full service health center to serve the Bolingbrook, Naperville and Aurora area. The new Aurora health center will provide approximately 13,000 visits each year when it is completed and will also provide space for community education. The Aurora health center is currently scheduled to open in September of 2007.

The Borrowers will also use proceeds of the Bonds to refinance certain taxable indebtedness, the proceeds of which were used to finance certain of the costs described above. The Borrowers may also use a portion of the proceeds of the Bonds to finance various capital costs for use in the Corporation's facilities.

The Authority makes no warranty or representation, whether express or implied, with respect to the Project or the location, use, operation, design, workmanship, merchantability, fitness, suitability or use for particular purpose, condition or durability thereof or title thereto.

### THE BONDS

**General**

The Bonds will be issued as fully registered Bonds without coupons and will be dated as of and bear interest from the date of their initial delivery. The Bonds will mature on January 1, 2037, and are subject to mandatory, optional and extraordinary optional redemption prior to maturity as described below under "THE BONDS—Redemption Prior to Maturity." The Bonds are issuable in denominations of $100,000 or integral multiples of $5,000 in excess thereof.

A DEFAULT BY THE BORROWERS UNDER THE CREDIT AGREEMENT COULD CONSTITUTE AN EVENT OF DEFAULT UNDER THE INDENTURE AND RESULT IN THE ACCELERATION OF THE BONDS PRIOR TO THEIR MATURITY.

The Bonds will be issued initially solely in book-entry form. See "THE BONDS— Book-Entry Only System" below.

C00796

and expenses incurred in connection with the issuance of the Bonds and the credit enhancement thereof, are estimated to be as follows:

SOURCES OF FUNDS:

| | |
|---|---|
| Bond Proceeds | $8,050,000.00 |
| Borrowers' Funds[1] | 1,592,087.00 |
| Total Sources | $9,642,087.00 |

USES OF FUNDS:

| | |
|---|---|
| Deposit to Construction Account | $6,655,331.70 |
| Refinance Taxable Debt | $2,532,855.00 |
| Capitalized Interest | 218,356.25 |
| Letter of Credit Fees[2] | 37,594.05 |
| Costs of Issuance[3] | 197,950.00 |
| Total Uses | $9,642,087.00 |

---

[1]  Includes gifts, grants and other Borrowers' equity.

[2]  Includes closing fee, Bank counsel fee and the initial quarterly fees for the Letter of Credit.

[3]  Including Underwriter's fee, attorneys' fees, rating agency fees and other costs associated with the issuance of the Bonds.

## LITIGATION

### Authority

There is not now pending (as to which the Authority has received service of process) or, to the actual knowledge of the Authority, threatened, any litigation against the Authority restraining or enjoining the issuance or delivery of the Bonds or questioning or affecting the validity of the Bonds or the proceedings or authority under which the Bonds are to be issued. Neither the creation, organization or existence of the Authority nor the title of any of the present members or other officers of the Authority to their respective offices is being contested. There is no litigation against the Authority pending (as to which the Authority has received service of process) or, to the actual knowledge of the Authority, threatened, which in any manner questions the right of the Authority to enter into the Indenture, the Loan Agreement or the Bond Purchase Agreement or to secure the Bonds in the manner provided in the Indenture, the Resolution authorizing the issuance of the Bonds and the Act.

### Borrowers

No action, suit, proceeding, or investigation at law or in equity, before or by any court, any governmental agency, or any public board or body is pending or, to the Borrowers' knowledge, threatened affecting the validity of the Loan Agreement, the Indenture, the Tax

000797

Compliance Agreement, the Bond Purchase Agreement among the Underwriter, the Authority and the Borrowers (the *"Bond Purchase Agreement"*), the Remarketing Agreement between the Borrowers and the Remarketing Agent (the *"Remarketing Agreement"*), the Credit Agreement or the Bonds, or contesting the corporate existence or powers of either of the Borrowers. There is presently no material litigation pending or, to the knowledge of its officers, threatened against the Borrowers except for litigation in which the probable recoveries and the estimated costs and expenses of defense, in the opinion of management to each of the Borrowers, will be entirely within each of the Borrowers' applicable insurance policy limits (subject to applicable deductibles), or which otherwise would not materially adversely affect the business or properties of either of the Borrowers.

## CERTAIN LEGAL MATTERS

Certain legal matters incident to the authorization and issuance of the Bonds are subject to the unqualified legal opinion of Katten Muchin Rosenman LLP, Chicago, Illinois, Bond Counsel, whose approving opinion will be delivered simultaneously with the issuance of the Bonds. Certain legal matters will be passed upon for the Authority by its special counsel, Kevin M. Cahill, Chicago, Illinois; for the Borrowers by their counsel, Sonnenschein Nath & Rosenthal LLP, Chicago, Illinois; for the Bank by its counsel, Chapman and Cutler LLP, Chicago, Illinois; and for the Underwriter by its counsel, Chapman and Cutler LLP, Chicago, Illinois.

## TAX EXEMPTION

**Summary of Bond Counsel Opinion**

Katten Muchin Rosenman LLP, Bond Counsel, is of the opinion that, under existing law, interest on the Bonds is not includable in the gross income of the owners thereof for federal income tax purposes. If there is continuing compliance with the applicable requirements of the Internal Revenue Code of 1986, as amended (the *"Code"*), Bond Counsel is of the opinion that interest in the Bonds will continue to be excluded from the gross income of the owners thereof for federal income tax purposes. Bond Counsel is further of the opinion that the Bonds are "qualified 501(c)(3) bonds" within the meaning of Section 145(a) of the Code. Accordingly, interest on the Bonds is not an item of tax preference for purposes of computing individual or corporate alternative minimum taxable income but is includable in corporate earnings and profits and therefore must be taken into account when computing, for example, corporate alternative minimum taxable income for purposes of the corporate alternative minimum tax.

