17

1  support that some statement made by someone is attributable to

2  Aurora.  That someone on behalf of Aurora, an employee, an

3  agent, or someone with authority, made statements to Planned

4  Parenthood that would be attributed to the City of Aurora.

5       There is no foundation, at least at this point.

6       MR. WILSON:  We are simply offering the e-mail as a

7  business record of Planned Parenthood at this point, your

8  Honor.

9       THE COURT:  Go on with the argument.

10      MR. WILSON:  Okay.  Becky Novak reports to

11  Mr. Trombley and Teri Huyck, who is at that time an employee of

12  Planned Parenthood.

13      "Just got off the phone with Bill Wyatt in which he

14  informed me that the address we gave him was already owned by

15  someone else.

16      "I explained about the letter of intent, and now,

17  quote, 'It all makes sense,' so we are all good.  He already

18  checked on the permits for Gemini, and everything is all set

19  obviously.  So he is talking to the mayor today."

20      That we are offering, your Honor, for the state of

21  mind of Planned Parenthood about their contacts with the City

22  of Aurora.

23      This e-mail indicates we were reaching out, having

24  discussions with people at the City of Aurora in February of

25  2007.

CO1461

1              And if I can turn to page 9, this, we have offered --
2    I'm sorry, Exhibit 9.  This is the backup phone record which
3    indicates two calls from Aurora to Chicago and from Chicago to
4    Aurora, the day before that conversation on February 21st.
5              And in our affidavit we indicated that that phone
6    conversation, which is detailed here, February 21st, according
7    to the Cingular phone records, as being between Bill Wyatt and
8    Steve Trombley in which the entire relationship between Planned
9    Parenthood, Gemini, the City of Aurora, and our facility were
10   discussed.
11             This simply gets to, your Honor, whether or not there
12   is some sort of fraud being perpetrated on the City of Aurora
13   in the permit process.  We had these discussions in February of
14   2007, and we are presenting evidence on that to you now.
15             MR. MALINA:  Judge, just for the record, the same
16   objection would apply.  We object to using it for that purpose.
17             THE COURT:  Sustained.
18             MR. WILSON:  Your Honor, we are simply -- if these
19   documents could be entered into evidence as business records of
20   Planned Parenthood, if they want to object to what they show,
21   they can.
22             THE COURT:  Well, it may be a business record of
23   Planned Parenthood that these are the telephone records of
24   Planned Parenthood, but the substance of the conversations, if
25   any occurred, during the course of the phone call is not a

1  business record.

2          MR. WILSON:  That's true.  We have offered that by

3  affidavit of Steve Trombley.  Mr. Trombley is here if you'd

4  like to have us present that later.

5          THE COURT:  You haven't proffered that he was a

6  conversant.

7          MR. WILSON:  Correct.  Let's get through the

8  presentation, and if we need specific evidence on that point we

9  will present Mr. Trombley.

10         At page -- paragraph 10 of the loan documents

11  demonstrating that we issued tax exempt bonds under the names

12  of both Gemini Office Development and Planned Parenthood

13  Chicago Area pursuant to the authority of the Illinois Finance

14  Authority in the amount of $8 million in May of 2007.

15         This is, again, a relationship between Gemini and

16  Planned Parenthood that was a public record at that time.

17         THE COURT:  Are you suggesting that this form of

18  public record would put Aurora on notice that somehow Aurora

19  should know of the financing arrangements that Planned

20  Parenthood and Gemini were making with the Illinois Finance

21  Authority, with the Amalgamated Bank, and Charter One?  That

22  somehow Aurora would know that?

23         MR. WILSON:  No.  That's not what we're -- what we

24  are trying to respond to, your Honor, is the allegation both in

25  the public and before this Court that we committed fraud by not

C01463

1  disclosing our relationship, and somehow we were obligated to

2  provide information that we did not provide.

3          THE COURT:  I don't think Aurora is saying that there

4  is any fraud involved with respect to the loan agreement.

5          MR. WILSON:  No, they are not.

6          THE COURT:  Is that right?

7          MR. MALINA:  And, Judge, also we haven't alleged

8  fraud, per se.  We are alleging the right to investigate an

9  allegation of fraud without interference by the Court.

10          THE COURT:  That's correct.

11          You may proceed.

12          MR. WILSON:  Exhibit 11 is the public notice in the

13  Sun-Times that included both Planned Parenthood and Gemini, as

14  well the address 240 Oakhurst where the facility was being

15  opened and financed through these public bonds.

16          THE COURT:  Just one second, please.

17      (Pause.)

