1          Now, that committee made a recommendation of

2   approval, and they actually did approve, and they had the right

3   to approve it.

4          On the other hand, there was as part of that

5   ordinance a right by members of the City Council to call for a

6   review by the full City Council.

7          Now, that was never done.

8          And one -- the issue, procedurally, now is once the

9   allegations of fraud were raised -- and I'm going to talk about

10  the timing of those newspaper articles were raised -- the mayor

11  and the City Council under their authority to investigate in

12  their ordinances decided that they wanted to call up this

13  matter for review by the City Council.

14         And their decision was -- and this is what Mr. Wilson

15  is complaining about as his injury -- the decision was that

16  they had a temporary occupancy permit, but they would not be

17  allowed to open pending a result of the investigation of the

18  fraud allegations and advice from independent counsel as to the

19  facts, the findings, and their relevance under Aurora law, and

20  then they would make a decision on whether to allow a late

21  appeal of that development -- they could take that procedural

22  posture, I suppose, based on the fraud, just like a

23  misstatement in a court proceeding can be used to reopen

24  something where ordinarily you wouldn't be able to -- or some

25  other procedural decision regarding what they find and what

C01493

1    their options are based on the advice they get and what they

2    decide to do.

3              THE COURT:  And that hearing was open to the public?

4              MR. MALINA:  Yes.  The decision was made as part of a

5    public meeting that was held.  The initial decision was made as

6    part of a public meeting held on August 28th of 2007, this past

7    August 28th.

8              And then -- counsel is correct -- there has been some

9    shifting around because of allegations of connections to the

10   City, which the City would like to avoid.  It would like to get

11   an analysis without that.

12             And so there was an individual appointed.  I was

13   asked for names of people that, you know, could do a review.  I

14   gave a list of four or five originally.

15             Originally the City chose Dick Martens, and there

16   were some objections from I think a couple alderman, because

17   they had been informed that Dick Martens was a law clerk for us

18   40 years ago.  Never worked as an associate, but was employed

19   as a law clerk 40 years ago, and rents an office in our suite.

20   And those allegations are true.

21             And the mayor made the initial appointment on his

22   own.  But what we said, when the decision was reached on August

23   28th is:  "I have made this decision, and I have circulated the

24   biography of Mr. Martens to the City Council members, and I

25   believe he is qualified to do the investigation.  But if the

1  Council members object, it's not anything set in stone.  If the

2  Council members would prefer someone else, we could that.  I

3  only ask that it be someone with no ties to the City:  who

4  hasn't done work for the City, who hasn't made money off the

5  City."

6          Because his view -- and this was concurred in by the

7  Council members -- is that that would be a better way to get

8  the determination of the significance of these issues, and then

9  to act on them in a way that, the City hopes, ultimately

10 satisfies more people than would otherwise be the case; they

11 took careful steps to make sure of what the ramifications are

12 of how Planned Parenthood went through this permitting process.

13          THE COURT:  So rather than conduct an extensive

14 internal investigation, you decided to go outside to find an

15 independent person who would report to the mayor and the

16 Council.

17          MR. MALINA:  Correct.  Looking at the records of the

18 City, some of the minutes of a meeting that I'm going to talk

19 about in a little bit.

20          The existing law, both zoning laws of the City of

21 Aurora on the PDD ordinances that are involved, which

22 ultimately are involved, and also the existing laws of the

23 United States as determined by the Supreme Court as it relates

24 to abortion rights, and how those are going to affect what the

25 City's options are, depending on what it finds actually

1    occurred and what its significance is.

2              So have I answered your question?

3              THE COURT:  Yes.

4              MR. MALINA:  All right.  Back to my e-mail.

5              Counsel said that an alderman in this e-mail has said

6    that he wouldn't allow this facility to open unless ordered to

7    by a Court.

8              I suggest, Judge, that isn't what he says here at

9    all.  And what he says --

10             THE COURT:  Read it, please.

11             MR. MALINA:  I will.

12             "I am pro-life."  This is an excerpt.  "I will also

13   abide by the law of the land, as I am sworn to do" -- not as

14   ordered to by a Court -- "as I am sworn to do as an elected

15   official."  Those were my words.  "I will not go along with it,

16   though, until the law says I must."  Not a Court, the law.

17             "I will also never think positively about a medical

18   practice that will perform abortions on minors without parental

19   consent, regardless of their extremist ideas of why they should

20   be allowed to."

