## AMENDMENT NO. 1 TO AGREEMENT
### BETWEEN OWNER AND CONSTRUCTION MANAGER

Redacted

## Executive Team Biographies

**Cheryl Harris, CPA • Chief Financial Officer**

Ms. Harris joined PP/CA in October 2000 with 20 years of experience, mostly in health care and not-for-profit agencies. She earned her Bachelor's degree in accounting from the University of Illinois, became a certified public accountant in 1983, and received her MBA from University of Virginia. Prior to her employment with PP/CA, Ms. Harris was a Senior Staff Accountant for Blue Cross Blue Shield of Illinois and Manager of Accounting for United American Healthcare, Inc.

**Teri Huyck, FACHE • Senior Vice President and Chief Operating Officer**

In FY99, Ms. Huyck joined PP/CA as its first Vice President for Business Development and Client Services; in FY 2001, she was promoted to Chief Operating Officer. Ms. Huyck, a Fellow of the American College of Healthcare Executives, is an experienced, senior-level executive in health care administration, management of hospital and health system ambulatory services, and physician multi-specialty group practice management. She lends extraordinary skill in strategy, planning, financial management, new services development, and outreach to her oversight of PP/CA's operations, including medical services, community education, finance, information services, human resources, and facilities. She graduated Summa Cum Laude and Phi Beta Kappa from The Ohio State University and holds a Masters of Health Care Administration from Xavier University.

**Steve Trombley • President and Chief Executive Officer**

Mr. Trombley began his career at the Chicago Affiliate in 1989 as a Public Affairs Organizer, and held the positions of Director of Public Affairs, Vice President for External Affairs, and Senior Vice President, before being selected President and CEO in 1998. Under his leadership, PP/CA has nearly tripled it annual budget and has seen substantial growth in its medical and abortion services programs. Mr. Trombley has also guided the agency's most innovative programs, such as "EC4U," which provided access to emergency contraception via the Internet and telephone; a successful partnership with an adoption agency offering on-site counseling at PP/CA health centers; and collaboration with CPS to provide PP/CA's Healthy Sexuality education program to 7th and 9th graders.

Mr. Trombley holds a degree in Social Thought from Lawrence University in Appleton, Wisconsin. He services as a member of the Board of Directors for PPFA, as well as on a number of national committees for PPFA, including the Power the Promise Campaign Steering Team and the Campaign's Mobilizing to Win Implementation Team, the Philanthropic Markets Team, and the 3-business group that laid the foundation for what is now E-Enterprise Steering Committee and national Portal Project.

An articulate and thought-provoking speaker, Steve has been sought as a spokesperson by both national and local media, including *Time, The New York Times, Chicago Tribune, The New Republic, Chicago Sun-Times,* the FOX-TV network, ABC radio, National Public Radio, and Chicago affiliates for WGN, ABC, CBS, NBC and FOX.



**PLANNED PARENTHOOD/CHICAGO AREA
AND AFFILIATED CORPORATION**
Chicago, Illinois

**CONSOLIDATED FINANCIAL STATEMENTS**
June 30, 2004 and 2003

*Redacted*



**PLANNED PARENTHOOD/CHICAGO AREA**
Chicago, Illinois

**FINANCIAL STATEMENTS**
June 30, 2005 and 2004

*Redacted*



**PLANNED PARENTHOOD/CHICAGO AREA**
Chicago, Illinois

**FINANCIAL STATEMENTS**
June 30, 2006 and 2005

*Redacted*

C01822

04/12/07
03:45 PM

*Planned Parenthood/Chicago Area*
*BALANCE SHEET*
*March 31, 2007*

Redacted

001823

**PLANNED PARENTHOOD CHICAGO AREA**
**FORECASTED BALANCE SHEET**
**FOR THE YEARS 2007 - 2010**

Redacted

Planned Parenthood

| ($ Thousands Omitted) | Historical | | | | Projected | | |
|---|---|---|---|---|---|---|---|
| | 12/31/2004 | 12/31/2005 | 12/31/2006 | | 12/31/2007 | 12/31/2008 | 12/31/2008 |

Redacted

Pro Forma-Most Likely
Kankakee II.xls
4/17/2007

**Attachment #13**

**AURORA FACILITY**
**CASH FLOW PROJECTIONS**
**FY 2007 - FY 2014**

Redacted

C01826

**CHARTER ONE BANK**
**LETTER OF CREDIT**
**Term Sheet Financial Covenants**

Redacted

# EXHIBIT F4

C01828

CC1829

NEW ISSUE—BOOK-ENTRY ONLY

Rating: Moody's: "Aa2/VMIG1"
(See "Credit Rating" herein)

*In the opinion of Katten Muchin Rosenman LLP, Bond Counsel, under existing law, and subject to the conditions described under the caption "TAX EXEMPTION" herein, interest on the Bonds is excludable from the gross income of the owners thereof for federal income tax purposes and is not an item of specific tax preference for purposes of computing individual or corporate alternative minimum taxable income. Interest on the Bonds is includable in corporate earnings and profits when computing, for example, corporate alternative minimum taxable income for purposes of the corporate alternative minimum tax and may be subject to other federal tax consequences as described under the caption "TAX EXEMPTION" herein. Interest is not exempt from income taxation in the State of Illinois.*

# $8,050,000
# ILLINOIS FINANCE AUTHORITY
## Variable Rate Demand Revenue Bonds, Series 2007A
## (Planned Parenthood/Chicago Area Project)

**Dated: Date of Issuance**                **Price: 100%**                **Due: January 1, 2037**

The Illinois Finance Authority Variable Rate Demand Revenue Bonds, Series 2007A (Planned Parenthood/Chicago Area Project) (the "*Bonds*") will be issuable as fully registered bonds in denominations of $100,000 or any integral multiple of $5,000 in excess thereof. The Bonds will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("*DTC*"). Purchases of beneficial interests in the Bonds will be made in book-entry only form through DTC Participants (as defined herein) only and no physical delivery of the Bonds will be made to purchasers as described herein. DTC will act as securities depository for the Bonds. For further information on the book-entry only system, see the caption "THE BONDS-Book-Entry Only System" herein.

