Mode to a new Interest Rate Mode. An Interest Period Reset Date must be the first Business Day of a month; provided that, upon conversion from a Six Month, One Year or Five Year Interest Rate Mode, an Interest Period Reset Date will be the first day of a month; and provided further that, except when converting from a Weekly Interest Rate Mode, an Interest Period Reset Date may not occur prior to the end of the preceding Interest Rate Period and shall the first day or Business Day after the end of such preceding Interest Rate Period.

On the first Business Day of June, 2007, and on any Interest Period Reset Date thereafter, the Interest Rate Mode on the Bonds may be converted to a different Interest Rate Mode upon receipt by the Trustee and the Remarketing Agent of a written direction from the Corporation on behalf of the Borrowers approved in writing by the Bank given on behalf of the Authority, not less than 45 days prior to such Interest Period Reset Date, to convert the Interest Rate Mode on the Bonds to an Interest Rate Mode other than the Interest Rate Mode then in effect. Except when converting from the Weekly Interest Rate Mode, no Interest Period Reset Date will be earlier than the day after the end of the last Interest Rate Period for the Interest Rate Mode in effect on the date of such direction from the Corporation, the end of such Interest Rate Period to be determined as if such direction had not been given. Such direction to convert the Interest Rate Mode on the Bonds to a different Interest Rate Mode must be accompanied by (a) an opinion of nationally recognized bond counsel (*"Bond Counsel"*) selected by the Borrowers delivered to the Authority, the Trustee, the Bank and the Remarketing Agent, stating that the conversion to the specified Interest Rate Mode will not adversely affect the exclusion from gross income of the interest on the Bonds for federal income tax purposes, (b) a written certificate of the Remarketing Agent stating that the interest coverage period provided by the then existing Letter of Credit is appropriate for the Interest Rate Mode directed to be in effect and that the termination date of the Letter of Credit is no earlier than fifteen days after the end of the new Interest Rate Period or, in the event of a conversion to the Fixed Interest Rate, no earlier than fifteen days after the First Optional Redemption Date (as hereinafter defined), and (c) a written certificate of the Remarketing Agent stating that it has received certifications, opinions or other evidence satisfactory to it that there has been or will be compliance with any applicable state or federal securities law requirements. If the Bonds bear interest at the Weekly Interest Rate, the One Month Interest Rate or the Three Month Interest Rate, the interest coverage period for the Letter of Credit must be at least 42 days of interest at the maximum interest rate. If the Bonds bear interest at the Six Month Interest Rate, the One Year Interest Rate, the Five Year Interest Rate or the Fixed Interest Rate, then the interest coverage period for the Letter of Credit must be at least 195 days of interest at the maximum interest rate. The Borrowers will be required to provide a Letter of Credit or an Alternate Letter of Credit which will provide the appropriate interest coverage. The Letter of Credit provides only 42 days of interest coverage. Notwithstanding any provision of this paragraph, no conversion will be effective (i) if the Bonds after the conversion would bear interest at a One Year Interest Rate, Five Year Interest Rate or Fixed Interest Rate and the Borrowers make an election on the day immediately succeeding any Interest Rate Determination Date not to proceed with the proposed conversion or (ii) the Trustee has not received on the effective date of such conversion an opinion of Bond Counsel to the same effect as described in clause (a) of this paragraph above. In either such event, the Interest Rate Mode for the Bonds will remain as the Interest Rate Mode then in effect for the Bonds without regard to any proposed conversion. The Bonds will continue to be subject to tender for purchase on the scheduled effective date of the proposed conversion without regard to the failure

001850

of such proposed conversion. If the Trustee has sent any notice to Holders regarding the proposed conversion, then in the event of a failure of such conversion as specified above, the Trustee will promptly notify all Holders of such failure, of the reason for such failure, and of the continuation of the Interest Rate Mode then in effect.

If the Interest Rate Mode on the Bonds is converted to a different Interest Rate Mode, at least 30 days prior to the Interest Period Reset Date, the Trustee will notify Holders of all outstanding Bonds by first class mail that on such Interest Period Reset Date the Bonds will be converted to a different Interest Rate Mode, which Interest Rate Mode will be specified, and that all Bonds and Beneficial Ownership Interests will be subject to mandatory tender, subject to the right of Holders or Beneficial Owners to affirmatively elect to waive and not be subject to the mandatory tender, and to retain their Bonds or Beneficial Ownership Interests. See "THE BONDS—Mandatory Tender for Purchase of Bonds or Beneficial Ownership Interests Upon Conversion Between Modes." Except as otherwise described herein, so long as the Bonds are held by DTC or its nominee, Cede & Co., in book-entry only form, the Trustee will recognize and treat DTC or its nominee, Cede & Co., as the Holder of Bonds for all purposes under the Indenture. See "THE BONDS—Book-Entry Only System" herein. Consequently, the foregoing notices of conversion will be sent by the Trustee only to DTC or its nominee and any corresponding notice to the Beneficial Owners will be the responsibility of DTC and the applicable Direct Participant or Indirect Participant.

The Borrowers may elect to convert between Interest Rate Modes with respect to the Bonds from time to time, as described above. If the Borrowers, however, elect to convert the Bonds to a Fixed Interest Rate Mode, no further conversions between Interest Rate Modes may be made with respect to the Bonds.

## Mutilated, Lost, Wrongfully Taken or Destroyed Bonds

If a Bond is mutilated, lost, wrongfully taken or destroyed, in the absence of written notice to the Authority and the Registrar or the Trustee that such Bond has been acquired by a bona fide purchaser, the Registrar will authenticate a new Bond of like date, maturity and denomination. Any mutilated Bond will be surrendered to the Registrar, and in the case of any lost, wrongfully taken or destroyed Bond, there must be first furnished to the Registrar evidence of such loss, wrongful taking or destruction satisfactory to the Registrar, together with indemnity to the Registrar, the Authority, the Trustee, the Authorized Borrower Representative and the Bank by the nondelivering Holder satisfactory to each of them. In the event any such lost, wrongfully taken or destroyed Bond has matured, instead of issuing a new Bond, the Borrowers may direct the Trustee to pay the same without surrender thereof upon the furnishing of the satisfactory evidence and indemnity as in the case of issuance of a new Bond. The Registrar and the Trustee may charge the Holder of such Bond their reasonable fees and expenses in connection therewith.

**Redemption Prior to Maturity**

The Bonds are callable for redemption in the circumstances and in the manner described below under "Optional Redemption," "Extraordinary Redemption," "Mandatory Sinking Fund Redemption" and "Mandatory Redemption."

*Optional Redemption.* At the option of the Authority, upon the direction of the Borrowers and with the prior written consent of the Bank, to the extent the Bonds are secured by a Letter of Credit (which shall be inferred with respect to any optional redemptions which may be required by the Bank pursuant to the Credit Agreement so long as the funds necessary to reimburse the Bank for moneys to be drawn under the Letter of Credit to redeem the bonds for which notice of redemption is to be given are on deposit with the Trustee prior to the Trustee giving such notice of redemption), the Bonds are subject to redemption by the Authority, but only while the Bonds bear interest in one of the Adjustable Interest Rate Modes, in whole or in part (in integral multiples of $5,000, provided that the unredeemed portion of any Bond redeemed in part must be $100,000 or more) on any Interest Payment Date, while the Bonds bear interest in a Weekly Interest Rate, and on any Interest Rate Adjustment Date, while the Bonds bear interest in other Adjustable Rates, at a redemption price of 100% of the principal amount redeemed, plus interest accrued thereon to the redemption date.

If the Bonds bear interest at the Fixed Interest Rate, upon the election of the Borrowers, the Bonds are subject to redemption by the Authority in whole or in part (in integral multiples of $5,000, provided that the unredeemed portion of any Bond redeemed in part must be $100,000 or more) at any time on or after the First Optional Redemption Date, as defined below, at redemption prices described below (as a percentage of principal to be redeemed) plus accrued interest to the date of redemption:

| Redemption Dates<br>Occurring During Following Periods | Redemption Prices |
|---|---|
| First Optional Redemption Date, through the following last day of December | 103% |
| First Anniversary of the First Optional Redemption Date, through the following last day of December | 102% |
| Second Anniversary of the First Optional Redemption Date, through the following last day of December | 101% |
| Third Anniversary of the First Optional Redemption Date and thereafter | 100% |

001852

"*First Optional Redemption Date*" means the January 1 occurring in the year which is a number of years after the Interest Period Reset Date for the Fixed Interest Rate Period equal to the number of full years between the Interest Period Reset Date and the maturity date of the Bonds, multiplied by one-half and rounded up to the nearest whole number.

