EXHIBIT A

CC1946



Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2001 WL 531537 (D.N.H.), 2001 DNH 083
(Cite as: Not Reported in F.Supp.2d)

Planned Parenthood of Northern New England v.
City of Manchester, NH
D.N.H.,2001.

NOT FOR PUBLICATION
United States District Court, D. New Hampshire.
PLANNED PARENTHOOD OF NORTHERN
NEW ENGLAND, and 24 Penacook Street, LLC,
Plaintiffs
v.
CITY OF MANCHESTER, New Hampshire, De-
fendant
No. CIV. 01-64-M.

April 27, 2001.

MEMORANDUM ORDER
MCAULIFFE, District J.
*1 Plaintiffs, Planned Parenthood of Northern New
England ("PPNNE") and 24 Penacook Street, LLC
("Owner"), have sued the City of Manchester, New
Hampshire, and its Zoning Board of Adjustment
("ZBA"), claiming that the ZBA's action in revok-
ing a previously issued building permit was both ar-
bitrary and unreasonable. Moreover, plaintiffs say
the ZBA's action amounts to intentional and pur-
poseful discrimination against PPNNE (and its pa-
tients) based upon its engagement in constitution-
ally protected activities (e.g., facilitating a woman's
consideration and acquisition of abortion services,
contraception services, and family planning ser-
vices, as well as its general advocacy of reproduct-
ive rights).

Plaintiffs' application for preliminary injunctive re-
lief was heard on April 20, 2001.

Based upon the affidavits and materials filed, as
well as the representations of counsel during the
course of the hearing, the following pertinent facts
were developed. The Owner obtained a variance
under the applicable city zoning ordinance which
allowed the building at issue (formerly used as an
auto parts store) to be used for "medical offices."
The city contends, however, that it was under the

impression, in granting the variance, that the per-
mitted "medical office" use would involve two to
three "general practitioners" and associated staff. It
further contends that a restriction to that effect is
necessarily implicit in the variance actually issued.
(On its face, the variance is not conditional.) After
obtaining the variance, the Owner entered into a
lease with PPNNE for most of the building's space.
PPNNE and the Owner also entered into an agree-
ment to fit the leased space for a medical office use.

Building plans were submitted to the Building
Commissioner, who, after reviewing the plans and
insuring compliance with the medical office use au-
thorized by the variance, issued a building permit.
After obtaining the building permit, the Owner and
PPNNE made arrangements to finance and com-
plete the necessary construction work.

Several months later, in the fall of 2000, PPNNE
publicly announced its intent to occupy the building
and provide medical services to the residents of
greater Manchester, including family planning and,
at some future date, abortion services. That an-
nouncement provoked some public opposition to
Planned Parenthood's use of the building, and vari-
ous people sought relief from the Zoning Board of
Adjustment. By a divided vote, the ZBA revoked
the building permit on January 3, 2001, after hear-
ing from interested parties and members of the pub-
lic. Plaintiffs then filed this suit seeking to remedy
what they see as an unconstitutional deprivation of
federal rights under color of state law.[FN1]

FN1. The defendants' motions to dismiss
or stay plaintiffs' action under various ab-
stention doctrines were orally denied at the
April 20 hearing, though the court advised
that it will likely not exercise supplemental
jurisdiction over plaintiffs' strictly state
law zoning claims. See, e.g., 28 U.S.C. §
1367(c)(1) and (4); Raskiewicz v. Town of
New Boston, 754 F.2d 38, 44 (1st
Cir.1985). That issue, as well as requested
intervenor status, will be addressed in a

   © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 2
Not Reported in F.Supp.2d, 2001 WL 531537 (D.N.H.), 2001 DNH 083
(Cite as: Not Reported in F.Supp.2d)

separate order. For now it is sufficient to note that no grounds exist warranting abstention and plaintiffs are entitled to proceed with their federal claims. *See, e.g., Planned Parenthood League of Massachusetts v. Bellotti, 868 F.2d 459, 467 (1st Cir.1989)* (abstention improper where federal claims can be adjudicated without encroaching on principles of federalism and comity).

### Discussion

The first point of significance is that the ZBA's reasons for revoking the building permit are unknown, because they are undisclosed. The board made no findings of fact and provided no explanation for revoking the permit, either orally on the record (in the minutes), or by written decision.[FN2] And, the city chose not to put on any evidence of the ZBA's reasoning during the course of the April 20 hearing; no ZBA members testified as to the actual reason or reasons for the decision. Instead, the city relied upon the administrative record in the case, that is, the minutes of the January 3, 2001, ZBA meeting.

> FN2. The city attorney suggests that under state law the ZBA is not required to make findings, provide rulings of law, or in any way explain its decisions, absent a request by a party. And, of course, strictly speaking the ZBA is not required to explain its decision here. However, it would seem exceedingly difficult for it to meet its burden of demonstrating that the building permit was revoked for legitimate (or at least constitutionally permissible) reasons, when it chooses to stand mute in the face of credible and supported allegations that the permit was revoked based upon the identity of the property's lessee, PPNNE, its advocacy role with respect to abortion, contraception, and family planning services, and its intent to assist women in considering and obtaining such services. *See, e.g., Mt. Healthy City School Dist. Bd. of Educ. v.*

*Doyle, 429 U.S. 274 (1977).*

*2 The next point of significance is (and the city agrees) that the *variance* permitting the Owner to use the property in question as a medical office remains in effect, unmodified. So, even accepting, for the moment, the city's perception that the extant and valid variance implicitly comes with restrictions-i.e., that the medical office use is limited to a "general medical practice," consisting of two to three physicians and associated staff-it was conceded (candidly and necessarily) by the city's counsel that the refitting plans submitted by the Owner and PPNNE to the Building Commissioner describe work that, when completed, will be entirely consistent with the medical office use authorized by the variance, *as the city itself construes the variance.*

The city's counsel also agreed, necessarily and correctly, that the variance sought for the medical office use could not have been lawfully or constitutionally denied based merely upon the identity of the Owner's tenant, Planned Parenthood of Northern New England, nor on the basis that abortion services would be provided as part of the "general practice" of medicine on the site (whether by PPNNE or a "general practice physician"). The minutes of the January 3, 2000, ZBA meeting suggest some confusion on the part of ZBA members as to the effect of constitutional limits on their municipal authority-but it is by now clear that personal opposition to abortion or personal disapproval of Planned Parenthood's activities cannot serve as a lawful basis for denying a variance or making other zoning decisions. *See, e.g., Deerfield Medical Center v. City of Deerfield Beach, 661 F.2d 328, 331 n. 5 (5th Cir.1981); Dailey v. City of Lawton, Okl., 425 F.2d 1037, 1039 (10th Cir.1970).*

In determining whether to issue preliminary injunctive relief, courts in this circuit are required to consider the following factors:
1. whether plaintiffs are likely to succeed on the merits;
2. whether in the absence of injunctive relief plaintiff would suffer irreparable injury;
3. whether the balance of harms militates in favor

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2001 WL 531537 (D.N.H.), 2001 DNH 083
(Cite as: Not Reported in F.Supp.2d)

of granting injunctive relief (that is, whether withholding injunctive relief will cause more harm to plaintiffs than granting injunctive relief will cause to defendants); and

4. whether the public interest lies in favor of granting or withholding injunctive relief under the circumstances.

