Planning Commission Minutes                                                    11
11/1/2006

Mr. Agama said they were removed in the 90's, 1991 or 1992. There were testings done then and those were clean. The bank's required 6 months newer ones, so that was redone and it came back also that it was clean.

Ms. Roehlk said just to let you guys know, that was one of the reasons why this case was held up for a few months was to make sure that the site was clean, so they were doing testing and that is why it was held up also.

Mr. Bergeron said what about the concern for with the lift? That's probably under concrete. Has that been tested as well?

Mr. Agama said they did some boring tests behind the building. They also did some closer.

Chairman Donnell said so I guess the final analysis is you have an EPA sheet that says that your site is certified clean.

Mr. Agama said and regarding the parking and the traffic, at Gary's Auto Mechanics they have cars in the parking lot. There's like 20 vehicles parked in there.

Chairman Donnell said what does that have to do with this case?

Mr. Agama said that you were concerned about the parking situation.

Chairman Donnell said we just have to evaluate this case on its own merits. What about your hours of operation?

Mr. Agama said 6 to 6.

Chairman Donnell said and how about special events? Do you plan to have holiday celebrations where you'd invite other people to the site?

Mr. Agama said I would say due to the constraints on the site, they would have to think twice before doing that. They would have to be within the limitations of the site. I'm sorry, the activities he is talking about is during the time the children are there, so it is not the parents, it is the children.

Chairman Donnell said you wouldn't be inviting additional people to this site.

Mr. Agama said no.

Mrs. Cole said how many days a week are you going to be open? Is it Monday through Friday, or will you be open on Saturdays also?

Mr. Agama said it would be very limited on the weekends only maybe feedback to the parents or meetings for the parents, but really not for normal activity.

Planning Commission Minutes
11/1/2006

12

Mrs. Cole said so was that a yes or a no or was that 5 days?

Mr. Agama said really Monday through Friday.

Mr. Karrels said I have a question of staff. Due to our pending changes with what will be required for fencing and that stuff, it is showing 6-foot high chain link fence here. Being that this is abutting up to a residential property, I think it would be fair to do something that would be more fitting in with the residential neighborhood there like maybe a wrought iron fence instead of chain link.

Ms. Roehlk said as you can see, one of the conditions of approval was, it's actually Condition 1e, we asked that they change the fence from chain line to a decorative metal fence.

Mr. Karrels said and about how far it comes out towards the sidewalk there? Are we meeting what will be the requirements there for side yard or whatever for fencing?

Mr. Sieben said well this is a commercial use. It as not applicable as the residential component.

Ms. Roehlk said they are going to be putting some landscaping inside the playground area, so that will add additional buffer. We are requesting that they put more landscaping along the front of the playground and also along the trash enclosure just to give more buffering. If you feel that they need to put it all along the eastern part of the property on the playground, we can ask that they do that.

Mr. Karrels said I wasn't thinking so much about bringing it out as restricting the residential person's view from their yard and that stuff with the fence there.

Mr. Sieben said if I can just make a comment. I have dealt with this property. This is actually 2 properties. The building that is going to be used, the 1042 Talma, I don't know if you call it the Old Key Shop or whatever, it had the old sign up there, it is a legal non-conforming commercial building. It has been zoned R-2. I've been getting calls on this building for 5 years and it was tough reuse. It really hadn't been used too much except for storage, I think, in the last several years. We've had everything from proposed restaurants and other high intense uses, which would have taken a rezoning on that. You also have maybe not the best looking property next door with the garage with all the outside storage of vehicles. Also the perimeter of these 2 properties was entirely pretty much asphalted. There is not a stitch of green on any of this. The way we looked at it, there is a need for daycare, especially on the east side. We have been working with the Munoz's actually to look for a property like this for about 3 or 4 years. As you know, several years ago, they attempted to try to get some additional children in their home when they lived on Adobe Drive on the northwest side. So we've been working with them for a while. This is taking down the old garage. This is adding a lot of green area. It is actually replacing the parkways, which are now all asphalt and actually adding some setback landscaping too. So we are looking at it as a real win-win. I know there are concerns with parking, which are legitimate, but it is going to be a lot better looking corner then it does now.

13

Planning Commission Minutes
11/1/2006

Chairman Donnell said I personally think this is an excellent use for this site. I don't know if Parker is truly a collector, but it does, I think, serve as a collector, but it is within a residential neighborhood. I think you've heard me pontificate in the past about the location of daycare centers. I think they really should be in places like this and I think we've tried this in other locations. I salute you on finding this location. The only thing that I still have a little problem with is we try hard, once we have someone come before us, we try hard to get the best plan we can and to have 4 parking spaces driving across the sidewalk is something we don't normally do and I was wondering as maybe a compromise if we took out the handicapped space and that next space located on Talma, you would remove basically 2 spaces and replace it with 1 space on the street so you have a net loss of 1 space, although albeit on the street, and then you'd only have the width of a normal driveway left to come in there, which is something consistent with what we've approve in the past, and so in effect you'd only lose 1 parking space, you would gain some additional green, you'd gain an on-street parking space and I guess I would like for you to take a closer look at that as a staff because I know they tried to make it work, but I'd like you as staff to look at that. I'm not going to make it a condition, but I'd like you to look at that and see if that still makes sense to you.

Ms. Roehlk said like I said, staff did look at it and we are kind of getting feedback from you guys.

Chairman Donnell said well I know that it's not really for staff to come and recommend a lot of variances. I'm asking you to look at maybe a small variance to try to help us be a little more consistent in how we look at this property across the board with other properties.

Mr. Sieben said well it sounded like the Petitioner was willing to remove all those spaces. Again, it is a compromise. We did look at it. Some of us wanted it all removed. This is a compromise. Right now it is entirely asphalt. I believe there are 7 or 8 spaces you can squeeze in there now with the bumper. They've gotten it down to 4. I don't have a problem if they don't have a problem with making a condition that we lose that space and then we only have 3. Like you said, it is about the width of a normal driveway with the 3 spaces and you can get a little bit more green there and then also with the re-centering of the handicapped space in the main parking lot so you can kind of walk through the striped area, I think that is a big improvement to the site plan.

Mr. Pilmer said the other option I might add on that is we spent a lot of time talking about parking in general and I know that's not the ideal situation, but if it ends up staying it could be marked as employee parking so there is not a lot of in and out and maybe a car would be there all day and that would be a good compromise.

Ms. Roehlk said we could see if the Petitioner wants to put it, I would assume you would want it along Parker.

Mr. Pilmer said well I'm just saying eliminate the cars backing up across the driveway or across the sidewalk on Talma. That seems to be the real issue.

Planning Commission Minutes
11/1/2006

14

Mr. Sieben said keep the 3 on Talma as employee so you don't have them backing out into traffic.

Mr. Pilmer said right.

Chairman Donnell said I think that is a good suggestion.

Mr. Jones said I have one question. Is there any vacant area nearby where you could put some of the cars that are currently in the parking lot? I'd like to see them, if possible, remove the parking next to the building area. Is it possible to do that?

Mr. Agama said we not aware of any other parking in the area. I would think that would be a very good option to use those parking spaces for employee parking so people are not pulling their cars in there.

Chairman Donnell said I think Matt raises a good point as well. I think we have a couple different options here. We are definitely looking at losing the handicapped space, which would put about 20 by 20 of green back on the site and give you enough to maybe park a car on the street. I'd like to see you continue with that. I don't know if we are going to solve it all tonight, but I do agree with Matt. This is not the situation we like, but we understand we are tight.

Ms. Roehlk said staff would recommend conditional approval. There are 3 conditions with a nice list of sub-categories underneath that. We will add conditions to move the handicapped space to the middle so there is more access to the building, to put the 3 parking spaces on Talma as marked for employees, and to also lose 2 spaces on Talma and replace with grass and review the curb cut.

MOTION OF APPROVAL WAS MADE BY: Mrs. Smilgys
MOTION SECONDED BY: Mrs. Cole
AYES:   Mr. Bergeron, Mr. Cameron, Mrs. Cole, Mr. Divine, Mrs. Dunn, Mr. Engen, Mr. Jones, Mr. Karrels, Mr. Offutt, Mr. Pilmer, Mrs. Smilgys, Mrs. Truax
NAYS:   None

### FINDINGS OF FACT

1.     Will the establishment of the proposed Special Use be unreasonably detrimental to or endanger the public health, safety, morals, comfort or general welfare?

Mrs. Smilgys said I think it is extremely in the opposite. This will be providing a service for daycare on the east side of Aurora, which is sorely needed. Although there are some issues with the site, they don't compare to the present uses that are there.