Interest on the Bonds in not exempt from income taxation in the State of Illinois.

The opinion of Bond Counsel is given in reliance upon certifications by representatives of the Borrowers as to certain facts material to both the opinion and the requirements of the Code.

C00798

**Exclusion from Gross Income: Requirements**

The Code contains certain requirements that must be satisfied from and after the date of issuance of the Bonds in order to preserve the exclusion from gross income for federal income tax purposes of interest on the Bonds. These requirements relate to the use and investment of the proceeds of the Bonds, the payment of certain amounts to the United States, the security and source of payment of the Bonds and the use of the property financed with the proceeds of the Bonds. The Authority and the Corporation has covenanted to comply with these requirements. Among these specific requirements are the following:

*Restrictions on Ownership and Use.* The Code requires that any property financed with the proceeds of the Bonds be owned by a 501(c)(3) organization or by a governmental unit. In addition, the Code generally requires that property financed with the proceeds of the Bonds be used by a 501(c)(3) organization in an activity that is integrally relate to its exempt purpose.

*Investment Restrictions.* Except during certain "temporary periods," proceeds of the Bonds and investment earnings thereon (other than amounts held in a reasonably required reserve or replacement fund, if any, or a part of a "minor portion") may generally not be invested in investments having a yield that is "materially higher" than the yield on the Bonds.

*Rebate of Permissible Arbitrage Earnings.* Unless the Corporation qualifies for one of several exemptions, earnings from the investment of the "gross proceeds" of the Bonds in excess of the earnings that would have been realized if such investments had been made at a yield equal to the yield on the Bonds are required to be paid to the United States at periodic intervals. For this purpose, the term "gross proceeds" includes the original proceeds of the Bonds, amounts received as a result of investing such proceeds and amounts to be used to pay debt service on the Bonds.

**Covenants to Comply**

The Corporation has covenanted to comply with the requirements of the Code relating to the exclusion from gross income for federal income tax purposes of interest on the Bonds.

**Risks of Non-Compliance**

In the event that the Corporation fails to comply with the requirements of the Code, interest on the Bonds may become includable in the gross income of the owners thereof for federal income tax purposes retroactively to the date of issue. In such event the Indenture does not require acceleration of payment of principal of, or interest on, the Bonds or payment of any additional interest or penalties to the owners of the Bonds.

**Other Federal Income Tax Consequences**

Pursuant to Section 103 of the Code, interest on the Bonds is not includable in the gross income of the owners thereof for federal income tax purposes. However, the Code contains a

-33-

000799

## LEGAL OPINIONS AND ENFORCEABILITY OF RIGHTS AND REMEDIES

The enforceability of the rights and remedies of the Trustee or the owners of the Bonds under the Indenture and the Loan Agreement and the availability of remedies to any party seeking to enforce the Indenture or the Loan Agreement are in many respects dependent upon judicial actions which are often subject to discretion and delay. Under existing constitutional and statutory law and judicial decision, including specifically Title 11 of the United States Code (the federal bankruptcy code), the enforceability of the rights and remedies under the Indenture and the Loan Agreement and the availability of remedies to any party seeking to enforce the security granted thereby may be limited.

The various legal opinions to be delivered concurrently with the delivery of the Bonds will be qualified as to the enforceability of the various legal instruments by limitations imposed by the valid exercise of the constitutional powers of the State of Illinois and the United States of America and bankruptcy, reorganization, insolvency or other similar laws affecting the rights of creditors generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). These exceptions would encompass any exercise of federal, State or local police powers (including the police powers of the State), in a manner consistent with the public health and welfare. The enforceability of the Indenture and the availability of remedies to a party seeking to enforce a pledge of security under the Indenture in a situation where such enforcement or availability may adversely affect public health and welfare may be subject to these police powers.

The various legal opinions to be delivered concurrently with the delivery of the Bonds express the professional judgment of the attorneys rendering the opinions as to the legal issues explicitly addressed therein. By rendering a legal opinion, the opinion giver does not become an insurer or guarantor of that expression of professional judgment of the transaction opined upon or of the future performance of parties to such transaction. Nor does the rendering of an opinion guarantee the outcome of any legal dispute that may arise out of the transaction.

## CREDIT RATING

A rating for the Bonds was applied for by the Borrowers, and certain information was supplied by the Borrowers to Moody's Investors Service (*"Moody's"*), to be considered in evaluating the Bonds. Moody's has assigned its municipal bond rating of "Aa2/VMIG1" to the Bonds, with the condition that upon delivery of the Bonds the Letter of Credit will be issued by the Bank. No application was made to any other rating agency for the purpose of obtaining an additional rating on the Bonds. The rating for the Bonds referred to herein is subject to change, suspension, or withdrawal at any time by such rating service for a number of reasons, including changes in, or the unavailability of, information for the rating service, and any such change, suspension, or withdrawal may affect the market price or marketability of the Bonds. Such rating reflects only the view of the rating agency and is not a recommendation to buy, sell, or hold the Bonds, and the rating and the Bonds should be evaluated independently. Additional information with respect to the rating may be obtained from Moody's at 99 Church Street, New York, New York 10007.

-35-

C00800

### UNDERWRITING

The Underwriter has agreed, subject to certain customary conditions precedent to closing, to purchase the Bonds from the Authority at a purchase price of $8,000,800, representing the original aggregate principal amount of the Bonds less Underwriter's fee of $49,200. The Underwriter will be obligated to purchase all of the Bonds if any are purchased. The Bonds may be offered and sold to certain dealers and others at prices lower than the initial public offering price, and such public offering price may be changed, from time to time, without notice by the Underwriter. The Borrowers have agreed to indemnify the Underwriter and the Authority against certain civil liabilities, including liabilities under the federal securities laws.