18          THE COURT:  The financing papers use the expression

19  as I recall, the loan agreement states:  "the qualifying

20  industrial projects."

21          So the financing through the Illinois Finance Agency

22  related to industrial projects as defined under that Act.

23          Now, what is the definition under that Act of an

24  "industrial product"?

25          MR. WILSON:  I don't know, your Honor.

1          THE COURT:  "Project," I should say.  "Project."

2          MR. WILSON:  The bonded documents were prepared by

3    counsel for the purposes of obtaining bonding.  All we're

4    offering it for --

5          THE COURT:  The reason I bring this up is to say that

6    if you are saying that people are on notice of the financing,

7    it uses the term "industrial projects," which may be perfectly

8    appropriate under the Illinois Finance Authority.

9          And yet, in common parlance, one would look at

10   "industrial projects" more in the nature of industry, and not

11   an office complex.

12         But as the papers point out, "as defined under the

13   Illinois Finance Authority."  So it has its own internal

14   definition.

15         MR. WILSON:  Correct.

16         If I could explain more globally, our presentation to

17   this Court is that we were -- complied with all the regulations

18   of the City of Aurora; that we were careful about exposing

19   Planned Parenthood to publicity because of the potential for

20   violence, harassment and intimidation.

21         But we at no time did not publicly disclose as

22   necessary what we were doing and the relationship between

23   Planned Parenthood and Gemini.

24         We are offering the tax documents for that purpose;

25   that where it was necessary, we complied with that obligation.

1    .    This is not just Gemini, this is Planned Parenthood

2    and Gemini and the 240 Oakhurst property, and as evidence of

3    our compliance with the obligations, and evidence that we are

4    not committing fraud or perpetrating a deceit on the people of

5    Aurora.

6          If I could go back, your Honor?

7          THE COURT:  Go ahead.

8          MR. WILSON:  Exhibit 4 is an important critical date

9    in the time line here.

10          In July of 2007, Planned Parenthood publicly

11    disclosed that it was operating a facility in Aurora; that it

12    was related to Gemini; and that this project is a 22,000-square

13    foot facility, was a Planned Parenthood facility.

14          That was in the public record as of July 27th, 2007.

15          In Exhibit 5 there was, in response to that --

16          THE COURT:  It's in what you call a public record,

17    but it's not within the record of the City of Aurora.

18          MR. WILSON:  Correct.  We will get to that in a

19    second.

20          THE COURT:  All right.

21          MR. WILSON:  But it was in the Chicago Tribune as of

22    July 27th, this entire relationship, it was on the front page

23    of the Tribune.  It was publicly discussed throughout the

24    community.

25          Whether the City of Aurora knew that or not we will

1    get to in a minute.

2         But it was certainly a public record, and general

3    public knowledge as of July 27th.

4         THE COURT:  And you have attached in one of your

5    exhibits the Chicago Tribune article of July 27th, 2007.

6         MR. WILSON:  Correct.

7         In here it describes the $7 and a half million at 240

8    North Oakhurst Drive.

9         Your Honor, I'd like to just point out that address,

10   240 North Oakhurst Drive, which is the address in the building

11   permit and the address in the architectural drawings too.  And

12   that will become significant in a minute, but remember 240

13   North Oakhurst Drive.

14        The $7 and a half million facility, it also discussed

15   where it was located, adjacent to a Dominick's.  It also

16   discussed that we were scheduled to open September 18th.

17        All that was in the public record as of July 27th,

18   2007.

19        If we could turn to Exhibit 5, not unexpected there

20   were protests related to that.  There was a vigil at the

21   facility August 9th.  This is an article from the Aurora Beacon

22   dated August 9th, 2007, describing a candlelight vigil that was

23   held at the facility.

24        Thirdly, I'd like to note this quote:  "We feel that

25   since the Planned Parenthood clinic probably will open, we are

1   going to pray just peacefully"; that that was the response at

2   that point: "We feel it's going to open." It was recognized

3   in the community; there were demonstrations.

4        If we could turn to Exhibit 6, in light of both the

5   Chicago Tribune article and the candlelight vigil on August

6   9th, the City of Aurora issued a certificate of occupancy and

7   compliance on August 16th, 2007.

8        I have blown this one up, your Honor, because you

9   should spend a minute with it.

10       This is the certificate of occupancy. It has two

11  simple conditions, your Honor, for permanent occupancy of the

12  facility:

13       "Complete the following: Install permanent exit

14  directional signnage and exit sign in conference room."

15       And two: "Install glass at service counters."

16       We have done both of those simple things. In fact,

17  this would have not only allowed us to open September 18th,

18  this would have allowed us to open August 16th.