21             So what we are expressing is -- and this is that --

22             THE COURT:  Have you completed what he wrote?

23             MR. MALINA:  I have.

24             THE COURT:  You have?

25             MR. MALINA:  I'm sorry?

1          THE COURT:  Have you completed what he said?

2          MR. MALINA:  No.  I could read the whole e-mail.

3          THE COURT:  The point is to get a better

4    understanding of it, you should read the whole thing.

5          MR. MALINA:  Okay.  Well, what it is, Judge, it is a

6    personal e-mail responding to an individual, and he's writing

7    to someone named Melissa.

8          "Since you decided to make your email widely public,

9    I did too.  I gave you a perspective on the issue that I felt

10   you should know.  I think Planned Parenthood and its leaders

11   are widely deceptive to the governments of communities all

12   around the United States.

13         "I do not like the fact that they took the ability to

14   plan out of our hands with their deception.  I can't imagine

15   that even a pro-Planned Parenthood person could see that the

16   long-term effects of their location are not good for my

17   neighborhood.

18         "You touched on my morality.  I have never been a

19   pro-life activist, but I am pro-life.  I do believe life begins

20   at conception.  Why else would people put ultrasounds on their

21   refrigerator?

22         "Even though I am elected, I come to the office with

23   life experiences that lead me one way or another.

24         "I am pro-life.  I will also abide by the law of the

25   land as I am sworn to do" and then completed as I had already

C01497

1    quoted.

2           THE COURT:  Yes.

3           MR. MALINA:  Judge, my position is, this statement is

4    nothing other than what judges do every day.  They make

5    decisions.  Their personal views on whether a law was wisely

6    passed or was a good idea or good for the public, they have

7    personal views.

8           They are people, like anyone else.  But they apply

9    the law, and they do it in a manner that may go against their

10   personal views, but they follow the law.

11          It's akin to what a prosecutor does when he sees a

12   case before him with evidence, feels that the crime was

13   committed and that the individual he is looking at committed

14   the crime, but there is not sufficient evidence to bring a

15   prosecution.

16          He declines the prosecution, subjectively believing

17   that the person is guilty of the crime and that a crime will go

18   unpunished.

19          But his job is to apply and make charges only where

20   they are appropriate and where they will be supported by a

21   good-faith basis to get a conviction.

22          This is what people do every day.  And this is what

23   elected officials do.  This elected official is simply saying:

24   "I don't like this here, but I'm going to follow the law."

25          That's all.  And he is entitled to do that.

1          And no inference that he is going to -- see, part of

2    the problem here, Judge, is he hasn't voted against it yet.

3    They are drawing that conclusion.  No decision has been made.

4          They are being delayed pending the investigation, and

5    that investigation has to do with fraud, and it's clear -- I'll

6    get to more support for that in a minute.

7          Judge, I was going to go in next to the process here,

8    and I have already articulated it.  The -- Dick Martens was

9    originally selected there was a complaint by a couple of

10   aldermen feeling there could be bias or a perception of bias.

11   And then Phillip Luetkehans as selected by -- what happened is

12   that the two aldermen at large, who also happened to be

13   attorneys -- one a long-standing member, and the other who ran

14   against the current mayor in the last mayoral campaign -- were

15   chosen to go find somebody.

16         And Phillip Luetkehans was selected, and then there

17   was information that Richard Irvin, the alderman who had run

18   against Mayor Weisner in the last election and lost that

19   election, had received a campaign contribution from Phillip

20   Luktahans.

21         So then the City Council had to deal with issue,

22   okay, once it was discovered, and they chose to ask John

23   Barsanti to look at -- and what's going to happen is Barsanti

24   is going to get both reports, the Martens' report and the

25   Luetkehans' report, which should be done within -- by the end

1  of the week.

2      Martens is already completed, and I believe is at

3  Barsanti's office, and he is going to give direction to the

4  City Council on what he believes the relevance of the various

5  facts are, and their significance to the zoning laws of the

6  City of Aurora and the State of Illinois.

7      That's where we are.  And he has indicated that he

8  will complete that process and give his recommendation within

9  seven days, and the City Council will conduct a special

10  meeting, or, if a regular meeting is imminent, can make a

11  decision on this one way or the other.

12      So that's what we have here.

13      THE COURT:  Is it your understanding, as a matter of

14  generally practice, that the State's Attorneys are advisors to

15  county boards?

16      MR. MALINA:  I do.

17      THE COURT:  But it is not certainly your position

18  that a State's Attorney is an advisor to local communities, is

19  that right?