The Bonds are being issued to provide funds to Planned Parenthood/Chicago Area, an Illinois not for profit corporation (the "*Corporation*"), and Gemini Office Development LLC, an Illinois limited liability company ("*Gemini*" and together with the Corporation, the "*Borrowers*"), to be used, together with other funds, to (i) finance the payment of or the reimbursement of the costs of acquiring, constructing, installing and equipping a new healthcare center, (ii) finance various capital costs for use in the Corporation's facilities, (iii) refinance certain taxable indebtedness, the proceeds of which were used by the Corporation to finance costs of acquiring, renovating, constructing and equipping certain existing health care centers of the Corporation (clauses (i), (ii) and (iii) are hereinafter referred to as the "*Project*"), (iv) pay interest with respect to certain portions of the Project and (v) pay certain costs of issuance of the Bonds and the credit enhancement thereof.

The Bonds will be initially issued in a Weekly Interest Rate Mode as described herein. Subject to the conditions set forth in the Trust Indenture dated as of May 1, 2007 (the "*Indenture*"), between the Illinois Finance Authority (the "*Authority*") and Amalgamated Bank of Chicago, as trustee (the "*Trustee*"), the Bonds may operate in one of several Modes: Weekly, One Month, Three Month, Six Month, One Year and Five Year (each an "*Adjustable Interest Rate Mode*"), or a Fixed Interest Rate Mode, all as more fully described herein. Generally, the modes have different operating features. Additional information regarding subsequent modes, interest rates, and conversion between Interest Rate Modes will be made available as described herein.

The Bonds will be subject to optional, mandatory and extraordinary redemption prior to maturity, as more fully described herein.

The Bonds in the Adjustable Interest Rate Modes are subject to optional tender for purchase as described herein. The Bonds in the Fixed Interest Rate Mode are not subject to optional tender for purchase. The Bonds are subject to mandatory tender for purchase under certain circumstances described herein.

From the date of original issuance, the payment of principal of, interest on and purchase price of the Bonds will be secured by an irrevocable, transferable direct pay letter of credit (the "*Letter of Credit*"), as described herein, issued in favor of the Trustee by:

## CHARTER ONE BANK, N.A.

The Letter of Credit will permit the Trustee to draw thereunder up to an amount sufficient to pay (i) the principal of the Bonds when due, at stated maturity, upon redemption or upon acceleration, (ii) the portion of the purchase price equal to the principal amount of the Bonds tendered for optional or mandatory purchase and (iii) up to 42 days' accrued interest on the Bonds at the maximum interest rate of 10% per annum, all as described herein. The stated expiration date of the Letter of Credit is May 23, 2012. The stated expiration date of the Letter of Credit may be extended as described herein or terminated prior to such date as described herein. Under certain circumstances, the Borrowers may replace the Letter of Credit with an Alternate Letter of Credit, and the Bank may terminate the Letter of Credit prior to its stated expiration date, all as described herein. If the Bonds bear interest at the Six Month, One Year or Five Year Interest Rate, the Indenture requires the Borrowers to provide a Letter of Credit or an Alternate Letter of Credit that provides interest coverage for a period of at least 195 days at the maximum interest rate. The Letter of Credit provides only 42 days of interest coverage.

**Except for a very limited description of the Borrowers contained herein, no information with respect to the Borrowers (financial or otherwise) is included herein, and the Borrowers make no representation herein concerning their present or future financial condition. Potential investors should base their investment decisions with respect to the Bonds solely upon the credit of Charter One Bank, N.A.. This Official Statement should be not relied upon in determining whether to purchase Bonds that are not in the Weekly, One Month, Three Month or Six Month Mode and secured by a Letter of Credit.**

This cover page contains only a summary of information regarding the Bonds. Potential investors should read the entire Official Statement prior to making an investment decision.

THE BONDS AND THE INTEREST THEREON DO NOT CONSTITUTE AN INDEBTEDNESS OR AN OBLIGATION, GENERAL OR MORAL, OR A PLEDGE OF THE FULL FAITH OR A LOAN OF CREDIT OF THE AUTHORITY, THE STATE OF ILLINOIS OR ANY POLITICAL SUBDIVISION THEREOF, WITHIN THE PURVIEW OF ANY CONSTITUTIONAL OR STATUTORY LIMITATION OR PROVISION. THE AUTHORITY IS OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, AND INTEREST ON THE BONDS AND OTHER COSTS INCIDENTAL THERETO ONLY FROM THE SOURCES SPECIFIED IN THE INDENTURE. NEITHER THE FULL FAITH AND CREDIT NOR THE TAXING POWERS, IF ANY, OF THE AUTHORITY OR THE STATE OF ILLINOIS OR ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, AND INTEREST ON THE BONDS OR OTHER COSTS INCIDENTAL THERETO, EXCEPT AS OTHERWISE PROVIDED IN THE INDENTURE. NO OWNER OF ANY BOND SHALL HAVE THE RIGHT TO COMPEL THE TAXING POWER, IF ANY, OF THE AUTHORITY, THE STATE OF ILLINOIS OR ANY POLITICAL SUBDIVISION THEREOF TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS. THE AUTHORITY DOES NOT HAVE THE POWER TO LEVY TAXES FOR ANY PURPOSES WHATSOEVER.

The Bonds are offered by RBC Dain Rauscher Inc., doing business under the name RBC Capital Markets (the "Underwriter") when, as, and if issued by the Authority and received by the Underwriter, subject to prior sale, withdrawal, or modification of the offer without any notice, and subject to the delivery of an approving opinion by Katten Muchin Rosenman LLP, Chicago, Illinois, Bond Counsel. Certain legal matters will be passed upon for the Authority by its special counsel, Kevin M. Cahill, Esq., Chicago, Illinois; for the Borrowers by their counsel, Sonnenschein Nath & Rosenthal LLP, Chicago, Illinois; for the Bank by its counsel, Chapman and Cutler LLP, Chicago, Illinois; and for the Underwriter by its counsel, Chapman and Cutler LLP, Chicago, Illinois. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about May 24, 2007.

## RBC CAPITAL MARKETS

The Date of this Official Statement is May 16, 2007.

001830

REGARDING USE OF THIS OFFICIAL STATEMENT

No dealer, broker, salesperson or other person has been authorized by the Authority, the Borrowers, the Bank or the Underwriter to give any information or to make any representations other than those contained in this Official Statement (which term, whenever used herein, will be deemed to include the front cover, the table of contents and all of the appendices to this Official Statement), and, if given or made, such information or representations must not be relied upon as having been authorized by the Authority, the Borrowers, the Bank or the Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth herein has been obtained from the Authority, the Borrowers, the Bank, and other sources which are believed to be reliable, but it is not guaranteed as to accuracy or completeness, and is not to be construed as a representation, by the Underwriter. The Underwriter has provided the following sentence for inclusion in this Official Statement. The Underwriter has reviewed the information in this Official Statement in accordance with, and as part of, its responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriter does not guarantee the accuracy or completeness of such information. This Official Statement is submitted in connection with the sale of the securities described in it, and may not be reproduced or used, in whole or in part, for any other purposes. The information, estimates and expressions of opinion in this Official Statement are subject to change without notice, and neither the delivery of this Official Statement nor any sale of the Bonds shall, under any circumstances, create any implication that there has been no change in the affairs of the Authority, the Borrowers, the Bank, or any other person described herein subsequent to the date as of which such information is presented.