*Any portion of any redemption price in excess of 100% of the principal amount redeemed plus accrued interest is not payable from a draw on the Letter of Credit.*

*Extraordinary Redemption.*  In addition, at the option of the Borrowers, Bonds are subject to redemption by the Authority at any time in whole or in part in the minimum amount of Three Million Dollars ($3,000,000) with respect to (a) and (b) below only at a redemption price of 100% of the principal amount thereof redeemed, plus accrued interest thereon to the redemption date, upon the occurrence of any of the following events:

      (a)    A portion of the Project has been damaged or destroyed to such an extent that (1) it cannot reasonably be expected to be restored, within a period of three months, to the condition thereof immediately preceding such damage or destruction or (2) its normal use and operation is reasonably expected to be prevented for a period of three consecutive months;

      (b)    Title to, or the temporary use of, all or a portion of the Project has been taken under the exercise of the power of eminent domain (l) to such extent that a portion of the Project cannot reasonably be expected to be restored within a period of three months to a condition or usefulness comparable to that existing prior to the taking or (2) as a result of the taking, normal use and operation of a portion of the Project is reasonably expected to be prevented for a period of three consecutive months; or

      (c)    As a result of any changes in the Constitution of the State of Illinois, the Constitution of the United States of America, or state or federal laws, or as a result of legislative or administrative action (whether state or federal) or by final decree, judgment or order of any court or administrative body (whether state or federal) entered after the contest thereof by the Authority, the Trustee or the Borrowers in good faith, the Loan Agreement has become void or unenforceable or impossible of performance in accordance with the intent and purpose of the parties as expressed in the Loan Agreement, or if unreasonable burdens or excessive liabilities have been imposed with respect to the Project or the operation thereof, including, without limitation, federal, state or other ad valorem, property, income or other taxes not being imposed on the date of the Loan Agreement other than ad valorem taxes presently levied upon privately owned property used for the same general purpose as the Project.

To exercise any such redemption option, the Borrowers within 90 days following the event authorizing the exercise of that option, or at any time during the continuation of the condition referred to in clause (c) above, will give notice to the Authority and to the Trustee specifying the date on which the Borrowers will deliver the funds required for that redemption,

which date shall be not more than 90 days from the date that notice is mailed, and will make arrangements satisfactory to the Trustee for the giving of the required notice of redemption.

With the prior consent of the Bank, the Borrowers also have the option, in the event that title to or the temporary use of a portion of the Project is taken under the exercise of the power of eminent domain, even if the taking is not of such nature as to permit the exercise of the redemption option upon an event specified in (b) above, to direct the redemption, at a redemption price of 100% of the principal amount thereof prepaid, plus accrued interest to the redemption date, of that part of the outstanding principal balance of the Bonds as may be payable from the proceeds received by the Borrowers (after the payment of costs and expenses incurred in the collection thereof) in the eminent domain proceeding, provided that the Borrowers furnish to the Authority and the Trustee a certificate of an Engineer (as defined in the Loan Agreement) stating that (1) the property comprising the part of the Project taken is not essential to continued operations of the Project in the manner existing prior to that taking, (2) the Project has been restored to a condition substantially equivalent to that existing prior to the taking, or (3) other improvements have been acquired or made which are suitable for the continued operation of the Project.

Notwithstanding the provisions above, any Pledged Bonds shall be redeemed first.

*Mandatory Sinking Fund Redemption.* In the event the Bonds bear interest in the Five Year Interest Rate Mode or the Fixed Interest Rate Mode, the Bonds will be subject to mandatory sinking fund redemption requirements at a redemption price of 100% of the principal amount of the Bonds redeemed, plus interest accrued to the redemption date, on each January 1 and July 1 commencing on the first January 1 or July 1 immediately succeeding the conversion to the Five Year Interest Rate or the Fixed Interest Rate, in the principal amounts set forth in the Credit Agreement as in effect 225 days prior to the conversion.

The Authority, or the Borrowers on behalf of the Authority, shall have the option to deliver to the Registrar for cancellation Bonds in any aggregate principal amount and to receive a credit against the then current mandatory sinking fund requirement (and corresponding mandatory redemption obligation) of the Authority. That option shall be exercised by the Authority, or the Borrowers on behalf of the Authority, on or before the 60th day preceding the applicable mandatory sinking fund redemption date, by furnishing the Trustee a certificate, executed by an Authorized Issuer Representative or an Authorized Borrower Representative (each as defined in the Indenture), as the case may be, setting forth the extent of the credit to be applied with respect to the then current mandatory sinking fund requirements, and the Bonds to be so credited. If the certificate and the Bonds to be credited are not timely furnished to the Trustee, the mandatory sinking fund requirement (and corresponding mandatory redemption obligation) shall not be reduced. With the prior written consent of the Bank, credit against the then current mandatory sinking fund requirement (and corresponding mandatory redemption obligation) also shall be received by the Authority for any Bonds which prior thereto have been redeemed (other than through the operation of the mandatory sinking fund requirements) or purchased for cancellation and canceled by the Trustee, to the extent not applied theretofore as a credit against any redemption obligation.

001854

Notwithstanding the provisions above, any Pledged Bonds shall be redeemed first.

Except as otherwise provided in the preceding paragraph, each Bond previously redeemed, or purchased and canceled, shall be credited by the Trustee at 100% of the principal amount thereof against the mandatory sinking fund requirements (and corresponding mandatory redemption obligations) in inverse order of the maturity of the mandatory sinking fund requirements.

*Mandatory Redemption.* Upon the occurrence of a Determination of Taxability, as defined below, the affected Bonds are subject to mandatory redemption in whole by the Authority at a redemption price of 100% of the outstanding principal amount thereof, plus accrued interest to the redemption date, at the earliest practicable date selected by the Trustee, after consultation with the Borrowers, but in no event later than 45 days following the Trustee's receipt of notification of the Determination of Taxability.

*The occurrence of a Determination of Taxability with respect to the Bonds will not constitute an Event of Default under the Indenture and the Bonds will be subject to mandatory redemption in accordance with this paragraph. No redemption premium will be payable and no increase in the interest payable with respect to the Bonds will occur in the event a Determination of Taxability occurs.*

*"Determination of Taxability"* means and shall occur when (i) the Trustee receives written notice from the Corporation, supported by an opinion of Bond Counsel, that interest on the Bonds is includable in the gross income of Holders of the Bonds for federal income tax purposes or (ii) the Internal Revenue Service shall claim in writing that interest on the Bonds is includable in the gross income of Holders of the Bonds for federal income tax purposes; provided, that such a claim will not be deemed a Determination of Taxability unless the Borrowers are afforded reasonable opportunity (at their sole expense and for a period not to exceed two years) to pursue any judicial or administrative remedy available to the Borrowers with respect to such claim.

*Notice of Redemption and Payments.* Unless waived by any Holder of Bonds to be redeemed, official notice of any such redemption with respect to the Bonds is to be given by the Registrar or the Trustee on behalf of the Authority to the registered owner of each Bond being redeemed by first class mail, addressed to the last known address of such Holder as it appears upon the register (the *"Register"*) maintained by the Registrar, or at such other address as is furnished in writing by the Holder to the Registrar, not less than 30 days nor more than 60 days prior to redemption (except in the case of mandatory redemption upon the occurrence of a Determination of Taxability, in which case notice must be given at least five days and not more than fifteen days prior to the date fixed for redemption). Failure to receive any such notice or any defect therein will not affect the validity of any proceeding for the redemption of any other Bond.

Notice of the call for redemption of Bonds held under a book entry system will be sent by the Registrar or the Trustee only to DTC or its nominee as registered owner. Selection of book entry interests in the Bonds called for redemption is the responsibility of DTC, Direct

Participants and Indirect Participants. Any failure of DTC to advise any Direct Participant, or of any Direct Participant or any Indirect Participant to notify the Beneficial Owners, of any such notice and its content or effect will not affect the validity of any proceedings for the redemption of the Bonds. See "THE BONDS—Book-Entry Only System" herein.

When less than the entire unmatured portion of the Bonds are called for redemption at any time or from time to time, the selection of such Bonds or portions of Bonds in the amount of $5,000 or any integral multiple thereof is to be made by lot in such manner as determined by the Trustee, provided that the Trustee shall select Bonds for redemption so as to assure that Pledged Bonds are redeemed first and also the unredeemed portion of any Bond or Beneficial Ownership Interest redeemed in part must be $100,000 or more. Except as provided in the preceding sentence, if less than all of an outstanding Bond of one maturity in a book entry system is to be called for redemption, the Trustee will give notice of redemption only to DTC or its nominee as registered owner. The selection of the book entry interests in that Bond to be redeemed, and notice of the call to the Beneficial Owners of those interests called, is the responsibility of DTC, Direct Participants and Indirect Participants.

The Trustee is required to draw upon the Letter of Credit in amounts sufficient to pay the principal amount of the Bonds to be redeemed and any interest accrued thereon.

If any Bonds are not presented for payment at the date fixed for their redemption and the funds for such payment are available therefor, the Holders of such Bonds will thereafter be restricted exclusively to the funds available for redemption for the satisfaction of any claim relating to such Bonds. Any such funds remaining unclaimed for four years after becoming due and payable will be paid to the Bank, unless it confirms to the Trustee that no moneys are due to the Bank under the Credit Agreement, in which case such funds will be paid to the Borrowers and the Holders of such Bonds will thereafter be entitled to look only to the Borrowers for payment and only in an amount equal to the amounts received by or paid to or on behalf of the Borrowers, without any interest thereon.