*See* *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981).

### I. *Likelihood of Success on the Merits*

Plaintiffs have met their burden of establishing likelihood of success on the merits. That is, they will likely be able to prove at trial that the decision to revoke the previously issued building permit was motivated by discriminatory animus toward PPNNE, as lessee, based upon the nature of the constitutionally protected activity in which they intend to engage (facilitating consideration and acquisition of abortion, contraception, and family planning services by their patients).

**\*3** As noted, the ZBA chose to give no reasons for revoking the permit at its meeting or since. Moreover, the record provides no apparent valid reasons for the revocation. What is apparent from the record is that significant numbers of people expressed personal objection to Planned Parenthood's location in the area due to their general opposition to abortion, contraception, or family planning activities. Just as it is clearly constitutionally impermissible for the ZBA to premise its decision upon board members' personal, philosophical, moral, religious, and/or political opposition to these protected activities, acquiescence in public opposition of a like nature is equally impermissible. *See Deerfield Medical Center,* 661 F.2d at 337;*West Side Women's Services, Inc. v. City of Cleveland,* 573 F.Supp. 504, 523 (N.D.Ohio 1983) ("A municipality has no legitimate interest in shielding certain members of a community from constitutionally-protected activities which they find offensive on personal, moral, or even religious grounds."); *cf. Dailey v. City of Lawton,* 425 F.2d at 1039.

To be sure, no ZBA member affirmatively disclosed a constitutionally impermissible basis for revoking the permit, but "if proof of a civil right[s] violation depends on an open statement by an official of an intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection. [I]t is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals."*Dailey v. City of Lawton,* 425 F.2d at 1039 (citations omitted); *see Snowden v. Hughes,* 321 U.S. 1, 8 (1944) (intentional or purposeful discrimination may appear on face of action taken with respect to particular class or person).

It may be that the city will offer evidence at trial suggesting that other, legitimate, reasons motivated the revocation decision. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977). But, insufficient evidence of a legitimate purpose was presented at the hearing on plaintiffs' application for preliminary relief. The only arguably relevant evidence the city's counsel could point to was the minutes of the January 3, 2000, ZBA meeting consisting of a few vague questions and statements made by one or two board members suggesting the city had been "misled" when it first issued the variance. However, it is not clear what was meant by those cryptic comments. If the issuing authority was "misled" as to the identity of the prospective tenant who would be providing medical services at the site, that identity would have been irrelevant to any impartial decision to issue or deny a variance for a medical *use* of the property. And, that the proposed tenant intended to engage in constitutionally protected activities in providing medical services-such as providing abortion and contraception counseling and services-would have been equally irrelevant.

**\*4** If the "misrepresentation" alluded to by the ZBA involved some potential but unidentified collateral impact of PPNNE's actual intended use of the property, then the record is at best undeveloped. The board does not appear to have seriously considered such factors, and certainly did not have any substantive evidence regarding such factors before it. Nor did it make any findings (or at least disclosed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 531537 (D.N.H.), 2001 DNH 083
(Cite as: Not Reported in F.Supp.2d)

no findings) with respect to such issues.

Counsel for the city did gamely argue that the board members probably meant (and implicitly "found") that the *nature* of the "medical practice" to be carried out at the site was misrepresented and, consequently, the variance was procured by misrepresentation, or even fraud-i.e., the *variance* was granted based on the Owner's agent's representation that the building would be used as a "general medical practice," while the actual intended use is significantly different because a medical practice is not "general" if it focuses on gynecology and obstetrics. Under that rationale, a "medical office" for podiatrists, dermatologists, pediatricians, or any medical group other than perhaps a general family practice, would probably be equally violative of the implicit "general practice" limitation.[FN3]

> **FN3.** "General practice" is apparently nowhere defined in the zoning ordinance.

The city's argument is not very compelling, and is substantially undermined by the fact that the board left the variance intact when it revoked the building permit, which simply authorizes construction conceded by the city to be entirely consistent with a medical use allowed by the variance, *even as the ZBA itself construes the variance.*It is additionally instructive, perhaps even dispositive as to preliminary relief, to note that the city's Building Commissioner, who has obvious professional expertise in the matter, testified forthrightly before the ZBA that the building permit authorized construction of facilities that were entirely consistent with the variance permitting a medical use of the building.

Accordingly, at this stage, and on this record, the conclusion is nearly inescapable that plaintiffs are likely to prove at trial that the actual factor motivating the ZBA to revoke the Owner's building permit was not any legitimate zoning, or unlitigated "intensity of use" concern, or any inconsistency between the planned construction and the permissible use, but, rather, was its antipathy for the abortion and contraception services PPNNE will provide, or, its acquiescence in the expression of

public antipathy for such constitutionally protected activity. In either event, revocation of the permit based upon such considerations operates to deprive the Owner and PPNNE (and its patients) of their constitutionally protected freedoms. *See Deerfield Medical Center, 661 F.2d at 336;P.L.S. Partners, Women's Medical Center of Rhode Island, Inc. v. City of Cranston, 696 F.Supp. 788, 796-97 (D.R.I.1988)* (citing cases); *see also generally Family Planning Clinic, Inc. v. City of Cleveland, 594 F.Supp. 1410 (N.D.Ohio 1984)* (zoning ordinance disallowing clinic operated primarily for abortions in residence-office district unconstitutionally interfered with woman's right to seek and obtain abortion and did not survive constitutional scrutiny); *West Side Women's Services, Inc. v. City of Cleveland, 573 F.Supp. 504 (N.D.Ohio 1983)* (permitting medical offices, but not abortion clinics, to operate in business district is not sustainable). Such decisions, taken under color of state law, are clearly unlawful and actionable. *See*42 U.S.C. § 1983.

## II. *Irreparable Injury*

*5 The ZBA's decision to revoke the building permit significantly impacts upon plaintiffs' fundamental and constitutionally protected rights, and the burden imposed is more than de minimus. By revoking the permit, the ZBA halted construction of medical offices which are entirely consistent with a currently authorized use of the building pursuant to the existing variance-even as the city perceives and construes that variance.