2.     Will the establishment of the proposed Special Use be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted?

15

Planning Commission Minutes
11/1/2006

Mr. Offutt said the establishment of the proposed Special Use will allow for the upgrading of one of the vacant commercial buildings and the razing of the other commercial building. These improvements should not be injurious to the use and enjoyment of the other property in the area for the purposes already permitted.

3.      Will the establishment of the proposed Special Use substantially diminish/impair property values within the neighborhood?

Mr. Offutt said as stated in #2, this proposed Special Use will allow for the improvement of this property and most likely will increase its market value. This should have a positive affect on the property values within the neighborhood and not diminish or impair their value.

4.      Will the establishment of the proposed Special Use impede the normal and orderly development and improvement of surrounding properties for uses permitted by their respective zoning districts?

Mrs. Smilgys said this is a reuse, so it is not any more development, but it could possibly be a good influence on other properties to improve in the area.

Chairman Donnell said there is going to be substantial improvement in the parkway landscaping area, which should have a very positive affect on the neighborhood.

5.      Are adequate utilities, access roads, drainage and other necessary facilities provided or shown as being proposed on the site plan for the proposed Special Use?

Mr. Jones said they are either in place or will be provided.

6.      What effect will the proposed Special Use have on traffic? Has ingress and egress been designed to minimize congestion in the public streets?

Chairman Donnell said I think this is the one area where we are really sort of wrestling with meeting the parking requirements and creating what I think some of the Plan Commissioners feel might be a hazard in backing across the sidewalk and we've asked staff to take a closer look at that.

7.      Does the proposed Special Use conform in all other respects to the applicable regulations of the zoning district in which it is located, except as such regulations are modified pursuant to the Plan Commission recommendations?

Mr. Jones said by means of the Special Use they will.

Ms. Roehlk said this petition will be next heard at the Planning and Development Committee meeting on November 16th on the 5th Floor of this building.

Planning Commission Minutes
11/1/2006

B)    NA19/4-06.299-PA  - Annexation Agreement Petition with Preliminary Plan/Plat on 5.71
      acres for residential and commercial/office development at the SWC of New York Street
      and Vaughn Road  by CYPRESS DEVELOPMENT II, LLC (Ward 8  - JR/ST)

Ms. Roehlk said the Petitioner is proposing a residential parcel and a commercial parcel. The
commercial parcel will be off of E. New York Street. They are going to have an access point off
of there. The single family residential development is going to be accessed off of Vaughn Road.
They are proposing 9 single family lots. There are 2 existing houses that are going to be kept.
They are on Lot 9 and 1, so those 2 existing houses are going to be kept, well actually they may
be kept. It is up to the developer whether they will be kept, but since they are pretty new, they
are thinking about keeping those 2 houses there. The stormwater detention will be contained on
Lot 10 for the residential property. Stormwater for the commercial property will be on Lot 12.
The single family houses will range in size from 10,289 square feet to 16,748 square feet. The
commercial property might have a cross access easement. The Petitioner is looking at buying the
eastern property that is currently vacant and outside the city and doing a commercial on that
property there. There would be a cross access easement so that would work out well for that site.
Just to let people know, you may notice that Forest Drive is located on the southern portion of
the proposed residential development. That will remain. It will won't be removed. Forest Drive
will remain and it will remain for the Brentwood Estates houses that are backing up against it. I
just wanted to let everyone know that that won't be removed.

Chairman Donnell said does Forest Drive dead-end into Lot 10?

Ms. Roehlk said I would have to defer that to the Petitioner. I don't know that for sure.

Chairman Donnell said is this a Preliminary Plat and Plan?

Ms. Roehlk said that's one of my conditions. They need additional information on it. Usually
we ask that it is all on one document, so it should actually be called a Preliminary Plat and Plan,
so all the information should be on one document. That's one of our conditions.

The Petitioners were sworn in.

Good evening. I'm Bruce Goldsmith with the Dykema law firm. I'm here on behalf of the
Petitioner, Cypress Development. With me is Tom Verive, who is the president of Cypress
Development, and also Bernard Wilhelmson, who is the engineer on the project. We've already
turned in, for the record, notices and we also turned our affidavit with respect to the posting of
the sign on the property consistent with the requirements of the city code. The property
generally is in this yellowed area. It is just a little bit west of New York Street at Vaughn Road.
It comes down Vaughn Road. There are 2 existing residential structures on the property. One of
them will be integrated into the future development. The other one will eventually be
demolished and replaced. The Forest Way actually goes behind the Lot 10 detention into the
unincorporated area and will remain in place. It is a private drive that is maintained by the
property owners of that area of development. The general trend of development is, as you know,
you are generally increasing commercial along New York Street go to the east, and I believe you
already approved a redevelopment project southwest of Vaughn and New York Street. You have

Planning Commission Minutes
11/1/2006

multi-family generally to the north. You have multi-family to the west. The property actually is
buffered by a detention pond on the west. You have single family to the south. In fact,
Brentwood I is a subdivision that was developed by Cypress Development and a similar type of
housing product is intended for this project. You have some single family homes on the east side
of Vaughn. So generally you've got a trend of development with adding some commercial along
New York Street, especially towards the corners, the south corners on Vaughn, and you have
basically a feathering to single family residential to the south with higher intensity multi-family
to the west and the north. What we are seeking to do is create a small residential subdivision
along Vaughn, which consists of 9 lots around a circle coming in off of Vaughn. You've already
heard about lot sizes. This is intended to be a high end residential development similar to what's
in the existing Brentwood. Typical homes that were part of Brentwood, and this is just for use in
giving you a general idea about the architectural, very I think, pretty imaginative variety of
housing types with a lot of attention to detail, both in the depth fenestration, use of roof line,
window treatment, etc. to give a very classy look to the residences. Similar types of architectural
detail will be applied to the homes that are built in this subdivision. There would be a total of,
generally a minimum of 3,000 square foot homes. In addition, a small commercial pod to the
northwest. That would be a single building and the front of the elevation on New York Street
will show some attention to detail with respect the architecture. This building has an average
height of about 22 feet. It is a two story building. There is a substantial grade change, as you
might have seen from the plan, front to back, so on the back you have a full two story look.
Basically you have an elevation on the front and a separate elevation on the back side to make it
work within the site. Again, a lot of attention to detail on the architecture to make this a very
nice looking building facing New York Street, but also some attention to detail on the south side
of the building as well. Going back to the plan, two detention ponds, which are actually
interconnected, a detention on the south of the commercial, which is Lot 12 and a detention pond
on the back end of the residential Lot 10 meeting the requirements of the city stormwater
management. Currently this property is zoned in the County. This is an annexation petition as
part of this process. We are seeking to create a Planned Development in which we would have
R-1 property to the south and a B-2 use to the north. As you can see by the nature of the
building, we are looking for probably office users, and professional space. We believe there is a
good market for that. For further information, the commercial space would be about 14,000
square feet. We would have a homeowners association. Actually there is an existing
homeowners association in Brentwood that would be expanded to include the single family
residences, so for maintenance of common area, like the detention pond, that would be taken care
of. Since it is a one owner operation with respect to the commercial, that will be maintained by
the owner. We are asking for really two variations, basically the same concept. Side yard
setbacks, this is a very tight site to develop, especially given the turning radius that was required
by the Fire Department, so we've had to try to seek a small variation with respect to side yard
setbacks on all the lots. Some of them are down to 7½, some of them are down to 6. Those are
spelled out in our Plan Description. On the commercial, a similarly tight site, so that we are
asking for short side yards of 5 feet, interior side yards with the intention of hopefully acquiring
the property to the northeast and integrating that and we've already made commitments in the
Annexation Agreement that would provide for cross access in any event however that is
developed, eventually perhaps an integrated project, but we don't control that side at this time.
I'd be happy to answer questions or make Mr. Verive or Mr. Wilhelmson available for questions.

Planning Commission Minutes
11/1/2006

Mr. Bergeron said Bruce, ingress and egress to the commercial property is going to be where? On New York Street?

Mr. Goldsmith said yes.

Chairman Donnell said Mr. Goldsmith, I have a question about Lot 10. It appears the way this is drawn, do you own that portion of Forest Drive to the south of Lot 10?

Mr. Verive said as far as I know, no it does not. Lot 10 was a 1 acre parcel, or I think an acre and a half parcel, and I purchased half of that parcel for my detention area from the lady on Forest Drive. As far as I know, it is a dedicated easement.

Chairman Donnell said it appears from the way this plat is drawn the developer of this property, which I believe is you, owns the 14 to 15 feet of Forest Drive. I would imagine there are some people in the audience concerned about that.