### SECONDARY MARKET DISCLOSURE

The Bonds are exempt from the continuing disclosure requirements of Section (b)(5) of Rule 15c2-12 adopted by the Securities and Exchange Commission under the Securities Exchange Act of 1934 (the *"Rule"*) so long as they bear interest in an Adjustable Interest Rate Mode having a duration of nine months or less. If the Bonds are converted to bear interest in a Fixed Interest Rate Mode or an Adjustable Interest Rate Mode having a duration of more than nine months, the Bonds may become subject to the continuing disclosure requirements of the Rule and, in such event, the Borrowers have covenanted that it will comply with the Rule and all other statutes, regulations, judicial decisions or laws relating to continuing disclosure, including, without limitation, executing and delivering an undertaking to comply with such statutes, regulations, judicial decisions or laws on or prior to the remarketing of such Bonds upon their conversion to bear interest in a Fixed Interest Rate Mode or an Adjustable Rate Interest Mode having a duration of more than nine months.

The Authority has not made and will not make any provision to provide any annual financial statements or other credit information of the Borrowers to investors on a periodic basis.

### CERTAIN RELATIONSHIPS

Alan Gilbert, a partner at Sonneschein Nath & Rosenthal LLP, is an ex-officio member of the Board of Directors of the Corporation. Sonneschein Nath & Rosenthal LLP is serving as special counsel to the Borrowers in connection with the issuance of the Bonds.

### MISCELLANEOUS

The agreement of the Authority with the Holders of the Bonds is fully set forth in the Indenture, and neither any advertisement of the Bonds nor this Official Statement is to be construed as constituting an agreement with the purchasers of the Bonds. The references herein to the Act, the Indenture, the Loan Agreement, the Bond Purchase Agreement, the Remarketing Agreement, the Letter of Credit and the Credit Agreement are summaries of certain provisions thereof. Such summaries do not purport to be complete and for full and complete statements of the provisions thereof reference is made to the Act, the Indenture, the Loan Agreement, the Bond Purchase Agreement, the Remarketing Agreement, the Letter of Credit and the Credit

-36-

The execution and delivery of this Official Statement have been duly authorized by the Borrowers.

PLANNED PARENTHOOD/CHICAGO AREA

By _____/s/ Steven Tromble_____
      President and Chief Executive Officer

GEMINI OFFICE DEVELOPMENT LLC

By _____/s/ Teresa A. Huyck_____
           President

000802

**APPENDIX B**

**FORM OF BOND COUNSEL'S APPROVING OPINION**

May 24, 2007

Illinois Finance Authority
Chicago, Illinois

Amalgamated Bank of Chicago
Chicago, Illinois

RBC Capital Markets
Chicago, Illinois

Re:                 $8,050,000 Illinois Finance Authority
                Variable Rate Demand Revenue Bonds, Series 2007A
                       (Planned Parenthood/Chicago Area)

Ladies and Gentlemen:

We have examined a record of proceedings with respect to the issuance by the Illinois Finance Authority (the "Issuer") of its Variable Rate Demand Revenue Bonds, Series 2007A (Planned Parenthood/Chicago Area) (the "Bonds"), in the aggregate principal amount of $8,050,000. The proceeds to be received by the Issuer from the sale of the Bonds will be lent to Planned Parenthood/Chicago Area, an Illinois not for profit corporation (the "Corporation") and to Gemini Office Development LLC, an Illinois limited liability company ("Gemini" and together with the Corporation, the "Borrowers") pursuant to a Loan Agreement dated as of May 1, 2007 between the Issuer and the Borrowers (the "Loan Agreement"). Such proceeds will be used to: (i) pay and reimburse Gemini for the costs of acquiring, constructing, installing and equipping a healthcare center located in Aurora, Illinois; (ii) refinance costs of renovating, installing and equipping certain health centers of the Corporation located in Chicago, Illinois; (iii) pay for other capital costs of the Corporation for use in its Chicago and suburban facilities located at the above referenced locations as well as Orland Park, Schaumburg, and Naperville, Illinois (collectively with (i) and (ii), the "Project"); (iv) to capitalize interest up to December 31, 2007; and (v) pay certain costs of issuance relating to the Bonds.

The Corporation is the sole member of Twenty-First Century Office Development LLC ("Twenty-First Century"), which is the sole member of Gemini.

The Bonds are being issued pursuant to a Trust Indenture dated as of May 1, 2007 (the "Trust Indenture"), between the Issuer and Amalgamated Bank of Chicago, as trustee ("Trustee"), and to a resolution adopted by the Issuer on May 8, 2007 (the "Bond Resolution") pursuant to the Illinois Finance Authority Act, 20 ILCS 3501/801-1 *et seq.* (the "Act"). The

000803

Bonds are being issued in fully registered form, without coupons in denominations of $100,000 each or integral multiples of $5,000 in excess thereof.

The Bonds will be issued in a Weekly Interest Rate Mode as described in the Trust Indenture. Thereafter, the Bonds may operate in one of several modes including the Weekly Mode, One Month, Three Month, Six Month, One Year and Five Year Mode ("Adjustable Interest Rate Modes") or at a Fixed Interest Mode subject to the terms of the Trust Indenture. The Bonds are initially dated May 24, 2007, mature on January 1, 2037, and initially bear interest at a Weekly Interest Rate Mode commencing on the first Business Day of June, 2007. Subject to certain conditions specified in the Trust Indenture, the interest rate on the Bonds may be converted to a Fixed Rate.