19       It was simply because of scheduling and

20  administrative reasons that we waited until the 18th, and that

21  was our published date.

22       But this would have allowed us to open for business

23  on August 16th.

24       Now, if I could, we talked about the address.

25       Old address:  240 North Oakhurst Drive.

1        The new address:   3051 E. New York Street.

2        Planned Parenthood had already published all of its

3   materials as 240 North Oakhurst.  We printed our materials.

4        We were required to change this because of an

5   objection from a member of the City Council that they did not

6   want it to be on the same address as the address of their

7   street.  So it was changed to 3051 East New York Street.

8        There is not much better to show that with public

9   knowledge, they issued a certificate of occupancy, and we were

10  allowed to do business on this date.

11       Exhibit 8 is the beginning of the unraveling, your

12  Honor.

13       THE COURT:  What is the significance of the word

14  "temporary"?  And how is it defined in the Aurora Code?

15       MR. WILSON:  Section 10 of the Aurora Municipal Code

16  provides the issuance of occupancy permits, temporary and

17  permanent.

18       Within three days of requesting a permit, the City is

19  required to do a review and provide you an occupancy permit.

20  It's temporary in nature until they have conducted the full

21  review of your drawings -- your architectural drawings, your

22  engineer drawings -- and complying with any provisions they put

23  in there.

24       At that point it becomes permanent.

25       That process can take six to nine months.  But this

1  temporary occupancy permit allows you to open for business

2  immediately.  If it's a house, it allows you to live in the

3  house.  And if it's a building, it allows you to occupy the

4  building.  If it's a business, it allows you to conduct your

5  business.

6      On August 31st the City of Aurora had its Claude

7  Reins moment.  They were shocked, shocked to find out that this

8  clinic would be providing abortion services.

9      They issued a letter the day before Labor Day

10  weekend:  "We are modifying the conditions of the occupancy

11  issued August 16th, 2007, to include an additional condition

12  that you may not open for business until such time.

13      There is no citation.  There is nothing wrong with

14  our permit.  There is nothing wrong with the facility; that

15  people are welcome to go into the facility, they just can't

16  open for business.

17      That, we submit, your Honor, is when we were treated

18  differently than any other similarly situated health facility

19  in the City of Aurora.

20      According to this document, on August 31st they

21  recognized, specifically recognized that we intended to open

22  September 18th, last Tuesday:

23      "We understand that your projected opening date is

24  September 18th, 2007.  And it is our intention to conclude our

25  review in order to provide you with further direction prior

1   thereto."

2          They were treating us differently.  They were

3   treating us unfairly.  But they were treating in a way, we

4   thought, to allow us to open for business as intended.  That

5   turned out not to be the case.

6          They hired a lawyer, Richard Martens, the former head

7   of the municipal law section of the American Bar Association,

8   to review all of our documentation.

9          Mr. Martens began that review.  And in the first week

10  of September, he was fired by the City of Aurora because of

11  objection that he was somehow linked with this gentleman's law

12  firm.

13         He did not -- was not able to conclude his review.

14  He never issued a report.  He was stopped from doing any

15  further work.

16         They hired a second lawyer, Phillip Luetkehans, who

17  began a review of the proceedings again.

18         We then received a second letter.

19         THE COURT:  He had worked in the Kane County State's

20  Attorney's Office?

21         MR. WILSON:  I believe he had, your Honor.

22         It also, it turned out, attributed --

23         THE COURT:  Was his boss Mr. Barsanti?

24         MR. WILSON:  I don't know the relationship with

25  Mr. Barsanti.

1          THE COURT:  Or Miss Gorecki.

2          MR. WILSON:  I don't know that either, your Honor.

3          On September 11th we received this letter during

4    Mr. Luetkehans' review.  It refers to the letter we got on

5    August 31st telling us we could not open for business.

6          "At that time we indicated it was our intention to

7    have the review concluded by September 18th.  We wish to advise

8    that you it is not likely that the review process will be

9    completed prior to your projected opening date.

10          "The City of Aurora has no intention of allowing you

11   to open for business prior to the completion of that

12   independent review.

13          Again, your Honor, we submit we are being treated

14   entirely different than any other medical provider in the City

15   of Aurora because of the procedures that we perform:

16   reproductive contraception and abortion procedures.

17          Your Honor, if we could, the story continues just

18   briefly.

19          THE COURT:  Take all the time you need.

20          MR. WILSON:  On September -- on September 18th, we

21   planned to open.  We came into this Court on September 17th

22   seeking an emergency injunction so that we could open.