20      MR. MALINA:  I don't know of any provision under

21  state law that gives him that duty.  I told you exactly what

22  the situation is:  He has been asked and has agreed.

23      That's the situation.

24      THE COURT:  You may proceed with your argument.

25      MR. MALINA:  And this decision, Judge, I want to talk

1   about a little bit.

2          Well, I already talked about the planned district

3   development.  It's an involved process, and this is a process,

4   again, where you didn't just file for a building permit.  You

5   had to appear before a City Committee and answer questions

6   about what you are proposing.  And counsel has alluded to that.

7          And, Judge, the key here is the allegations were

8   raised of fraud.  And it's one thing to go under an assumed or

9   to use another corporate entity that's related.

10         That's something that's reasonably common, although

11  in the papers that they filed there is this constant reference

12  to "tenant unknown" which ties into what I'm about to quote to

13  you.

14         Indeed, this is part of the record, in the minutes

15  meeting from November of 2006, Alderman Elmoore.

16         THE COURT:  November 16th, 2006?

17         MR. MALINA:  Yes.

18         Alderman Elmoore, who is one of those sitting

19  aldermen and on this Committee along with Alderman Saville, he

20  asked the question:  "Is this building being built for,

21  specifically for a client?

22         "Unidentified Gentleman:  We are in negotiations with

23  a tenant.  We do not currently have a lease, but we still want

24  to move ahead."

25         Now, Judge, here is the situation:

1          If you file your paperwork and you are using an

2    assumed corporate, or using an affiliate, a corporate affiliate

3    -- and there is no ban on that; in other words, there is

4    nothing in the permitting process that would require you to

5    list all other corporate affiliations" -- okay.  You are just

6    kind of lying low.

7          But once you are at a hearing -- and this is a

8    hearing, this isn't just stuff before the Building Committee --

9    they had to be at a public meeting and answer questions.

10         This is a concern to the City because the City

11   expects honest answers to questions given to people who want to

12   develop in their City.  It's critical.  Is it material?  That's

13   one of the things that the City is investigating.

14         But regardless of that Judge, it is critical, and

15   this is not a thing that regardless of whether the developer

16   performs abortions or whether he is building a Jewel that the

17   City wants to see in answer to its questions.

18         If the answer to the question, Judge, was:  "We can't

19   disclose it at this time," that would have been an honest

20   answer.

21         Maybe somebody then would have thought, hum, maybe we

22   should check out the public records and see what they say about

23   the affiliations.

24         And then what would have happened, Judge?  Well,

25   then, the cat would have been out of the bag, as they say.

1          Planned Parenthood would have been out there, which

2    apparently they have no problem with, they say it's no big

3    deal.

4          And then what would have happened?  Well, the City

5    months and months and months ago would have been on notice and

6    could have looked into the very issues that it's concerned

7    about now:  location, size of the facility, and they would have

8    done an internal review.

9          And it would have come out however it came out.  And

10   maybe their plans would have been delayed for three or four

11   weeks, and they would have had no cause to come in here.

12          The City routinely looks into things.  It takes a

13   while to turn around documents, and internally takes longer to

14   reach a decision of something raised:  What are our

15   obligations?  Do we have a say in this?

16          Things like that could have been discussed.  But the

17   City was deprived of the opportunity of that, and it only came

18   up at the 11th hour.

19          And so the delay that Planned Parenthood is talking

20   about is its own fault for playing this -- for playing this

21   game.

22          THE COURT:  May I take you back to the meeting?

23          It's the Planning and Development Committee minutes

24   of November 16.

25          So that comment -- or that question and that answer

1  is contained within the minutes, and this appears to have been

2  transcribed by a court reporter.  So these are the official

3  records of Aurora, and that these statements were, indeed, made

4  on November 16th, 2006.

5       MR. MALINA:  That's correct.  The affidavit of

6  corporation counsel does certify that.

7       THE COURT:  The -- but looking at the transcription,

8  the question is:  "Alderman Elmoore:  Is this building being

9  built specifically for a client?"  That's the question.

10      Then the transcript is:  "Unidentified Gentleman:"

11  Unidentified Gentleman says:  "We're in negotiations with a

12  tenant.  We do not currently have a lease, but we still want to

13  move ahead."

14      Who is the Unidentified Gentleman?

15      MR. MALINA:  Judge, the reason for that is because

16  the transcription came later.  This was a taped meeting, and

17  then a court reporter transcribed from the tape.  And it was

18  unclear who the gentleman was.