The information set forth herein relating to the Authority under the headings "THE AUTHORITY" and "LITIGATION – Authority" has been obtained from the Authority. All other information herein has been obtained by the Underwriter from the Borrowers, the Underwriter and other sources deemed by the Underwriter to be reliable, and is not to be construed as a representation by the Authority or the Underwriter. The Authority has not reviewed or approved any information in this Official Statement except for the information relating to the Authority under the headings "THE AUTHORITY" and "LITIGATION – Authority." The information herein is subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of the Authority or the Borrowers since the date hereof.

In connection with this offering, the Underwriter may over-allot or effect transactions which stabilize or maintain the market price of the Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time.

The Bonds have not been registered with the Securities and Exchange Commission under the Securities Act of 1933, as amended, nor has the Indenture been qualified under the Trust Indenture Act of 1939, as amended, in reliance upon exemptions contained in such acts.

C01831

EXCEPT FOR A VERY LIMITED DESCRIPTION OF THE BORROWERS CONTAINED IN THE FOREPART OF THIS OFFICIAL STATEMENT, NO INFORMATION WITH RESPECT TO THE BORROWERS (FINANCIAL OR OTHERWISE) IS INCLUDED IN THIS OFFICIAL STATEMENT, AND THE BORROWERS MAKE NO REPRESENTATION HEREIN CONCERNING THEIR PRESENT OR FUTURE FINANCIAL CONDITION. POTENTIAL INVESTORS SHOULD BASE THEIR INVESTMENT DECISIONS WITH RESPECT TO THE BONDS *SOLELY* UPON THE CREDIT OF THE PROVIDER OF THE LETTER OF CREDIT SECURING THE BONDS, INITIALLY, CHARTER ONE BANK, N.A.. THIS OFFICIAL STATEMENT SHOULD NOT BE RELIED UPON IN DETERMINING WHETHER TO PURCHASE BONDS THAT ARE NOT IN THE WEEKLY, ONE MONTH, THREE MONTH OR SIX MONTH MODE AND SECURED BY A LETTER OF CREDIT.

These securities have not been recommended by any federal or state securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this document. Any representation to the contrary is a criminal offense.

[THIS PAGE INTENTIONALLY LEFT BLANK]

001333

## TABLE OF CONTENTS

**HEADING**                                                                 **PAGE**

INTRODUCTORY STATEMENT ...............................................................................1

THE AUTHORITY ..............................................................................................4

THE BORROWERS ............................................................................................6

THE PLAN OF FINANCE.....................................................................................6

THE BONDS....................................................................................................7

SECURITY AND SOURCES OF PAYMENT FOR THE BONDS ...................................26

THE LETTER OF CREDIT AND THE CREDIT AGREEMENT ....................................28

ESTIMATED SOURCES AND USES.......................................................................30

LITIGATION....................................................................................................31

CERTAIN LEGAL MATTERS ..............................................................................32

TAX EXEMPTION ............................................................................................32

LEGAL OPINIONS AND ENFORCEABILITY OF RIGHTS AND REMEDIES ...............35

CREDIT RATING .............................................................................................35

UNDERWRITING .............................................................................................36

SECONDARY MARKET DISCLOSURE...................................................................36

CERTAIN RELATIONSHIPS ...............................................................................36

MISCELLANEOUS ............................................................................................36


APPENDIX A - INFORMATION CONCERNING CHARTER ONE BANK, N.A. .................... A-1

APPENDIX B - FORM OF BOND COUNSEL APPROVING OPINION ...................................B-1

APPENDIX C - DEFINITIONS ....................................................................................C-1

APPENDIX D - SUMMARY OF THE LOAN AGREEMENT AND THE INDENTURE .............. D-1

001834

[THIS PAGE INTENTIONALLY LEFT BLANK]

001835

**OFFICIAL STATEMENT**

**RELATING TO**
**THE ORIGINAL ISSUANCE OF**

**$8,050,000**
**Illinois Finance Authority**
**Variable Rate Demand Revenue Bonds,**
**Series 2007A (Planned Parenthood/Chicago Area Project)**

**INTRODUCTORY STATEMENT**

This Official Statement, including the cover page, the Table of Contents page, the Official Statement Summary and the Appendices, is provided to furnish information in connection with the original issuance and sale by the Illinois Finance Authority (the *"Authority"*) of $8,050,000 Illinois Finance Authority Variable Rate Demand Revenue Bonds, Series 2007A (Planned Parenthood/Chicago Area Project) (the *"Bonds"*).  The Bonds are being issued pursuant to a Trust Indenture dated as of May 1, 2007 (the *"Indenture"*), between the Authority and Amalgamated Bank of Chicago, as trustee (the *"Trustee"*).  The Bonds will be dated as of and bear interest from the date of their initial delivery pursuant to the instructions of RBC Dain Rauscher Inc., doing business under the name RBC Capital Markets (the *"Underwriter"*).  The Bonds will mature on January 1, 2037, and will be subject to redemption prior to maturity as described herein under "THE BONDS—Redemption Prior to Maturity."

See APPENDIX C to this Official Statement for the definitions of capitalized terms used but not otherwise defined herein.

The proceeds from the sale of the Bonds will be loaned to Planned Parenthood/Chicago Area, an Illinois not for profit corporation (the *"Corporation"*), and Gemini Office Development LLC, an Illinois limited liability company (*"Gemini"* and together with the Corporation, the *"Borrowers"*), to be used together with other funds, to (i) finance the payment of or the reimbursement of the costs of acquiring, constructing, installing and equipping a new healthcare center located in Aurora, Illinois, (ii) finance various capital costs of the Corporation for use in its facilities located in Chicago, Illinois and Chicago's suburbs, (iii) refinance certain taxable indebtedness, the proceeds of which were utilized by the Corporation to finance the costs of acquiring, renovating, constructing and equipping certain existing health care centers of the Corporation (clauses (i), (ii) and (iii) are herein referred to as the *"Project"*), (iv) pay interest with respect to certain portions of the Project and (v) pay certain costs of issuance of the Bonds and the credit enhancement thereof.  The financing of all or a portion of the costs of the Project and the projected use of the proceeds of the Bonds are more particularly described in "THE PLAN OF FINANCE."  Pursuant to the Loan Agreement dated as of May 1, 2007 (the *"Loan Agreement"*), the Borrowers will agree to make payments by the times and in the amounts necessary to pay the principal of, premium (if any) and interest on the Bonds when due (the *"Bond Service Charges"*).  To evidence such obligation, the Borrowers also will execute and

C01336

deliver to the Authority a promissory note (the *"Note"*) in a principal amount equal to the principal amount of the Bonds which Note will be assigned by the Authority to the Trustee.