## Purchase of Bonds or Beneficial Interests on Demand of Holders or Beneficial Owners

While the Bonds bear interest in any Adjustable Interest Rate Mode, each Holder and each Beneficial Owner will have the option to tender for purchase at 100% of the principal amount thereof, all of the Bonds or Beneficial Ownership Interests owned by such Holders or Beneficial Owners, or (in either case) such lesser principal amount thereof (in denominations of $100,000 or integral multiples of $5,000 in excess thereof, provided that the untendered portion of any Bond or Beneficial Ownership Interest will be $100,000 or more in principal amount) as such Holder or Beneficial Owner may specify in accordance with the terms, conditions and limitations set forth in the Indenture. The term "Bond Purchase Date" means any Business Day selected by the Holder or Beneficial Owner while the Bonds bear interest in the Weekly Interest Mode and if the Interest Rate Mode on the Bonds is to be converted from the Weekly Interest Rate Mode to a new Interest Rate Mode, must be a date prior to the Interest Period Reset Date with respect to that new Interest Rate Mode. While the Bonds bear interest in any other Adjustable Interest Rate Mode, the term "Bond Purchase Date" means any Interest Rate Adjustment Date. The Holders or Beneficial Owners do not have the option to tender their

001856

Bonds or Beneficial Ownership Interests for purchases after the Interest Rate Mode on the Bonds has been converted to the Fixed Interest Rate Mode.

The Trustee must purchase such tendered Bonds or Beneficial Ownership Interests at their par value plus, if the Bonds bear interest in the Weekly Interest Rate Mode, interest accrued to the date of purchase. The purchase price will be paid by the Trustee first from the proceeds of the remarketing of the Bonds or Beneficial Ownership Interests, and second from money drawn on the Letter of Credit if the proceeds of remarketing are insufficient to pay the purchase price. Such purchase price will be paid in lawful money of the United States of America by check or draft and, will equal the principal amount, or such portion thereof, to be purchased and will be paid in full on the Bond Purchase Date.

To exercise the option to tender for purchase, the Holder or Beneficial Owner must (1) give notice to the Trustee by the time and the date set forth below in writing or by telecopy stating (i) the name and address of the Holder or Beneficial Owner, (ii) the principal amount, CUSIP number and Bond numbers of Bonds or Beneficial Ownership Interests to be purchased, (iii) that such Bonds or Beneficial Ownership Interests are to be purchased on the Bond Purchase Date pursuant to the terms of the Indenture, and (iv) that such notice is irrevocable; (2) in the case of a purchase of a Beneficial Ownership Interest, the Beneficial Owner must provide the Trustee with evidence satisfactory to the Trustee of such Beneficial Owner's Beneficial Ownership Interest; (3) in the case of a Holder, deliver to the Trustee at its principal corporate trust office (by the time and date set forth below), the Bonds to be purchased, accompanied by fully completed and executed Instructions to Sell, the form of which is printed on the Bonds; and (4) in the case of a Beneficial Owner, cause the transfer of the Beneficial Owner's Beneficial Ownership Interest on the records of DTC as instructed by the Trustee (by the date and time set forth below). After a demand for purchase any Bonds not so delivered will be deemed tendered. After a demand for purchase, Beneficial Owners of Beneficial Ownership Interests are obligated to cause the transfer of such Beneficial Ownership Interests on the records of DTC. All references to local time mean the applicable Eastern Standard Time. Notwithstanding the foregoing, so long as the Bonds are held in the DTC book-entry only system, the requirement of physical delivery of tendered Bonds will be deemed to be satisfied as described herein under "THE BONDS—Book-Entry Only System."

*Weekly Interest Rate Mode.* To exercise the option to tender the Bonds or Beneficial Ownership Interests while the Bonds bear interest in the Weekly Interest Rate Mode, the Holder or Beneficial Owner must (1) give the notice (which notice is irrevocable) no earlier than the seventh day and not later than the fifteenth (15th) day next succeeding the date of giving of such notice to the Trustee and, if the interest rate on the Bonds is to be converted from the Weekly Interest Rate to a new Interest Rate Mode, is a date prior to the Interest Period Reset Date with respect to the new Interest Rate Mode, (2) in the case of a Holder, deliver the Bonds no later than 10:00 a.m. Eastern Standard Time on the second Business Day preceding the applicable Bond Purchase Date and (3) in the case of a Beneficial Owner, cause the transfer of the Beneficial Ownership Interest on the records of DTC by 10:00 a.m. Eastern Standard Time on the Bond Purchase Date.

CC1857

*Other Adjustable Interest Rate Modes.* To exercise the option to tender Bonds or Beneficial Ownership Interests while the Bonds bear interest in any Adjustable Interest Rate Mode other than the Weekly Interest Rate Mode, the Holder or Beneficial Owner must (1) give the notice (which notice is irrevocable) to the Trustee no earlier than fifteen days prior to the Bond Purchase Date and no later than 11:00 a.m. Eastern Standard Time on the fifth Business Day prior to the Bond Purchase Date, (2) in the case of a Holder, deliver the Bonds no later than 10:00 a.m. Eastern Standard Time on the fourth day prior to the Bond Purchase Date or the next preceding Business Day if such fourth day is not a Business Day, and (3) in the case of a Beneficial Owner, cause the transfer of the Beneficial Ownership Interest on the records of DTC by 10:00 a.m. Eastern Standard Time on the Bond Purchase Date.

If less than all of a Bond so delivered is to be purchased, the Trustee will authenticate one or more Bonds in exchange therefor, registered in the name of such Holder, having the aggregate principal amount being retained by such Holder, and will deliver such authenticated Bond or Bonds to such Holder.

Any Bonds not delivered by Holders following the giving of notice of tender shall nevertheless be deemed tendered for remarketing. Subject to the right of such nondelivering Holders to receive the purchase price of such Bonds and accrued interest to the day preceding the Bond Purchase Date, such Bonds shall be null and void, and the Trustee shall authenticate and deliver new Bonds in replacement thereof pursuant to the remarketing of such Bonds. After the giving of a notice of tender, Beneficial Owners shall be obligated to transfer their Beneficial Ownership Interests on the records of the DTC in accordance with the instructions of the Trustee.

The tender options granted to the Holders and the Beneficial Owners and all mandatory Bond tenders are subject to the additional condition that any tendered Bonds or Beneficial Ownership Interests (or the applicable portions thereof) will not be purchased if such Bonds (or applicable portions thereof) mature or are redeemed on or prior to the applicable Bond Purchase Date.

*So long as the Bonds are held by DTC or its nominee, Cede & Co., in book-entry only form, the Trustee will recognize and treat DTC or its nominee, Cede & Co., as the Holder of the Bonds for all purposes under the Indenture, provided however that the Trustee will recognize Beneficial Owners for purposes of the purchase of Beneficial Ownership Interests. See "THE BONDS— Book-Entry Only System" herein. Each Beneficial Owner is responsible for observing the procedures of DTC, the Direct Participant, any Indirect Participant and the Trustee, as set forth in the Indenture, in order to permit the timely observance of the tender process with respect to Beneficial Ownership Interests.*

## Mandatory Tender for Purchase of Bonds or Beneficial Ownership Interests upon Conversion Between Modes

Upon any conversion of the Bonds from one Interest Rate Mode to another, the Bonds and Beneficial Ownership Interests will be subject to mandatory purchase on the Interest Period Reset Date with respect to the new Interest Rate Mode.

001858

The Borrowers are required to give notice to the Trustee and Remarketing Agent of its election to convert the Bonds to a new Interest Rate Mode at least 45 days prior to the Interest Period Reset Date for the new Interest Rate Mode. The Trustee is required to notify Holders of all outstanding Bonds of such conversion to a different Interest Rate Mode at least 30 days before the Interest Period Reset Date. Unless the new Interest Rate Mode is a Weekly Interest Rate Mode or the One Month Interest Rate Mode, the Remarketing Agent will determine the interest rate for the first Interest Rate Period for the new Interest Rate Mode on the Interest Rate Determination Date, which will be the tenth Business Day before the Interest Period Reset Date for the new Interest Rate Mode. If the new Interest Rate Mode is the Weekly Interest Rate Mode, the Remarketing Agent will determine the first Weekly Interest Rate on the Interest Rate Determination Date for the Weekly Interest Rate Mode, which will be 2:00 p.m. Eastern Standard Time of the Trustee on the Business Day preceding the Interest Period Reset Date. If the new Interest Rate Mode is the One Month Interest Rate Mode, the Interest Rate Determination Date will be the seventh Business Day before the Interest Period Reset Date. A Holder or Beneficial Owner may be advised of the interest rate for the first Interest Rate Period for the new Interest Rate Mode by contacting the Trustee or the Remarketing Agent on the Interest Rate Determination Date or thereafter.

Bonds or Beneficial Ownership Interests will be deemed to have been tendered whether or not the Holders thereof shall have delivered such Bonds to the Trustee and without the need for further action by the Beneficial Owners thereof and subject to the right of the Holders or Beneficial Owners of such Bonds or Beneficial Ownership Interests to receive the purchase price of such Bonds or Beneficial Ownership Interests and interest accrued thereon to the Interest Period Reset Date, such Bonds or Beneficial Ownership Interests will be null and void and the Trustee will authenticate and deliver new Bonds, or new Beneficial Ownership Interests will be created, in replacement thereof pursuant to the remarketing of such Bonds or Beneficial Ownership Interests or the pledge of such Bonds or Beneficial Ownership Interests to the Bank in lieu of remarketing such Bonds or Beneficial Ownership Interests.