The ZBA's decision to revoke the building permit unquestionably results in irreparable injury to plaintiffs, as well as PPNNE's patients. By revoking the permit, the ZBA significantly interrupted and delayed PPNNE's patients' ability to consider and obtain family planning, contraceptive, and at some point, abortion services, by delaying PPNNE's (as yet) legitimate occupancy of the building. Because the burden imposed on plaintiffs' fundamental rights is more than de minimus, strict scrutiny applies. *See Deerfield Medical Center, 661 F.2d at 335;Family Planning Clinic, Inc., 594 F.Supp. at*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 5
Not Reported in F.Supp.2d, 2001 WL 531537 (D.N.H.), 2001 DNH 083
(Cite as: Not Reported in F.Supp.2d)

1415.

That is, to sustain its action the ZBA must demonstrate that the infringement represented by the revocation of the building permit is justified by a "compelling governmental interest," and, that the burden it has imposed is the least restrictive alternative means of serving that compelling interest. *See, e.g., Deerfield Medical Center, 661 F.2d at 334.* The ZBA has not yet attempted to do so, and the injury to plaintiffs (if defendants do not meet their very heavy burden at trial) is and will continue to be irreparable. *See generally Elrod v. Burns, 427 U.S. 347, 373 (1976)* (loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying preliminary injunctive relief); *P.L.S. Partners, Women's Medical Center of Rhode Island, Inc. v. City of Cranston, 696 F.Supp. 788* (official action having the potential to frustrate or delay a woman's abortion decision constitutes irreparable injury); *West Side Women's Services, Inc. v. City of Cleveland, 573 F.Supp. at 518* ("The question is not whether the activity may be engaged in elsewhere, but whether it was constitutional to restrict it in the manner chosen by defendants.")

A limited right to abortion is, of course, a fundamental and constitutionally protected right. *Roe v. Wade, 410 U.S. 113 (1973).* Every day PPNNE is prevented from occupying its new facility increases the likelihood that abortion or contraception or family planning patients will have to seek alternative care either in hospital settings, at considerable expense, or by traveling to other facilities. The ZBA's act revoking the building permit imposes a non-de minimus burden on plaintiffs' constitutionally protected rights, because its official action "ha[s] the potential to frustrate or delay a woman's abortion decision."*See P.L.S. Partners, Women's Medical Center of Rhode Island v. City of Cranston, 696 F.Supp. at 796;Planned Parenthood of Rhode Island v. Board of Medical Review, 598 F.Supp. 625, 630 (D.R.I.1984).* That burden, alone, constitutes "irreparable injury." *Elrod v. Burns, 427 U.S. at 373.*

*6 Absent injunctive relief, plaintiffs' protected constitutional rights would continue to be abridged and plaintiffs (and their patients) will continue to suffer irreparable injury.

### III. *Balancing of the Equities*

In this case, balancing the harms likely to flow from granting or withholding preliminary injunctive relief is an exercise that militates strongly in favor of granting injunctive relief. Allowing construction of medical offices on the proposed site, according to the plans previously approved, will inflict no harm at all upon the city. The city, by its own concession, could have no reasonable objection to the Owner leasing the space at issue to a "general medical practice" group consisting of two to three physicians and associated staff. Since the refitting plans are entirely consistent with that use, when the construction is completed the building will be suitable for the very use the ZBA says it intended.

So, worst case, if the subject property is refitted to accommodate a medical office use as permitted even under the ZBA's view, the Owner will be in a position to let the space as medical offices, and its tenant(s) will be able to use the space appropriately. Therefore, the city cannot possibly be harmed by an injunction allowing plaintiffs to go forward with their construction, as authorized by the Building Commissioner. Whether the actual future use by PPNNE is or is not consistent with the variance is a question entirely different from whether the approved construction will cause any harm to the city if it is completed.

On the other hand, absent injunctive relief, plaintiffs will suffer a number of irreparable harms. First and foremost their constitutionally protected rights will continue to be denied with each passing day of unjustified delay. Secondly, the plaintiffs have invested considerable sums of money in financing and contracting for the refurbishment construction. While, ordinarily, economic losses are recoverable in actions at law (and therefore do not constitute irreparable injury), in this case it is highly unlikely that any economic losses will be re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 531537 (D.N.H.), 2001 DNH 083
(Cite as: Not Reported in F.Supp.2d)

coverable as a practical matter. As the Owner's counsel persuasively argued, it is likely that individual Zoning Board of Adjustment members would be immune from personal liability for money damages, and the city is probably not amenable to a suit for money damages, given the probable absence of a custom, practice, or policy encouraging the deprivation of constitutional rights by ZBA members. *But see P.L.S. Partners, Women's Medical Center of Rhode Island, Inc. v. City of Cranston, 696 F.Supp. at 799.* (municipal building inspector acting under color of state law held liable for monetary damages under 42 U.S.C. § 1983 when he required proposed outpatient abortion facility to obtain special use permit to operate as hospital).

### IV. *The Public Interest*

The public interest clearly militates in favor of issuing injunctive relief in this case. The public interest never favors governmental action that is arbitrary, unreasonable, and motivated by personal animus toward groups or individuals based upon their exercise of constitutionally protected freedoms. Given that plaintiffs are likely to succeed on the merits in establishing the constitutionally impermissible motive and purpose driving the ZBA's revocation of the previously issued building permit, the public interest clearly lies in favor of bringing the potential harm flowing from those likely constitutional violations to an immediate and abrupt halt.

**\*7** The city has articulated no public policy that would favor the denial of injunctive relief in this case. As noted above, at worst, issuing injunctive relief will permit the Owner and PPNNE to fit out the building in a manner consistent with its use as a medical office in a manner entirely consistent with even the ZBA's asserted version of what medical use is permissible. Therefore, common sense militates in favor of preliminarily alleviating the very real economic harm being inflicted upon plaintiffs, ending the apparent threat to plaintiffs' constitutional rights, and permitting construction to fit out the building for medical office use at the earliest, and, therefore, at the least costly, point. Plaintiffs have, of course, readily acknowledged that the burden of loss in continuing to fund the construction project is theirs, should their occupancy or use later be denied or restricted for lawful and non-discriminatory reasons.

### Conclusion

Based upon the affidavits and materials submitted by all parties (including the proposed intervenors), as well as the arguments, proffers, and statements by counsel during the course of the hearing on April 20, 2001, the court finds that plaintiffs are likely to succeed in proving that the ZBA acted unconstitutionally when it revoked the building permit because it did so based upon a discriminatory animus, intending thereby to impose a significant obstacle in the path of the plaintiffs' provision of abortion counseling and services, contraceptive counseling and services, and family planning medical services. Moreover, plaintiffs are likely to succeed in demonstrating that no valid justification exists for the board's action, no compelling state interest is served by the ZBA's revocation of the building permit, and revocation of the building permit is not, in any event, the least restrictive available alternative to vindicate any legitimate state interest that may be at issue here. The court also finds that plaintiffs are suffering and will continue to suffer irreparable injury absent the issuance of injunctive relief. The balance of equities lies in favor of issuing preliminary injunctive relief, particularly in light of the fact that the city will not be harmed in any way if the construction is completed and the building is made useful for a "medical office," particularly given that the city concedes that the construction, when completed, will indeed be consistent with even its own view of an authorized "medical office" use. Finally, the court finds that public policy militates strongly in favor of granting preliminary injunctive relief, and that no public policy considerations militate at all in favor of denying injunctive relief in this case.