Mr. Goldsmith said I think we think there is an existing easement of access and we intend to preserve that.

Chairman Donnell said so you have no intention of restricting any access or making any improvements to the roadway at this time?

Mr. Goldsmith said absolutely not. It is not part of this project.

Chairman Donnell said Mr. Goldsmith, do you plan on Isabella Court, are you planning to use a landscaped island in the center of that cul-de-sac?

Mr. Goldsmith said to the extend the Fire Department allows us.

Chairman Donnell said we will talk to the Fire Department.

Mr. Goldsmith said nobody thinks you can turn a truck in any kind of cul-de-sac.

Mr. Cameron said are both of those detention areas wet or are they dry?

Mr. Wilhelmson said they will be dry bottom detention with green field.

The public input portion of the public hearing was opened. The witnesses were sworn in.

My name is Kevin Tremain. I live at 32W468 Forest Drive. I guess first and foremost, would it be possible to spin this picture around so the vast majority of us could see what is involved here? I haven't been informed by anyone as to what the actual plans are.

Chairman Donnell said we have that plan so Mr. Goldsmith if you could maybe sit that up so that the audience can see that plan.

19

Planning Commission Minutes
11/1/2006

Mr. Goldsmith would you like me to go over this again for the audience?

Chairman Donnell said sure, why don't you go ahead and give them the basics.

Mr. Goldsmith said I apologize, we never have figured out in this room how to deal with both sides of the easel at the same time. This is Vaughn and this is New York Street. This lot is a little bit off the corner. This is where the commercial would be. It is designated as Lot 11 in the plan. Off of Vaughn would be Isabella Circle. There would be 9 single family homes. There's currently a home on Lot 1, which is the southeast corner and there currently is a home on Lot 9. The Lot 9 home probably would remain. The Lot 1 home eventually would be removed and replaced with a new home. The homes basically face the cul-de-sac. There is detention to the west, which is required by city ordinance to catch stormwater runoff from the site from development. On the north for the Lot 11, there's a Lot 12, which is also a stormwater management facility where stormwater would be catched in a major storm event. Real quickly, the homes in the residential would be very similar to what you are used to seeing in Brentwood, since it is the same developer. These are typical examples of those kinds of homes. For the commercial, we would be looking from the backside, which you might see, this is the lower elevation on the rear of the commercial site. The front of the commercial site, which would face New York Street, would look like this. That's my short summary.

Mr. Tremain said first and foremost, Forest Drive, the easement access to Vaughn Road for the 7 homes, 6 now that use Forest Drive as ingress and egress to their properties, currently the easement section connecting Vaughn Road to Ms. Parker's house should be, according to DuPage County, be maintained by the current property owner, and it isn't. It isn't being addressed in the proposal now. My understanding is it is the property owner, who would be the developer, is responsible for it's current condition and improvements that are required by DuPage County. I guess if this is, in fact, approved is the ownership going to maintain the County portion of this development, which is the ingress and egress to Vaughn Road for the rest of us folks that live on Forest Drive? The other concern I have for the commercial site is the exterior lighting in the evening. By putting flood lamps on parking spaces and whatever, you have seriously impacted the quality of life that I enjoy in the evenings in attempting to look at the star patterns and enjoying the little fires we have, campfires we have in our backyard that have been ongoing for years, if not decades, by previous owners. The exterior lighting is going to be a major concern for me as to providing a change in my quality of life. I would like the ownership to address that issue.

Chairman Donnell said could you point out on the map approximately where your home is?

Mr. Tremain said I am right about here. I believe my lot is Lot 13. I'm not sure.

Chairman Donnell said there is an aerial map down there. Maybe you can try with that one.

Mr. Tremain said I would be off the map. I'm right about here. Those are my concerns at this point.

Planning Commission Minutes
11/1/2006

My name is Dell McCoy. I live at 7S568 Vaughn Road. Where we live is in the lot right here. This is the house that was going to be retained. Well first off, I'm not against a good quality single family redevelopment there. I'm supportive of that. What my concern is there is a lot of slope down here. This is very low land here. I know down here where Brentwood I has been developed, there's a house on the corner here that's also been built and my understanding is it has now been vacated because the foundation has been cracking and settling. I don't know if that would be a major problem here because of the kind of soils that are here. I'm not an expert in that, but there is a major drop off going this way. Another concern I have is when I hear that you are going to have 6-foot setbacks, a variance for that. You are packing a lot of homes in there. If you could look at the density, instead of 9 homes, make it 8 or something so these houses are not quite packed in so close and tight. Again, I think this is a good use of the property up here for commercial. I hadn't thought about the lights. We will have the lights shining right in the back of our house, so we are concerned about that.

My name is Ralph Savaglio. I'm president of the Woodland Lakes Homeowners Association, which is right across Vaughn Road. I live at 370 Vaughn Circle. My main concern with this coming in or anything else is the traffic on Vaughn Road coming off of New York. Coming out of our subdivision at 7:00 o'clock in the morning or 4:00 or 5:00 o'clock in the afternoon, you earn your kamikaze license. I kid you not. Also, what's commercial, a property being put on the east corner, a strip mall going in there, it is going to be horrendous trying to get in and out of that place. My concern is what are they going to do? Are they going to put a stoplight there? You can't get any straight answers. That is my biggest concern.

Chairman Donnell said sir, so you live north of New York Street in the townhome development?

Mr. Savaglio said yes, right across from this.

My name is Jim Gilbert and I also, like Ralph, am a resident of Woodland Lakes. I live at 384 Vaughn Circle and I wanted to reiterate the traffic concerns that we have. We also have development that is occurring immediately east of this development. There are two commercial developments going in there now. There is no traffic control device at Vaughn and New York and we are literally trapped in the morning rush and the evening rush from exiting or entering the development and that needs to be addressed. The other concern we have is the sidewalks. We have sidewalks east of, there's two developments east of this that are in the process of construction right now and then we will have this one. We have sidewalks from Eola to about half way to these developments and they are sidewalks to nowhere, so we have shopping, like the Dominicks and Walgreens store that we live within a quarter mile of, it would be nice to be able to walk there and we can't. We take our lives in our hands. I know this is probably not the responsibility of the developer, but we certainly want to make the city aware of our concerns and see to it that they are addressed. That's all I have.

I'm Mike Higgins. I live at 440 Vaughn Circle, which is also Woodland Lakes. And just to reinforce what's already been said, I'm pro the development. I think it is a good looking development. I think the commercial looks good. I think the homes look good, but I'm concerned that there may be some consideration of a change in traffic flow. It is a bad situation the way it is. The only way I can see to correct it is to put a signal in. It's not your job, I

Planning Commission Minutes
11/1/2006

understand that, but as long as there are no plans currently with this subdivision to change the traffic flow, to change the access to Vaughn or Vaughn Circle, it's a very difficult subdivision, Woodland Lakes is, to get out of. You have 120 yards both ways with 45 mile per hour traffic and some very difficult curves. I guess to summarize, I don't have a problem with this subdivision. I would encourage it, it is a good looking one, but that it doesn't have any negative impact on the traffic in that area.

Chairman Donnell said the traffic seems to be a common theme. Have you talked to any city representatives and haven't had any answer?

Mr. Higgins said it is 2 to 3 years out.

Chairman Donnell said warrants, you've got to meet warrants, right?

Mr. Higgins said yes.

Chairman Donnell said anyone else? Okay, we'd like to maybe ask the Petitioner to come forward and help shed some light on some of these issues.

Mr. Goldsmith said on traffic, the only thing I can add to the inside is we knew that if we acquired the corner piece there would be an extra dedication for Vaughn, so we know the city is looking for additional right-of-way on Vaughn and we are actually adding a little bit of right-of-way to Vaughn as part of our Annexation Agreement, but the real improvement would have to be at the corner and we don't have any control of any part of that in this development. With respect to the question about lighting on the commercial, as I know the Plan Commission knows, but the residents may not know, we would have to do a photometric study as part of our development and we will have to prove out that there will be no spillage that exceeds the city's limit, which is very low, so the light will not spill off-site. Also, this is basically intended to be an office use. We don't anticipate, really, nighttime use. I guess it would depend on security issues as to how much lighting will be on at night. With respect to the drive, it is our understanding it is just an access easement. The maintenance is really the homeowner's responsibility. It is a gravel road. It has never been paved. It probably could use some upgrade, but this is one of the problems with unincorporated areas, they don't have public street systems. As I indicated, and if there is any question about this, we can make it a condition, we have no intention of having any restriction on access on Forest Drive. Our only intention is to build a detention pond next to it.