The Bonds are subject to redemption prior to maturity at the times, in the manner and upon the terms set forth in the Trust Indenture and in the Bonds.

The Bonds are initially secured by an irrevocable, transferable, direct pay letter of credit issued by Charter One Bank, N.A. (the "Letter of Credit"). We express no opinion on the validity or enforceability of the Letter of Credit.

We have examined the Bond Resolution executed counterparts of the Trust Indenture, the Loan Agreement and the form of the Bond; the applicable laws of the State of Illinois; the transcript of proceedings relating to the issuance and sale of the Bonds and the opinions, certifications and statements of facts and expectations contained in such transcript; and such other such documents and materials as we deem relevant to the opinion expressed herein.

Based on the foregoing, and in reliance upon certain documents and showings hereinafter referred to, we are of the opinion that:

1.    The Issuer is a body politic and corporate of the State of Illinois, created under the provisions of the Act, with lawful authority to enter into the Trust Indenture and the Loan Agreement, to issue the Bonds and lend the proceeds thereof to the Borrowers for the purposes specified in the Trust Indenture and the Bond Resolution.

2.    The Trust Indenture and the Loan Agreement have been duly authorized, executed and delivered by the Issuer and, assuming the due authorization, execution and delivery of each such instrument by, and the binding effect thereof on, the other parties thereto, the Trust Indenture and the Loan Agreement constitute legal, valid and binding obligations of the Issuer, enforceable in accordance with their respective terms, subject to the qualification that the enforcement thereof may be limited by laws relating to bankruptcy, insolvency or other similar laws affecting creditors' rights generally and by the availability of equitable remedies.

3.    The Bonds have been duly authorized, issued and delivered by the Issuer and are valid and legally binding upon the Issuer according to the import thereof and as provided by the Trust Indenture, except to the extent that the enforcement thereof may be limited by laws relating to bankruptcy, insolvency or other similar laws affecting creditors' rights generally and by the availability of equitable remedies.

B-2

000804

4.    The Bonds and the interest thereon are limited obligations of the Issuer payable solely from moneys, securities and other revenues pledged therefor under the Trust Indenture. All right, title and interest in and to such moneys, securities and other revenues have been pledged and assigned under the Trust Indenture as security for the Bonds.  The Bonds and the interest thereon do not constitute an indebtedness of the Issuer within the meaning of any State of Illinois constitutional or statutory provision, nor do the Bonds or the interest thereon give rise to a pecuniary liability of the Issuer or a charge against its general credit or taxing powers.  Neither the faith and credit nor the taxing power of the State of Illinois, the Issuer or any political subdivision of the State of Illinois is pledged to the payment of the Bonds.  No owner of any Bond shall have the right to compel any exercise of the taxing power of the Issuer to pay the Bonds or the interest thereon.  Neither the members of the Issuer nor any persons executing the Bonds shall be liable personally on such Bonds by reason of the issuance thereof.

5.    The Internal Revenue Code of 1986 (the "Code"), contains certain requirements that must be satisfied from and after the date hereof in order to preserve the exclusion from gross income for Federal income tax purposes of interest on the Bonds.  These requirements relate to, among other things, the use and investment of the proceeds of the Bonds, the periodic payment of certain amounts to the United States of America, and the use and tax ownership of any property financed or refinanced with the proceeds of the Bonds.  The Borrowers have covenanted in the Loan Agreement and the Tax Compliance Agreement dated as of May 24, 2007 (the "Tax Agreement"), among the Issuer, the Borrowers and the Trustee, to comply with these requirements.

Under existing law, interest on the Bonds is not includable in the gross income of the owners thereof for Federal income tax purposes.  If there is continuing compliance with the requirements of the Code described in the preceding paragraph, we are of the opinion that interest on the Bonds will continue to be excluded from the gross income of the owners thereof for Federal income tax purposes.  We are further of the opinion that the Bonds are "qualified 501(c)(3) bonds" within the meaning of Section 145(a) of the Code.  Accordingly, interest on the Bonds is not an item of tax preference for purposes of computing individual or corporate alternative minimum taxable income.  However, interest on the Bonds is includable in corporate earnings and profits and therefore must be taken into account when computing, for example, corporate alternative minimum taxable income for purposes of the corporate alternative minimum tax.

In rendering this opinion, we have relied, among other things, upon the representations and certifications of the Issuer and the Borrowers with respect to certain material facts solely within their knowledge relating to the application of the proceeds of the Bonds and the property financed with such proceeds.

6.    Under existing law, the Bonds and the income therefrom are not exempt from State of Illinois income taxes.

In rendering the opinion contained in the preceding paragraphs, we have relied upon representations and covenants contained in the Tax Compliance Agreement with respect to certain facts that are solely within the Borrowers' knowledge relating to, among other things, the

B-3

nature and users of the property financed or refinanced with the proceeds of the Bonds, and the opinion of Sonnenschein Nath & Rosenthal LLP with respect to the status of the Corporation as a 501(c)(3) organization as well as the status of Twenty-First Century and Gemini as disregarded entities of the Corporation whose activities are treated in the same manner as a branch or division of the Corporation for Federal income tax purposes.

Respectfully yours,

B-4

000806

"Bond Fund" means the Bond Fund created in the Indenture.

"Bond Purchase Date" means any Bond Purchase Date as defined and provided for in the Indenture.

"Bond Service Charges" means the principal of, premium, if any, and interest on the Bonds, for any period or payable at any time, whether due on an Interest Payment Date, at maturity or upon acceleration or redemption.