23          Because something that has been happening throughout

24   all of this human cry is that people in Aurora have been

25   calling our facility, asking to set up appointments.

1          We have a full range of appointments scheduled on

2  September 18th, and these aren't just for abortions, your

3  Honor.

4          These are people that want to get cancer screenings.

5  There are people who want gynecological exams.  There are

6  people who want immunizations.  There are people who want to be

7  sexually transmitted diseases.

8          They are simply want a facility in their area that's

9  clean, that's pretty, that's reasonably priced, and will not

10  turn them away at the door.  And that is what we wanted to

11  provide to them.

12          But on September 18th we had more briefing before

13  this Court.  And what happened was while we were briefing,

14  somebody from the City of Aurora decided to refer this for

15  criminal review to John Barsanti, the State's Attorney for Kane

16  County.

17          MR. MALINA:  Judge, I object.  That's not when it

18  happened.

19          Mr. Koresh -- and I don't think there is any

20  testimony as to when, but I didn't tell you -- but he doesn't

21  know.

22          THE COURT:  Can you stipulate as to when it was?

23          MR. MALINA:  Yes.  It was at the closed session to

24  discuss this pending at a City Council meeting on Tuesday.

25          THE COURT:  What date?

1          MR. MALINA:  Whatever date the was.  The 18th.

2          THE COURT:  The 18th.

3          MR. WILSON:  It the 18th.

4          THE COURT:  I mean, that is the date on the calendar.

5          MR. MALINA:  Right.  It was while we were here in

6     court on the 17th.  The decision was made -- that's part of the

7     reason why my motion for abstention came so late.  It was a

8     very recent development due to the allegation --

9          THE COURT:  But your communication with the State's

10    Attorney of Kane County occurred on the 18th of September.

11         MR. MALINA:  It probably occurred on the 19th.  The

12    decision to request private counsel was made on the 18th.

13         THE COURT:  What form did it take?  Did you write

14    something?

15         MR. MALINA:  I was uninvolved.

16         I believe that someone from the mayor's office

17    contacted the State's Attorney's Office and the process was

18    begun.  And then there were further communications about

19    whether he would be willing to take the assignment or the

20    request, and also how quickly he could get it done.

21         And that was concluded yesterday.

22         THE COURT:  All right.  You may proceed with your

23    argument, counsel.

24         MR. WILSON:  Very good.

25         I stand corrected it wasn't yesterday, it was the

1   18th.

2           The important fact is it was after we came before

3   this Court that somebody decided this ought to be reviewed by a

4   prosecutor.

5           As we presented to you on Monday, we think there may

6   be animus supporting this.  But I think the fact that this is

7   being reviewed for criminal proceedings shows how far certain

8   people of the City of Aurora are willing to push this.

9           THE COURT:  I think it may be hearsay and speculation

10  in terms of what the State's Attorney is or is not going to do

11  regarding this matter.

12          There is no document before the Court.  There is no

13  affidavit.  However, counsel does agree that somehow there is a

14  communication between Aurora, the City of Aurora, and the

15  State's Attorney as to what the State's Attorney is about to do

16  for guidance.

17          MR. MALINA:  Judge --

18          THE COURT:  Criminality is speculative.

19          MR. MALINA:  -- there is an affidavit from the

20  corporation counsel that we supplemented this morning that just

21  lays out that the State's Attorney -- what I told you -- the

22  State's Attorney agreed to take the referral and look at all

23  the facts in it, and to advise the City.

24          THE COURT:  Did you give that supplementary pleading

25  to someone?

32

```
 1          MR. MALINA:  Yes.

 2          MR. WILSON:  I don't have it yet, but we will review

 3    it at the break.

 4          MR. MALINA:  It was delivered with the motion for

 5    abstention.

 6          THE COURT:  All right.  Go on with your argument.

 7          MR. WILSON:  If I can step back now after the factual

 8    review.

 9          Simply, I wanted to highlight to this Court four

10    points with these exhibits:

11          First, that we submitted all the materials as a

12    medical out-patient facility, and that should be the only

13    relevant inquiry when we get into the case law.

14          Second, we did have discussions with the City of

15    Aurora in February about this issue specifically.  There was no

16    fraud on the City of Aurora.

17          Third --

18          THE COURT:  Let me just press the point here.

19          You are saying, using the plural "we."  It is Gemini

20    who proceeded --

21          MR. WILSON:  Correct.

22          THE COURT:  -- with all of these forms and

23    applications, right?

24          MR. WILSON:  That is correct, your Honor.

25          THE COURT:  And Planned Parenthood does not appear on
```

1  any of those documents.