19      THE COURT:  These tapes are in the news nowadays.

20      MR. MALINA:  The Open-Meetings Act type tapes or --

21      THE COURT:  Tapes are in the news nowadays.

22      MR. MALINA:  Oh, yes.

23      Proceed.

24      MR. MALINA:  That's true.

25      And there is one other section here later where

1  Alderman Elmoore says -- and, again, they are talking about

2  various things, about access to the site -- Alderman Elmoore

3  says: "It's a nice buffer between them and the retail center"

4  -- meaning the residential -- "and these usually are pretty

5  quiet because they usually function in the daytime and that

6  makes it nice.  I'd be interested to know who your client is

7  when you can release that."

8          It is clear that the City would have liked an answer

9  to its question.

10          THE COURT:  In terms of who that person was or was

11  not, according to the minutes, it says "Others Present:  Tom

12  Lehman, Gemini Office Development."

13          MR. MALINA:  Right.

14          THE COURT:  Is the inference that he is the

15  unidentified gentleman?

16          MR. MALINA:  Yes.

17          THE COURT:  At least that's your position?

18          MR. MALINA:  Yes.

19          THE COURT:  All right.  Go on with your argument.

20          MR. MALINA:  Let me just get my bearings here.

21          THE COURT:  Okay.  So the question was put and there

22  was an answer.

23          MR. MALINA:  Yes.

24          And, Judge, the point here is that these statements

25  -- this was what was presented as part of the allegations of

1  fraud.  And now I want to go back to these newspaper articles,

2  Judge, because they don't suggest what counsel suggests they

3  do.

4          If you go to the July 27th Tribune article, Judge --

5          THE COURT:  Just a minute.  Now, what exhibit number

6  was that, counsel?

7          MR. MALINA:  4.

8          THE COURT:  Number 4.

9          You may proceed.

10         MR. MALINA:  It is clear from the article that

11 Planned Parenthood is now going to be part of this site, and

12 that it is clear that they decided to the lay low because they,

13 quote Steve Trombley's statement that "He was surprised they

14 were able keep it a secret for so long."  Okay.

15         So we know that.  And then, counsel says, and the

16 City took no action at that time.  Okay.

17         Now we go to August 9th.  You have anti-abortion

18 demonstrators are on the site today.  And this report is about

19 that.  There are quotations from a pastor at a church saying:

20 "We are pro-life, and we want to let them know we are upset

21 with this."

22         And -- and this is important, I think -- "that they

23 expected that the facility would open."  In other words, that

24 it would open because -- just because the facility provides

25 abortions would not stop it from going in.

1       And then Mr. Wilson argued, "and the City took no

2 further action."

3       His inference he wants you to draw is, we knew about

4 it, and only did it after the protests.  Okay.  That's what he

5 wants you to draw.

6       It's exactly the opposite, because you have to

7 remember, what was new that was disclosed when the protests

8 came forward:  It was the allegations of fraud.

9       These articles do not indicate any of the minute

10 statements by people by Planned Parenthood or its

11 representatives.  Somebody did some digging after that and came

12 up with, using the permitting process, concerns about that.

13       The City officials heard those concerns.  They are

14 concerned about their zoning code.  They care about their land

15 use.

16       These are serious allegations and there was some

17 backup to them.  And it was then and only then that they

18 decided to investigate and put Gemini-Planned Parenthood on

19 hold.

20       So the very issuance of that temporary occupancy

21 permit disproves Mr. Wilson's case and his argument:  They

22 issued it knowing an abortion -- knowing abortions were going

23 to be performed there.

24       When did it change?  What was the new information?

25       The substantiated allegations of misstatements and

1    fraud in the permitting process.

2            Judge, this record is crystal clear:  the City of

3    Aurora's officials are doing nothing against the Constitution

4    of the United States of America.  The City of Aurora is abiding

5    by the protesters' First Amendment rights to be out there in

6    protest.

7            The City of Aurora is abiding by the law of the land

8    in Roe versus Wade.

9            This case is about the land use process, and how --

10   an allegation that it was misused by a developer.

11           If any other developer did this, they would be

12   investigated and they would be held up.  And there is nothing

13   that suggests that some developer who did this was not

14   subjected to any investigation or slowed closure.

15           Now, I will admit, Judge, that if any developer who

16   was putting in a retail and had, perhaps, lied as part of the

17   permitting process and someone complained about that, probably

18   wouldn't have been assigned out to an independent

19   investigation.