**The Bonds will constitute special limited obligations of the Authority, payable solely from the revenues assigned and pledged by the Indenture to secure such payment, which will include moneys drawn under the Letter of Credit described below. See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS" herein. Those revenues will also include the loan payments required to be made by the Borrowers under the Loan Agreement and the Note.**

The Bonds will be payable from the proceeds of draws under a Letter of Credit (the *"Letter of Credit"*) initially issued by Charter One Bank, N.A. (the *"Bank"*). The repayment of drawings under the Letter of Credit will be provided pursuant to a Reimbursement Agreement dated as of May 1, 2007 (the *"Credit Agreement"*), between the Bank and the Borrowers. See "THE LETTER OF CREDIT AND THE CREDIT AGREEMENT" herein.

The Bank does not control, either directly or indirectly through one or more intermediaries, the Borrowers. Likewise, the Borrowers do not control, either directly or indirectly through one or more intermediaries, the Bank. "Control" for this purpose has the meaning given to such term in Section 2(a)(9) of the Investment Company Act of 1940. The Borrowers agree to provide written notice to the Trustee, the Remarketing Agent (as hereinafter defined), and the Bondholders thirty days prior to consummation of any transaction that would result in the Borrowers controlling or being controlled by the Bank or any provider of an Alternate Letter of Credit or Supplemental Credit Facility.

*The Bonds are being offered solely on the basis of the Letter of Credit and the financial strength of the Bank and are not being offered on the basis of the financial strength of the Authority, the Borrowers or any other security. Except for a very limited description of the Borrowers contained herein, no information with respect to the Borrowers (financial or otherwise) is included in this Official Statement, and the Borrowers make no representation herein concerning their present or future financial condition. Potential Investors should base their investment decisions with respect to the Bonds SOLELY upon the credit of the Bank. The Bonds are subject to acceleration of maturity upon the occurrence of a default by the Borrowers under the Credit Agreement, but such defaults are not fully described herein and such defaults may be waived by agreement between the Bank and the Borrowers. As a result of the foregoing, prospective investors will not be able to evaluate the likelihood of a default by the Borrowers under the Credit Agreement and resulting acceleration of the Bonds.*

ANY PREMIUM PAYABLE ON THE BONDS UPON THEIR OPTIONAL REDEMPTION WHILE THEY BEAR INTEREST AT THE FIXED INTEREST RATE IS NOT SECURED BY THE LETTER OF CREDIT.

As long as the Bonds bear interest in any of the Adjustable Interest Rate Modes defined under "THE BONDS—Interest" herein, the Bonds will be purchased by the Trustee upon demand by the registered owner thereof (initially, The Depository Trust Company, or its nominee) (the *"Holder"*), and beneficial ownership interests in Bonds (*"Beneficial Ownership Interests"*) will be purchased by the Trustee upon the demand of the owners thereof (*"Beneficial Owners"*).

Any such purchase will be made on the applicable Bond Purchase Date, as defined herein under "THE BONDS—Purchase of Bonds or Beneficial Ownership Interests on Demand of Holders or Beneficial Owners." The Beneficial Owner must provide satisfactory evidence to the Trustee of such Beneficial Owner's Beneficial Ownership Interest and must comply with the remaining requirements of the Indenture applicable to the tender of Beneficial Ownership Interests. See "THE BONDS—Purchase of Bonds or Beneficial Ownership Interests on Demand of Holders or Beneficial Owners." The Indenture provides for the remarketing by the Remarketing Agent, initially, RBC Dain Rauscher Inc., doing business under the name RBC Capital Markets (the "*Remarketing Agent*"), of the Bonds or Beneficial Ownership Interests tendered by the Holders or Beneficial Owners thereof. If the proceeds of remarketing are not sufficient to purchase the Bonds or Beneficial Ownership Interests tendered for purchase, the Trustee is required to draw on the Letter of Credit to pay the necessary purchase price.

The Borrowers may convert the Bonds to a different Adjustable Interest Rate Mode or to a Fixed Interest Rate Mode as of a specified date (the "*Interest Period Reset Date*"). The Bonds or Beneficial Ownership Interests are subject to mandatory purchase on any such Interest Period Reset Date from the proceeds of remarketing or from the proceeds of a drawing on the Letter of Credit, subject to the right of each Holder or Beneficial Owner to affirmatively elect to waive and not be subject to the mandatory tender, and to retain its Bonds or Beneficial Ownership Interests. See "THE BONDS—Mandatory Tender for Purchase of Bonds or Beneficial Ownership Interests Upon Conversion Between Modes" herein.

The Borrowers may provide for the delivery of an Alternate Letter of Credit (as hereinafter defined) to the Trustee. The Bonds or Beneficial Ownership Interests are subject to mandatory tender upon the delivery of an Alternate Letter of Credit to the Trustee, subject to the right of each Holder or Beneficial Owner to affirmatively elect to waive and not be subject to the mandatory tender, and to retain its Bonds or Beneficial Ownership Interests. See "THE BONDS— Mandatory Tender for Purchase of Bonds or Beneficial Ownership Interests Upon Delivery of an Alternate Letter of Credit" herein.

On the Interest Payment Date which next precedes the Termination Date by at least two Business Days (as hereinafter defined) of the Letter of Credit or the expiration date of any Alternate Letter of Credit, the Bonds or Beneficial Ownership Interests are subject to mandatory purchase from the Holders or Beneficial Owners thereof unless, at least 45 days prior to such Interest Payment Date, the Bank will have provided to the Trustee written evidence of an extension of the expiration date of the Letter of Credit to a date not earlier than 364 days from the expiration date of such Letter of Credit. The mandatory purchase of Bonds or Beneficial Ownership Interests upon expiration of the Letter of Credit or any Alternate Letter of Credit may not be waived by the Holders or Beneficial Owners of such Bonds or Beneficial Ownership Interests, and the Holders or Beneficial Owners have no right to elect to retain their Bonds or Beneficial Ownership Interests. See "THE BONDS—Mandatory Tender for Purchase of Bonds or Beneficial Ownership Interests Upon Expiration of the Letter of Credit or Alternate Letter of Credit."