*So long as the Bonds are held by DTC or its nominee, Cede & Co., in book-entry only form, the Trustee will recognize and treat DTC or its nominee, Cede & Co., as the Holder of the Bonds for all purposes under the Indenture, provided however that the Trustee will recognize a Beneficial Owner with respect to waivers of the purchase of Beneficial Ownership Interests. See "THE BONDS—Book-Entry Only System" herein. Each Beneficial Owner is responsible for observing the procedures applicable to DTC, the Direct Participant, any Indirect Participant and the Trustee, as set forth in the Indenture, in order to permit the timely observance of the mandatory tender waiver process with respect to Beneficial Ownership Interests.*

## Mandatory Tender for Purchase of Bonds or Beneficial Ownership Interests upon Delivery of an Alternate Letter of Credit

If the Borrowers provide for the delivery to the Trustee of an Alternate Letter of Credit (as hereinafter defined), then on any Interest Payment Date selected by the Borrowers (which must be at least two Business Days prior to the Termination Date of the Letter of Credit being replaced), which Interest Payment Date must be the same date as the Replacement Date (as hereinafter defined) (a *"Bond Purchase Date"*), the Bonds and Beneficial Ownership Interests

will be subject to mandatory tender for purchase from the Holders and Beneficial Owners thereof.

Prior to such Bond Purchase Date, the Trustee will, if the Bonds are then rated by a Rating Service (as hereinafter defined) give notice to each Rating Service which then has a rating on the Bonds of the provision of the Alternate Letter of Credit.  At least 30 days prior to the Bond Purchase Date, the Trustee will provide written notice to the Holders of all outstanding Bonds, by first class mail to all Holders, that an Alternate Letter of Credit is to be delivered by the Borrowers to the Trustee.  Such notice must advise the Holders of the Bond Purchase Date, that the requirements of the Indenture and the Bonds relating to Alternate Letter of Credit have been met, the name of the financial institution issuing the Alternate Letter of Credit, the rating, if any, on the Bonds upon the provision of the Alternate Letter of Credit and that all Bonds and Beneficial Ownership Interests will be subject to mandatory purchase from the Holders and Beneficial Owners thereof.

Bonds or Beneficial Ownership Interests will be deemed to have been tendered without further action by the Holders or Beneficial Owners thereof and subject to the right of the Holders or Beneficial Owners of such Bonds or Beneficial Ownership Interests to receive the purchase price of such Bonds or Beneficial Ownership Interests and interest accrued thereon to the Bond Purchase Date, such Bonds or Beneficial Ownership Interests will be null and void and the Trustee will authenticate and deliver new Bonds, or new Beneficial Ownership Interests will be created, in replacement thereof pursuant to the remarketing of such Bonds or Beneficial Ownership Interests or the pledge of such Bonds or Beneficial Ownership Interests to the Bank in lieu of remarketing such Bonds or Beneficial Ownership Interests.

*So long as the Bonds are held by DTC or its nominee, Cede & Co., in book-entry only form, the Trustee will recognize and treat DTC or its nominee, Cede & Co., as the Holder of the Bonds for all purposes under the Indenture, provided however, that the Trustee will recognize a Beneficial Owner with respect to waivers of the purchase of Beneficial Ownership Interests.  See "*THE BONDS—Book-Entry Only System*" herein.  Each Beneficial Owner is responsible for observing the procedures applicable to DTC, the Direct Participant, any Indirect Participant and the Trustee, as set forth in the Indenture, in order to permit the timely observance of the mandatory tender waiver process with respect to Beneficial Ownership Interests.*

**Mandatory Tender for Purchase of Bonds or Beneficial Ownership Interests upon Expiration of the Letter of Credit or Alternate Letter of Credit**

The Bonds and Beneficial Ownership Interests will be subject to mandatory tender for purchase on the Interest Payment Date which next precedes the Termination Date of the Letter of Credit by at least two Business Days, or the Interest Payment Date which next precedes the expiration date of any Alternate Letter of Credit by at least two Business Days (a *"Mandatory Bond Purchase Date"*) unless, at least 45 days prior to such Mandatory Bond Purchase Date, the Bank has provided to the Trustee written evidence of an extension or further extension of the expiration date of the Letter of Credit to a date not earlier than 364 days from the Termination Date of the Letter of Credit being extended.  See "THE LETTER OF CREDIT AND THE CREDIT

001860

AGREEMENT—Credit Agreement" herein for a further discussion of the events which may trigger the Termination Date of the Letter of Credit.

At least 30 days but no more than 45 days prior to a Mandatory Bond Purchase Date, the Trustee will notify the Holders of all outstanding Bonds, by first class mail to all Holders or Beneficial Owners, of the Termination Date of the Letter of Credit or the expiration date of any Alternate Letter of Credit. The notice must advise the Holders or Beneficial Owners, that all Bonds and Beneficial Ownership Interests will be subject to mandatory tender on such Mandatory Bond Purchase Date.

Bonds or Beneficial Ownership Interests not tendered for purchase as required by the preceding paragraph will be deemed to have been tendered without further action by the Holders or Beneficial Owners thereof, subject to the right of the Holders or Beneficial Owners of such Bonds or Beneficial Ownership Interests to receive the purchase price of such Bonds or Beneficial Ownership Interests and interest accrued thereto to the Mandatory Bond Purchase Date.

*So long as the Bonds are held by DTC or its nominee, Cede & Co., in book-entry only form, the Trustee will recognize and treat DTC or its nominee, Cede & Co., as the Holder of the Bonds for all purposes under the Indenture. See "THE BONDS—Book-Entry Only System" herein.*

### Remarketing of Bonds or Beneficial Ownership Interests

Whenever Bonds or Beneficial Ownership Interests are tendered for purchase by the Holders or Beneficial Owners thereof, either by optional tender or mandatory tender (other than a mandatory tender pursuant to the expiration of the Letter of Credit or any Alternate Letter of Credit), as described above, the Remarketing Agent will use its best efforts to remarket such Bonds or Beneficial Ownership Interests. If Bonds or Beneficial Ownership Interests tendered for purchase are not remarketed by the Remarketing Agent, the Trustee will draw on the Letter of Credit to pay the purchase price of such Bonds or Beneficial Ownership Interests and such Bonds or Beneficial Ownership Interests will be delivered to the Bank or, at the direction of the Bank, held by the Trustee for the benefit of the Bank.

Bonds or Beneficial Ownership Interests tendered for purchase upon the expiration of the Letter of Credit or any Alternate Letter of Credit will be delivered to the Bank or, at the direction of the Bank, held by the Trustee for the benefit of the Bank. Such Bonds or Beneficial Ownership Interests will not be remarketed prior to the Borrowers' delivery of a Letter of Credit which satisfies the terms of the Indenture with respect to the delivery of an Alternate Letter of Credit (as hereinafter defined).

### SECURITY AND SOURCES OF PAYMENT FOR THE BONDS

The Loan Agreement is a general unsecured obligation of the Borrowers and requires the Borrowers to make payments on the Note in amounts sufficient to pay when due (whether at

C01861

maturity, by redemption or otherwise) the principal of, premium, if any, and interest on the Bonds.

The Bonds and the interest thereon are limited obligations of the Authority payable solely from amounts on deposit in the Bond Fund established under the Indenture, from payments or prepayments to be made on the Note, from other payments made by the Borrowers under the Loan Agreement, and from payments made under the Letter of Credit (as hereinafter defined) and will be secured by a pledge and assignment of such amounts and such payments to the Trustee pursuant to the Indenture.

THE BONDS, ANY PREMIUM THEREON AND THE INTEREST THEREON DO NOT CONSTITUTE INDEBTEDNESS OR AN OBLIGATION, GENERAL OR MORAL, OR A PLEDGE OF THE FULL FAITH OR A LOAN OF CREDIT OF THE AUTHORITY, THE STATE OF ILLINOIS OR ANY POLITICAL SUBDIVISION THEREOF, WITHIN THE PURVIEW OF ANY CONSTITUTIONAL OR STATUTORY LIMITATION OR PROVISION. THE AUTHORITY IS OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, AND INTEREST ON THE BONDS AND OTHER COSTS INCIDENTAL THERETO ONLY FROM THE SOURCES SPECIFIED IN THE INDENTURE. NEITHER THE FULL FAITH AND CREDIT NOR THE TAXING POWERS, IF ANY, OF THE AUTHORITY, THE STATE OF ILLINOIS OR ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, AND INTEREST ON THE BONDS. NO OWNER OF ANY BOND SHALL HAVE THE RIGHT TO COMPEL THE TAXING POWER OF THE AUTHORITY, THE STATE OF ILLINOIS OR ANY POLITICAL SUBDIVISION THEREOF TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON THE BONDS. THE AUTHORITY DOES NOT HAVE THE POWER TO LEVY TAXES FOR ANY PURPOSE WHATSOEVER.

The principal of and interest on the Bonds will be payable from the proceeds of draws under the Letter of Credit. The Borrowers' obligation to reimburse the Bank for such draws will be provided for in the Credit Agreement.