Accordingly, the City of Manchester, its Zoning Board of Adjustment, their employees, agents, servants, attorneys, and anyone acting for or in concert with them, are hereby preliminary enjoined from:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

C01952

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 531537 (D.N.H.), 2001 DNH 083
**(Cite as: Not Reported in F.Supp.2d)**

1. revoking the building permit issued to the plaintiff Owner;

**\*8** 2. seeking to enforce any cease and desist order issued relative to construction carried out pursuant to the building permit previously issued to the Owner;

3. interfering with or frustrating completion of the construction project authorized by the previously issued building permit; and

4. taking any enforcement action whatsoever based upon or related to the ZBA's revocation of the previously issue building permit.

SO ORDERED.

D.N.H.,2001.
Planned Parenthood of Northern New England v. City of Manchester, NH
Not Reported in F.Supp.2d, 2001 WL 531537 (D.N.H.), 2001 DNH 083

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PLANNED PARENTHOOD CHICAGO          )
AREA, an Illinois non-profit Corporation, and )
GEMINI OFFICE DEVELOPMENT LLC,      )
an Illinois limited liability company,          )
                                                )
      Plaintiffs,                                 )     No. 07 C 5181
                                                )
v.                                              )     Judge Norgle
                                                )     Magistrate Judge Brown
CITY OF AURORA, ILLINOIS                        )
                                                )
Defendant.                                      )

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
## FOR PRELIMINARY INJUNCTION

      Plaintiffs, Planned Parenthood Chicago Area and Gemini Office Development

(hereafter "Planned Parenthood"), are entitled to an injunction to avoid the irreparable

harm to their constitutional rights, and to the rights of Planned Parenthood's patients,

now being caused by Aurora's ("Aurora") continued refusal to allow Planned Parenthood

to open its outpatient medical facility at 3051 E. New York Street.

      Defendants' Response to Planned Parenthood's Motion contains a number of

factual admissions which should be fatal to Aurora's opposition to the entry of a

preliminary injunction.  First, Aurora incorrectly contends that its conduct should be

assessed under the "rational basis" test, rather than heightened strict scrutiny demanded

of any interference with fundamental constitutional rights.  This is an apparent admission

that Aurora cannot withstand scrutiny under the higher standard and dooms its further

opposition.

      Next, Aurora admits that it has made its decisions "within the politically charged

abortion issue," Affidavit of Alayne Weingartz, at ¶7, and that "Aurora has indicated that

C001954

it will not allow Plaintiffs to use their facility as an abortion clinic." Defendant's

Response Brief at ¶12. Thus, Aurora has conceded what it would not at the initial

hearing: its decisions were based on the fact that the Planned Parenthood facility would

provide abortions, not simply a broad concern about the enforcement of the Aurora

Zoning Code.

Third, Aurora contends, incorrectly, that Planned Parenthood cannot assert the

constitutional injuries of its patients. Yet, a line of cases extending more than 25 years

has held precisely the opposite. Providers of contraception and abortion services can and

have asserted claims both on their own behalf and on behalf of their patients. *See e.g.*

*Deerfield Med. Center v. City of Deerfield Beach*, 661 F.2d 328, 333-34 (5th Cir. 1981).

Finally, Aurora attempts to revive its *Williamson* argument which it raised in a

motion to dismiss and which this Court denied at the initial hearing. But Aurora has cited

no new cases nor presented new arguments that could present any basis for this Court to

reverse its decision.

Most glaringly, however, despite the explicit request of this Court, Aurora has

given no time frame for its "review" of Planned Parenthood's permit documents, the

nature of those reviews, or the process by which this review will be conducted and, more

importantly, concluded. Instead, it has now fired its second attorney and has referred this

matter to the Kane County State's Attorney for further "review." Nothing speaks more

clearly to the political nature of this debate than this eleventh hour referral to an elected

official. It is precisely because of this open-ended, indefinite and undefined "review" of

its permits, that Planned Parenthood has sought injunctive relief from this Court.

### Statement of Supplemental Facts

Today, at the corner of Oakhurst and New York streets in Aurora, a $7.5 million, state-of-the-art medical outpatient facility sits empty. This Planned Parenthood facility is fully staffed with doctors and nurses, administrators and clerical staff. Trombley Affidavit at ¶17. From the first days after Planned Parenthood announced that it would open the facility in Aurora, patients from the City and surrounding communities have telephoned seeking appointments. *See* Trombley Affidavit at ¶18. Among the services Planned Parenthood will provide to both men and women are the following:

- Annual gynecological exams;

- Cancer screening for cervical, breast, and other cancers;

- Examinations and counseling about birth control and family planning, including education about abstinence;

- Prescribing and dispensing contraceptive drugs and devices;

- Screening and treatment for sexually transmitted infections;

- Screening and treatment for vaginal and urinary tract infections;

- Confidential HIV testing and counseling;

- Immunizations;

- Pap tests, as well as colposcopy and cryotherapy for abnormal Pap results; and

- Medical and surgical abortions.

Supplemental Trombley Affidavit at ¶5

Planned Parenthood provides these services on an "as needed basis" to its patients, regardless of means. Supplemental Trombley Affidavit at ¶6. For many people, then, this facility offers the only affordable gynecological, contraceptive or reproductive medical care within a reasonable distance. Supplemental Trombley Affidavit at ¶6. And

001956

despite the public outcry surrounding this new facility, less than 10 percent of the services which Planned Parenthood provides relate to abortions. Supplemental Trombley Affidavit at ¶7.

On August 16, 2007, with the full knowledge that Planned Parenthood would operate the new medical facility, Aurora granted a Temporary Occupancy Permit to Planned Parenthood. *See* Trombley Affidavit at ¶10. On July 27, 2007, the Chicago Tribune published a front page article describing the Aurora clinic and Planned Parenthood's role. Supplemental Trombley Affidavit at ¶8. In response to this article, opponents of abortion staged a candlelight vigil at the outpatient facility on August 9, 2007, a week before Aurora issued the Temporary Occupancy Permit. Supplemental Trombley Affidavit at ¶9.

Aurora's awareness of Planned Parenthood was not limited to the Chicago Tribune article and the candlelight vigil. *See* Supplemental Trombley Affidavit at ¶10-12. Representatives of Planned Parenthood had conversations with officials of Aurora in February 2007. Supplemental Trombley Affidavit at *See* Supplemental Trombley Affidavit at ¶10. These conversations are supported by contemporaneous email and telephone records. Supplemental Trombley Affidavit at ¶10. Further, the bond financing which Planned Parenthood obtained through the Illinois Finance Authority required certain public disclosures. Supplemental Trombley Affidavit at ¶11. In and around May 2007, therefore, the Chicago Sun Times published public notices describing the relationship between Planned Parenthood and Gemini, and the Aurora medical facility. Supplemental Trombley Affidavit at ¶11.