Chairman Donnell said let me ask something. It appears from the plan, as I read the plan, a portion of that Forest Drive, ¾ of it I would say from Vaughn Road back to Lot 10, doesn't appear to be on your property or part of your ownership.

Mr. Goldsmith said correct.

Chairman Donnell said this plan makes it appear like approximately 135 feet of it is on your property and although I don't think we can answer that question this evening, I think that before you come back, we need to understand do you or do you not own that and the answer that the petitioner was asking was who is responsible for maintaining that. We've heard from the people

Planning Commission Minutes
11/1/2006

on Forest Drive in the past when other development came through and I can't remember what the definitive answer is.

Mr. Goldsmith said we can check the title record on that and verify what the easement language is and that's an easy thing for us to look at. I would agree with you that at least, well it would look like the whole of that Forest Drive for that one length of that one lot is, in fact, within the boundaries of our site. We'll verify that with the survey, so that's a simple thing that we can do. One of the speakers asked about the pitch of the land. Yes it is pitching generally to the south and we showed you that because the elevations on the commercial building, but we are catching all the stormwater from the commercial right next to the commercial and we are also catching the stormwater that is basically going to the southwest in Lot 10, so this probably certainly by meeting city standards in an area that is currently unregulated will provide some quality stormwater management. With respect to the setbacks, the question was asked, I mean not only are these high quality homes, but these are large lots. The minimum lot is above the city's minimum of 10,000 and we get up to 16,000. Even though there are setback variations requested, sometimes that will be because of a driveway and sometimes it will be because of a building structure. Obviously, the building is not going to go from one corner to the other corner, especially given the odd configuration of the site. Most of these lots are irregular lots that you typically find around a cul-de-sac.

Chairman Donnell said how about Lot 9? Are you requesting a variance for the side yard setback on Lot 9?

Mr. Goldsmith said yes we are, but that's an existing home that we are intending to maintain.

Chairman Donnell said how about Lot 7?

Mr. Goldsmith said there is a setback.

Chairman Donnell said I'm just looking to see if you are requesting a variance. These are the lots that are adjacent to the homeowner that is here this evening.

Mr. Goldsmith said and the answer is that on the side yards we are requesting on all the lots, but some of them are down to 7½ and some are down to 6.

Chairman Donnell said but the rear setback on Lot 7 you are requesting no variance?

Mr. Goldsmith said no.

Chairman Donnell said and Lot 9 does have an existing home, so the conditions would remain the same as they are today?

Mr. Goldsmith said that is our intention, yes.

Mr. Sieben said could I clarify that Mr. Chairman, I have your Plan Description here. The actual variance is for the side yard setback. It is only for 3 lots. Those are the most narrow pie shaped

lots, 3, 5, and 6. They are kind of near the back of the cul-de-sac. What we normally require is 10% of the lot width is the side yard setback. They are maintaining the 7½-foot side yard setback on all the lots, except those three because it is a little bit narrower with the pie shape, so they are allowed to go down to 6 on those. We were okay with that. The other ones are going to be the standard 7½ because these are a minimum 75-foot of width and 10,000 square feet.

Chairman Donnell said so for the record for the audience, we're talking about a 16,000, 15,000, and 11,500 lot size, so these are some of the larger lots that you're just making a 2½-foot variance.

Mr. Sieben said a 1½-foot variance.

Chairman Donnell said a 1½-foot variance from the city's standards.

Mr. Sieben said just for perspective, the existing 2 units of Brentwood Estates, those are all 6-foot side yard setbacks, so they are smaller lots and those are at 6 foot. We tried to get a little more separation near houses. Through the negotiation process, they did lose one lot within that court. Even though they had 10,000, they were squeezed in even more with more variances requested, so the layout fit a lot better taking out a lot, so they are down to the 9 and just the minimal setback variance on the side yards for just those 3 is what it turned out to be.

Chairman Donnell said while you have the mic, could you give the city's official answer on signalization because I don't think that the developer can answer that question?

Mr. Sieben said sure. There were a couple of things I was going to comment on, including that. The other issues on the sidewalk, or pedestrian connections, yes the city is aware of that. We are requesting that those be put in along the frontages. Just a little background on New York Street, as you know New York was recently improved from Commons to west of Asbury with the four lane divided landscaped median. That is the ultimate intention from where it ends now just past Asbury all the way to Farnsworth. My guess is that will be done in phases and as the one gentleman suggested, it will be a number of years before that is done. It has been planned and is in the planning stages. My guess is most likely, based on the current configuration, you would have a signal at Vaughn based on the spacing with Asbury and County Line Road. That is a full access right now, both for Woodland Lakes and S. Vaughn Road. There are left turn lanes on New York Street, but obviously it is a major intersection. It probably does warrant a signal in the future. We have been working with the Traffic Engineer, also some traffic calming on Vaughn Road south of New York street is a major, almost a cut-through, if you will, at rush hour times, so we've been looking at some traffic calming there. I'm not sure where that stands, but with a signal, I think they are correct, that is down the road. I don't know if pressure were to come sooner whether they would attempt to do a temporary like they did at County Line, I really don't know. But I think that is planned down the road. As far as Forest Drive goes, that is a separate lot. That is a private drive. It is not a public street. I would believe that there's got to be some sort of a maintenance agreement with all the homeowners that use that and I would guess based on Mr. Verive purchasing part of Lot 10 that he is now going to be part of that if part of Forest Drive does look like it goes through part of Lot 10. I don't know the whole recorded agreement on that, but keep in mind that Forest Drive is a separate parcel, private parcel.

Planning Commission Minutes
11/1/2006

Chairman Donnell said I know we could discuss that, and we have discussed that at other meetings, but this is a preliminary plat. They need to come back to us for a final plat, and I guess what I'm asking for is if the Petitioner will do his research and come back to us with a full answer at the time of final plat.

Mr. Goldsmith said and I am making that commitment. I would note, if it wasn't clear, we are dedicating additional right-of-way on E. New York Street, which will allow for that future improvement. That's part of our commitment in the Annexation Agreement.

Chairman Donnell said what is your access for the commercial lot? Is that single full access?

Mr. Goldsmith said full access on New York Street.

Chairman Donnell said single full access?

Mr. Goldsmith said yes.

Ms. Roehlk said that's why they are going to be doing cross access easements if they were to develop the eastern property.

Chairman Donnell said I guess maybe at preliminary maybe that would be part of the plat portion, but normally those things are indicated at the preliminary stage so that we don't have to discuss those at the final. Should that be indicated on the preliminary plat, I guess probably delineated in the document?

Ms. Roehlk said basically they did a preliminary plan and I had asked the Petitioner to put the preliminary plan and plat all on one document. They only submitted a preliminary plat. The preliminary plan does show the access off of New York Street and the kind of preliminary layout of the commercial. Unfortunately, you weren't given that document.

Chairman Donnell said well that's why I'm asking the question.

Mr. Goldsmith said I apologize for the confusion on that.

Ms. Roehlk said usually we do have all that for you guys.

Mr. Sieben said but in answer to your question, yes it is being required.

Ms. Roehlk said those are some of our conditions.

Mrs. Cole said Bill, just to clarify, I know you have a question about the Forest Drive where it abuts to Lot 10, but what about Forest Drive from Vaughn to Lot 10? It looks like somebody has to be responsible for that and you're asking him to find out about that also?

Planning Commission Minutes
11/1/2006

Chairman Donnell said it would be nice if he did that. It doesn't appear that it is part of his ownership.

Mr. Goldsmith said it is not, but we'll get answers to all that as part of the same investigation.

Mr. Cameron said have you done any drilling on the site to determine what the subsoil conditions are on that Lot 2, 3 and 4?

Mr. Verive said yes. We have soil borings for the site.

Mr. Cameron said so as far as we know, the soil conditions are such that they are typical of handling the weight of the foundation of the house without a problem?

Mr. Verive said yes.

Chairman Donnell said one other thing I would like to add, we are sensitive to spill light from commercial and residential developments and in addition to doing photometrics, we always ask that lights be directed down and not across so that we don't have spill light, and we will get photometrics to insure that we are not going to unduly spill light over into residential areas.

Mr. Cameron said you can put shields on those back corners to minimize that problem.

Chairman Donnell said that is something that we do look at.

Mr. Cameron said and we are also, per the rewrite of the zoning ordinance, looking at that for residential as well.

Chairman Donnell said do we have some new questions in the audience? Just reintroduce yourself so that we get the minutes right.