"Bonds" means the Illinois Finance Authority Variable Rate Demand Revenue Bonds, Series 2007A (Planned Parenthood/Chicago Area Project), in the original principal amount of $8,050,000 authorized in the Bond Resolution and in the Indenture.

"Book-entry form" or "book-entry system" means, with respect to the Bonds, a form or system, as applicable, under which (a) the Beneficial Ownership Interests may be transferred only through a book-entry and (b) physical Bond certificates in fully registered form are registered only in the name of a Depository or its nominee as Holder, with the physical Bond certificates "immobilized" in the custody of the Depository. The book-entry system maintained by and the responsibility of the Depository and not maintained by or the responsibility of the Issuer or the Trustee is the record that identifies, and records the transfer of the interests of, the owners of book-entry interests in the Bonds.

"Borrowers" means the Corporation and Gemini.

"Borrowers Bonds" means Bonds purchased with moneys provided to the Trustee, or Beneficial Ownership Interests purchased with moneys provided to the Remarketing Agent, by the Borrowers, the Issuer, the Trustee or an agent of the Trustee for the account of the Borrowers or the Issuer, an affiliate of the Borrowers, or by any other person for the account of the Borrowers or the Issuer.

"Business Day" means any day of the year other than a Saturday or Sunday or a day on which banking institutions in the city in which the designated corporate trust office of the Trustee or the designated corporate trust office of the Paying Agent or the designated office of the Remarketing Agent is located, or in the city where draws on the Letter of Credit are presented, which initially is Medford, Massachusetts, are required or authorized by law to remain closed, or other than a day on which the payment system of the Federal Reserve System is not operational.

"Closing Date" means the date of delivery of and payment for the Bonds.

"Code" means the Internal Revenue Code of 1986, as amended from time to time. References to the Code and Sections of the Code include relevant applicable regulations and proposed regulations thereunder (and under the related provisions of the Internal Revenue Code of 1954, as amended) and any successor provisions to those Sections, regulations or proposed regulations.

C-2

C00807

"Corporation" means Planned Parenthood/Chicago Area, an Illinois not for profit corporation, and its successors and assigns.

"Credit Agreement" means the Reimbursement Agreement dated as of May 1, 2007, between the Bank and the Borrowers, as amended and supplemented from time to time. Upon the issuance of any Alternate Letter of Credit, "Credit Agreement" shall mean the credit or similar agreement relating to such Alternate Letter of Credit, entered into between the Borrowers and the issuer of such Alternate Letter of Credit.

"Depository" means any securities depository that is a clearing agency under federal law operating and maintaining, with its participants or otherwise, a book-entry system to record ownership of book-entry interests in Bonds, and to effect transfers of book-entry interests in Bonds in book-entry form, and includes and means initially The Depository Trust Company (a limited purpose trust company), New York, New York.

"Determination of Taxability" means and shall occur when (a) the Trustee receives written notice from the Corporation, supported by an opinion of Bond Counsel, that interest on the Bonds is includable in the gross income of Holders of the Bonds for federal income tax purposes or (b) the Internal Revenue Service shall claim in writing that interest on the Bonds is includable in the gross income of Holders of the Bonds for federal income tax purposes; provided, that such a claim shall not be deemed a Determination of Taxability unless the Borrowers are afforded reasonable opportunity (at the Borrowers' sole expense and for a period not to exceed two years) to pursue any judicial or administrative remedy available to the Borrowers with respect to such claim.

"Direct Participant" means a Participant as defined in the Letter of Representations.

"Eastern Standard Time" means the prevailing time in effect at any point in New York, New York.

"Eligible Funds" means amounts on deposit in the Bond Fund (other than funds derived from a draw on the Letter of Credit) for a continuous period of 124 consecutive days during which there shall not have occurred the filing of a voluntary or involuntary petition in bankruptcy under the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (as it may be amended from time to time), or the commencement of a proceeding under any other applicable laws concerning insolvency, reorganization or bankruptcy, by or against the Borrowers or the Issuer, unless such petition or proceeding shall have been dismissed and such dismissal shall be final and not subject to appeal.

"Eligible Investments" means:

    (a)    Government Obligations;

    (b)    Federal Home Loan Mortgage Corporation (FHLMC) and Farm Credit Banks (Federal Land Banks, Federal Intermediate Credit Banks and Banks for

000308

appointed or the Remarketing Agent has failed to determine the Fixed Interest Rate for whatever reason, or the Fixed Interest Rate cannot be determined pursuant to clause (a) for whatever reason, the interest rate then in effect with respect to the Bonds, without adjustment; provided that in no event shall the Fixed Interest Rate exceed the Maximum Rate.

"Fixed Interest Rate Commencement Date" means the Interest Period Reset Date from and after which the Bonds shall bear interest at the Fixed Interest Rate, as that date shall be established as provided in the Indenture.

"Gemini" means Gemini Office Development LLC, an Illinois limited liability company.

"Government Obligations" means (a) direct noncallable obligations of the United States of America for the payment of which the full faith and credit of the United States of America is pledged, (b) obligations issued by a person controlled or supervised by and acting as an instrumentality of the United States of America, the payment of the principal of, premium, if any, and interest on which is fully guaranteed as a full faith and credit obligation of the United States of America (including any securities described in (a) or (b) issued or held in book-entry form on the books of the Department of Treasury of the United States of America or Federal Reserve Bank), and (c) securities which represent an interest in the obligations described in (a) and (b) above.

"Holder" or "Holder of a Bond" or "Bondholder" means the Person in whose name a Bond is registered on the Register.

"Indirect Participant" means a Person utilizing the book-entry system of the Depository by, directly or indirectly, clearing through or maintaining a custodial relationship with a Direct Participant.