2          MR. WILSON:  It does not, your Honor.  What I --

3          THE COURT:  I understand.  And it is agreed that

4  Gemini is an affiliate of Planned Parenthood.

5          MR. WILSON:  Correct.

6          THE COURT:  All right.  Proceed.

7          MR. WILSON:  In February there were discussions with

8  officials of Planned Parenthood with officials of the City of

9  Aurora.  That's all we're offering.

10          MR. MALINA:  Judge, it's the same.  He is using it

11  for exactly the purpose that you have disallowed.  And I don't

12  appreciate him keeping getting into it.  I object.

13          THE COURT:  You may proceed.

14          MR. WILSON:  The third point, your Honor, is that the

15  temporary occupancy permit, which allowed us to open for

16  business on that day, on August 16th, was issued with the

17  knowledge that Planned Parenthood was the tenant at 240 North

18  Oakhurst, now 3051 E. New York.

19          There is no question that that permit was issued, and

20  that the knowledge in the community at that time -- whether the

21  people of the City of Aurora want to come forward and deny it

22  -- but that the candlelight vigil, the Chicago Tribune article,

23  that the reason we had to change our address was that this was

24  generally known in the community when they issued the temporary

25  occupancy permit.

1          And the fourth point is, whatever quasi-judicial,

2    independent review, whatever you want to call it, this process

3    has broken down and turned into some sort of a Marx Brothers

4    movie of a review of our permit applications.

5          It may never get done.

6          When we were here on Monday, your Honor, they said:

7    "It could take four to seven days."

8          The only thing that's happened in four days is that

9    it's expanded and that they have gotten new attorneys, and they

10   have new reasons to look into this.

11         Absent intervention by this Court, there may never be

12   an operating health facility at 3051 East New York, and that is

13   why we are in front of you.

14         Now, if I could, I would like to step to why we are

15   here today.

16         We are here pursuant to 1983, 42 U.S.C. 1983, for an

17   injunction because we, Planned Parenthood and Gemini

18   Out-Patient Office Development, are being denied equal

19   protection under the laws because of the constitutionally

20   protected services we are providing.

21         Gonzales versus Carhart, Planned Parenthood versus

22   Casey, and Roe versus Wade present an unbroken line of cases

23   for 30 years that say the state cannot interfere with a woman's

24   right, before viability, to obtain abortion or reproductive

25   services.

1        The question is whether or not the City of Aurora is

2   putting a substantial obstacle in the way of women seeking

3   those services.

4        We -- they have done exactly that, your Honor.  They

5   are not only putting an obstacle, they have shuttered this

6   facility.

7        And the question is:  Once the burden shifts to them,

8   have they shown under strict scrutiny a narrowly tailored

9   response that gets to a compelling state interest.

10       We submit that they absolutely cannot.

11       They have not shown that they can demonstrate that

12  their procedures, their independent review, their special

13  treatment of the Aurora facility, is due to anything other than

14  questions about the services we are providing.

15       Now, when we were here on Monday, we discussed the

16  question of animus, whether this was a question of hostility to

17  abortion rights.

18       In our papers we demonstrated that's not the test.

19       The test is:  Does this have the purpose or effect.

20  The purpose would be animus, the effect is what's happening.

21       The effect is that there is a substantial obstacle in

22  the path of women seeking abortions in Aurora.

23       They have closed this facility.

24       Now, they have not met any basis for not letting us

25  open for business, other than this independent review, which is

36

1   unending, indefinite, indeterminate, and undefined in nature.

2        Now, to step back for a second, though, if we are

3   required to show animus, we believe Exhibit 16 shows just that.

4        These are e-mails from an alderman of the City

5   Council saying he is angry about Planned Parenthood.  He thinks

6   Planned Parenthood is deceitful.  He thinks Planned Parenthood

7   is an unlawful organization.

8        And if he is ordered by the Court, he will go through

9   with it.  But, otherwise, he objects to Planned Parenthood and

10  does not want them in that facility.

11       These are evidence of animus, your Honor.  Evidence

12  by elected officials speaking against, and claiming they are

13  angry about Planned Parenthood.

14       Nothing could be further evidence of animus than the

15  e-mails described in Exhibit 16.

16       The question, per the injunction we're seeking, is

17  that the certificate of occupancy, which was issued on August

18  16th, and has these two conditions have been met.

19       We ask that we be treated like any other medical

20  facility:  an eyecare clinic, a footcare clinic, dermatology

21  center.