20           Maybe it could have been done a little quicker, maybe

21   without, you know, the problems that we've had, but that's not

22   animus to abortion.

23           It is raised because of the political volatility of

24   the whole issue, and it has nothing whatever to do with animus

25   against the United States Supreme Court's decisions.

1            And I respectfully ask you to deny this motion.   I

2    don't believe it's well-taken.   I don't believe the issue is

3    ripe.   And I don't believe there is any likelihood of success

4    on the merits, as it relates to this decision to conduct the

5    investigation and to hold them up pending the outcome.

6            And I thank you for your time.   If you have any

7    questions, I --

8            THE COURT:   I think I have been asking them along the

9    way, along with observations.

10           MR. MALINA:   Thank you.

11           THE COURT:   Counsel.

12           MR. WILSON:   Your Honor, Chris Wilson for Planned

13   Parenthood.

14           If I could just respond?

15           THE COURT:   It doesn't have to be quick.   Take all

16   the time you need.

17           MR. WILSON:   Thanks.

18           All of these allegations from counsel for the City of

19   Aurora seem to revolve around this question of fraud.

20           We spent a lot of time this morning trying to

21   explain, we were quiet but we weren't fraudulent.

22           But if there was fraud involved, or if there was

23   deceit, or somehow something wrong, let's find out about it.

24   Let's get citations, let's get some allegations.

25           But, in the meantime, let us open for business.

1  There is no allegation that the people of Aurora will be harmed

2  by us opening and providing medical services.  It just makes no

3  sense.

4          What happened here was the political process demanded

5  that we get shut down, and they found a reason to shut us down.

6  That's all.

7          What was absolutely clear was that a medical health

8  facility was being opened in the City of Aurora.

9          Now, the fact that they provide abortion services as

10  part of the -- less than 10 percent of their services are

11  abortion services, and as part of all of their services that

12  they provide that that's is a component part, is really

13  irrelevant to the analysis.

14          Manchester, the case we presented, Planned Parenthood

15  versus Manchester, in which the Court observed they could not

16  deny variance -- a variance -- based on the fact that abortion

17  services were being provided, is absolutely on point here.

18          And they looked at the specific example.

19          In that case, 24 Pennicoat Street, LLC, was the

20  developer, just like Gemini is the developer.

21          Only later was it disclosed that Planned Parenthood

22  was going to be the tenant of the building.  And just like here

23  there was hew and cry:  How we were misled.  How did this come

24  about?

25          And just like here, the Court held that is

1  irrelevant.

2          If it was an eyecare clinic, if it was a dermatology

3  clinic, if it was a footcare clinic, we would not be here.

4  It's the fact that we are providing abortion services that we

5  are getting all of this microscope treatment.

6          And, I think, running through what I heard counsel

7  say, things like:  Well, the law isn't clear.  We would have

8  determined what our obligations were.  We would have sought --

9  found out whether there was anything we could do about this.

10          That shows you what the thinking is:  If we had known

11  you were an abortion clinic in November of 2006, we might have

12  been clever enough to find a way to discriminate against you,

13  but you denied us that opportunity.

14          And that's exactly what the Court said in Manchester,

15  which is, this is a red herring of an issue.  It's irrelevant.

16          The fact that it's abortion services does not justify

17  all of this special treatment.  That's all we're getting, your

18  Honor:  special treatment, discriminatory treatment, treatment

19  that interferes with our constitutionally protected rights.

20          They knew about those rights when they allowed us to

21  open.  They allowed us to open on August 16th.  They knew we

22  were providing services that included abortion services, and

23  that is the absolutely crystal clear point here:  The law can't

24  allow them to place obstacles in the path of people seeking

25  abortion, reproductive and contraceptive services.

1              And that is what they are doing.

2              There now -- there may be allegations of fraud.  But,

3    your Honor, if you allow a few protesters to bring up

4    allegations of any nature, and then members of the City Council

5    to demand an independent investigation, there will never be an

6    abortion clinic open in the United States of America because

7    there will always be allegations around them.

8              That is why Gemini was used and not Planned

9    Parenthood, because of objections and intimidation and

10   harassment in legal proceedings.

11             It should be irrelevant.  It should be treated like

12   any other medical provider, and that's how it was treated.

13             If you look at the minutes of the November 16, 2006,

14   City Council, they complimented what the facility looked like.

15   They thought it was a nice development.  They thought it was

16   conveniently located.  They thought it would make sense.

17             They wanted to know who the client was.  And the

18   answer was absolutely honest:  We're in negotiations with a

19   client.  We don't have a lease yet.