Except for the information contained herein under the captions "THE AUTHORITY" and "LITIGATION—Authority," the Authority has not provided any of the information contained in

C01338

this Official Statement. The Authority is not responsible for and does not certify as to the accuracy or sufficiency of the disclosures made herein or any other information provided by the Borrowers, the Bank, the Underwriter or any other person.

This Official Statement should not be relied upon in determining whether to purchase Bonds that are not in the Weekly, One Month, Three Month or Six Month Mode and secured by a Credit Facility.

Herein follow brief descriptions of the Authority, the Borrowers, the financing and refinancing of the Project, together with summaries of the Letter of Credit and the Credit Agreement. Information regarding the Bank is included in APPENDIX A hereto. Summaries of the Loan Agreement and the Indenture are included in APPENDIX D hereto. The descriptions and summaries of the Letter of Credit, the Credit Agreement, the Loan Agreement, the Indenture and other documents contained herein do not purport to be comprehensive or definitive and are qualified in their entirety by reference to those documents, and all references to Bonds are qualified in their entirety by the definitive form thereof included in the Indenture. Copies of such documents will be available at the offices of the Underwriter, at 1211 Avenue of the Americas, New York, New York 10036-8705, Attention: Manager, until the issuance and delivery of the Bonds, and thereafter at the designated corporate trust office of the Trustee, presently Amalgamated Bank of Chicago, One West Monroe Street, Chicago, IL 60603, Attention: Corporate Trust Department.

**THE AUTHORITY**

**Description of the Authority**

The Authority is a body politic and corporate of the State of Illinois (the *"State"*). The Authority was created under the Illinois Finance Authority Act, 20 ILCS 3501/801-1 et seq., as supplemented and amended (the *"Act"*), which consolidated seven of the State's previously existing financing authorities (the *"Predecessor Authorities"*). All bonds, notes or other evidences of indebtedness of the Predecessor Authorities were assumed by the Authority effective January 1, 2004. Under the Act, the Authority may not have outstanding at any one time bonds for any of its corporate purposes in an aggregate principal amount exceeding $25,200,000,000, excluding bonds issued to refund the bonds of the Authority or bonds of the Predecessor Authorities. Pursuant to the Act, the Authority is governed by a 15-member board appointed by the Governor of the State of Illinois with the advice and consent of the State Senate. Presently, fourteen members have been duly appointed, and one vacancy exists. The members receive no compensation for the performance of their duties but are entitled to reimbursement for all necessary expenses incurred in connection with the performance of such duties.

**Powers**

The Authority has, among other powers, the statutory power (i) to make mortgage loans or other secured or unsecured loans to or for the benefit of any person (as defined in the Act) for

001339

the cost of a project in accordance with an agreement between the Authority and such person; (ii) to refund outstanding obligations, loans, indebtedness or advances issued, made, given or incurred by a person for the cost of a project; (iii) to refinance indebtedness incurred by a person for a project undertaken and completed or for other projects acquired prior to or after the enactment of the Act; and (iv) to mortgage all or any portion of a project or other properties and the property on which any such project or other properties are located whether owned or thereafter acquired, and to assign or pledge mortgages, notes and other securities of any person to which or for the benefit of which the Authority has made loans, and the revenues therefrom, for the benefit of the holders of bonds issued to finance such project or issued to refund or refinance outstanding obligations, loans, indebtedness or advances of such person as permitted by the Act.

**Bonds of the Authority**

The Authority may from time to time issue bonds as provided in the Act for the purposes set forth in the Act. Any bonds issued by the Authority (and any interest thereon) shall not be or become an indebtedness or obligation, general or moral, of the State of Illinois or any political subdivision thereof nor be or become a pledge of the full faith and credit of the State of Illinois or any political subdivision thereof, other than the Authority. The Bonds of the Authority as described herein are limited obligations of the Authority payable solely from the specific sources and revenues of the Authority specified in the resolution authorizing the issuance of the Bonds (the *"Resolution"*) and the Indenture. No Owner of any Bond shall have the right to compel any taxing power of the State of Illinois or any political subdivision thereof to pay the principal of, premium, if any, or interest on the Bonds, and the Authority has no taxing power.

The Authority makes no warranty or representation, whether express or implied, with respect to the Project or the use thereof. Further, the Authority has not prepared any material for inclusion in this Official Statement, except that material under the headings "THE AUTHORITY" and "LITIGATION – Authority." The distribution of this Official Statement has been duly approved and authorized by the Authority. Such approval and authorization does not, however, constitute a representation or approval by the Authority of the accuracy or sufficiency of any information contained herein except to the extent of the material under the headings referenced in this paragraph.

The offices of the Authority are located at Two Prudential Plaza, 180 North Stetson Avenue, Suite 2555, Chicago, Illinois 60601 and its telephone number is (312) 651-1300.

**Authority Advisors**

D.A. Davidson & Co. and Scott Balice Strategies, LLC serve as co-senior financial advisors to the Authority. Additionally, certain legal matters with respect to the Bonds will be passed upon for the Authority by its special counsel Kevin M. Cahill, Esq., Chicago, Illinois.

001840

## THE BORROWERS

The Corporation was incorporated in October of 1946 and is an Illinois not for profit corporation providing family planning and reproductive health services in Chicago and the surrounding communities. The Corporation has been determined by the Internal Revenue Service to be an organization exempt from taxation under Section 501(a) of the Internal Revenue Code of 1986, as amended (the *"Code"*), as an organization described in Section 501(c)(3) of the Code, and currently operates 10 health centers, seven in Chicago and three in the surrounding suburbs. During fiscal year 2006, the Corporation served approximately 54,000 patients for over 122,000 visits for male and female services.

The need for the Corporation's services has been growing and the Corporation is expanding its operations and locations to meet these needs. As part of these efforts, the Corporation has formed several subsidiaries to assist in the acquisition of new land and assets and the development of new facilities to meet needs. The Corporation is the sole member of 21st Century Office Development LLC (*"21st Development"*) and 21st Century Office Management LLC (*"21st Management"*), Illinois limited liability companies formed for the purpose of developing and managing real estate for the Corporation's mission. 21st Development is the sole member of Gemini and Gemini Office Management LLC (*"Gemini Management"*), which are also Illinois limited liability companies. 21st Management is the manager of 21st Development and Gemini Management is the manager of Gemini.