*The Bonds are being offered solely on the basis of the Letter of Credit and the financial strength of the Bank and are not being offered on the basis of the financial strength of the Authority, the Borrowers or any other security. Except for a very limited description of the Borrowers contained herein, no information with respect to the Borrowers (financial or otherwise) is included in this Official Statement, and the Borrowers make no representation herein concerning their present or future financial condition. Potential Investors should base their investment decisions with respect to the Bonds SOLELY upon the credit of the Bank. The Bonds are subject to acceleration of maturity upon the occurrence of a default by the Borrowers under the Credit Agreement but such defaults are not fully described herein. As a result of the foregoing, prospective investors will not be able to evaluate the likelihood of a default by the Borrowers under the Credit Agreement and resulting acceleration of the Bonds.*

Enforceability of the provisions of the Bonds, the Loan Agreement, the Letter of Credit and the Indenture may be subject to bankruptcy, insolvency, reorganization, moratorium or other laws in effect from time to time affecting creditors' rights, and to the exercise of judicial discretion in accordance with general principles of equity.

C01862

IN THE EVENT OF A DEFAULT BY THE BANK UNDER THE LETTER OF CREDIT, NO INSURANCE PROCEEDS FROM THE FEDERAL DEPOSIT INSURANCE CORPORATION OR ANY OTHER GOVERNMENTAL AGENCY, INSTRUMENTALITY OR AUTHORITY WOULD BE AVAILABLE TO PAY BONDHOLDERS.

### THE LETTER OF CREDIT AND THE CREDIT AGREEMENT

The Letter of Credit will be issued pursuant to the Credit Agreement. The following, in addition to information contained under the heading *"INTRODUCTORY STATEMENT,"* summarizes certain provisions of the Letter of Credit and the Credit Agreement, to which documents, in their entirety, reference is made for the complete provisions thereof. The provisions of any substitute Letter of Credit and related Credit Agreement may be different from those summarized below.

## Letter of Credit

The Letter of Credit is an irrevocable obligation of the Bank. The Letter of Credit will be issued in an amount equal to the aggregate principal amount of the outstanding Bonds, plus 42 days' interest thereon at the rate of 10% per annum (the *"Cap Interest Rate"*). The Trustee, upon compliance with the terms of the Letter of Credit, is authorized and directed to draw up to (a) an amount sufficient (i) to pay principal of the Bonds (other than Borrowers Bonds and Pledged Bonds (each as defined in the Indenture)) when due, whether at maturity or upon redemption or acceleration, and (ii) to pay the portion of the purchase price of Bonds (other than Borrowers Bonds and Pledged Bonds) delivered for purchase pursuant to a demand for purchase by the owner thereof or a mandatory tender for purchase and not remarketed (a *"Liquidity Drawing"*) equal to the principal amount of such Bonds, plus (b) an amount not to exceed 42 days of accrued interest on such Bonds at the Cap Interest Rate (i) to pay interest on Bonds (other than Borrowers Bonds and Pledged Bonds) when due, and (ii) to pay the portion of the purchase price of Bonds (other than Borrowers Bonds and Pledged Bonds) delivered for purchase pursuant to a demand for purchase by the owner thereof or a mandatory tender for purchase and not remarketed, equal to the interest accrued, if any, on such Bonds.

The amount available under the Letter of Credit will be reduced to the extent of any drawing thereunder, subject to reinstatement as described below. With respect to a drawing by the Trustee solely to pay interest on the Bonds on an interest payment date, the amount available under the Letter or Credit will be automatically reinstated immediately unless the Trustee shall have received on or before the close of business on the fifth business day after payment by the Bank of such drawing written notice from the Bank that the Bank has elected not to reinstate such amount. With respect to a Liquidity Drawing made by the Trustee prior to the date on which all of the Bonds are converted to the Fixed Interest Rate (the *"Conversion Date"*), upon a remarketing of Bonds (or portions thereof) purchased with the proceeds of such Liquidity Drawing, the amount available under the Letter of Credit will be reinstated in an amount equal to the principal amount of the Bonds purchased with the proceeds of such Liquidity Drawing, plus the amount of accrued interest thereon paid with the proceeds of such Liquidity Drawing, upon receipt by the Bank (or the Trustee on behalf of the Bank) of the amount of any Liquidity Drawing relating to Bonds purchased with the proceeds of such Liquidity Drawing plus all accrued interest thereon.

001863

The Letter of Credit will terminate on the earliest of the Bank's close of business on (a) the stated expiration date (May 23, 2012, unless renewed or extended); (b) the earlier of (i) the date which is fifteen (15) days following the Conversion Date as specified in a notice from the Trustee to the Bank or (ii) the date on which the Bank honors a drawing under the Letter of Credit on or after the Conversion Date; (c) the date which is fifteen (15) days following the Bank's receipt of written notice from the Trustee that all Bonds have been paid or that a letter of credit has been issued in substitution for the Letter of Credit in accordance with the terms of the Indenture and the Credit Agreement; (d) the date on which an acceleration drawing is honored by the Bank; or (e) the date which is fifteen days following the date the Trustee receives a written notice from the Bank specifying the occurrence of an event of default under the Credit Agreement and directing the Trustee to accelerate the Bonds.

## Credit Agreement

If an Event of Default under the Credit Agreement occurs and is continuing, the Bank may, among other things, (i) require that the Borrowers immediately prepay to the Bank an amount equal to the amount then available under the Letter of Credit, (ii) declare all amounts due thereunder by the Borrowers immediately due and payable, (iii) give notice of the occurrence of such Event of Default to the Trustee directing the Trustee to accelerate the Bonds, thereby causing the Letter of Credit to expire 15 days thereafter, (iv) pursue any rights or remedies the Bank may have under the Related Documents, or (v) pursue any other action available at law or in equity. The Indenture directs the Trustee, upon receipt of the notice described in clause (iii) of the preceding sentence, to immediately accelerate the Bonds and to make the required drawing prior to the fifteenth day following receipt of such notice.

*"Events of Default"* under the Credit Agreement include the following:

(a)     any material representation or warranty made by either Borrower in the Credit Agreement (or incorporated therein by reference) or in any of the other Related Documents or in any certificate, document, instrument, opinion or financial or other statement contemplated by or made or delivered pursuant to or in connection with the Credit Agreement or with any of the other Related Documents, shall prove to have been incorrect, incomplete or misleading in any material respect;

(b)     the occurrence of any *"event of default"* under any of the Related Documents; *provided, however,* that if the Trustee waives an event which would be an event of default under the Indenture, such event shall not constitute an event of default under the Credit Agreement so long as the waiver is not revoked;

(c)     failure to pay the Bank any obligations when and as due under the Credit Agreement;

(d)     default in the due observance or performance by either Borrower of certain covenants set forth in the Credit Agreement;

001864

(e)    default in the due observance or performance by either Borrower of any other term, covenant or agreement set forth in the Credit Agreement and the continuance of such default for 30 days after the occurrence thereof;

(f)    any material provision of the Credit Agreement or any of the Related Documents shall cease to be valid and binding, or either Borrower shall contest any such provision, or a Borrower or any agent or trustee on behalf of a Borrower shall deny that it has any or further liability under the Credit Agreement or any of the Related Documents;

(g)    the occurrence of certain events of bankruptcy, insolvency or liquidation of a Borrower or any Subsidiary (as defined in the Credit Agreement);

(h)    dissolution or termination of the existence of a Borrower or any Subsidiary;

(i)    default under certain evidences of indebtedness issued, assumed, or guaranteed by a Borrower or any Subsidiary;

(j)    certain judgments or writs are entered or filed against either Borrower or any Subsidiary or against any of their respective Property (as defined in the Credit Agreement) and remain unvacated, unbonded or unstayed for a period of 30 days;

(k)    the occurrence of certain events with respect to certain retirement plans maintained by either Borrower or certain related entities;

(n)    a default shall occur and be continuing under any agreement between either Borrower and the Bank or any affiliate of the Bank or under any obligation owed by either Borrower to the Bank; and

(o)    a default shall occur and be continuing under any rate management obligation.

*"Related Documents"* means the Credit Agreement, the Letter of Credit, the Indenture, the Loan Agreement, the Bonds, the Remarketing Agreement, the Bond Purchase Agreement and this Official Statement.

Under the Credit Agreement, the Corporation agrees to optionally redeem the Bonds in accordance with a schedule set forth in the Credit Agreement. Such optional redemption requirements may be waived by the Bank or modified by the Bank and the Borrowers without notice to or consent of the Bondholders, the Trustee or the Authority.

## ESTIMATED SOURCES AND USES

The sources and uses of Bond proceeds to pay, together with other funds, the costs of financing and refinancing of the Project, interest with respect to certain portions of the Project,

C 01865

and expenses incurred in connection with the issuance of the Bonds and the credit enhancement thereof, are estimated to be as follows:

SOURCES OF FUNDS:

| | |
|---|---|
| Bond Proceeds | $8,050,000.00 |
| Borrowers' Funds[1] | 1,592,087.00 |
| Total Sources | $9,642,087.00 |

USES OF FUNDS:

| | |
|---|---|
| Deposit to Construction Account | $6,655,331.70 |
| Refinance Taxable Debt | $2,532,855.00 |
| Capitalized Interest | 218,356.25 |
| Letter of Credit Fees[2] | 37,594.05 |
| Costs of Issuance[3] | 197,950.00 |
| Total Uses | $9,642,087.00 |

[1]  Includes gifts, grants and other Borrowers' equity.