Finally, the architectural drawings that Gemini submitted to Aurora contained unusual security features: bullet resistant glass in the reception area, bullet resistant doors and bullet resistant drywall. Supplemental Trombley Affidavit at ¶12. These security measures were necessary protection given the violence that has occurred at many abortion facilities, but also were early signals to Aurora. Supplemental Trombley Affidavit at ¶12.

The decision to revoke Planned Parenthood's occupancy permit was the result of complaints from the community about abortion, not concern for the integrity of the Zoning Code. As Alayne Weingartz, Aurora's Corporation Counsel admits in her affidavit, "Because allegations of fraud were made within the context of the politically charged abortion issue," Aurora "modified" the permit to include a provision that Plaintiffs could not open for business. Affidavit of Alayne Weingartz at ¶7. The City has since informed Plaintiffs: "We have no intention of allowing you to open for business." *See* Exhibit 6 of Trombley Affidavit. Perhaps the best statement of Aurora is set forth in the Defendant's Response Brief at ¶12: "Aurora has indicated that it will not allow Plaintiffs to use their facility **as an abortion clinic** *until* a review of allegations related to Plaintiff's actions during the permitting process has been completed."

The highly unusual and "politically charged" review of Plaintiff's permit applications has also become a quagmire. On August 28, Aurora named Richard Martens, a former chair of the ABA Section of Municipal Law, as the attorney conducting the "independent review" of Planned Parenthood's applications. Supplemental Trombley Affidavit at ¶13. On August 31, Aurora terminated Mr. Martens in response to complaints from City Council members. Supplemental Trombley

C01958

Affidavit at ¶14. Aurora then named Phillip Luetkehans as the new "independent"

counsel. Supplemental Trombley Affidavit at ¶15. However, questions soon arose about

Mr. Luetkehans political contributions. Supplemental Trombley Affidavit at ¶15. Last

night, Aurora designated Kane County State's Attorney John Barsanti as the new counsel

to oversee the "independent review." Supplemental Trombley Affidavit at ¶16.

## ARGUMENT

A.  **PLANNED PARENTHOOD MEETS ALL THE REQUIREMENTS FOR INJUNCTIVE RELIEF.**

1.  **Likelihood of Success on the Merits**

Planned Parenthood has asserted a claim for violation of its civil rights under 42

U.S.C. 1983. Specifically, Planned Parenthood contends that by "modifying" the

Temporary Occupancy Permit and subjecting it to an undefined and indefinite review

process in response to vague and unsubstantiated charges of "fraud" and "deceit," Aurora

has treated Planned Parenthood differently than any other medical provider and interfered

with its constitutionally-protected right to provide contraception, reproductive and

abortion services. This discriminatory treatment constitutes a denial of equal protection

and a violation of Section 1983.

In response, Aurora contends that there is no record that it has acted with animus

toward abortion rights and, because this is the basis for Planned Parenthood's claims,

there can be no likelihood of success. Aurora, however, is wrong on both points:

Planned Parenthood's claims are broader than a specific charge of "animus" and even

assuming that its claims rested on this narrow basis, there is sufficient evidence of such

animus now in the record to support Planned Parenthood's claims on that basis.

a.    **Planned Parenthood can demonstrate that Aurora has placed a substantial obstacle in the path of women seeking abortions, violating its constitutional rights.**

The question this court must ultimately resolve is whether the actions of Aurora have improperly interfered with a fundamental right of Planned Parenthood and its patients. *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68-69 (1981); *Marks v. City of Chesapeake, Va.*, 883 F.2d 308, 311 (4th Cir. 1989). Once Planned Parenthood demonstrates that a classification is based on the exercise of a constitutional right, or infringes on a constitutional right, the burden shifts to Aurora to justify its treatment and strict scrutiny is applied. *Schad*, 452 U.S. at 68 ("[W]hen a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial governmental interest."); *Islamic Ctr. of Miss., Inc. v. City of Starkville*, 840 F.2d 293, 299 (5th Cir. 1988) (when the exercise of zoning power burdens a fundamental right, government must justify the burden by showing a compelling interest.)

The fundamental right at issue in this case is the right to reproductive and contraceptive services, including abortion services. As the United States Supreme Court reaffirmed just this term, "Before viability a State 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy.'" *Gonzalez v. Carhart,* __ U.S. __, 127 S. Ct. 1610, 1626 (quoting *Planned Parenthood v. Casey,* 505 U.S. 833, 879 (1992)) (emphasis added). In *Gonzales,* the Supreme Court further reiterated its holding in *Casey*, noting that the State "may not impose upon this right an undue burden, which exists if a regulation's **'purpose or effect is to place a substantial obstacle** in the path of a woman seeking an abortion.'" *Id.* at 1626-27 (quoting *Casey,* 505 U.S. at 878).

001960

Once Planned Parenthood demonstrates that either the "***purpose or effect***" of Aurora's actions is to place a "***substantial obstacle*** in the path of women seeking an abortion," the burden shifts to the City to justify its treatment of Planned Parenthood and to demonstrate that its actions are "narrowly tailored" to further a "sufficiently substantial" or "compelling state interest." *Schad*, 452 U.S. at 69, *Islamic Ctr.*, 840 F.2d at 299. *See also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 33-36) (5th Cir. 1981) (preliminary injunction appropriate where clinic was denied a permit and city justifications did not "fit within a defined plan or scheme of logical development serving legitimate state ends").[1]

Thus, while "animus" to abortion rights is a clear basis for a violation of Section 1983, simply demonstrating that the effect of Aurora's conduct is to place "substantial obstacles in the path of women seeking abortion" and that Aurora has not "narrowly tailored" its conduct to meet a "compelling state interest" is also sufficient to demonstrate a likelihood of success on the merits.

Here, Aurora has not only placed a substantial obstacle in the path of women seeking an abortion, they have shuttered the facility altogether. Aurora has done this, while admitting it is an unprecedented action, because of "allegations of fraud made within the context of the politically charged abortion issue." Affidavit of Alayne Weingartz at ¶7. The City has pulled Planned Parenthood's permits, permits which are required to be issued within **three days** under the Aurora Municipal Code, and instead subjected Planned Parenthood to an open-ended, indefinite and undefined review process.

---

[1] In its Response, Aurora contends incorrectly that the more lenient "rational basis" test applies. This test is inapplicable, however, where fundamental, constitutional rights apply. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440-41 (1985).