Again, my name is Dell McCoy, 7S568 Vaughn Road, that's the lot adjacent to the house they are going to be retaining. A question more of just general, not for this development specifically, but now this is going to take my lot and be surrounded by the City of Aurora. Does that mean I'm facing a likelihood of being annexed into the city as well? Land use planning puts my lot as well as commercial long-range.

Mrs. Roehlk said historically the City of Aurora of does not forcibly annex any property into the city.

My name is Ralph Savaglio. The commercial property that's going to be on New York, what is going to be the access? Is that going to be full, like you said? Does that mean they can come in going east and west?

Chairman Donnell said he said a full access.

Mr. Savaglio said so that's going to screw things up even more.

Planning Commission Minutes
11/1/2006

Mr. Sieben said maybe if I can just clarify. It essentially is going to be a full now because there is not a divided median there. In the future, there will be a divided median like there is further east. That will have to be looked at at that time. That may become a right-in/right-out, but for the time being, that essentially will be a full.

Mr. Savaglio said for the time being? Before somebody gets killed on that intersection, the city will not do anything. Is that correct sir? Am I understanding you correctly?

Mr. Sieben said do what where?

Mr. Savaglio said that intersection of New York and Vaughn Road.

Chairman Donnell said now Ralph, Mr. Sieben is a planner with the City of Aurora. We are all citizens. If you would like to take your case to your Alderman, I think that would be the better place to start.

Mr. Savaglio said I've already talked to the Alderman.

Chairman Donnell said the Commission can only recommend, and this is your opportunity to tell us what you feel.

Mr. Savaglio said I understand. All I'm trying to do is to re-emphasize how bad it is there. And if you are going to have a commercial property and have full access, that means that you are going to have right hand and left hand turning in there.

Mr. Sieben said correct.

Mr. Savaglio said so that means people that are going west on New York Street to go into this property are going to be making another left hand turn.

Mr. Sieben said you are saying into the commercial drive?

Mr. Savaglio said correct.

Mr. Sieben said there are no plans to put turn lanes there, this would just be a drive lane.

Mr. Savaglio said in other words, they are going to be stopping in that outer lane to make a left hand turn?

Mr. Sieben said the inner lane.

Mr. Savaglio said and then people that are using Vaughn Road as a cut through, I have counted as many as 17 cars backed up when I was trying to get out making a left hand turn to cut through. Vaughn Road was downgraded from a major collector to a residential just recently, right?

27

Planning Commission Minutes
11/1/2006

Mr. Sieben said correct.

Mr. Savaglio said are you telling me that is not a major collector?

Mr. Sieben said I believe I did already testify, if I can just reiterate. The city Traffic Engineer, Bob Green, working with the Alderman of the Ward, they are looking at some traffic calming scenarios on Vaughn Road. I don't know what they are at this point. It is also my understanding that eventually Vaughn and New York may get a stoplight. I totally agree with you. I think it is probably needed right now. I don't know what that timing is. That's something to keep in touch with the Engineering Department and your Alderman and the city Traffic Engineer.

I'm John Young from 32W482 Forest Drive. Regarding Forest Drive from Vaughn Road west, a few months ago, one of our neighbors went to DuPage County and complained about the deplorable conditions of that road. The end result was that DuPage County came out and gave us a summons that if we did not repair that road in 2 weeks, we were subject to a $75.00 fine. If we violated the 2 week period, then the fine went up to about $150.00 and it kept on going up as time passed. We ended up repairing that road in spite of the neighbor. We didn't need her help. She doesn't pay anything to keep that road up anyway, but we got the road fixed and in DuPage and in its laws right now, it is on the books that the homeowners are responsible for the maintenance of Forest Drive and that includes the developer. So it is on the books in DuPage County. He is subject to the fine the same as we are. So I would like you to be aware of that. Get in touch with DuPage County and see what they say.

Chairman Donnell said I don't mean to laugh, but you asked for help and you got a fine.

Mr. Young said we didn't get fined because we got the road fixed thanks to our cooperation.

Chairman Donnell said good.

Mr. Young said but as far as I know, nobody got a fine.

Chairman Donnell said well I appreciate your clarification.

Mr. Young said the road is passable. It is better then what it was, but the developer is just as responsible as we are.

Chairman Donnell said I think he's got 135 feet of your road.

Mr. Young said that's right, and he can put in blacktop and curbing as far we're concerned. We'd be very happy.

Chairman Donnell said we'll see what comes out in the final plat.

Mr. Young said thank you very much.

Planning Commission Minutes
11/1/2006

Mr. Tramain said to expand on Mr. Young's statement, DuPage County is requiring each homeowner responsible for their frontage on Forest Drive. We do not have an association per se. We work through cooperation and not all homeowners on Forest Drive are as willing to commit to the cooperation of fixing Forest Drive as others, but specifically the frontage on Forest Drive for each homeowner is their responsibility and cost.

Chairman Donnell said we have about 315 feet that is in question then.

Mr. Tramain said my personal feeling is it is the developer's responsibility and how he's going to solve that by subdividing that into city lots, does that now pass onto the new homeowner, or perspective homeowner, on that city lot for the back frontage for Forest Drive or how does that can of worms get kept closed?

Mr. Sieben said I reiterate again, you are incorrect. That portion of Forest Drive behind Lots 1, 2 and 3, they do not go into Forest Drive. Forest Drive is its own separate parcel. Someone owns that piece. I don't know who in your development owns that, but someone owns that. You are correct, 100 and some feet of Lot 10, he does own that section of Forest Drive and whatever you guys agree on, he would have to be part of that, but the frontage behind the 3 lots there between the Brentwood lots and these proposed lots, there's a separate owner. I don't know who that is, but he's not responsible.

Mr. Tramain said well I know who owns the portion of Forest Drive in front of my property and that's me. I own the 14-foot easement and every other person that lives on Forest Drive also is in the same situation. My assumption, without looking at the County records, is that the developer owns that 100 and some feet of whatever parcel he owns that buts up on Forest Drive. That will be something that is clarified, I'm sure.

Chairman Donnell said we could debate this this evening, but I think we have attorneys that should go up there and really get us an answer. I would like the staff to also verify that answer before we go to final plat.

Mr. Tramain said I don't know if this would be considered new business, but at the intersection of Forest and Vaughn Road, because of the traffic patterns and last year when Vaughn Road was downgraded to a lesser traffic pattern, I requested then a school bus crossing sign be put up because you have a number of small children being bussed to and from their various schools. At that time, the Vaughn Road was under study and something was going to happen. Well in the interim, it has been another year and there are more school children there being picked up and dropped off at that intersection, yet the traffic patterns seem to be increasing and I'd like to request that this body recommend a school bus sign on the north and south end of whatever that distance feet is be in place whenever this is going to be decided just as an addendum to your already busy schedule.

Chairman Donnell said I guess from the school bus signage, we can certainly have the planning staff pass this on to engineering, who could give a professional look at your recommendation.

Planning Commission Minutes
11/1/2006

My name is Richard Kastner. I live at 2483 Jamestown Lane. The subdivision that I live in is Abington Trace and that's just west of Woodland Lakes, which is shown on the map that we received. We did not know that there was a Jamestown Lane also in Woodland Lakes. We had heard at one time that eventually our Jamestown Lane would somewhere proceed into Woodland Lakes and connect up, which would be great for us. Is that still in the plans or being considered?

Chairman Donnell said it seems like the east/west railroad coming together, so staff?

Mr. Sieben said yes we are greatly, greatly aware of that major problem getting in and out of Abington Trace. It is supposed to be a right-in/right-out. I have former staff that live in there, so I know the situation well. We've had some calls. I know the 2 narrow lots, there is a house on one of them, are for sale. We've had calls. The one thing we do stress is any development, which most likely would be again an infill townhome, obviously it is limited space, but it would be a townhome type of development and Jamestown, obviously, is a big, big portion of that. I agree with you totally, it needs to be done ASAP, unless the city were to go in there and buy that and construct it. We are kind of hoping it comes in sooner then later for development and we can get that connected.

Mr. Kastner said one additional item I'd like to suggest in both of our subdivisions, Abington Trace and Woodland Lakes, and I can speak more for Abington Trace, there are no playground facilities at all available. When Jamestown Lane eventually becomes connected, can that become a possibility to provide a playground for some of those young children in there?

Chairman Donnell said that is an interesting thought. I represent the Fox Valley Park District on this board and when these developments came in they said they were empty nesters, senior targeted developments, and you're telling me that there are a lot of kids in here.

Mr. Kastner said definitely.

Chairman Donnell said we will take that under consideration.