"Indenture" means the Trust Indenture, between the Issuer and the Trustee, as amended or supplemented from time to time.

"Interest Payment Date" or "Interest Payment Dates" means (a) while the Bonds bear interest at the Six Month Interest Rate, the One Year Interest Rate, the Five Year Interest Rate or the Fixed Interest Rate, the first day of each January and July, and (b) while the Bonds bear interest at the Weekly Interest Rate, the One Month Interest Rate, or the Three Month Interest Rate, the first Business Day of each month commencing the first Business Day of June, 2007.

"Interest Period Reset Date" means the date on which the Interest Rate Mode on the Bonds converts from the Interest Rate Mode applicable to the Bonds prior to such date to a new Interest Rate Mode. An Interest Period Reset Date shall be the first Business Day of a month; provided that upon conversion from a Six Month, One Year or Five Year Interest Rate Mode, an Interest Period Reset Date shall be the first day of a month; and provided further, that except when converting from a Weekly Interest Rate Mode, an Interest Period Reset Date may not occur prior to the end of the preceding Interest Rate Period and shall be the first day or Business Day after the end of such preceding Interest Rate Period.

C-6

C00309

LAW OFFICES

R I C H A R D   A.   M A R T E N S

SUITE 1660
20 NORTH WACKER DRIVE
CHICAGO, ILLINOIS 60606
martensatty@aol.com

FACSIMILE
(708) 386-4539

TELEPHONE
(708) 715-4400

September 6, 2007

<u>VIA FACSIMILE</u>

Ms. Diane L. Hamburger
Director, Marketing and Public Relations
Illinois Finance Authority
Two Prudential Plaza
180 N. Stetson Avenue – Suite 2555
Chicago, Illinois 60601

Re: Freedom of Information Act Request

Dear Ms. Hamburger:

    I understand that you are the Freedom of Information Act Officer for the Illinois Finance Authority.

    Pursuant to the Freedom of Information Act (5 ILCS 120/6 <u>et seq.</u>), I am requesting that the Illinois Finance Authority make available for my inspection all documents and records pertaining to IFA Project N – NP – TE – CD – 7096 – Planned Parenthood Association (Chicago Area) and Gemini Office Development LLC. I am particularly interested in reviewing the Bond Transcript, in the event that the bonds for this project have been sold and the transaction closed.

    I will call you this afternoon to arrange for a convenient time to review the documents. I would anticipate that I will be able to review these documents in approximately 45 minutes.

    Thank you for your attention to this matter.

Sincerely,

RICHARD A. MARTENS

RAM:jw

000810

**NA20/3-06.390-FPN** - GEMINI OFFICE DEVELOPMENT - FINAL PLAN ON 3.24 ACRES FOR A 21,777 SQ FT MEDICAL OFFICE BLDG ON LOT 2 OF THE PDA RESUBDIVISION LOCATED NEAR THE SWC OAKHURST AND NEW YORK (Ward 10- JR/JHS)

Parcel Number ...........................07-20-302-081

Size ...............................................3.24 acres

Street Frontage ...........................416 feet, along N. Oakhurst Drive

Current Zoning ...........................PDD Planned Development District

Contiguous Zoning...................North: PDD (S) Planned Development District
                                                   South: PDD Planned Development District
                                                   East:   PDD Planned Development District
                                                   West:  PDD Planned Development District

Contiguous Land Uses ..............North: Vacant
                                                   South: Residential
                                                   East:   Residential
                                                   West:  Commercial

Comp Plan Designation............Commercial

## CHARACTER OF THE AREA

The Subject Property is located near the SWC of Oakhurst Drive and New York Street and at the time of Final Plan approval was utilized as Vacant Land. The property to the north is currently vacant, but is going to be developed as a gas station with car wash. To the south is a residential townhome development. East of the subject property is a residential apartment development. Adjacent to the property on the west side the land is used as a Dominick's.

## DEVELOPMENT PROPOSAL

The GEMINI OFFICE DEVELOPMENT proposed a Final Plan on 3.24 acres for a 21,750 square foot medical office building, on Lot 2 of the PDA Resubdivision of Fox Valley East Region II Unit No. 52 – Oakhurst 1st Resubdivision, located near the SWC of Oakhurst Drive and New York Street. The proposal consisted of a medical office building and 71 parking spaces. The site is proposed to be landscaped pursuant to our current standards including some additional landscaping to the existing berm to screen the adjacent townhome development to the south. The stormwater detention for the site has been provided in the stormwater facility directly to the west of the proposed building.

000811

HISTORY

This Final Plan petition was referred by the City Council to the Planning Division on August 1, 2006.

The property was annexed on July 27, 1973 by Ordinance Number O73-4326 pursuant to an Annexation Agreement approved by the City of Aurora on July 27, 1973 by Ordinance Number O73-4315. An Amendment and Restatement of the Principal Annexation Agreement O93-123 approved on December 7, 1993. There were public hearings required for both the 1973 and the 1993 Annexation Agreement actions.

The Final Plan was reviewed as to the substantial conformance with the preliminary plat, which was approved by the City Council on May 27, 1997 by Resolution Number R97-203; with the Plan Description B-1 Business District –Local Retail, Permitted Uses, section 12.2-1.34. "Offices, business and professional, including medical clinics"; and the Schedule of parking requirements section 10.6-10 "For medical or dental clinics – three (3) parking spaces per doctor engaged at clinic, plus one space for each two (2) regular employees including nurses".

At the time of Final Plan approval the property was undeveloped and legally known as Lot 2 of the PDA Resubdivision of Fox Valley East Region II Unit No. 52 – Oakhurst 1st Resubdivision approved by the City of Aurora as Resolution Number PDFNL02-027 on May 16, 2002.