22       Any other medical provider in the City of Aurora can

23  be allowed to open for business.  We ask that whatever

24  independent review they do, that it comply with one simple

25  point, which is:  that it treats us the same as any other

1    medical provider.

2         There is no evidence they are doing that, your Honor.

3    In fact, in the affidavit of Elaine Weingartz, she admits that

4    this entire proceeding is going conducted in the, quote,

5    "politically charged abortion context."

6         It's a reference specifically, specifically to the

7    fact that because abortion services are at issue, that they are

8    making special determinations regarding us.

9         That is simply unfair.

10        Irreparable harm, your Honor, is occurring every day.

11   Women are not getting treatment for sexually transmitted

12   diseases, women are not receiving exams, women are not

13   receiving breast cancer screening.

14        If there is a woman out there who goes from Stage 1

15   to Stage 2 while they are conducting their independent review,

16   that is irreparable harm.

17        If there is a child who can't get an immunization and

18   can't go to school because of that, that is irreparable harm.

19        If there is someone who is not able to get birth

20   control and has an unwanted pregnancy as a result, that is

21   irreparable harm.

22        And that is happening every single day that they go

23   on with this independent review.

24        Now -- and I hope your Honor recognizes when I say

25   "independent review," there are huge quotation marks around

1  that, that phrase.

2       Your Honor, our final exhibit, we attached Exhibit

3  18, which was an email that Steve Trombley, president of

4  Planned Parenthood received, and I'm quoting.

5       This if from a Kelli Haley, 2828 Village Green Drive,

6  in Aurora, Illinois.  She shared with Mr. Trombley something

7  she sent to the Aurora City Council:

8       "I just moved to this area in February of 2006" --

9       MR. MALINA:  Object on the basis of hearsay.

10      THE COURT:  Overruled.

11      You may proceed.

12      MR. WILSON:  "I just moved to this area in February

13 2006.  The time came around for my annual exam.  I tried to get

14 appointments at several of the local clinics, hospitals, etc.,

15 all of which had at least a three-month waiting list for new

16 patients.

17      "As a result, I had to drive to Bolingbrook just to

18 be seen.

19      "My insurance does not cover a yearly exam, so I had

20 to pay $300 for my screening.

21      "15 minutes of the doctor's time cost me three days

22 of work.

23      "Last Friday I called the Aurora Planned Parenthood

24 and they informed me that not only could I get in this Thursday

25 -- my exam has been cancelled as a result of delayed opening,

1  but I fully intend on calling back tomorrow to reschedule --

2  but that the exam would also cost $150:  half the price, none

3  of the wait.

4       "There are many women in this area who need this

5  clinic open, so that they too can seek women's health.  Women

6  need a convenient, trusted place to go to receive comprehensive

7  quality services.  Planned Parenthood is more than an abortion

8  clinic.

9       "I think it would be interesting to see how many

10  unplanned pregnancies which could result in abortions are

11  prevented by the people of Planned Parenthood every day.

12       "And to be honest with you, I had no idea that

13  Planned Parenthood even administered abortions until I saw the

14  protesters.

15       "So, again, please open your Aurora location.  You

16  will see that this decision will result in far more good than

17  bad."

18       Your Honor, we want to open tomorrow.  We want an

19  injunction that tells the City of Aurora they can't play games

20  anymore.  They can't hide behind independent reviews.  They

21  can't continue to deny medical services to the people of

22  Aurora.

23       90 percent of the services we provide have nothing to

24  do with abortion.  In fact, they have to with preventing

25  abortions.

1            We want to provide services to all the people of

2    Aurora.   We are being blocked because of our constitutionally

3    protected rights.

4            We are petitioning your Honor for an order pursuant

5    to Section 1983 allowing us to open for business, and allowing

6    us to provide constitutionally protected services to the people

7    of Aurora.

8            Thank you.

9            THE COURT:  All right.  Are you ready to proceed, or

10   do you need a couple of minutes to absorb all this, counsel?

11           MR. MALINA:  I'd like a couple of minutes.

12           THE COURT:  All right.

13           MR. MALINA:  Just five, if I could.

14           THE COURT:  Make it ten.

15           Thank you.

16       (Recess.)

17           THE COURT:  You may proceed, counsel.

18           MR. MALINA:  Yes, Judge.

19           Judge, opposing counsel, and members of the public

20   present:

21           My name is Lance Malina.  I'm the attorney for the

22   City of Aurora in this matter.  I represent the City in this

23   case.

24           Judge, the City of Aurora is a home rule municipality

25   in the State of Illinois that has been around for a long time

1  and has significant issues all across the board that deal with

2  crime, redevelopment, housing, and things such as that.