20             There is nothing fraudulent about --

21             THE COURT:  That's a misstatement.  It was:  "We're

22   in negotiations with a tenant.  We do not currently have a

23   lease, but we will want to move ahead."

24             What occurred here -- the question is simple:  "Is

25   this building being built specifically for a client?"

1          The answer is an obfuscation.

2          MR. WILSON:  Correct, your Honor.  And there is

3    nothing in the Zoning Code --

4          THE COURT:  A lawyer would say:  "Not responsive to

5    the question."

6          MR. WILSON:  If it was important to them, they would

7    have followed up.

8          The real concern here, your Honor, is if it's

9    important because we provide abortion services, that's

10   constitutionally impermissible.

11         But we wouldn't be here today, your Honor -- I think

12   everyone recognizes that -- and all these people wouldn't be

13   here today if this was a footcare clinic.

14         If they had said:  "Oh, we're opening Dr. Scholl's

15   Footcare Clinic September 18th," and that -- those same points

16   were in the record, would this really be happening?

17         We are getting special treatment.  We are getting

18   discriminatory treatment because of the services we provide.

19         What should happen, your Honor, is we should be

20   allowed to open.  They gave us a permit, and they pulled it.

21         And let me read something -- and this is very

22   important -- from their briefs.  This is from page 7 of the

23   response briefs, which says:  "Aurora has indicated that it

24   would not allow plaintiffs to use their facility as an abortion

25   clinic."

1        We could use it for any other purposes.  We could

2   open up any other operation there consistent with the Zoning

3   Code.

4        We are being denied the opportunity to open as an

5   abortion clinic.  That is constitutionally impermissible, and

6   that is what this case is all about today, your Honor.

7        If there is a citation, like any business that is

8   operated, if there is something wrong in the process, they can

9   come to us then.

10       They have the authority to go and investigate anybody

11  in the City of Aurora.  Actually, they are not doing that.  I'm

12  sure there are plenty of developers who came in under different

13  names, who used strawmen, who bought property under different

14  names.

15       That, as counsel admitted, is a very common real

16  estate tactic.  There is nothing -- in fact, when we said:  "We

17  are in negotiations with a tenant," there was no:  "Well, we

18  need to know, we can't go further until we know who the tenant

19  is."

20       They took that as it should have been, at face value,

21  because it wasn't important.  It isn't the core part of this

22  case.

23       The core part of this case is medical health

24  facilities.  Did we comply with medical -- the law about

25  medical health facilities?

C01514

1          And the evidence that we did is they issued the

2    temporary occupancy permit.

3          It's the fact that when they found out the type of

4    services we provide, that they went back and started getting

5    out the tweezers and the microscope and figuring out whether

6    there was any way they could block this.

7          There isn't.

8          We have done nothing wrong, we have complied with all

9    of the laws, and we want to start providing medical service to

10   the people of the City of Aurora.

11         And it's simply unfair the way we are being treated

12   today, your Honor.  And we have to come before this Court to

13   get the relief we are seeking.

14         And, finally, if I could go back to those e-mails

15   they made a point about?

16         I certainly don't want to be accused of misreading

17   something to the Court.  And what I took this to mean is not

18   relevant.

19         We should just read what's in the record, which is,

20   the first email in the record, which is the first e-mail.  This

21   is from Alderman Beykirch of the Eighth Ward.  B-e-y-k-i-r-c-h.

22   Ward 8.

23         "If Planned Parenthood would have been up front with

24   the City, we could have done a much better job of helping them

25   locate.  As it is, based on their admitted deceit, they will be

1  located" -- I think it should be "next" -- "to the major

2  grocery and video store in the area.

3          "We will have to parade our children past protests

4  and face the fact daily that lives are being aborted in that

5  building.

6          "I do not pass judgment on supporters of PP, but I

7  will tell you they are a deceitful organization, and I am angry

8  that they are located where they did without ever consulting

9  anyone in our government."

10         Planned Parenthood doesn't have to consult the City

11  of Aurora about its business.

12         It has to provide answers to the questions that they

13  ask.  But they don't -- there is not a special requirement for

14  them to disclose the type of medical services they provide.

15  That would be unconstitutional.

16         This is evidence of animus.  This alderman is angry.

17  He considers Planned Parenthood deceitful.  He does not like

18  Planned Parenthood.

19         If a federal judge took those positions, your Honor,

20  that would be unacceptable.