As part of the expansion plans, Gemini acquired a parcel of land in Aurora, Illinois which is the site for a new full service clinic to serve the Bolingbrook, Naperville and Aurora area. See "THE PLAN OF FINANCE" below.

THE BONDS ARE BEING OFFERED ON THE BASIS OF THE LETTER OF CREDIT AND NOT ON THE BASIS OF THE FINANCIAL STRENGTH OF THE BORROWERS. EXCEPT FOR A VERY LIMITED DESCRIPTION OF THE BORROWERS CONTAINED HEREIN, NO INFORMATION WITH RESPECT TO THE BORROWERS (FINANCIAL OR OTHERWISE) IS INCLUDED IN THIS OFFICIAL STATEMENT, AND THE BORROWERS MAKE NO REPRESENTATION HEREIN CONCERNING THEIR PRESENT OR FUTURE FINANCIAL CONDITION. POTENTIAL INVESTORS SHOULD BASE THEIR INVESTMENT DECISIONS WITH RESPECT TO THE BONDS *SOLELY* UPON THE CREDIT OF THE BANK.

ALTHOUGH THE CREDIT AGREEMENT CONTAINS CERTAIN FINANCIAL COVENANTS WHICH COULD LIMIT THE BORROWERS' ABILITY TO INCUR ADDITIONAL INDEBTEDNESS (WHICH MAY BE WAIVED BY AGREEMENT BETWEEN THE BANK AND THE BORROWERS), NEITHER THE INDENTURE NOR THE LOAN AGREEMENT RESTRICTS THE ABILITY OF THE BORROWERS TO INCUR ADDITIONAL INDEBTEDNESS.

## THE PLAN OF FINANCE

The proceeds of the Bonds will be loaned to the Borrowers and used to finance and refinance all or a portion of the costs of the Project, to pay interest with respect to certain portion of the Project, and to pay certain costs of issuance of the Bonds and credit enhancement thereof.

001841

The Borrowers will utilize certain of the proceeds of the Bonds, together with other funds, to finance, reimburse and refinance the costs of acquisition, construction, renovation, improvement, furnishing and equipping of certain capital improvements to the Borrower's health centers. The Project has several components. The first is the acquisition, renovation, construction and equipping of a new replacement clinic on the west side of Chicago (just three blocks from the Corporation's health center it replaced). This Austin health center opened in 2004 and is a two-story building with elevator access, an expanded 1500 square foot operating space and an expansive community education office and meeting space. The second component of the Project is the acquisition, renovation, construction and equipping of a new replacement clinic on the south side of Chicago (just blocks from the Corporation's health center it replaced). This Roseland health center opened in 2003 with an improved floor plan and continues to serve a growing client base.

The largest component of the Project, for approximately $7,400,000, is the acquisition, construction, installation and equipping of a full service health center to serve the Bolingbrook, Naperville and Aurora area. The new Aurora health center will provide approximately 13,000 visits each year when it is completed and will also provide space for community education. The Aurora health center is currently scheduled to open in September of 2007.

The Borrowers will also use proceeds of the Bonds to refinance certain taxable indebtedness, the proceeds of which were used to finance certain of the costs described above. The Borrowers may also use a portion of the proceeds of the Bonds to finance various capital costs for use in the Corporation's facilities.

The Authority makes no warranty or representation, whether express or implied, with respect to the Project or the location, use, operation, design, workmanship, merchantability, fitness, suitability or use for particular purpose, condition or durability thereof or title thereto.

## THE BONDS

### General

The Bonds will be issued as fully registered Bonds without coupons and will be dated as of and bear interest from the date of their initial delivery. The Bonds will mature on January 1, 2037, and are subject to mandatory, optional and extraordinary optional redemption prior to maturity as described below under "THE BONDS—Redemption Prior to Maturity." The Bonds are issuable in denominations of $100,000 or integral multiples of $5,000 in excess thereof.

A DEFAULT BY THE BORROWERS UNDER THE CREDIT AGREEMENT COULD CONSTITUTE AN EVENT OF DEFAULT UNDER THE INDENTURE AND RESULT IN THE ACCELERATION OF THE BONDS PRIOR TO THEIR MATURITY.

The Bonds will be issued initially solely in book-entry form. See "THE BONDS—Book-Entry Only System" below.

001842

In the event that the Bonds are no longer held in a book-entry only system, the principal of and redemption premium (if any) on the Bonds will be payable at the principal corporate trust operations office of, or at the office designated by, the Trustee, as Paying Agent, as defined in the Indenture, and payments of interest due on each Bond will be made by check or draft mailed on each Interest Payment Date described below to the Holder of that Bond as of the close of business on the Business Day next preceding an Interest Payment Date (the *"Regular Record Date"*) at such Holder's address as it appears on the registration books maintained by the Trustee, as registrar (the *"Registrar"*). The term "Business Day" means any day of the year other than a Saturday or Sunday or a day on which banking institutions in the city in which the designated corporate trust office of the Trustee or the designated office of the Remarketing Agent is located, or in the city where draws on the Letter of Credit are presented, which initially is Medford, Massachusetts, are required or authorized by law to remain closed, or other than a day on which the payment system of the Federal Reserve System is not operational. In the event of a default in the payment of interest on any Bond when due, the Trustee may establish a Special Record Date with respect to that payment of interest when money becomes available for such payment.

Any act required to be done by a certain time is to be done as of the applicable Eastern Standard Time.

**Book-Entry Only System**

*The information under this caption concerning DTC and DTC's book-entry system is based solely on information provided by DTC. Accordingly, no representation is made by the Authority, the Trustee, the Borrowers, the Bank or the Underwriter as to the completeness or accuracy of such information, or as to the absence of changes in such information subsequent to the date hereof.*

The Depository Trust Company (*"DTC"*), New York, NY, will act as securities depository for the Bonds. Initially, the Bonds will be issued as fully-registered Bonds, registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered bond will be issued in the principal amount of the Bonds and will be deposited with DTC. The following discussion will not apply to any Bonds issued in certificate form due to the discontinuance of the DTC Book-Entry Only System, as described below.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's participants (*"Direct Participants"*) deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions, in deposited securities, through electronic computerized book-entry transfers and

pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("*DTCC*"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("*Indirect Participants*"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at **www.dtcc.com** and **www.dtc.org**.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of each Bond ("*Beneficial Owner*") is, in turn, to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds will be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of the Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interest in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults and proposed amendments to the bond documents. For example, Beneficial Owners of

C01844

Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners, or in the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to the Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority or the Trustee as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date identified in a listing attached to the Omnibus Proxy.