[2]  Includes closing fee, Bank counsel fee and the initial quarterly fees for the Letter of Credit.

[3]  Including Underwriter's fee, attorneys' fees, rating agency fees and other costs associated with the issuance of the Bonds.

## LITIGATION

### Authority

There is not now pending (as to which the Authority has received service of process) or, to the actual knowledge of the Authority, threatened, any litigation against the Authority restraining or enjoining the issuance or delivery of the Bonds or questioning or affecting the validity of the Bonds or the proceedings or authority under which the Bonds are to be issued. Neither the creation, organization or existence of the Authority nor the title of any of the present members or other officers of the Authority to their respective offices is being contested. There is no litigation against the Authority pending (as to which the Authority has received service of process) or, to the actual knowledge of the Authority, threatened, which in any manner questions the right of the Authority to enter into the Indenture, the Loan Agreement or the Bond Purchase Agreement or to secure the Bonds in the manner provided in the Indenture, the Resolution authorizing the issuance of the Bonds and the Act.

### Borrowers

No action, suit, proceeding, or investigation at law or in equity, before or by any court, any governmental agency, or any public board or body is pending or, to the Borrowers' knowledge, threatened affecting the validity of the Loan Agreement, the Indenture, the Tax

001866

Compliance Agreement, the Bond Purchase Agreement among the Underwriter, the Authority and the Borrowers (the *"Bond Purchase Agreement"*), the Remarketing Agreement between the Borrowers and the Remarketing Agent (the *"Remarketing Agreement"*), the Credit Agreement or the Bonds, or contesting the corporate existence or powers of either of the Borrowers. There is presently no material litigation pending or, to the knowledge of its officers, threatened against the Borrowers except for litigation in which the probable recoveries and the estimated costs and expenses of defense, in the opinion of management to each of the Borrowers, will be entirely within each of the Borrowers' applicable insurance policy limits (subject to applicable deductibles), or which otherwise would not materially adversely affect the business or properties of either of the Borrowers.

## CERTAIN LEGAL MATTERS

Certain legal matters incident to the authorization and issuance of the Bonds are subject to the unqualified legal opinion of Katten Muchin Rosenman LLP, Chicago, Illinois, Bond Counsel, whose approving opinion will be delivered simultaneously with the issuance of the Bonds. Certain legal matters will be passed upon for the Authority by its special counsel, Kevin M. Cahill, Chicago, Illinois; for the Borrowers by their counsel, Sonnenschein Nath & Rosenthal LLP, Chicago, Illinois; for the Bank by its counsel, Chapman and Cutler LLP, Chicago, Illinois; and for the Underwriter by its counsel, Chapman and Cutler LLP, Chicago, Illinois.

## TAX EXEMPTION

### Summary of Bond Counsel Opinion

Katten Muchin Rosenman LLP, Bond Counsel, is of the opinion that, under existing law, interest on the Bonds is not includable in the gross income of the owners thereof for federal income tax purposes. If there is continuing compliance with the applicable requirements of the Internal Revenue Code of 1986, as amended (the *"Code"*), Bond Counsel is of the opinion that interest in the Bonds will continue to be excluded from the gross income of the owners thereof for federal income tax purposes. Bond Counsel is further of the opinion that the Bonds are "qualified 501(c)(3) bonds" within the meaning of Section 145(a) of the Code. Accordingly, interest on the Bonds is not an item of tax preference for purposes of computing individual or corporate alternative minimum taxable income but is includable in corporate earnings and profits and therefore must be taken into account when computing, for example, corporate alternative minimum taxable income for purposes of the corporate alternative minimum tax.

Interest on the Bonds in not exempt from income taxation in the State of Illinois.

The opinion of Bond Counsel is given in reliance upon certifications by representatives of the Borrowers as to certain facts material to both the opinion and the requirements of the Code.

C01867

## Exclusion from Gross Income: Requirements

The Code contains certain requirements that must be satisfied from and after the date of issuance of the Bonds in order to preserve the exclusion from gross income for federal income tax purposes of interest on the Bonds. These requirements relate to the use and investment of the proceeds of the Bonds, the payment of certain amounts to the United States, the security and source of payment of the Bonds and the use of the property financed with the proceeds of the Bonds. The Authority and the Corporation has covenanted to comply with these requirements. Among these specific requirements are the following:

*Restrictions on Ownership and Use.* The Code requires that any property financed with the proceeds of the Bonds be owned by a 501(c)(3) organization or by a governmental unit. In addition, the Code generally requires that property financed with the proceeds of the Bonds be used by a 501(c)(3) organization in an activity that is integrally relate to its exempt purpose.

*Investment Restrictions.* Except during certain "temporary periods," proceeds of the Bonds and investment earnings thereon (other than amounts held in a reasonably required reserve or replacement fund, if any, or a part of a "minor portion") may generally not be invested in investments having a yield that is "materially higher" than the yield on the Bonds.

*Rebate of Permissible Arbitrage Earnings.* Unless the Corporation qualifies for one of several exemptions, earnings from the investment of the "gross proceeds" of the Bonds in excess of the earnings that would have been realized if such investments had been made at a yield equal to the yield on the Bonds are required to be paid to the United States at periodic intervals. For this purpose, the term "gross proceeds" includes the original proceeds of the Bonds, amounts received as a result of investing such proceeds and amounts to be used to pay debt service on the Bonds.

## Covenants to Comply

The Corporation has covenanted to comply with the requirements of the Code relating to the exclusion from gross income for federal income tax purposes of interest on the Bonds.

## Risks of Non-Compliance

In the event that the Corporation fails to comply with the requirements of the Code, interest on the Bonds may become includable in the gross income of the owners thereof for federal income tax purposes retroactively to the date of issue. In such event the Indenture does not require acceleration of payment of principal of, or interest on, the Bonds or payment of any additional interest or penalties to the owners of the Bonds.

## Other Federal Income Tax Consequences

Pursuant to Section 103 of the Code, interest on the Bonds is not includable in the gross income of the owners thereof for federal income tax purposes. However, the Code contains a

001868

number of other provisions relating to the treatment of interest on the Bonds that may affect the taxation of certain types of owners, depending on their particular tax situations. Some of the potentially applicable federal income tax provisions are described in general terms below. PROSPECTIVE PURCHASERS SHOULD CONSULT THEIR TAX ADVISORS CONCERNING THE PARTICULAR FEDERAL INCOME TAX CONSEQUENCES OF THEIR OWNERSHIP OF THE BONDS.

*Cost of Carry.*  Owners of the Bonds will generally be denied a deduction for otherwise deductible interest on any debt that is treated for federal income tax purposes as incurred or continued to purchase or carry the Bonds. Financial institutions are denied a deduction for their otherwise allowable interest expense in an amount determined by reference to their adjusted basis in the Bonds.

*Corporate Owners.*  Interest on the Bonds is generally taken into account in computing the earnings and profits of a corporation and consequently may be subject to federal income taxes based thereon. Thus, for example, interest on the Bonds is taken into account not only in computing the corporate alternative minimum tax but also the branch profits tax imposed on certain foreign corporations, the passive investment income tax imposed on certain S corporations and the accumulated earnings tax.

*Individual Owners.*  Receipt of interest on the Bonds may increase the amount of social security and railroad retirement benefits included in the gross income of the recipients thereof for federal income tax purposes.

*Certain Blue Cross or Blue Shield Organizations.*  Receipt of interest on the Bonds may reduce a special deduction otherwise available to certain Blue Cross or Blue Shield organizations.

*Property or Casualty Insurance Companies.*  Receipt of interest on the Bonds may reduce otherwise deductible underwriting losses of a property or casualty insurance company.

*Foreign Personal Holding Company Income.*  A United States shareholder of a foreign personal holding company may realize taxable income to the extent that interest on the Bonds held by such a company is properly allocable to the shareholder.

**Change of Law**

The opinion of Bond Counsel and the descriptions of the tax law in this Official Statement are based on statutes, judicial decisions, regulations, rulings, and other official interpretations of law in existence on the date the Bonds are issued. There can be no assurance that such law or the interpretation thereof will not be changed or that new provisions of law will not be enacted or promulgated at any time while the Bonds are outstanding in a manner that would adversely affect the value or tax treatment of ownership of the Bonds.

### LEGAL OPINIONS AND ENFORCEABILITY OF RIGHTS AND REMEDIES

The enforceability of the rights and remedies of the Trustee or the owners of the Bonds under the Indenture and the Loan Agreement and the availability of remedies to any party seeking to enforce the Indenture or the Loan Agreement are in many respects dependent upon judicial actions which are often subject to discretion and delay. Under existing constitutional and statutory law and judicial decision, including specifically Title 11 of the United States Code (the federal bankruptcy code), the enforceability of the rights and remedies under the Indenture and the Loan Agreement and the availability of remedies to any party seeking to enforce the security granted thereby may be limited.