This process has already consumed more than a month and may not conclude for weeks, if not months, in the future.[2]

If unsubstantiated allegations of "fraud" by anti-abortion protestors are sufficient to allow a municipality to withdraw a valid permit and close a facility indefinitely, few medical facilities in the country will be providing abortion services in the very near future. *See Deerfield Med. Center*, 661 F.2d at 336 (the right to an abortion "would be adversely affected if abortion facilities were restricted to the most unattractive, inaccessible and inconvenient areas of a city.").[3]

**b.    There is Evidence of Aurora's Animus in the Record.**

Even assuming that Planned Parenthood must demonstrate Aurora's 'animus' to abortion to state a claim under Section 1983, there is sufficient evidence to do so. First, as recognized in *Planned Parenthood of Northern New England v. City of Manchester, N.H.*, No. CIV. 01-64-M, 2001 WL 531537, at *3 (D.N.H. April 27, 2001), the fact that decisions were made following a hearing in which "significant numbers of people expressed personal objection to Planned Parenthood" is evidence of a general animus to abortion rights.[4] As the court noted in *Manchester*, "'if proof of a civil right[s] violation depends on an open statement by an official of an intent to discriminate, the Fourteenth

---

[2] By contrast, the Aurora Municipal Code recognizes the importance of prompt resolution of zoning issues. For example, the Code requires that Certificates of Occupancy "shall be acted upon within three (3) days. Section 10.3-2. Similarly, Appeals to the Zoning Board must be made within four (4) days of the Zoning Board's decision. Section 10.2-5.3.

[3] Aurora's contention that Planned Parenthood has failed to name individual patients as additional parties is completely unsupported by the case law. For more than 25 years, Court's have recognized that providers of abortion services have standing to assert claims on behalf of their patients. *Deerfield Medical Center*, 661 F.2d at 333-34 (plaintiffs have standing to assert the claims of pregnant women whose privacy rights would be "adversely affected." *See also Planned Parenthood v. Casey*, 505 U.S. 833 (1992); *Planned Parenthood v. Atchison*, 126 F.3d 1042 (8th Cir. 1997).

[4] The City's Response incorrectly asserts that *Manchester* involved 24 individual plaintiffs in addition to Planned Parenthood and was, therefore, distinguishable on that basis. In fact, *Manchester* involved two plaintiffs, Planned Parenthood and the developer, and is therefore identical to our case. The developer and second plaintiff was "24 Penacook Street, LLC" which may have been the cause of the confusion.

001962

Amendment offers little solace to those seeking its protection.  [I]t is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals.'" *Id.* (quoting *Dailey v. City of Lawton*, 425 F.2d 1037, 1039 (10th Cir. 1970)).

The record contains, however, the actual animus expressed by a member of Aurora's City Council. The following emails obtained by Planned Parenthood demonstrate the basis for its unfair treatment specifically by members of the Aurora City Council. A September 17, email from City Council member Chris Beykirch states as follows:

> **We will have to parade our children past protests and face the fact daily that lives are being aborted in that building . . . I will tell you they are a deceitful organization and I am angry that they located where they did without ever consulting anyone in our government.**

A second email sent by Alderman Beykirch on September 18, 2007 further states:

> I think PP and its leaders are widely deceptive to the governments of communities all around the U.S. I do not like the fact they took our ability to plan out of our hands with their deception.  I can't imagine that even a pro-PP person could see that the long term effects of their location are not good for my neighborhood.
>
> **I do believe life begins at conception.**  Why else would people put ultrasounds on their refrigerator?  Even though I am elected, I come to the office with life experiences that lead me one way or another.  **I am Pro-Life.  I will also abide by the law of the land as I am sworn to do.  I will not go along with it though until the law says I must.  I will also never think positively about a "medical practice" that will perform abortions on minors without their consent regardless of their extremist ideals of why they should be allowed to.**

It would be difficult to describe "animus" by an elected official more clearly than is set forth in these emails.

### c.    There is No Evidence of Fraud or Deceit by Plaintiff

Despite the swirling allegations of "fraud and deceit" against Planned Parenthood there is no evidence that anything like this occurred. First, Aurora issued the Temporary Occupancy Permit after the full disclosure that Planned Parenthood would occupy the facility, including a front-page article in the Chicago Tribune. Anti-abortion protestors had even staged a "candlelight vigil" at facility making their views known to Aurora a full week before the Temporary Occupancy Permit issued.[5]

Beyond this, public tax documents demonstrated the connection between Planned Parenthood, Gemini Office Development and the Aurora Outpatient Facility as early as May 2007. The Chicago Sun Times carried a public notice relating to the $8 million bond issue for the new property at this time.

Most importantly, representatives of Planned Parenthood and Aurora discussed the outpatient facility in February 2007. Contemporaneous email and telephone records confirm that these conversations took place. Accordingly, there is no basis for the claim of "fraud" which serves as the only justification for Aurora's actions.

Aurora's actions place a substantial obstacle in the path of women seeking an abortion. There is no justification for these actions, let alone a "narrowly tailored" response to meet a "compelling state interest." Planned Parenthood, therefore, has a strong likelihood of prevailing on the merits of its equal protection claim under 42 U.S.C. 1983, and a preliminary injunction is appropriate under the circumstances.

---

[5] As the court noted in *Manchester*, however, the entire argument over whether Aurora was somehow "misled" is a red herring. The only relevant question is whether the area was designated for medical use and whether Planned Parenthood properly described its intended use of the property for "medical purposes." There is no question that Planned Parenthood and Gemini did just that. The narrower question of whether Gemini disclosed its relationship to Planned Parenthood and whether Aurora knew that the medical services were abortion services is irrelevant to the zoning question. Aurora could make no valid decision based on the fact that Planned Parenthood was to be the tenant or that the facility would provide abortion services.

001964

2.    **Irreparable Injury for which there is no adequate remedy at law**

Irreparable harm is presumed where, as here, violations of fundamental or constitutional rights are alleged. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Aurora agrees with this proposition and there is no need for further elaboration on this point. The City is incorrect that individual plaintiffs must be named. No such plaintiffs were named in *Planned Parenthood v. Casey, Planned Parenthood v. Manchester or Planned Parenthood v. Atchison*. There simply is no such requirement and Aurora cites no case law to support its unusual contention.[6]

B.    ***WILLIAMSON* RIPENESS STANDARDS DO NOT APPLY TO PLAINTIFFS' EQUAL PROTECTION CLAIM**

Defendant attempts to revive its claim that plaintiffs' injunctive relief complaint is not ripe for judicial consideration under *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). Without asserting any new facts or law, Defendant argues that *Williamson* bars the Court's consideration of plaintiffs' equal protection claim because the review process initiated by the Aurora City Council "has not resulted in a final administrative decision that has been formalized and its effects felt in a concrete way by Plaintiffs." *Defendant's Response to Plaintiffs' Motion for Preliminary Injunction* at ¶13.