Mr. Gilbert said my question was how would we get copies of the minutes of these proceedings?

Chairman Donnell said they are public record. As soon as they are completed and approved by the Plan Commission, they are available from the Planning Department.

Mr. Karrels said they are also available on the city website after they are approved.

Mr. Gilbert said what is the timeframe for that.

Mr. Sieben said let's be realistic. When conservatively could they be ready? By the first meeting in December? They can be approved and then sometime thereafter they would be on the city website.

Mr. Cameron said Plan Commission is always on the website.

Planning Commission Minutes
11/1/2006

Mr. Young said I want you to know that I have the original Plat of Survey, which is over 50 years old, and on that Plat of Survey it shows the easement of Forest Drive and there's no division on Forest Drive separating Forest Drive from the property owned by each individual. Anytime you want to see that Plat of Survey, I'll run it right up here.

Chairman Donnell said you might share that with the attorney. I think he might be the guy that might be interested in it.

Mr. Tramain said many of us did not receive a copy of the proposal before us here and I was wondering if we can get a copy of that. Is that also on the website?

Chairman Donnell said I'm sure the developer would be happy to talk to you after the meeting and make these exhibits at least available for you to look at. They are also available to look at in the Planning Department.

Ms. Roehlk said just to let everyone know, usually when public notices go out to the residents, they do have the option to come into our office and look at the plans, so whenever they get a public notice, they can always look at the plans before the meeting. That's always stated on the letter. Basically the Petitioner sends out letters if you are within 250 feet of the subject property. The attorney can probably answer that for you.

Mr. Goldsmith said we gave notice to actually hundreds of people because as we did our 250 feet, as you actually cross New York Street, we got into associations that had common areas that were owned by individual owners, so we had to actually give notice to a lot more people then you would normally expect. But we certainly gave notice to everyone and I gave a certified copy of the list to the staff of all the people who were given notice.

Chairman Donnell said and then you posted the property?

Mr. Goldsmith said the property was posted.

Ms. Roehlk said they put 2 signs up, I believe one up on E. New York Street and one on Vaughn Road.

Chairman Donnell said and by the fact that you are here this evening, we have sort of a duplication system to try to do the best we can to notify everyone.

Ms. Roehlk said we also notify in the Beacon News.

Mr. Goldsmith said I will note that a lot of people don't like to pick certified mail up, so sometimes it is not accepted.

Chairman Donnell said so everything was sent certified?

Mr. Goldsmith said everything was sent certified.

31

Planning Commission Minutes
11/1/2006

Chairman Donnell said so you did send those out and you've sent copies to the City of Aurora staff?

Mr. Goldsmith said yes, we gave a full complete list.

Ms. Roehlk said staff would recommend conditional approval. As you can see on page 4 and 5, we have four conditions and we will add a fifth condition stating that at the time of final plat that the Petitioner verify who owns Forest Drive and any necessary easements that are on there and maintenance responsibility of the property.

Mr. Karrels said I'd like to add a couple more conditions to that. We've had trouble in the past with Brentwood when they were constructed with debris blowing around, so I would like to see a condition that all the construction debris be put in dumpsters. I'm not going to say there needs to be one on every site, but needs to put in a regular dumpster instead of just a fenced in area. Also I think that I would like to see a requirement that any advertisement done for the property be advertised as the City of Aurora in Indian Prairie District 204 schools and not Naperville and not Naperville schools like the developer has done in the past.

Mr. Cameron said I would make a comment on the dumpster. I found in the years that I was in the business that I typically had a painted 8-foot square container and then had someone come and pick it up. It seemed as though dumpsters seemed to be open season for everyone to dump everything from couches to that type of thing.

Chairman Donnell said I understand what you are getting at Ken. Ed is there some city standard for construction sites as to how waste is supposed to be handled that maybe Brentwood didn't follow?

Mr. Sieben said not really. It is based on complaints. It is actually in the building code. They are not supposed to have debris blowing around and everything. We did have major problems with Brentwood Estates I and II, so we would hope that it wouldn't happen again here.

Chairman Donnell said the Park District is a recipient of a lot of residential trash and leaves this time of year. I can sympathize with you for a dumpster. Anyone of our cans is open season, but Ken's right, I remember the complaints. I remember the round plastic containers I think that they used and some of them with no lids on them.

Mr. Cameron said I don't have a major problem. I just wanted to make a comment.

Chairman Donnell said you have no problem with going forward with Ken's recommendation?

Mr. Cameron said I just wanted to make a comment that it creates an additional problem.

Mr. Karrels said and I think a lot of the dumpsters today have warnings on them about dumping and there are fines that the developer could do against people caught dumping in them too.

MOTION OF APPROVAL WAS MADE BY: Mrs. Truax

Planning Commission Minutes                                            32
11/1/2006

MOTION SECONDED BY: Mr. Engen
AYES:    Mr. Bergeron, Mr. Cameron, Mrs. Cole, Mr. Divine, Mrs. Dunn, Mr. Engen,
         Mr. Jones, Mr. Karrels, Mr. Offutt, Mr. Pilmer, Mrs. Smilgys, Mrs. Truax
NAYS:    None

## FINDINGS OF FACT

1.    Will the establishment of the proposed Special Use be unreasonably detrimental to or
      endanger the public health, safety, morals, comfort or general welfare?

Chairman Donnell said this is a small infill development that should not have any endangerment
for the public health, safety, morals, comfort or general welfare.

2.    Will the establishment of the proposed Special Use be injurious to the use and enjoyment
      of other property in the immediate vicinity for the purposes already permitted?

Mr. Offutt said with the residential development located on a cul-de-sac and the commercial lot
located on New York Street, this Special Use should not adversely affect the use and enjoyment
of other property in the area, except for the increase in traffic.

3.    Will the establishment of the proposed Special Use substantially diminish/impair
      property values within the neighborhood?

Mr. Offutt said this development seems to be of a high quality residential product, as well as the
commercial lot, and this should not diminish or impair the property values of the other ones in
the neighborhood.

4.    Will the establishment of the proposed Special Use impede the normal and orderly
      development and improvement of surrounding properties for uses permitted by their
      respective zoning districts?

Mrs. Smilgys said since this is an infill development, it will not impede the normal and orderly
development.

5.    Are adequate utilities, access roads, drainage and other necessary facilities provided or
      shown as being proposed on the site plan for the proposed Special Use?

Mrs. Smilgys said they are all there or on the plans.

Chairman Donnell said I think that we did note that the access point for the commercial site will
be shown on the combined plan and plat.

6.    What effect will the proposed Special Use have on traffic?  Has ingress and egress been
      designed to minimize congestion in the public streets?

33

Planning Commission Minutes
11/1/2006

Mrs. Truax said well we've heard considerable testimony that this will add to what is not a good situation as far as traffic goes and hopefully it can be addressed by an eventual stoplight at Vaughn and New York Street.

Chairman Donnell said I will say that this small infill development, 9 residential lots, which 2 of them already have homes on, so it would be a net gain of 7, and a small commercial area although will add to the traffic congestion on New York Street, the problems on New York Street exist today and are planned to be mitigated with future development. I think the Planning Commission realizes the gravity of the situation now and encourages the local residents to continue to be diligent with the city to get their voices heard.

7.    Does the proposed Special Use conform in all other respects to the applicable regulations of the zoning district in which it is located, except as such regulations are modified pursuant to the Plan Commission recommendations?

Mr. Engen said the Special Use conforms with all applicable regulation.

Chairman Donnell said the Plan Commission is a recommending body. This case will come back before us again as a final plat, but will not be republished. Is that correct Mr. Sieben?

Mr. Sieben said correct.

Chairman Donnell said it will not be republished, so you need to follow the process, which Mr. Sieben will describe now.

Mr. Sieben said this will next be heard by the Planning and Development Committee of the City Council on Thursday, November 16th, at 4:00 p.m. on the 5th Floor Conference room of this building. From there it will eventually go to City Council a couple of weeks after that.

Chairman Donnell said even though we've already acted, I would ask the Petitioner if you could come and tell us how quickly you plan to reappear before the Commission for final plat and plan.

Mr. Goldsmith said we would go right to final after City Council approval and we'd be back here in fairly short order, probably 60 days after the approval.