C00812



# City of Aurora

Division of Building and Permits - 65 Water Street - Aurora, Illinois 60505-3305 - Phone: (630) 892-8088 - Fax: (630) 892-8112

## DEPARTMENT OF COMMUNITY DEVELOPMENT
### DIVISION OF BUILDING AND PERMITS

## CERTIFICATE OF OCCUPANCY AND COMPLIANCE

### T E M P O R A R Y

```
Issue Date  . . . . . .   8/16/07
Expiration Date  . . . .  9/17/07

Parcel Number . . . . .   07-20-302-081
Property Address  . . .   3051 E NEW YORK ST
                          AURORA            IL 60504
Subdivision Name  . . .
Legal Description . . .   OLD ADDRESS WAS
                          240 N OAKHURST DR
                          VACANT LOT ON THE WEST SIDE OF
                          N OAKHURST DR SOUTH OF
Property Zoning . . . .   PLANNED DEVELOP DIST

Owner . . . . . . . . .   GEMINI OFFICE DEVELOPMENT

Contractor  . . . . . .   KRAHL CONSTRUCTION
                          31 264-8980

Application number  . .   06-00003529 000 000
Description of Work . .   COM - BUSINESS OFFICES
Construction type . . .   NONCOMBUSTIBLE 1 HOUR
Occupancy type  . . . .   BUSINESS OFFICE
Flood Zone  . . . . . .   PLS. VERIFY W/ FEMA MAP
Special conditions  . .
          GEMINI OFFICE DEVELOPMENT, 3051 E. NEW YORK ST.
          TEMP. C.O. IS CONTINGENT UPON THE FOLLOWING ITEMS:
          ENGINEERING; OK FOR TCO UNTIL COMPLETION OF ALL ENGINEERING
             FINAL APPROVAL REQUIREMENTS.
          ZONING; OK FOR TCO UNTIL SITE IMPROVEMENTS INSPECTED AND
             APPROVED.
          BUILDING; COMPLETE THE FOLLOWING: 1) INSTALL PERMANENT EXIT
          DIRECTIONAL SIGNAGE AND ADD EXIT SIGN AT CONFERENCE ROOM
          110 WEST EXIT DOOR, 2) INSTALL GLASS AT SERVICE COUNTERS
          OR PROVIDE ARCHITECT REVISION TO DELETE GLASS PARTITIONS


Approved  . . . . . . .   _____
                                 Building Official

          VOID UNLESS SIGNED BY BUILDING OFFICIAL
```

URCO

09/13/2007 16:23 FAX 6308928967          COA MAYORS OFFICE                     ☑001



# City of Aurora

Mayor's Office • 44 E. Downer Place • Aurora, Illinois 60507-2067 • 844-3612 • FAX 892-8967

Thomas J. Weisner
Mayor

# Fax Transmittal Sheet

**To:** Richard Martens          **From:** Bill Wief

**Company Name:** _____          **Date:** 9-13-07

**Fax Number:** 708-386-4537          **No. of Pages:** (including cover) 6

**RE:** _____          **CC:** _____

☐ **Urgent**    ☐ For Review    ☐ Please Handle    ☐ Please Reply    ☐ Please Recycle

**Comments:** Per our conversation last week.
Please call if you wish to discuss

Thanks

Bill Wief

If you receive this transmission in error, please contact us at (630) 844-3612.

000814

09/13/2007 16:23 FAX 6308928967          COA MAYORS OFFICE                                    002



# City of Aurora

**Mayor's Office • 44 E. Downer Place • Aurora, Illinois 60507-2067 • (630) 844-3612**
**FAX (630) 892-8967**

Thomas J. Weisner
Mayor

**Memorandum**

**To:**      Richard Martens

**From:**    Bill Wiet, Chief of Staff

**Date:**    Monday, September 10, 2007

**Subject:**   Planned Parenthood Discussions

---

In my former capacity as Community Development Director, I received hundreds of inquiries each year from businesses and organizations interested in possibly moving to Aurora. This is my best recollection of any and all contact I had related to Planned Parenthood in the last few years.

In February, I spoke via telephone with Ms. Becky Novak representing Planned Parenthood. Ms. Novak indicated that Planned Parenthood was considering relocating their Naperville offices to Aurora and might be interested in a site near Eola and New York Street. I surmised (to myself) that they were probably interested in the Gemini property, which was under construction at the time. I recommended she meet with myself, the Mayor and other staff to further explore options.

A few days later, Ms. Novak and I spoke again and she asked if I could coordinate a meeting and I agreed. That same day I also spoke via phone with a gentleman from Planned Parenthood, I do not recall that person's name. He briefly reiterated the same information I had already received from Ms. Novak and thus I did not take notes of the conversation.

I contacted the Mayor's Assistant Kari Ulrich and requested she set up the meeting. I provided her the contact name, number and approximate location via the e-mail attached. She indicated that she would take care of setting up the meeting and would try for a date in early April. Later, I received a tentative meeting date of April 4, 2007 from Kari.

Kari indicated that after several calls to Planned Parenthood, nobody phoned to confirm the April 4th meeting. Kari indicated she would work at scheduling an alternate date. A few weeks later, when I was in the Mayor's Office for an unrelated meeting, Kari indicated that she had tried to call Ms. Novak several times (four or five) to set up a meeting with no response. Kari asked me to check the number and even wondered if the person might no longer work there. I said I would go back and confirm the phone number.