3      The police force is integral and very important to

4  the City, and any burden upon it is also of great concern, and

5  land use relates to that as well.

6      Judge, opposing counsel has suggested that this case

7  is about abortion.  It's about the City of Aurora, its elected

8  officials, not letting the clinic open as they desire to on

9  September 18th solely because of the City's animus towards

10 abortion rights at articulated by the United States Supreme

11 Court in Roe versus Wade.

12      The record -- and what they do, Judge, is they say

13 that based on its action of not letting the clinic open, that

14 that's the only inference you can draw because it is otherwise

15 unexplainable.

16      Judge, this case isn't about abortion in that sense.

17 But it is in this sense:  Counsel uses against the City a

18 statement that this investigation, the issues that are here

19 before you, occur within the politically charged atmosphere of

20 abortion.

21      Well, Judge, that's true and that does affect some of

22 the City's decisions as far as wanting to get advice from as

23 independent a source as possible, because of that atmosphere.

24      But it does in no way suggest that the actual

25 decision to investigate -- before completing an investigation

1  and to decide the issue, the allegation of the zoning use, was

2  that abortion animus was the motivating factor that leads to

3  those.

4         And you I'd like to talk just a little bit about

5  that.

6         The City has taken some unusual steps, Judge.  But I

7  mean, that's obvious.  The City is not a police chief coming

8  and finding that there has been a DUI arrest and finding out

9  that the inmate is O.J. Simpson, or some other great celebrity.

10         To argue that the chief stepping back and saying:  "I

11  want to look at those reports, I want to make sure everything

12  is done right," is somehow showing animus to one side or the

13  other in the case, or is singling out that individual for

14  discriminatory action, just doesn't follow.

15         When politically charged issues reach a unit of local

16  government -- or any governmental entity -- but particularly

17  units of local governments that are right out there where the

18  rubber meets the road, they do step back, because they want to

19  make sure they are doing things right.

20         They want to make sure that they are reaching the

21  right decision.

22         There is no inference that the fact that the City

23  wanted to get an independent investigation means that the City

24  is going to deny them ultimate occupancy because they provide

25  abortion services.  It just doesn't follow.

1          It does follow that the City thinks of this as a very

2    publicized and important matter, and it wants to make sure that

3    it has all the relevant information.  And, although, I

4    guarantee you no one -- or not everyone is going to say that

5    the City did it correctly, or that was the end result, at least

6    it will satisfy some people.

7          And that's important because the City of Aurora's

8    image is important, its goal and its duties to its citizens as

9    a unit of local government in following constitutional

10   principles is important.

11         And so for it to want to step back, or to take

12   certain steps to make sure the investigation is done, perhaps a

13   little differently than if it was just some developer where the

14   allegation was had committed fraud in the permitting process,

15   doesn't mean that the decision to investigate and to hold

16   someone up to investigate these serious allegations is a result

17   of it being abortion.

18         It doesn't follow.

19         Judge, the references in the papers also talk about

20   you can only infer that we, the City, have acted to hold up

21   their opening, and will do so permanently, they keep arguing,

22   because it followed these meetings where many, many protesters

23   spoke.

24         And, again, that doesn't follow.

25         In those protests allegations were made about serious

1  fraud in the permitting process, and, as I'll discuss later,

2  with some backup to substantiate serious concerns on the part,

3  I think, of any reasonable elected official.

4          Not that the end result would be immediately clear,

5  but serious and grave concerns about what occurred.

6          Well, the fact that those were made by people who

7  don't want this facility to open doesn't mean that the City is

8  responding to that concern solely.

9          If the allegations are significant -- and they are, I

10 submit to you, and our pleadings and submissions show that they

11 are significant -- that the inference is that they are looking

12 into those allegations.  And I'll talk little bit about that as

13 well.

14         But also, the fact that there were so many people

15 there, they seem to want you to draw some inference that "well,

16 of course, there is something illicit about us being concerned

17 and wanting to treat it seriously."

18         Well, Judge, we are in a democratic republic.  If

19 hundreds of people voice a concern, it is natural for a City

20 government not to say:  "Oh, we want to do whatever you want,

21 no matter what the legal ramifications of it are."  Or:  "We'll

22 do anything to do what you want."

23         But the fact that you have so many people voicing a

24 concern means you are expected to look at it a little more

25 seriously.  It's natural, and it's licit and it's what we

1  expect in our frame of government.