21         It is unacceptable in a member of the City of Aurora

22  Council who is judging whether or not we get a permit.

23         We have a permit.  We should be allowed to operate.

24         It is simply unfair to block access to all the

25  healthcare we want to provide.

1     . People are being irreparably harmed by not being able

2 to see the doctors and nurses that are on our administrative

3 staff.

4     The balance of the hardships tips decidedly towards

5 us.  There really isn't any argument that the Zoning Code, on

6 the one hand, and all of the patients and doctors and the

7 facilities that we provide, are much more important to the

8 people of Aurora right now.

9     And, finally, the public interest is in not denying

10 constitutional rights.  The public interest is in not denying

11 medical care.  The public interest is in not seeing that

12 patients are treated.

13     The important thing today, your Honor, is that we are

14 here under 1983 to get an injunction, to stop all of these

15 games.  To stop references to the state prosecutor.  To stop an

16 endless administrative review, and to start letting us treat

17 patients.

18     We ask that you enter the injunction, and allow us to

19 begin providing services.

20     Thank you.

21     THE COURT:  Would you like to say a few words,

22 counsel?

23     MR. MALINA:  Very brief, if you will let me.

24     One thing I'd like to point out is the Kane County

25 State's Attorney, as you well know, Judge, is not just a

1   criminal prosecutor.

2         THE COURT:  That's correct.  They have a civil

3   division obviously.

4         MR. MALINA:  Right, right.

5         And the other thing I wanted to clarify is that when

6   Planned Parenthood comes before you today, they are arguing

7   under equitable principles that they need a preliminary

8   injunction, extraordinary injunctive relief.

9         And the reason for that, the reason they are in the

10  position they are in regarding the delay, is precisely because

11  they misled or may have misled the City, and they come into

12  this proceeding with unclean hands.

13        That's all I have.

14        THE COURT:  All right.  What is before the Court is a

15  preliminary injunction.  And the factors that the Court must

16  take into account in deciding such a motion include:  that the

17  movant, the party, has demonstrated a reasonable likelihood of

18  success on the merits, no adequate remedy at law, and

19  irreparable harm if preliminary relief is denied.

20        If the moving party clears these hurdles, the Court

21  must then consider irreparable harm the non-moving party will

22  suffer if the injunction is granted, balanced against

23  irreparable harm the moving party will suffer if the injunction

24  is denied.

25        And also the Court must consider the public

1    interests, which includes the rights of third parties.

2         These are the standards that counsel agree apply with

3    respect to a preliminary injunction.

4         Now, as Planned Parenthood-Gemini have argued and

5    have pleaded in the very brief complaint in this case, this is

6    brought as a 1983 action against the corporate defendant.  No

7    individuals are named as defendants in this case.

8         And the case law makes it clear that a local

9    governmental -- a local governmental unit is subject to suit

10   under 42 United States Code 1983 because it is deemed a person

11   within the meeting of that provision.

12        And this statement comes from Monell versus

13   Department of Social Services, 436 U.S. 658, a 1978 decision.

14        In that regard, municipalities are answerable only

15   for their own decisions and policies.  They are not vicariously

16   liable for the constitutional torts of their agents.

17        Rather, it is when execution of a government's policy

18   or custom, whether made by its lawmakers or by those whose

19   edicts or acts may fairly be said to represent official policy,

20   inflicts the injury that the government, as an entity, is

21   responsible for under 1983.

22        And the case law has identified three instances in

23   which a municipality can be said to have violated the civil

24   rights of a person because of its policy:

25        One, an express policy that, when enforced, causes a

1    constitutional deprivation.

2              No policy is alleged in this complaint.

3              Also, a widespread practice that, although not

4    authorized by written law or express municipal policy, is so

5    permanent and well-settled as to constitute a custom or usage

6    with the force of law.

7              And third would be an allegation that the

8    constitutional injury was caused by a person with final

9    policy-making authority.

10             There is no allegation within the complaint that a

11   person with final policy-making authority has violated the

12   rights of the plaintiffs in this case.  That presents a serious

13   difficulty for the plaintiff in terms of municipal liability

14   under 1983, as pleaded in the present form of the complaint.

15             Additionally, this action is brought under 1983 with

16   the constitutional deprivation being one of denial of equal

17   protection of law.

18             In that regard, Planned Parenthood in its papers and

19   argument of counsel take the position that they were treated

20   differently than any other health facility in the City of

21   Aurora.

22             But there is no specific reference in the complaint

23   or in the submissions to any person or entity similarly

24   situated.