Payments of principal, premium and interest on such Bonds will be made to Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts, upon DTC's receipt of funds and corresponding detail information from the Authority or the Trustee, on any payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, the Borrowers or the Authority, subject to any statutory and regulatory requirements as may be in effect from time to time. Payment of principal of, premium, if any, and interest on the Bonds to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

A Beneficial Owner shall give notice to elect to have its Bonds purchased or tendered, through its Participant, to the Trustee, and shall effect delivery of such Bonds by causing the Direct Participant to transfer the Participant's interest in the Bonds, on DTC's records, to the Trustee. The requirement for physical delivery of the Bonds in connection with an optional tender or a mandatory purchase will be deemed satisfied when the ownership rights in the Bonds are transferred by Direct Participants on DTC's records and followed by a book-entry credit of tendered Bonds to the Trustee's or Remarketing Agent's DTC's account, as appropriate.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Authority or the Trustee. Under such circumstances, in the event that a successor securities depository is not obtained, Bonds are required to be printed and delivered as described in the Indenture.

C01845

The Authority may discontinue use of the system of book-entry transfers through DTC (or a successor securities depository) as described in the Indenture. In that event, Bonds will be printed and delivered as described in the Indenture.

*The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Borrowers, the Authority and the Underwriter believe to be reliable, but the Borrowers, the Authority and the Underwriter take no responsibility for the accuracy thereof. No representation is made by the Authority, the Borrowers, the Trustee or the Underwriter as to the completeness or accuracy of such information or as to the absence of material adverse changes in such information subsequent to the date hereof. No attempt has been made by the Authority, the Borrowers, the Trustee, the Bank, or the Underwriter to determine whether DTC is or will be financially or otherwise capable of fulfilling its obligations. Neither the DTC Participants nor the Beneficial Owners should rely on the foregoing information with respect to such matters but should instead confirm the same with DTC or the DTC Participants, as the case may be.*

*None of the Authority, the Borrowers, the Underwriter, the Trustee or the Bank will have any responsibility or obligations to any Direct Participants or Indirect Participants or the persons for whom they act with respect to (i) the Bonds; (ii) the accuracy of any records maintained by DTC or any such Direct Participant or Indirect Participant; (iii) the payment by any Participant of any amount due to any Beneficial Owner in respect of the principal of, premium, if any, or interest on the Bonds; (iv) the delivery by any such Direct Participant or Indirect Participant of any notice to any Beneficial Owner that is required or permitted under the terms of the Indenture to be given to Bondholders; (v) the selection of the Beneficial Owners to receive payment in the event of any partial redemption of the Bonds; or (vi) any consent given or other action taken by DTC as Bondholder.*

**Revision of Book-Entry Only System**

In the event that either (i) the Authority receives notice from DTC to the effect that DTC is unable or unwilling to discharge its responsibilities as a clearing agency for the Bonds, or (ii) the Authority elects to discontinue its use of DTC as a clearing agency for the Bonds, and in either case the Authority does not appoint an alternative clearing agency, then the Borrowers and the Trustee will do or perform or cause to be done or performed all acts or things, not adverse to the rights of the holders of the Bonds, as are necessary or appropriate to discontinue use of DTC as a clearing agency for the Bonds, and to transfer the ownership of each of the Bonds, to such person or persons, including another clearing agency as the holders of the Bonds may direct in accordance with the Indenture. See the caption "THE BONDS—General" herein.

**Interest**

The Bonds will bear interest in one of several different Adjustable Interest Rate Modes: Weekly, One Month, Three Month, Six Month, One Year or Five Year (the *"Adjustable Interest Rate Modes"*) or at a Fixed Interest Rate in the Fixed Interest Rate Mode. (The Adjustable Interest Rate Modes and the Fixed Interest Rate Mode are collectively referred to as *"Interest Rate Modes."*) The Interest Rate Modes are described below under "Interest Rate Modes on

C01846

Bonds." The Borrowers may elect to convert the Interest Rate Mode on the Bonds, from time to time, as described under "Conversion Between Interest Rate Modes" below.

While the Bonds bear interest in one of the Adjustable Interest Rate Modes, they bear interest in such mode for a period of time generally corresponding to the title of that Adjustable Interest Rate Mode (the *"Interest Rate Period"*) at a rate determined by the Remarketing Agent. The Remarketing Agent determines the interest rate for a particular Interest Rate Period on the Interest Rate Determination Date for such Interest Rate Period. The Interest Rate Periods and Interest Rate Determination Dates for each Adjustable Interest Rate Mode are described below under "Interest Rate Modes on Bonds."

The Interest Payment Dates for the Bonds will be (a) the first Business Day of each month, commencing the first Business Day of June, 2007, for any periods that Bonds bear interest at the Weekly Interest Rate, the One Month Interest Rate or the Three Month Interest Rate or (b) the first day of each January and July for any periods that Bonds bear interest at the Six Month Interest Rate, the One Year Interest Rate, the Five Year Interest Rate or the Fixed Interest Rate.

While Bonds bear interest in the Weekly, the One Month or the Three Month Interest Rate Mode, such interest will be calculated on the basis of a 365/366 day year. While Bonds bear interest in the Six Month, One Year, Five Year or Fixed Interest Rate Mode, such interest will be calculated on the basis of a 360 day year, consisting of twelve 30-day months.

The Bonds will bear interest initially at the Weekly Interest Rate. The first Interest Payment Date on the Bonds will be the first Business Day of June, 2007.

From the date of initial delivery through Wednesday of the following week, the interest rate on the Bonds will be the rate per annum established in the Bond Purchase Agreement. Thereafter, the Bonds will bear interest at the Weekly Interest Rate as determined by the Remarketing Agent on each Interest Rate Determination Date, unless and until there has occurred a change to a different Interest Rate Mode on an applicable Interest Period Reset Date (defined under "Conversion Between Interest Rate Modes" herein).

**Interest Rate Modes on Bonds**

While the Bonds bear interest in one of the Adjustable Interest Rate Modes, the interest rate for a particular Interest Rate Period is determined by the Remarketing Agent on the Interest Rate Determination Date. Such interest rate is effective on the Interest Rate Adjustment Date, for the succeeding Interest Rate Period.