The various legal opinions to be delivered concurrently with the delivery of the Bonds will be qualified as to the enforceability of the various legal instruments by limitations imposed by the valid exercise of the constitutional powers of the State of Illinois and the United States of America and bankruptcy, reorganization, insolvency or other similar laws affecting the rights of creditors generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). These exceptions would encompass any exercise of federal, State or local police powers (including the police powers of the State), in a manner consistent with the public health and welfare. The enforceability of the Indenture and the availability of remedies to a party seeking to enforce a pledge of security under the Indenture in a situation where such enforcement or availability may adversely affect public health and welfare may be subject to these police powers.

The various legal opinions to be delivered concurrently with the delivery of the Bonds express the professional judgment of the attorneys rendering the opinions as to the legal issues explicitly addressed therein. By rendering a legal opinion, the opinion giver does not become an insurer or guarantor of that expression of professional judgment of the transaction opined upon or of the future performance of parties to such transaction. Nor does the rendering of an opinion guarantee the outcome of any legal dispute that may arise out of the transaction.

### CREDIT RATING

A rating for the Bonds was applied for by the Borrowers, and certain information was supplied by the Borrowers to Moody's Investors Service ("*Moody's*"), to be considered in evaluating the Bonds. Moody's has assigned its municipal bond rating of "Aa2/VMIG1" to the Bonds, with the condition that upon delivery of the Bonds the Letter of Credit will be issued by the Bank. No application was made to any other rating agency for the purpose of obtaining an additional rating on the Bonds. The rating for the Bonds referred to herein is subject to change, suspension, or withdrawal at any time by such rating service for a number of reasons, including changes in, or the unavailability of, information for the rating service, and any such change, suspension, or withdrawal may affect the market price or marketability of the Bonds. Such rating reflects only the view of the rating agency and is not a recommendation to buy, sell, or hold the Bonds, and the rating and the Bonds should be evaluated independently. Additional information with respect to the rating may be obtained from Moody's at 99 Church Street, New York, New York 10007.

001870

## UNDERWRITING

The Underwriter has agreed, subject to certain customary conditions precedent to closing, to purchase the Bonds from the Authority at a purchase price of $8,000,800, representing the original aggregate principal amount of the Bonds less Underwriter's fee of $49,200. The Underwriter will be obligated to purchase all of the Bonds if any are purchased. The Bonds may be offered and sold to certain dealers and others at prices lower than the initial public offering price, and such public offering price may be changed, from time to time, without notice by the Underwriter. The Borrowers have agreed to indemnify the Underwriter and the Authority against certain civil liabilities, including liabilities under the federal securities laws.

## SECONDARY MARKET DISCLOSURE

The Bonds are exempt from the continuing disclosure requirements of Section (b)(5) of Rule 15c2-12 adopted by the Securities and Exchange Commission under the Securities Exchange Act of 1934 (the *"Rule"*) so long as they bear interest in an Adjustable Interest Rate Mode having a duration of nine months or less. If the Bonds are converted to bear interest in a Fixed Interest Rate Mode or an Adjustable Interest Rate Mode having a duration of more than nine months, the Bonds may become subject to the continuing disclosure requirements of the Rule and, in such event, the Borrowers have covenanted that it will comply with the Rule and all other statutes, regulations, judicial decisions or laws relating to continuing disclosure, including, without limitation, executing and delivering an undertaking to comply with such statutes, regulations, judicial decisions or laws on or prior to the remarketing of such Bonds upon their conversion to bear interest in a Fixed Interest Rate Mode or an Adjustable Rate Interest Mode having a duration of more than nine months.

The Authority has not made and will not make any provision to provide any annual financial statements or other credit information of the Borrowers to investors on a periodic basis.

## CERTAIN RELATIONSHIPS

Alan Gilbert, a partner at Sonneschein Nath & Rosenthal LLP, is an ex-officio member of the Board of Directors of the Corporation. Sonneschein Nath & Rosenthal LLP is serving as special counsel to the Borrowers in connection with the issuance of the Bonds.

## MISCELLANEOUS

The agreement of the Authority with the Holders of the Bonds is fully set forth in the Indenture, and neither any advertisement of the Bonds nor this Official Statement is to be construed as constituting an agreement with the purchasers of the Bonds. The references herein to the Act, the Indenture, the Loan Agreement, the Bond Purchase Agreement, the Remarketing Agreement, the Letter of Credit and the Credit Agreement are summaries of certain provisions thereof. Such summaries do not purport to be complete and for full and complete statements of the provisions thereof reference is made to the Act, the Indenture, the Loan Agreement, the Bond Purchase Agreement, the Remarketing Agreement, the Letter of Credit and the Credit

001871

Agreement. Prior to the delivery of the Bonds, copies of the proposed forms of such documents may be obtained from the Underwriter. Subsequent to delivery of the Bonds, copies of such documents may be obtained from the Trustee. So far as any statements are made in this Official Statement involving estimates, projections or matters of opinion, whether or not expressly so stated, they are intended merely as such and not as representations of fact.

The attached Appendices are integral parts of this Official Statement and must be read together with all of the foregoing statements.

The Borrowers, represented by certain of their officers and administrative staff, have reviewed the information contained herein which relates to the Borrowers, the financing and refinancing of the Project, and the Borrowers, acting through such officers and administrative staff, have approved all such information contained herein for use within this Official Statement.

001872

The execution and delivery of this Official Statement have been duly authorized by the Borrowers.

PLANNED PARENTHOOD/CHICAGO AREA


By _____/s/ Steven Tromble_____
      President and Chief Executive Officer


GEMINI OFFICE DEVELOPMENT LLC


By _____/s/Teresa A. Huyck_____
      President

001873

## APPENDIX A

### INFORMATION CONCERNING CHARTER ONE BANK, N.A.

*The information contained in this APPENDIX A to this Official Statement relates to and has been provided solely by Charter One Bank, N.A. (the "Bank"). The delivery of this Official Statement does not create any implication that there has been no change in the affairs of the Bank since the date hereof or that the information contained or referred to in this APPENDIX A is correct as of any time subsequent to its date. Neither the Authority, the Borrowers, the Underwriter or the Remarketing Agent makes any representation or warranty as to the accuracy, adequacy or completeness of the information contained in this APPENDIX A.*

[THIS PAGE INTENTIONALLY LEFT BLANK]

001875

## CHARTER ONE BANK, N.A.
### (Information as of December 31, 2006)

The information set forth below regarding Charter One Bank, N.A. (the *"Bank"*) has been furnished solely by the Bank for use in this Official Statement and is believed to be reliable, but has not been verified independently by the Authority, the Borrowers, the Underwriter or the Remarketing Agent. The Authority, the Borrowers, the Underwriter and the Remarketing Agent make no representations or warranties as to the accuracy, adequacy or completeness of such information. No representation is made by the Bank as to the accuracy, adequacy or completeness of such information or as to the absence of material adverse changes in such information subsequent to the date of this Official Statement.

**The Bank**

The Bank, a national banking association, is a wholly-owned subsidiary of Citizens Financial Group, Inc. (*"Citizens"*) acquired in 2004. In addition to the Bank, Citizens is the holding company for banks located in Rhode Island, New Hampshire, Massachusetts, Pennsylvania, Delaware, Connecticut and New York. Citizens is a wholly-owned subsidiary of The Royal Bank of Scotland plc. (*"The Royal Bank"*). The Royal Bank acquired Citizens in 1988.

The Letter of Credit is an obligation of the Bank and not of Citizens, The Royal Bank or any of their other subsidiaries.

The Bank offers a complete range of banking services operating through 498 branches and offices in Ohio, Illinois, Michigan and Indiana as "Charter One Bank." Charter One Bank also owns CCO Mortgage, a mortgage banking company, which originates residential mortgages. CCO Mortgage is a wholly owned subsidiary of Charter One Bank, N.A., based in Richmond, Virginia. The Bank's loan portfolio is divided between commercial loans, including leases and commercial real estate loans, and consumer loans, including residential real estate mortgage loans.

In the third quarter of 2006, RBS (the Royal Bank of Scotland Group plc) combined the domestic asset finance businesses of Citizens Bank and Charter One Bank with its existing US RBS Lombard business. The newly created entity, RBS Asset Finance, ranks as the 8th largest bank lessor in the United States.

The Bank is subject to supervision and examination by the Office of the Comptroller of the Currency. It is also subject to requirements and restrictions under federal and state law, including requirements to maintain reserves against deposits, restrictions on the types and amounts of loan that may be granted and the interest that may be charged thereon, and limitations on the types of investments that may be made and the types of services that may be offered. Various consumer laws and regulations also affect the operations of Citizens' subsidiary banks.

001876

Citizens Financial Group, Inc., is a Providence-based commercial bank holding company. With $161 billion in assets and more than 26,000 employees, Citizens is one of the eight largest commercial bank holding companies in the nation and is New England's largest commercial bank holding company. Citizens also operates subsidiaries engaged in banking related business lines.

Based on its Consolidated Financial Statements for Bank Holding Companies for the quarter ended December 31, 2006, Citizens had total assets of $160.9 billion, total deposits of $101.2 billion, total loans and leases net of allowance for loan losses of $104.8 billion and total equity capital of $23.5 billion. Based on its Call Report for the quarter ended December 31, 2006, the Bank had total assets of $46 billion, total deposits of $21.3 billion, total loans and leases net of allowance for loan losses of $30.6 billion and total equity capital of $8 billion.