The 7th Circuit has clearly stated, however, that equal protection claims arising from land-use decisions are not subject to *Williamson* ripeness standards. *See Forseth v. Village of Sussex*, 199 F.3d 363, 370 (7th Cir. 2000) (citing *Hager v. City of West Peoria*,

---

[6] Aurora does not cite any case law or otherwise respond to Planned Parenthood's contention that the balance of the hardships tips in favor of Planned Parenthood. Further, while Aurora contends that the public interest favors even-handed enforcement of the Aurora Zoning Code, it is silent on the far greater public interest in health care and protection of constitutional freedoms. These, not the zoning code, are most clearly in the public interest. *Planned Parenthood of Northern New England v. City of Manchester, N.H.*, No. CIV. 01-64-M, 2001 WL 531537, at *5 (D.N.H. April 27, 2001).

84 F.3d. 865, 870 (7th Cir. 1996)) (emphasis added) ("[B]ona fide equal protection claims arising from land-use decisions can be made independently from a takings claim **and without being subject to *Williamson* ripeness.**"); *see also Northwestern University v. City of Evanston*, No. 00 C 7309, 2001 WL 219632, at *5 (N.D. Ill. March 6, 2001) (emphasis added) ("**[T]he Seventh Circuit has held that *Williamson* ripeness does not apply to equal protection claims.**").

In *Hager*, the Court concluded that "rather than just a single takings claim with different disguises (including one for equal protection), in this case at least, in addition to a takings/inverse condemnation claim, plaintiffs have raised a legitimate equal protection claim to be considered on its merits." *Id.* As a result, the Court held that *Williamson* provided no reason for the court to postpone consideration of plaintiffs' equal protection claims. *Id.*

In the present case, plaintiffs' complaint certainly evidences a *bona fide* equal protection claim meaning *Williamson* ripeness standards are inapplicable to their claim. As in *Hager*, plaintiffs' prayer for relief seeks primarily injunctive relief rather than damages. *See Plaintiffs' Verified Complaint For Preliminary Injunction And Other Relief* at ¶38. Plaintiffs' prayer for relief devotes three paragraphs to injunctive relief and only one line to damages. *See Hager*, 84 F.3d at 870 n.4 (holding that plaintiffs' pled a *bona fide* equal protection claim because their prayers for relief under their equal protection claims sought preliminary and permanent injunctive relief against the defendant in two separate sections and included only one sentence requests for damages). Plaintiffs equal protection claim would also "disappear" if Defendant treated all building permit applicants equally and eliminated the policy of conducting an *ad hoc*

001966

administrative review of the permitting process for medical facilities that provide abortion services.  Thus, plaintiffs' claim possesses both factors the *Hager* court identified as evidence of a *bona fide* equal protection claim.  Therefore, under *Hager*, *Forseth* and *Northwestern University*, plaintiffs' equal protection claim is therefore not subject to the *Williamson* ripeness standards.

In addition, it should be noted that plaintiffs are indeed currently suffering a concrete harm.  On August 31, 2007, defendant informed plaintiff by letter that plaintiff's Temporary Occupancy Permit was being modified and plaintiff would not be allowed to open its facility until defendant concluded a review of the permitting process.  At that time, defendant indicated the review would be complete by plaintiffs' planned opening date of September 18, 2007.  In a September 11, 2007 letter, however, defendant informed plaintiff that plaintiff's facility would be closed indefinitely as a result of the administrative review process.  By modifying plaintiff's occupancy permit and closing plaintiff's facility for the indefinite future, defendant has "significantly interrupted and delayed [Planned Parenthood's] patients' ability to consider and obtain family planning, contraceptives, and at some point, abortion services, by delaying [Planned Parenthood's] . . . legitimate occupancy of the building." *Manchester,* 2001 WL 531537, at *5.  Such interruption and delay are certainly injurious to plaintiffs.

## CONCLUSION

Accordingly, Plaintiffs, Planned Parenthood Chicago Area and Gemini Office Development, LLC, respectfully request that this court grant its motion  for preliminary injunction and enjoin Aurora from modifying the Temporary Occupancy Permit issued

on August 16, 2007 and otherwise enjoining Aurora from interfering with Plaintiffs'

lawful business operations.

PLANNED PARENTHOOD CHICAGO AREA and GEMINI
OFFICE DEVELOPMENT LLC

By: _____
One of Their Attorneys

Christopher B. Wilson
Peter Neumer
Perkins Coie LLP
131 S. Dearborn Street, Suite 1700
Chicago, Illinois 60603-5559
Phone: (312) 324-8400
Fax: (312) 324-9400

C01968

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PLANNED PARENTHOOD CHICAGO    )
AREA, an Illinois non-profit Corporation, and )
GEMINI OFFICE DEVELOPMENT LLC,    )
an Illinois limited liability company,    )
                            )
       Plaintiffs,    )     No. 07 C 5181
                            )
                            )     Judge Norgle
       v.    )     Magistrate Brown
                            )
CITY OF AURORA, ILLINOIS    )
                            )
       Defendant.    )

### SUPPLEMENTAL DECLARATION OF STEVE TROMBLEY

I, Steve Trombley, hereby declare as follows:

1.     I have personal knowledge of the facts set forth in the Declaration and could competently testify to them if called as a witness.

2.     I am the President and CEO of Planned Parenthood Chicago Area ("PPCA").

3.     I make this declaration in support of PPCA and Gemini Office Development LLC's ("Gemini") Motion for Preliminary Injunction.

4.     This declaration supplements my declaration of September 12, 2007 already filed in this action.

5.     Among the services Planned Parenthood will provide to both men and women at the 3051 E. New York Street facility are the following:

- Annual gynecological exams;

- Cancer screening for cervical, breast, and other cancers;

- Examinations and counseling about birth control and family planning, including education about abstinence;

- Prescribing and dispensing contraceptive drugs and devices;

- Screening and treatment for sexually transmitted infections;
- Screening and treatment for vaginal and urinary tract infections;
- Confidential HIV testing and counseling;
- Immunizations;
- Pap tests, as well as colposcopy and cryotherapy for abnormal Pap results; and
- Medical and surgical abortions.

6.    Planned Parenthood provides these services on an "as needed basis" to its patients, regardless of means.  For many people, then, this facility offers the only affordable gynecological, contraceptive or reproductive medical care within a reasonable distance.

7.    Less than 10 percent of the services which Planned Parenthood provides relate to abortions.

8.    On July 27, 2007, the Chicago Tribune published a front page article describing the Aurora clinic and Planned Parenthood's role.  **{A copy of this article is attached to the initial Trombley Affidavit as Exhibit 4}**.