C)    AU23/3-06.368-Rz - Rezoning Petition rezoning property from R-1 to P at 797 Spring Street by THE CITY OF AURORA (Ward 2 - PB/PH)

Mr. Boutsikakis said this property, 797 Spring Street, is located at the southwest corner of E. Spring Street and East Avenue. Currently the property is vacant. To the north, south and west are single family dwellings and to the east is a duplex. The City of Aurora is proposing a Rezoning Petition on .138 acres rezoning the property from R-1 to P. This property was purchased in 2004 by the City of Aurora. Previously it was also vacant. It is part of the density reduction program. It was referred to the Planning Division on July 11, 2006. It was annexed into the City of Aurora prior to 1925 and we are working Jim Pilmer to turn this into a playground, which will be held by the Parks Department. Due public notice was given for the

Planning Commission Minutes
11/1/2006

public hearing on this matter.  As of today, I've only received one general inquiry regarding this case.  The playground is the plan that I passed around.

The public input portion of the public hearing was opened.. No witnesses came forward.  The public input portion of the public hearing was closed.

Mr. Boutsikakis said the Planning staff has reviewed the rezoning petition submitted by the Petitioner and has found that the petition meets all the applicable codes and ordinances.  Staff would recommend approval of the rezoning petition from R-1 to P at the southwest corner of E. Spring Street and East Avenue by the City of Aurora.

> MOTION OF APPROVAL WAS MADE BY: Mr. Karrels
> MOTION SECONDED BY: Mrs. Cole
> AYES:  Mr. Bergeron, Mr. Cameron, Mrs. Cole, Mr. Divine, Mrs. Dunn, Mr. Engen,
> Mr. Jones, Mr. Karrels, Mr. Offutt, Mr. Pilmer, Mrs. Smilgys, Mrs. Truax
> NAYS:  None

### FINDINGS OF FACT

1.  Is the proposal in accordance with all applicable official physical development policies and other related official plans and policies of the City of Aurora?

Mrs. Truax said the physical development policy as listed in the staff report is providing adequate and convenient open space and recreational facilities.

2.  Does the proposal represent the logical establishment and/or consistent extension of the requested classification in consideration of the existing land uses, existing zoning classifications, and essential character of the general area of the property in question?

Mrs. Cole said it is not an extension of the existing zoning, however, it is a good use.  This is a densely populated area with very little public open space.  I believe the nearest public park is approximately 5 blocks from this site, so this will be a good use for this property.

3.  Is the proposal consistent with a desirable trend of development in the general area of the property in question, occurring since the property in question was placed in its present zoning classification (desirability being defined as the trend's consistency with other applicable official physical development policies and other related official plans and policies of the City of Aurora)?

Mrs. Smilgys said as Linda said this is a residential area and putting a park in that area is a good use for the property.

4.  Will the proposal permit uses which are more suitable than those uses permitted under the existing zoning classification?

35

Planning Commission Minutes
11/1/2006

Chairman Donnell said this was part of a density reduction program, so it has created more open space in the neighborhood.

5.    Will the proposal maintain a compatible relationship with traffic pattern and traffic volume of adjacent streets and not have an adverse effect upon traffic or pedestrian movement and safety in the general area of the property in question?

Mr. Jones said I believe we will see a slight reduction in traffic.

6.    Will the proposal allow for the provision of adequate public services and facilities to the property in question and have no adverse effect upon existing public services and facilities?

Mrs. Smilgys said it will have no adverse affect and there really aren't any facilities to be added.

Chairman Donnell said this is a public service, so it is an additional service to the City of Aurora.

Mr. Sieben said this will next go to the Planning and Development Committee meeting on Thursday, November 16th at 4:00 p.m. on the 5th Floor of this building.

VI.    PLAN / PLAT

A)    AU36/4-06.473-Ppn  - Preliminary Plan on 100 acres for the Master Plan Revision for Rush-Copley Medical Center located at 2000 Ogden Avenue  by RUSH-COPLEY MEDICAL CENTER (Ward 3  - TM)

Mr. Macholl said as you just stated, this is a Master Plan Revision for Rush-Copley.  Basically they are revising their plan to modernize their facility to meet their future needs.  Also, as part of this, they are delineating the possible northern access realignment to the north at the northwest corner of the property.

Mr. Engen said with the new addition of the building, are there any new thoughts on stormwater management or is there already something in place to handle that?

Mr. Macholl said yes.  They have submitted their stormwater calculations to Engineering at this point.  I just received those recently, so those will be addressed as we move further on.  We also do have the Engineer here to address that if that is a concern at this point, so I can pass that over to the Petitioners.

I'm Jim Bibby of 324 S. State Street, Geneva, Illinois.  The plan that is before you this evening is actually in very close conformance with the overall PUD that we brought through Plan Commission with the original Rush-Copley Medical Campus.  I believe that was approximately 12 years ago.  This then being, as outlined at that time, probably the last 20% to 25% of that build out.  We already had a question from a Plan Commissioner relative to stormwater management and engineering.  There are 8 separate stormwater management facilities already

Planning Commission Minutes
11/1/2006

constructed on the medical campus. We are only creating about an additional 5% of additional impervious on the campus with this last set of long range plans for upgrades of facilities and, therefore, there would be just a +5% on that stormwater management that's actually going to be implemented within the envelope of an existing facility. That stormwater management report has already been submitted to Engineering and is already well down the pipeline through that review process and would probably be concluded in the next several business days. We just received our final dot the I's cross the T's engineering review on that. Any other questions that the Planning Commission would have, we've submitted the traffic impact study to staff and are, again, going through the wrap up on the review of that with the overall traffic impact. Just to put it in a perspective, the overall traffic impact that would be created by these additional facilities that Alan Kato, the overall Planning Architect from Anderson Mikos will better describe to you in a second, if we were to just look at the entrance to the hospital and the increase in traffic, it would probably constitute about a 20% or 25% increase in the A.M. peak hour. In other words, if you are familiar with pulling in and out of the hospital at the present time, there might be a 4 or 5 car stack in that left hand turn bay as you turn left off of Ogden to come north into the hospital. When these facilities are done, you would probably see an additional car or a 5 or 6 car stack in that left hand turn bay, but readily handled by the existing channelized facilities out there on Ogden. As already mentioned by Tim, we have been working with all of the city staff that originally we had planned for a westerly Sedona Road access over to the residential townhome development as a final link up and access point. What we are now going to be constructing will be to the north across Waubonsie Creek in kind of a win/win where we can actually utilize that future access to spur development and create development rather then to do anything that could be perceived at all as a negative to the adjoining residential. At this point, I'd like to turn it over to Alan Kato.

Chairman Donnell said would you be requiring any Park District property to build that roadway to the north? I believe that we have an existing bike trail there.

Mr. Bibby said absolutely you do. What we would do would be very similar to what we did at the Waterford, originally Ridge Road, now Waterford crossing where we would coordinate with you and the Fox Valley Park District in implementing that bridge and bike path crossing. But really just looking at that is probably 3 or 4 years into the future.

Chairman Donnell said I would ask you just to clarify this document for the next bodies to see that, if you could add a delineation and show the trail and label that as Fox Valley Park District bike trail so that the City Council has full understanding of what we are talking about.

Mr. Bibby said absolutely. That's on a number of the engineering attachment documents and if it is not on the overall, we will get it there before it gets to City Council or the Development Committee.

Mrs. Cole said I have a question. You are adding quite a few additional square feet of space. Are you adding any beds?

I'm Alan Kato with Anderson Mikos Architects. In terms of the number of beds, I think Frank is more qualified to answer that, but we are going to be adding ICU space, so obviously there will

Planning Commission Minutes
11/1/2006

be more beds. Also the women's health is going to be expanded. Basically, in terms of the hospital itself, the women's health, there's an addition located right here, as well as expansion here and also and ICU addition here. So we're talking probably about 16 ICU beds, but that's kind of a ballpark figure. Also, we are talking about a cancer center addition. Obviously the growth in health care really parallels the growth in Aurora. All these facilities are really in response to the needs of the community and serving the community. In terms of the massing of the buildings, we are going to adhere to the 2 story type building for the hospital portion and 4 stories for the professional buildings. In terms of a difference from the original PD to now, we did add a parking facility. Obviously, to begin to add to the facility we are taking away some parking, so there is a 4 level parking garage located here.

Mrs. Cole said did you say 4 levels?

Mr. Kato said yes.

Mrs. Cole said so it is not all going to be 2 story?  That will be 4.