I confirmed the number I provided Kari matched the number I was given, 312-592-6861. I then told Kari that given the number of calls she had made already, Ms. Novak would call back if she was still interested in Aurora or they had found another site. In my experience, many, if not most, businesses and organizations consider multiple sites and it is not unusual for an organization to simply stop responding when they are no longer interested in a location. I do not recall ever discussing the request with Mayor Weisner.

To be thorough, I subsequently contacted the Building and Permits division, as well as the Land Use and Zoning division, to check if there were any changes in the tenant build-out information. No changes were indicated; Gemini was still listed on the permit.

Standard procedures for setting up meetings were followed and the city attempted to make contact with Ms. Novak several times after her inquiry. It is important to note that these conversations occurred after the zoning was already approved and construction was well underway at the site. Gemini was not mentioned in any of these conversations, nor did Planned Parenthood mention that the building was being built specifically for their use – a fact we all learned in the last few weeks.

Finally, following at a Planning and Development Committee meeting in August, it was mentioned that there was a rumor floating around about Planned Parenthood relocating to Aurora. I responded that it was interesting because I had received a call from them in the spring about wanting to meet with the city but they did not follow-up to confirm a meeting date after the initial inquiry.



# City of Aurora

**Mayor's Office • 44 E. Downer Place • Aurora, Illinois  60507-2067 • (630) 844-3612**
**FAX (630) 892-8967**

**Thomas J. Weisner**
**Mayor**

## Memorandum

**To:**       Bill Wiet, Chief of Staff

**From:**    Kari Ulrich, Executive Secretary

**Date:**    Monday, September 10, 2007

**Subject:**  Planned Parenthood Discussions

---

At Bill Wiet's request, I have detailed my involvement with attempting to schedule a meeting with Planned Parenthood.

Our records indicate that Rebecca Novak who represented Planned Parenthood contacted the Mayor's Office on January 3, 2007 to request a meeting to discuss "looking at a possible Aurora site to serve the outreach needs in our community." It is common practice for the Mayor's Office to refer initial outside meeting requests to department directors or other staff members to screen prior to scheduling a meeting with the Mayor.

While I do not specifically recall discussing this meeting request with anyone (I handle dozens of requests daily), Bill Wiet did follow up with me in late February asking me to set a meeting with Ms. Novak, himself, Chuck Nelson, and the Mayor. I tentatively held the date of April 4 for the meeting. Despite numerous calls to Ms. Novak to confirm the date, she never responded. As a result, the meeting was never confirmed with the Mayor and did not take place.

I called Ms. Novak to set another date several more times. When I advised Bill Wiet that Ms. Novak was not returning my calls, he told me that they would call us if they were still considering the site and they may no longer be interested in locating in Aurora.

I have attached my notes for your reference.

C00817

## Wiet, William

| | |
|---|---|
| **Subject:** | HOLD - Becky Novak Planned Parenthood & Representatives |
| **Start:** | Wed 4/4/2007 11:30 AM |
| **End:** | Wed 4/4/2007 12:00 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Accepted |
| **Required Attendees:** | Weisner, Tom; Wiet, William; Nelson, Chuck |

Per Bill Wiet  Becky Novak - Planned Parenthood 312-592-6861
Some representatives will be attending from Planned Parenthood. They will be locating in a new building near Eola & New York St. Bill Wiet spoke with them prior to setting up this meeting.
4/2 Awaiting confirmation from Becky left voice-mail          ku

1

# April 04, 2007
Wednesday

| April 2007 | May 2007 |
|---|---|
| S M T W T F S | S M T W T F S |
| 1 2 3 4 5 6 7 | 1 2 3 4 5 |
| 8 9 10 11 12 13 14 | 6 7 8 9 10 11 12 |
| 15 16 17 18 19 20 21 | 13 14 15 16 17 18 19 |
| 22 23 24 25 26 27 28 | 20 21 22 23 24 25 26 |
| 29 30 | 27 28 29 30 31 |

TaskPad

☑ TaskPad

**7** ⁰⁰

**8** ⁰⁰

**9** ⁰⁰

**10** ⁰⁰

Marvin Britt (here)

**11** ⁰⁰

HOLD - Becky Novak-Planned Parenthood & Representatives

**12** ⁰⁰

**1** ⁰⁰  Tony Bauer (here)    Updated: RE WIG #    RE WIG # - Meeting
Meeting (Mayor's
Office)

**2** ⁰⁰

Tony Bauer /mayor (Mayor's Office)

**3** ⁰⁰

**4** ⁰⁰

**5** ⁰⁰

**6** ⁰⁰

Notes

Wiet, William                    1                    9/11/2007

C00819

09/13/2007  16:25 FAX 6308928967          COA MAYORS OFFICE                    ☐007

*HOLD*

~~*HOLD*~~

*Wed April 4*
*11:30 - 12:00*

## Ulrich, Kari

| | |
|---|---|
| **From:** | Wiet, William |
| **Sent:** | Wednesday, February 28, 2007 7:14 AM |
| **To:** | Ulrich, Kari |
| **Subject:** | Mayor meeting with Planned Parenthood |

*Was originally on scheduling request.*

Kari

Some representatives from Planned Parenthood want to meet the mayor - they will be locating in a new building near Eola and New York Street. I talked to them to get some background prior to setting up with the mayor. I can be available as well.

Can you set up some times?

*Becky Novak*

*Wiet*
*Chuck*
*Mayor*

Thanks

Bill

*312 - 592 - 6861*

Bill Wiet, Community Development Director
City of Aurora
44 East Downer Place
Aurora, IL 60507
p (630) 844-3627
f (630) 906-7430
bwiet@aurora-il.org

*Numerous attempts  no answer*
*left VM*

*4/26 Bill Wiet will see if*
*he has another number!*

*5-14-07 File away per Bill Wiet*

1

000320