2         And, Judge, just a little bit of background.

3         If you are a local elected official and you are

4  dealing with a case about abortion rights.  Planned Parenthood

5  wants you to believe that, well, it's just -- it's all real

6  clear; of course, the actual Planned Parenthood's right to be

7  where it is, and as it relates to anything.

8         Judge, the abortion right is not exactly crystal

9  clear to the average person on the street.  The average person

10  on the street is not used to candidates for the U.S. Supreme

11  Court being asked if a right is present in the Constitution.

12         They don't usually get those questions about whether

13  there is a right to free speech under the Constitution.

14         You need to read some law, and need to get into it in

15  order to understand exactly what it is.  And, also, there is a

16  constant political presence, and a back and forth, and so your

17  average elected official is going to step back and look at:

18         Okay.  Here are these allegations of fraud, and, by

19  the way, what are our obligations under the current U.S.

20  Supreme Court's rulings as it relates to abortion and various

21  procedural issues.

22         What is it that it's licit for a municipality to do

23  or not do as part of our decision-making process?

24         So that fact, I think, is just something that's in

25  the mix.  The fact that the City would act more concerned, or

1    take certain procedural steps, or want to create certain

2    appearances that are legitimate, but, nevertheless a

3    transparency, are understandable, and have nothing to do with

4    not wanting to not follow the Constitution, but have everything

5    to do with wanting to do what is right and proper for a unit of

6    local government in the State of Illinois.

7              THE COURT:  Does that raise the issue of immunity on

8    the part of the defendant?

9              MR. MALINA:  Good-faith immunity?

10             THE COURT:  Under 1983 immunity.  But on that point,

11   no individual is named in the lawsuit.

12             MR. MALINA:  Right.

13             THE COURT:  It is only the corporate entity.

14             MR. MALINA:  That is correct.

15             THE COURT:  Proceed with your argument.

16             MR. MALINA:  But it relates to the injunction issue.

17   I understand.

18             And the other thing that is interesting is that

19   Planned Parenthood has argued that the fact that it was Planned

20   Parenthood was out there was obvious, like it's no big deal.

21             If it was no big deal, then why did they so carefully

22   hide it?  They carefully kept it below the radar screen.

23             And, Judge, that's a strategic move.  And maybe there

24   was nothing wrong with it at one point, and maybe there is

25   nothing wrong with it when the City ultimately looks into it.

1          But once you make your strategic moves you have to

2     live with them, Judge.  And I'll get into that in a minute.

3          But the point I want to make now is, the context of

4     this being raised as either it's no big deal for Planned

5     Parenthood to be the applicant, or it is, because they hid it

6     and said publicly that they kept it under the radar screen.

7          They want it both ways, and then to complain that the

8     City's reaction shows the animus against abortion rights, it

9     just doesn't add up.

10         Judge, I also want to front right now with you this

11    e-mail.  Because one of the things that I'm concerned about is

12    -- and one of the things the City is concerned about -- is

13    misrepresentations and mischaracterizations that Planned

14    Parenthood made.  And those -- the significance of those:  may

15    have made, made and what the significance of those is.

16         Counsel quoted to you -- or, purported to quote -- an

17    e-mail from a sitting alderman.  And his characterization,

18    which to me sounded like a quote, was that he would not let

19    this facility open unless ordered to by a Court.

20         It's not what the e-mail says, Judge, and I'd like to

21    just back up a little bit about that as well.

22         The fact that the elected officials who have not made

23    a decision in this matter -- by the way, which is my ripeness

24    argument in the equal protection context -- they have not made

25    a decision.

1          The appearance of the argument appears to be that

2    they have already decided, and this e-mail supports the issue.

3          THE COURT:  Let me ask this question.  Has this gone

4    before the City Council?

5          MR. MALINA:  No.  I mean only --

6          THE COURT:  Who makes up the City Council?

7          MR. MALINA:  The aldermen and the mayor.

8          THE COURT:  So at this point it's before committee.

9          MR. MALINA:  At this point, Judge, procedurally where

10   we are is that -- and I was going to get into this in a little

11   more detail later --

12         THE COURT:  All right.

13         MR. MALINA:  -- but to answer your question,

14   procedurally where we are in the process is that Planned

15   Parenthood, or Gemini, needed final plat approval as part of a

16   planned district development within the City of Aurora.

17         This wasn't an area that was zoned, let's say,

18   commercial, and then you come in for your building permit.

19         This goes back to 1973, it was an annexation

20   agreement and this was part of a planned district development.

21         Now, the area that this property lies within was

22   designated on the plan -- the preliminary plan -- as what's

23   called a business district.  But in order to get final approval

24   for their facility, they needed to come before a committee of

25   the City Council.