25             Counsel has referred to several medical facilities in

1  the area.  No developer is mentioned specifically.  And there

2  are numerous cases in the Seventh Circuit that deal with the

3  issue, for purposes of equal protection of law, that there is

4  an obligation to point to others specifically, who are

5  similarly situated, who were treated differently from the

6  constitutional viewpoint.

7       And in the Village of Winthrop Harbor case, in part

8  the developers requested different variances than the current

9  prospective developers requested, and submitted their plats

10  during different time periods, had their plat requests granted

11  by different and previous boards.

12       There is absolutely nothing in the record to indicate

13  with respect to these other medical facilities or entities what

14  procedures they followed in making their applications for

15  occupancy permits.  There is no indication of whether any of

16  those entities that are mentioned within the complaint went

17  before the same Board or the same Committee, in this case.

18       There is no indication how long ago it was, what the

19  administration was, who the mayor was, and what they may have

20  been subjected to along the way.

21       It is speculation, at the moment.  It may well have

22  been -- and certainly there is no evidence before the Court

23  from which an inference could be drawn -- but it may well have

24  been they encountered delays and even greater delays as they

25  appeared before the various zoning committees and other

1   departments within the City of Aurora.

2        But a part of what the plaintiff must show is who

3   these other persons or parties were, and the case law refers to

4   them as "comparators."

5        And so with whom does Planned Parenthood compare

6   itself?  And with whom does Gemini Development compare itself?

7        It is correct and not disputed that Gemini is an

8   affiliate of Planned Parenthood.

9        But no developers are named within the complaint to

10  suggest that developers have been treated differently from

11  Gemini in the application process.

12        Which developers?  When and by whom?  And under what

13  factual circumstances?  We are left to wonder.

14        And in the case to which I have referred there is a

15  reference:  "In order to succeed the persons must demonstrate

16  that they were treated differently than someone who is prima

17  facie identical in all relevant respects."

18        Since these entities are hardly identified, certainly

19  there is nothing -- not even prima facie -- to show that they

20  are identical in all relevant respects.

21        No -- as I have said, no developer is mentioned by

22  name.  How they can be the same as Gemini, one is left to

23  wonder.

24        In the case to which I have referred, the Court

25  states that the persons rely on comparisons with three other

1   developments in the village to support their assertion that

2   other similarly situated individuals were treated more

3   favorably.

4            The allegedly comparable individuals, however, are

5   not identically situated in all relevant respects, rationally

6   related to the government's mission.

7            Additionally, there is a reference in many of these

8   cases to a class of one.  And I think that Mr. Wilson brings

9   this as a class of one, because it is not brought on behalf of

10  anyone other than Gemini and Planned Parenthood.

11           So the Court views it as a class of one.

12           And in a major case coming out of the Seventh Circuit

13  which worked its way to the Supreme Court of the United States,

14  the Court does recognize there can be a class of one for

15  allegations of unequal treatment under the law.

16           "The number of individuals in a class is immaterial

17  for equal protection analysis.  To succeed on their

18  class-of-one claim" -- referring to the other case -- "the

19  persons must demonstrate that they have been intentionally

20  treated differently from others similarly situated, and that

21  there is no rational basis for the difference in treatment."

22           That is what that case says.

23           There are numerous other cases that deal with this

24  fundamental concept, and one of which is McDonald versus the

25  Village of Winnetka:

1       "The purpose of entertaining a class-of-one equal

2  protection claim is not to constitutionalize all tort law nor

3  to transform every claim for improper provision of municipal

4  services, or for improper conduct of an investigation in

5  connection with them into a federal case."

6       And in this case, the McDonald case, again, the issue

7  was that McDonald, in invoking the Constitution has failed to

8  identify someone similarly situated but treated differently.

9       It is not merely an identification.  It is not enough

10  to say "Every other health facility in the City was treated

11  differently."  That mere assertion does not -- is not enough to

12  support an argument in favor of unequal treatment under the

13  law.

14       And in other cases the Court takes the position --

15  the inquiry, in terms of unequal treatment from a

16  constitutional standpoint, the inquiry that seeks to determine

17  whether there are enough common features between the

18  individuals to allow a meaningful comparison.

19       There is nothing before the Court that would allow a

20  meaningful comparison.

21       The inquiry simply asks whether there are sufficient

22  commonalities on the key variables between the plaintiff and

23  the would-be comparator to allow the type of comparison that,

24  taken together with the other prima facie evidence, would allow

25  one to reach an inference of discrimination.