The interest rate determined on the Interest Rate Determination Date is to be that rate of interest per annum which the Remarketing Agent determines to be the lowest interest rate, for the Interest Rate Period commencing on the next Interest Rate Adjustment Date, that in the judgment of the Remarketing Agent (taking into consideration current transactions and comparable securities with which the Remarketing Agent is involved or of which it is aware and prevailing financial market conditions) would enable the Bonds to be remarketed at par, plus accrued

C 01847

interest (if any), on the Interest Rate Adjustment Date for that Interest Rate Period. In the event that the Remarketing Agent has been removed or has resigned and no successor has been appointed or the Remarketing Agent has failed to determine the appropriate interest rate on the Interest Rate Determination Date for whatever reason, the interest rate then in effect with respect to the Bonds, without adjustment, will continue for the next Interest Rate Period. In no event, however, may any interest rate on the Bonds exceed 10% per annum.

On the Interest Rate Determination Date, the Remarketing Agent will give the Trustee telephonic or electronic notice (immediately confirmed in writing) of the interest rate to be borne by the Bonds for the following Interest Rate Period. After any Interest Rate Determination Date, any Holder or Beneficial Owner may contact the Trustee or the Remarketing Agent in order to be advised of the applicable interest rate. No notice of the applicable interest rate will be sent to the Holders or Beneficial Owners.

The determination of any interest rate by the Remarketing Agent is binding and conclusive upon the Borrowers, the Bank, the Beneficial Owners and the Holders of the Bonds.

The Interest Rate Modes and their Interest Rate Determination Dates, Interest Rate Adjustment Dates and Interest Rate Periods are as follows:

*Weekly Interest Rate.* In the Weekly Interest Rate Mode, the Interest Rate Period is a period of one week commencing on Thursday. The Interest Rate Determination Date in the Weekly Interest Rate Mode is not later than 2:00 p.m. on Wednesday of each week, or the next preceding Business Day if such Wednesday is not a Business Day. The Interest Rate Adjustment Date for the Weekly Interest Rate Mode is Thursday of each week. (In the event of a conversion to the Weekly Interest Rate Mode from a different Interest Rate Mode, the first Interest Rate Period may be less than one week. Such first Interest Rate Period commences on the Interest Period Reset Date, which must be the first Business Day of a month (or the first day of a month upon conversion from a Six Month, One Year or Five Year Interest Rate Mode) and ends on the next succeeding Wednesday. In such event, the Interest Rate Determination Date is not later than 2:00 p.m. on the Business Day preceding the Interest Period Reset Date. In the event of a conversion from the Weekly Interest Rate Mode to a different Interest Rate Mode, the last Interest Rate Period may be less than one week as a result of such last Interest Rate Period ending on the day preceding the first Business Day or the first day of a month.)

*One Month Interest Rate.* In the One Month Interest Rate Mode, the Interest Rate Adjustment Date is the first Business Day of the month and the Interest Rate Period is one month commencing on the first Business Day of the month to and including the day preceding the first Business Day of the next month. The Interest Rate Determination Date is the seventh Business Day preceding the first Business Day of the month.

*Three Month Interest Rate.* In the Three Month Interest Rate Mode, the Interest Rate Adjustment Date is the first Business Day of each January, April, July or September and the Interest Rate Period commences on the Interest Rate Adjustment Date and continues up to and including the day preceding the next Interest Rate Adjustment Date. The Interest Rate Determination Date is the tenth Business Day before the Interest Rate Adjustment Date. (In the

001848

event of a conversion from another Interest Rate Mode to the Three Month Interest Rate Mode, the first Interest Rate Adjustment Date would be the Interest Period Reset Date for the Three Month Interest Rate Mode which may be the first Business Day or the first day of any month. Accordingly, the first Interest Rate Period may be shorter than a full three months.)

*Six Month Interest Rate.*   In the Six Month Interest Rate Mode, the Interest Rate Adjustment Dates are January 1 and July 1 and the Interest Rate Period commences on the Interest Rate Adjustment Date and continues up to and including the day preceding the next Interest Rate Adjustment Date.  The Interest Rate Determination Date is the tenth Business Day preceding the Interest Rate Adjustment Date.  (Upon a conversion from another Interest Rate Mode to the Six Month Interest Rate Mode, the first Interest Rate Adjustment Date is the Interest Period Reset Date for the Six Month Interest Rate Mode, which may be the first Business Day or the first day of any month.  Accordingly, the first Interest Rate Period may be shorter than a full six months.)

*One Year Interest Rate.*   In the One Year Interest Rate Mode, the Interest Rate Adjustment Date is either January 1 or July 1 and the Interest Rate Period is a one year period commencing on the appropriate Interest Rate Adjustment Date and ending on either December 31 or June 30.  The Interest Rate Determination Date is the tenth Business Day preceding the Interest Rate Adjustment Date.  (Upon a conversion from another Interest Rate Mode to the One Year Interest Rate Mode, the first Interest Rate Adjustment Date would be the Interest Period Reset Date for the One Year Interest Rate Mode, which may be the first Business Day or the first day of any month.  Accordingly, the first Interest Rate Period may be shorter than one full year).

*Five Year Interest Rate.*   In the Five Year Interest Rate Mode, the Interest Rate Adjustment Date is either January 1 or July 1 and the Interest Rate Period is a five year period commencing on the appropriate Interest Rate Adjustment Date and ending on either December 31 or June 30.  The Interest Rate Determination Date is the tenth Business Day preceding the Interest Rate Adjustment Date.  (Upon a conversion to the Five Year Interest Rate Mode from another Interest Rate Mode, the first Interest Rate Adjustment Date would be the Interest Period Reset Date for the Five Year Interest Rate Mode, which may be the first Business Day or the first day of any month.  Accordingly, the first Interest Rate Period may be shorter than five full years).

*Fixed Interest Rate.*   In the Fixed Interest Rate Mode, there is only one Interest Rate Adjustment Date and that is the Interest Period Reset Date upon which such Interest Rate Mode commences.  The Interest Rate Period commences on such Interest Rate Adjustment Date and continues to the final maturity of the Bonds.  The Interest Rate Determination Date is the tenth Business Day preceding the Interest Rate Adjustment Date.

**Conversion Between Interest Rate Modes**

The Interest Rate Mode on the Bonds may be changed, at the election of the Borrowers, as of an Interest Period Reset Date in the manner described below.  "Interest Period Reset Date" means the date on which the Interest Rate Mode on the Bonds converts from one Interest Rate