**Additional Information**

The foregoing summary information is provided for convenience purpose only. Important additional information with respect to Citizens and the Bank is contained in the publicly available portions of the Bank's Consolidated Reports of Condition and Income for a Bank with Domestic and Foreign Offices – FFIEC 0331, as submitted to the FDIC.

The Bank undertakes to provide, without charge to each person to whom a copy of this Official Statement has been delivered, on the written request of any such person, a copy of any and all of the publicly available portions of the document referred to above, other than exhibits to such document. Written requests for such copies should be directed to Ron Ohsberg, Vice President, Citizens Bank of Rhode Island, 20 Blackstone Valley Place, Lincoln, RI 02865.

Except as set forth in this Appendix, neither the Bank nor its affiliates make any representations as to the contents of this Official Statement, the suitability of the Bonds for any investor, the feasibility or performance of any project or compliance with any securities or tax laws and regulations.

C01877

**APPENDIX B**

**FORM OF BOND COUNSEL'S APPROVING OPINION**

May 24, 2007

Illinois Finance Authority
Chicago, Illinois

Amalgamated Bank of Chicago
Chicago, Illinois

RBC Capital Markets
Chicago, Illinois

Re:    $8,050,000 Illinois Finance Authority
Variable Rate Demand Revenue Bonds, Series 2007A
(Planned Parenthood/Chicago Area)

Ladies and Gentlemen:

We have examined a record of proceedings with respect to the issuance by the Illinois Finance Authority (the "Issuer") of its Variable Rate Demand Revenue Bonds, Series 2007A (Planned Parenthood/Chicago Area) (the "Bonds"), in the aggregate principal amount of $8,050,000. The proceeds to be received by the Issuer from the sale of the Bonds will be lent to Planned Parenthood/Chicago Area, an Illinois not for profit corporation (the "Corporation") and to Gemini Office Development LLC, an Illinois limited liability company ("Gemini" and together with the Corporation, the "Borrowers") pursuant to a Loan Agreement dated as of May 1, 2007 between the Issuer and the Borrowers (the "Loan Agreement"). Such proceeds will be used to: (i) pay and reimburse Gemini for the costs of acquiring, constructing, installing and equipping a healthcare center located in Aurora, Illinois; (ii) refinance costs of renovating, installing and equipping certain health centers of the Corporation located in Chicago, Illinois; (iii) pay for other capital costs of the Corporation for use in its Chicago and suburban facilities located at the above referenced locations as well as Orland Park, Schaumburg, and Naperville, Illinois (collectively with (i) and (ii), the "Project"); (iv) to capitalize interest up to December 31, 2007; and (v) pay certain costs of issuance relating to the Bonds.

The Corporation is the sole member of Twenty-First Century Office Development LLC ("Twenty-First Century"), which is the sole member of Gemini.

The Bonds are being issued pursuant to a Trust Indenture dated as of May 1, 2007 (the "Trust Indenture"), between the Issuer and Amalgamated Bank of Chicago, as trustee ("Trustee"), and to a resolution adopted by the Issuer on May 8, 2007 (the "Bond Resolution") pursuant to the Illinois Finance Authority Act, 20 ILCS 3501/801-1 *et seq.* (the "Act"). The

001878

Bonds are being issued in fully registered form, without coupons in denominations of $100,000 each or integral multiples of $5,000 in excess thereof.

The Bonds will be issued in a Weekly Interest Rate Mode as described in the Trust Indenture. Thereafter, the Bonds may operate in one of several modes including the Weekly Mode, One Month, Three Month, Six Month, One Year and Five Year Mode ("Adjustable Interest Rate Modes") or at a Fixed Interest Mode subject to the terms of the Trust Indenture. The Bonds are initially dated May 24, 2007, mature on January 1, 2037, and initially bear interest at a Weekly Interest Rate Mode commencing on the first Business Day of June, 2007. Subject to certain conditions specified in the Trust Indenture, the interest rate on the Bonds may be converted to a Fixed Rate.

The Bonds are subject to redemption prior to maturity at the times, in the manner and upon the terms set forth in the Trust Indenture and in the Bonds.

The Bonds are initially secured by an irrevocable, transferable, direct pay letter of credit issued by Charter One Bank, N.A. (the "Letter of Credit"). We express no opinion on the validity or enforceability of the Letter of Credit.

We have examined the Bond Resolution executed counterparts of the Trust Indenture, the Loan Agreement and the form of the Bond; the applicable laws of the State of Illinois; the transcript of proceedings relating to the issuance and sale of the Bonds and the opinions, certifications and statements of facts and expectations contained in such transcript; and such other such documents and materials as we deem relevant to the opinion expressed herein.

Based on the foregoing, and in reliance upon certain documents and showings hereinafter referred to, we are of the opinion that:

1.    The Issuer is a body politic and corporate of the State of Illinois, created under the provisions of the Act, with lawful authority to enter into the Trust Indenture and the Loan Agreement, to issue the Bonds and lend the proceeds thereof to the Borrowers for the purposes specified in the Trust Indenture and the Bond Resolution.

2.    The Trust Indenture and the Loan Agreement have been duly authorized, executed and delivered by the Issuer and, assuming the due authorization, execution and delivery of each such instrument by, and the binding effect thereof on, the other parties thereto, the Trust Indenture and the Loan Agreement constitute legal, valid and binding obligations of the Issuer, enforceable in accordance with their respective terms, subject to the qualification that the enforcement thereof may be limited by laws relating to bankruptcy, insolvency or other similar laws affecting creditors' rights generally and by the availability of equitable remedies.

3.    The Bonds have been duly authorized, issued and delivered by the Issuer and are valid and legally binding upon the Issuer according to the import thereof and as provided by the Trust Indenture, except to the extent that the enforcement thereof may be limited by laws relating to bankruptcy, insolvency or other similar laws affecting creditors' rights generally and by the availability of equitable remedies.

C01879

4.    The Bonds and the interest thereon are limited obligations of the Issuer payable solely from moneys, securities and other revenues pledged therefor under the Trust Indenture. All right, title and interest in and to such moneys, securities and other revenues have been pledged and assigned under the Trust Indenture as security for the Bonds. The Bonds and the interest thereon do not constitute an indebtedness of the Issuer within the meaning of any State of Illinois constitutional or statutory provision, nor do the Bonds or the interest thereon give rise to a pecuniary liability of the Issuer or a charge against its general credit or taxing powers. Neither the faith and credit nor the taxing power of the State of Illinois, the Issuer or any political subdivision of the State of Illinois is pledged to the payment of the Bonds. No owner of any Bond shall have the right to compel any exercise of the taxing power of the Issuer to pay the Bonds or the interest thereon. Neither the members of the Issuer nor any persons executing the Bonds shall be liable personally on such Bonds by reason of the issuance thereof.

5.    The Internal Revenue Code of 1986 (the "Code"), contains certain requirements that must be satisfied from and after the date hereof in order to preserve the exclusion from gross income for Federal income tax purposes of interest on the Bonds. These requirements relate to, among other things, the use and investment of the proceeds of the Bonds, the periodic payment of certain amounts to the United States of America, and the use and tax ownership of any property financed or refinanced with the proceeds of the Bonds.    The Borrowers have covenanted in the Loan Agreement and the Tax Compliance Agreement dated as of May 24, 2007 (the "Tax Agreement"), among the Issuer, the Borrowers and the Trustee, to comply with these requirements.

Under existing law, interest on the Bonds is not includable in the gross income of the owners thereof for Federal income tax purposes.  If there is continuing compliance with the requirements of the Code described in the preceding paragraph, we are of the opinion that interest on the Bonds will continue to be excluded from the gross income of the owners thereof for Federal income tax purposes.  We are further of the opinion that the Bonds are "qualified 501(c)(3) bonds" within the meaning of Section 145(a) of the Code. Accordingly, interest on the Bonds is not an item of tax preference for purposes of computing individual or corporate alternative minimum taxable income. However, interest on the Bonds is includable in corporate earnings and profits and therefore must be taken into account when computing, for example, corporate alternative minimum taxable income for purposes of the corporate alternative minimum tax.

In rendering this opinion, we have relied, among other things, upon the representations and certifications of the Issuer and the Borrowers with respect to certain material facts solely within their knowledge relating to the application of the proceeds of the Bonds and the property financed with such proceeds.

6.    Under existing law, the Bonds and the income therefrom are not exempt from State of Illinois income taxes.

In rendering the opinion contained in the preceding paragraphs, we have relied upon representations and covenants contained in the Tax Compliance Agreement with respect to certain facts that are solely within the Borrowers' knowledge relating to, among other things, the

001880

nature and users of the property financed or refinanced with the proceeds of the Bonds, and the opinion of Sonnenschein Nath & Rosenthal LLP with respect to the status of the Corporation as a 501(c)(3) organization as well as the status of Twenty-First Century and Gemini as disregarded entities of the Corporation whose activities are treated in the same manner as a branch or division of the Corporation for Federal income tax purposes.

Respectfully yours,