9.    In response to this article, opponents of abortion staged a candle light vigil at the outpatient facility on August 9, 2007.  **{A copy of the Aurora Beacon article describing this event is attached hereto as Exhibit 1 to this Declaration.}**

10.    Representatives of Planned Parenthood had conversations with officials of Aurora as early as February 2007.  These conversations are supported by contemporaneous email and telephone records.  **{A copy of the emails and telephone records of PPCA documenting these discussions is attached hereto as Exhibit 2}**.

11.    Further, the bond financing which Planned Parenthood obtained through the Illinois Finance Authority required certain public disclosures.  In and around May 2007, therefore, the Chicago SunTimes published public notices describing the relationship between

C01970

Planned Parenthood and Gemini, and a description of the Aurora medical facility. **{A copy of the SunTimes bond notice is attached hereto as Exhibit 3.}**

12.     Finally, the architectural drawings that Gemini submitted to Aurora, contained unusual security features:  bullet resistant glass in the reception area, bullet resistant doors and bullet resistant drywall.  These security measures were necessary protection given the violence that has occurred at many abortion facilities, but also were early signals to Aurora.  **{A copy of portions of the architectural drawings submitted to the City of Aurora is attached hereto as Exhibit 4.}**

13.     On August 28, Aurora named Richard Martens, a former chair of the ABA Section of Municipal Law, as the attorney conducting the "independent review" of Planned Parenthood's applications.  **{A copy of the Aurora Beacon article describing the hiring of Mr. Martens is attached hereto as Exhibit 5.}**

14.     On August 31, Aurora terminated Mr. Martens in response to complaints from City Council members.  **{A copy of the Aurora Beacon article describing these events is attached hereto as Exhibit 6.}**

15.     Aurora then named Phillip Luetkehans as the new "independent" council. However, questions soon arose about Mr. Luetkehans political contributions and his ability to conduct an "independent review."  **{A copy of the Aurora Beacon article describing these events is attached hereto as Exhibit 7.}**

16.    Aurora then designated Kane County State's Attorney John Barsanti, as the new counsel to oversee the "independent review."    **{A copy of the Aurora Beacon article describing these events is attached hereto as Exhibit 8}.**

17.    I received two emails from Melissa Ernst attaching communications she received from Alderman Chris Beykirch, a member of the Aurora City Council representing Ward 8. **{Copies of the September 17 and September 18 emails are attached hereto as Exhibit 9}.**

18.    On September 18, 2007, I received an email from Kelli Haley attaching correspondence she provided to the Aurora City Council.    **{A copy of this email is attached hereto as Exhibit 10.}**

Further affiant sayeth not.



Steve Trombley

Dated this 19th day of September, 2007

Subscribed and sworn to before me this
_19th_ day of September, 2007.

_Teresa M. albertino_
Notary Public

**"OFFICIAL SEAL"**
TERESA M. ALBERTINO
Notary Public, State of Illinois
My Commission Expires 07/01/08

# EXHIBIT 1

001973

Back to regular view    Print this page

## Anti-abortion group to launch 40-day vigil in Aurora

August 9, 2007
**By Kristen Zambo Staff Writer**

AURORA — Anti-abortion demonstrators today will launch a 40-day vigil against a Planned Parenthood women's health center opening next month on Aurora's far East Side.

Motorists along Oakhurst Drive near the Dominick's grocery will be greeted, starting at 8 a.m., by demonstrators praying, reading Bible passages and holding signs about the medical center and against abortions. Planned Parenthood/Chicago Area staff plan to open a full-service health center on 3.24 acres at 240 N. Oakhurst Drive, in the DuPage County section of Aurora.

"We're pro-life and we want to let them know we're very upset with this," the Rev. Hugh Fullmer, pastor at Our Lady of Mercy Church in Aurora, said Wednesday. "It's not wanted in our community. That's why we're doing it."

The health center is scheduled to open Sept. 18. Abortion services are expected to be available at the approximately 22,000-square-foot office.

"I hope they bring lots of water with them because it's hot," said Steve Trombley, president and CEO of Planned Parenthood/Chicago Area.

The vigil will last from 8 a.m. to 11 p.m. today. For the remaining 39 days until the center opens, two- to three-person shifts will man the vigil in front of the health center 24 hours a day, Our Lady of Mercy parishioner Jane Fonner said.

"We feel that since the Planned Parenthood clinic probably will open ... we are going to pray just peacefully. It's just to ask for God's grace and mercy for the unborn," said Fonner, the mother of two adopted daughters.

The medical center will provide an array of women's health-care services, such as gynecological exams, birth control counseling and prescriptions and cervical cancer screening. An estimated 10 percent of the medical care there will involve abortions.

"It isn't going to have an impact on our opening whatsoever," Trombley said of the vigils. "The building is done. People need these services."

Demonstrations hosted in other communities haven't stopped patients from seeking medical services, nor shuttered any Planned Parenthood offices, he added.

Aurora Police Lt. Brian Olsen said no extra patrols are scheduled because of the protests.

"We'll only respond there if we're called," Olsen said. "Hopefully it's nice and quiet."

Members of the Pro-Life Action League have scheduled a meeting about the health center for 7 p.m. Aug. 16 at the Prisco Community Center, 150 W. Illinois Ave., Aurora. A planned Aug. 22 demonstration at the center has been rescheduled to Aug. 25.

*kzambo@scn1.com*

001974

# EXHIBIT 2

001975

> ----~Original Message-----

> From: Trombley, Steve

> Sent: Wednesday, February 21, 2007 9:53 AM

> To: Fischman, Tracy; Novak, Becky; Huyck, Teri;

> Petronis, Dainius

> Subject: Re: Bill Wyatt

>

> He was on the phone so I left him a message with my

> cell phone number. I

> didn't make the earlier flight so hopefully he will

> call back while I am

> sitting here.

>

> Steve

>

>

>

> -----Original Message-----

> From: Fischman, Tracy <tracyf@ppca.org>

> To: Novak, Becky <beckyn@ppca.org>; Trombley, Steve

> <Stevet@ppca.org>;

> Huyck, Teri <Teri@ppca.org>; Petronis, Dainius

> <dainiusp@ppca.org>

> Sent: Tue Feb 20 15:58:46 2007

> Subject: RE: Bill Wyatt

>

> Agreed.  Let's go with Bill.

>

>

>

> Tracy Fischman, Vice President for Public Policy

>

> Planned Parenthood/Chicago Area

>

> 18 South Michigan Ave., 6th Floor

>

> Chicago, IL  60603

>

> Ph:  312.592.6833

>

> Fax: 312.592.6801

>

> www.plannedparenthoodaction.org

> <http://www.plannedparenthoodaction.org>

>

>

>

>

> _____

>

> From: Novak, Becky

> Sent: Tuesday, February 20, 2007 3:40 PM

> To: Fischman, Tracy; Trombley, Steve; Huyck, Teri;

> Petronis, Dainius

> Subject: RE: Bill Wyatt

>

>

>

> I can't find a cell number, but a friend has his

> home number.  I think