Mr. Kato said that will be 4 levels. Also, that coincides with the 4 level professional building next to it. This will be higher floor to floor for the parking facility because of handicapped accessibility issues. It basically aligns up with the existing POB 1 and the new POB 2. Also included in here is the new entrance to the facility, a new lobby. I don't know if you've been out there and tried to find the main entrance, well we tried to address that. Some of this stuff actually was included in the original PD. The second story above, located over here, I believe was originally designated as part of a future expansion at that point. The rest of these additions off to the side, basically to the north and west, are a slight change from that PD. Also included in the packets, we had a few other drawings. The Fire Department wanted clear delineation of fire truck access around the parking facility, around the POB, as well as the lobby. This is the POB. This is the parking garage and this is the main lobby. In addition, we had landscape plans. Our landscape architects did a tree survey and then determined how many types of species, and the quantities of planting material. Basically this portion would be for the first phase, if you will, of the next project, which would be the main lobby, POB and the parking facility. The final drawing is really just a tree survey. We also have some other drawings that basically indicate, it's something you haven't received, but it's for the future waivers that we are going to be going forward with in terms of the facility. I'll show these to you. These are just some isometrics, a 3-D model, to give you an idea of some of the building heights that we are seeing as developing. Basically north is down on this. The parking facility is here. POB 2 is here. The existing POB 1 is here, so you can see they really align. They're basically identical in scope. POB 2 is about 98,000 square feet. The main entrance would be between them. The 2 story portion for the hospital would be here. This is the women's health addition. This is the ICU addition. We are proposing to do very similar architecture, not a difference in terms of material. There will be brick as well as metal panels and the white and the green glass. So architecturally we are just going to fit into what's there now. This is also indicating a future professional building not contiguous to the hospital.

Chairman Donnell said what's an MOB?

Planning Commission Minutes
11/1/2006

Mr. Kato said medical office building and POB is professional office building. These are just some different views around. This gives you a better idea of the scale. Also a very important part of this is an addition to surgery. Right now the surgical volumes are skyrocketing and in the future we definitely feel that that will need some more space. This is the new main entrance. We want it to be very inviting and glassy and a nice front for the community so that you can go there and find where it is without having to look at signs.

Mrs. Cole said does anyone have the answer to the question on the beds?

My name is Frank Ferguson and I'm Director of Facilities Management for the medical center. Just as Alan indicated, we have started preliminary planning for additional intensive care unit beds, or ICU beds. There could be as many as 16. It may be a few as 8. You may be familiar with the Certificate of Need process.

Mrs. Cole said that was my next comment. You need to get a Certificate of Need before you can move forward.

Mr. Ferguson said exactly. We are hoping that we get approval of this final master plan revision, but any additional beds must be approved by the State.

Chairman Donnell said Mr. Bibby testified that the access road originally was going to go, I believe, to the west and at some point in time it turned north. Is this a public road or an access drive?

Mr. Sieben said originally, as you know, there is a public Sedona Drive, which comes in off of Farnsworth. It is within the Chatham Grove, 55 and older development that Newmann Homes did. That's located just to the north of the Gables apartments over there north of Ogden. The intent all along was that where Sedona ended at about the creek, I believe that is where it entered the hospital. From there it would be picked up as a private drive with full access into the hospital as kind of a third access point. It would not in anyway be the main access point, or even the secondary. It would kind of be a third access point, which was always planned. There were issues because the cart came before the horse, I guess, where all those townhome units got occupied at Chatham Grove prior to the connection being made and due to opposition of the people there and the City Council, I guess that was eliminated. So hence the need to have a third connection, but where it will go now is up into the undeveloped, that farm piece. I'm not sure if that's the Frieders piece or not, but it is west of the commercial up there, the Tom Mouroukas commercial buildings, and eventually this would connect up to Montgomery Road when that piece comes into the city and gets developed.

Mr. Bibby said it would be our understanding that it would be a public road within a probably narrower, slightly narrower then usual, right-of-way.

Chairman Donnell said well I've been around long enough when this Waterford Drive bridge went through. I fought for grade separation at that point in time. It's a new world with trails. Grade separation is more the norm then the exception. I'm not here to say the Park District wouldn't cooperate in this, but I think we are going to look very hard at this and I certainly

Planning Commission Minutes
11/1/2006

would be one that would recommend grade separation if we do approve this. This trail, when complete, will be the major connection to the Gilman Trail, which will not only go 11 miles to Waubonsee College, but will go down to the Midewin Tall Grass Prairie in Joliet. It is a major trail system that will link roughly a third of Aurora to that trail system. So it's going to be a major trail. Today it is a shadow of what it will be in the future, but in the future, again if you think of everybody that lives in DuPage and Will County linking up with the Gilman Trail and the Midewin Trail, it's a major link. I just want to make sure that I register the Park District's concern. I don't know if you've had any discussions with Jeff regarding this connection. This is the first I've seen it.

Mr. Sieben said we hear you totally. This is a preliminary. We kind of wanted to get this going. They are going to come in for the Final Plan Waiver on the parking garage and the addition. It should be noted that the hospital is cooperating with the city at the city's request. Again, this has been planned and through no fault of their own really. We've asked them to change that. I don't know, to be honest with you and maybe Mr. Bibby could state even, where the property line is. I'm not sure based on this drawing where that even is.

Chairman Donnell said I think our trail goes to the end of where it sort of curls around and so we own the shoreline of the Waubonsie Creek, a couple hundred feet in there, and we will own the other side according to a comprehensive plan that we brought in with the Waterford plan. I just know, and it follows logic to get any kind of height to achieve grade separation, it costs money that I wasn't successful to get when we did the Waterford grade, so we have a grade crossing there. We also have a grade crossing at Montgomery Road. We have those already. I think in the future you will see the Park District building bridges across those intersections to achieve grade separation. That's the trend. That's what we are seeing, not only in our area, but nation-wide.

Mr. Bibby said we would look forward to meeting with yourself, Jeff Palmquist and Bill Wiet here from the city and the Engineering Department to take a look at that. One thing we have going for us on the proposed north alignment is that we have a neck down point in the Waubonsie Creek there where the wetlands, the flood plain, everything just necks down with a rather steep embankment. It might be possible to get a grade separation path just by increasing the span of the bridge to over 14 feet and sneaking it down below. The path would be, it would not be above a 100 year flood level, but I think it would be doable and a workable situation. It is certainly something we can look at.

Chairman Donnell said thank you very much. Well the Park District's path is only a small component of this large plan.

Mr. Macholl said staff would recommend conditional approval of the preliminary plan with the condition that the northwest connection, as indicated on the revised Master Plan, be provided for future development purposes.

Chairman Donnell said what does be provided for mean?

Mr. Macholl said it is as indicated…

Planning Commission Minutes                                                    40
11/1/2006

Chairman Donnell said well first off, I don't know if this needs to be a condition, but on this plan, as I requested, I'd like to have the Park District's property delineated since it is impacted by this plan. So just to label the plan.

Ms. Roehlk said he can probably put a condition on the approval that the Park District property be delineated on the plan.

Chairman Donnell said be delineated and I think that as Mr. Bibby offered, that the developer have preliminary discussions with the Park District regarding the roadway crossing.

Mr. Macholl said so with the condition that the Park District's property be delineated on the Master Plan.

Chairman Donnell said I guess, and I think for the other part of it, that they initiate a discussion with the Fox Valley Park District about the crossing. We are approving a preliminary plan and I have had smart attorneys tell me before that that was part of the preliminary plan you approved, so I think I just need a little bit of condition there that we need to talk a little bit more.

Ms. Roehlk said he can probably have a second one stating that the Park District and the Petitioner discuss that connection.

Chairman Donnell said review the connection. It sounds good.

Mr. Ferguson said, and Ed can speak to this as well, he correctly stated that the hospital is cooperating with the city. We, in fact, had an approved plan and project well underway. It is one of the reasons we have detention already in place. We were at the point of starting the bridge and when the residents of the new home development raised a lot of concerns with the city and with the hospital. Then in conjunction with the city, in discussions with the city, the hospital agreed to delete the bridge. We want to be a good neighbor, but we felt we needed an alternative. This northwest connector is the alternative, but it is so preliminary we have not considered the property line and the bike path, etc. So we are willing to cooperate, not just with the Park District, but we would like the city to be part of those discussions. That's my request.

Mr. Sieben said it would have to be, I think, the hospital, the city, the Park District and eventually who develops north of your property. Am I correct where the creek is and a certain distance on either side, the Fox Valley Park District owns that, so where that bridge would be is where it is Park District property, am I correct?

Chairman Donnell said that's correct. Hopefully you understand me that I sit on this Commission to represent the Fox Valley Park District. You have a plan, which I think is a good plan, but part of it hinges upon using property that you don't own and that I can't fully commit to at this level. I report to a Board and we have to take this through a Board and through a staff review. I just want to make sure because I have had attorneys tell me that you approved this preliminary plan, therefore, don't come back and tell me anything at the final if it shows the same thing on a preliminary. That's why I just want to make sure that we have some condition