ORDINANCE NUMBER *4315*

ORDINANCE PROVIDING FOR THE EXECUTION
OF AN ANNEXATION AGREEMENT WITH
THE OWNERS OF RECORD OF TERRITORY
WHICH MAY BE ANNEXED TO THE CITY OF AURORA

WHEREAS, a proposed Principal Annexation Agreement ("Principal Annexation Agreement") in the form of Exhibit A hereto has been duly submitted to the Corporate Authorities of the City of Aurora with the request that all required hearings be held thereon, and requesting annexation to the City of Aurora of certain territory therein described, subject to the terms and conditions of said Annexation Agreement, pursuant to Chapter 24, Article 11-15.1-1 et seq. Illinois Revised Statutes (1972 Supp.); and

WHEREAS, the Corporate Authorities of the City of Aurora caused a notice to be prepared describing in general the terms and conditions of the proposed Principal Annexation Agree-ment and stating the time and place of a public hearing to con-sider the proposed Principal Annexation Agreement; and

WHEREAS, such notice of the public hearing was duly published not less than 15 nor more than 30 days prior to the hearing, in a newspaper of general circulation in the City of Aurora; and

WHEREAS, the City Council held a public hearing in the City upon the proposed Principal Annexation Agreement as specified in such notice; and

WHEREAS, the Aurora Plan Commission has held a public hearing on an Application for Establishment of Fox Valley East Planned Development District and for Related Zoning Amendments, Classifications, Exceptions and Variations (hereinafter called the "Application") after due publication of notice of such hearing and has submitted findings of fact and a Recommendation to the City Council of the City of Aurora to approve the Application, as submitted, subject, however, to the condition that certain amendments to the Plan Description be made prior to approval by the City Council, all in accordance with Aurora City Ordinance No. 3100; and

WHEREAS, the amendments to the Plan Description recommended by the Aurora Plan Commission and certain additional amendments deemed appropriate by the City Council have been incorporated in the Plan Description which is Exhibit A to the Principal Annexation Agreement; and

WHEREAS, all public hearings and other action required to be held or taken prior to the adoption and execution of the Principal Annexation Agreement in order to make the same effective have been held or taken, including all hearings and action required in connection with amendments to and classifications, exceptions, variations, modifications and special uses under the Zoning Ordinance and modifications and exceptions from the Subdivision Control Ordinance, such public hearings and other action having been held pursuant to notice as required by law and in accordance with all requirements of law; and

WHEREAS, the City of Aurora has given appropriate notice to each and every Fire Protection District or Library District and every other district all as provided for and as required by Chapter 24, Article 7-1-1, Illinois Revised Statutes (1972 Supp.); and

WHEREAS, no Library Districts are within the boundaries of the territory to be annexed; and

WHEREAS, the corporate authorities, after due investigation and consideration, and following the aforesaid public hearings, have determined that entering into the Principal Annexation Agreement in the form of Exhibit A hereto will serve the public good and benefit the City of Aurora and be compatible with the future development of the City of Aurora; and

WHEREAS, expenditures provided for in the Principal Annexation Agreement were not contemplated at the time of adoption of the annual appropriation pursuant to Section 2-21 of the Code of Ordinances of the City of Aurora (the "Appropriation Ordinance") and it is within the best interests of the City of Aurora that any obligation for expenditures contained in the Principal Annexation Agreement be considered as an exception to the Appropriation Ordinance pursuant to Section 6 of Article VII of the Constitution of the State of Illinois; and

WHEREAS, this ordinance with Exhibit A hereto, in its present form, has been on file with the City Clerk of the City of Aurora for public inspection for at least one week;

-3-

NOW, THEREFORE, BE IT ORDAINED, by the City Council of the City of Aurora, Illinois as follows:

Section 1:    That the Mayor and City Council hereby find as facts all of the recitals in the Preambles of this Ordinance, as well as the Preambles contained in the Principal Annexation Agreement in the form of Exhibit A hereto.

Section 2:    That the Principal Annexation Agreement in the form of Exhibit A hereto and incorporated in and made part of this Ordinance is hereby approved and the Mayor of the City of Aurora is hereby authorized and directed to execute such Principal Annexation Agreement on behalf of the City and the City Clerk is hereby authorized and directed to attest the Mayor's signature and affix the corporate seal of the City thereto.

Section 3:    That such number of duplicate originals of each Principal Annexation Agreement may be executed as the Mayor shall determine.

Section 4:    That pursuant to Section 6 of Article VII of the Constitution of the State of Illinois, any limitation contained in Article 8-2-9 of the Illinois Municipal Code and any limitation contained in the Appropriation Ordinance shall not be applicable to this Ordinance or to the Principal Annexation Agreement.

Section 5:    That this Ordinance is adopted pursuant to procedures set forth in Chapter 24 of the Illinois Revised Statutes (1972 Supp.) (the "Illinois Municipal Code"), provided

-4-

however, any limitation in the Illinois Municipal Code in con-
flict with this Ordinance or in conflict with the provisions of
the Principal Annexation Agreement in the form of Exhibit A
hereto shall not be applicable pursuant to Section 6 of Article
VII of the Constitution of the State of Illinois.

Section 6:    That this Ordinance shall take effect
and be in full force and effect upon and after its passage,
ap-proval and publication in pamphlet form as required by law.

PASSED by the City Council of the City of Aurora, Illinois
this __17th__ day of __July__, 1973 by a roll
call vote as follows:

| Ayes | Nays | Not Voting |
|------|------|------------|
| 5 | 0 | 0 |

SIGNED by the Mayor of the City of Aurora, Illinois,
this __17th__ day of __July__, 1973.

ATTEST:

_____          _____
City Clerk                                        Mayor

–5–

PRINCIPAL ANNEXATION AGREEMENT

## Index

| | | Page |
|---|---|---|
| I. | ANNEXATION | 9 |
| II. | ZONING | 10 |
| III. | THE REGIONAL SHOPPING CENTER | 10 |
| IV. | WATER UTILITIES | 11 |
| | 1. Phase I Water Facilities. | 11 |
| | 2. Guarantee. | 14 |
| | 3. Phase I Project Net Revenues. | 15 |
| | 4. Liability of Guarantors. | 16 |
| | 5. Payments under the Guarantee. | 16 |
| | 6. Termination of Guarantee. | 19 |
| | 7. Phase II and Phase III Water Facilities. | 20 |
| | 8. Junior Lien Bond Project Guarantee. | 24 |
| | 9. Definition of Terms. | 26 |
| | 10. Liability of Junior Lien Bond Project Guarantors. | 29 |
| | 11. Payments under the Junior Lien Bond Project Guarantee. | 29 |
| | 12. Termination of Junior Lien Bond Project Guarantee. | 33 |
| | 13. Credits Against Water Connection Charges. | 33 |
| | 14. Future Annexations. | 34 |
| | 15. Easements and Sites. | 37 |
| | 16. Schedule of Requirements. | 38 |
| | 17. Water Storage Tank Signs. | 39 |
| | 18. Revised Connection Charge Schedule. | 39 |
| | 19. Private Fire Protection Systems-- Connection Charge. | 40 |

Page

20. Dedication of Water Distribution System.     41

21. Changes in General Design Data.     41

V. ROADS AND HIGHWAYS     42

    1. Arterial Roads and Highways for the District--General Provisions.     42

       (a) Description of District Road and Highway Program.     42

       (b) Assistance from other Governmental Authorities.     43

       (c) General Provisions with Respect to Future Annexations.     44

       (d) Properties and Rights-of-Way from Developers.     48

       (e) Facilities Included in Road and Highway Programs.     49

       (f) Complementary Roads and Highways.     50

       (g) Provisions of Annexation Agreement Prevail.     50

    2. Region I Road and Highway Program.     50

       (a) General Provisions.     51

       (b) Delays.     52

       (c) Financing of the Region I Road and Highway Program.     53

       (d) Determination of Public and Private Benefit of the Region I Roads and Payment by Developers of Region I and other Benefited Owners of Private Benefit Portion of Net Costs of the Region I Roads.     53

       (e) Payments by Developers of Region I for Certain Portions of the Region I Road and Highway Program.     56

       (f) Public Benefit Portion of Phase I of the Region I Road and Highway Program.     57

       (g) Dedication.     58

|  |  | Page |
|---|---|---|
| (h) | Acquisition of other Land for Region I Roads. | 59 |
| (i) | Cost and Net Cost. | 60 |
| (j) | Governmental Grants and Assistance. | 61 |
| (k) | Future Annexations. | 62 |
| (l) | Recapture of Costs. | 62 |
| (m) | General Provisions as to Scheduling and Alignment. | 63 |
| 3. | Region II Road and Highway Program. | 64 |
| (a) | General Provisions. | 65 |
| (b) | Delays. | 66 |
| (c) | Determination of Public and Private Benefit of Region II Roads and Payment by Developers of Region II and other Benefited Owners of Private Benefit Portion of Net Costs of Region II Roads. | 67 |
| (d) | Dedication. | 69 |
| (e) | Acquisition of other Land for Region II Roads. | 70 |
| (f) | Cost and Net Cost. | 71 |
| (g) | Governmental Grants and Assistance. | 72 |
| (h) | Future Annexations. | 72 |
| (i) | Recapture of Costs. | 73 |
| (j) | Schedule of Completion for Priority Roads and Twenty-Year Roads. | 74 |
|  | Priority Roads. | 74 |
|  | Twenty-Year Roads. | 77 |
|  | General Schedule Provisions. | 80 |
| 4. | Financing of the Region I Roads and of the Region II Roads. | 82 |
| (a) | General Provisions. | 82 |
| (b) | Special Assessment and Other Financing. | 86 |

Page

(c)  Right of City to Use Special
Assessment, General Obligation
or Other Financing, and Require-
ment in Certain Instances to Use
Only Special Assessment.                    91

(d)  Developers' Obligation to Pay in
Cash Amount of Private Benefit
Portion Applicable to Property
Owned by the Developers on the
Annexation Date with Respect to
the 1973-1974 Phases.                       93

(e)  Interest Rate and Terms of Special
Assessment Bonds.                           96

(f)  Obligations of City and of
Developers with Respect to Owned
and Non-Owned Non-Special
Assessment Properties.                      97

(g)  Bidding.                                    103

(h)  Guarantee with Respect to Private
Benefit Portion of Special As-
sessment Bonds Covering Private
Benefit Portion of Owned and
Non-Owned Special Assessment
Properties.                                 104

(i)  Estimated Total Net Costs of
Certain Roads and Readjustments.            111

(j)  Developers' Election with Respect
to Phases of Region I Roads and of
Region II Roads, Other than the
1973-1974 Phases.                           112

(k)  Spreading of Cost on Assessment
Roll, as Against Owned and Non-
Owned Special Assessment Proper-
ties, and Repayment of Advances
in Connection Therewith.                    115

(l)  Bridges and Grade Separations.             120

VI.  CITY OBLIGATIONS REGARDING SEWERAGE
SERVICE SYSTEM                                  121

1.  Provision of Sewerage Service System
by Aurora Sanitary District.               121

2.  Inability of Sanitary District to
Provide Sewerage Service System.           122

3.  Provision of Sewerage Service
System by the City.                        122

                                                                    Page

        4.   City Financing of Project.                             123

        5.   Provision of Sewerage Service
             System Other than By City.                             128

        6.   Disconnection Rights.                                  129

        7.   Continued City Water Service to the
             Territory after Disconnection.                         131

        8.   Termination of Annexation Agreement
             Provisions upon Disconnection.                         131

        9.   Future Annexations.                                    132

       10.   Prohibited Annexations.                                134

VII.    PROVISIONS RELATING TO THE CITY BUILDING
        CODE AND OTHER CITY ORDINANCES                              134

        1.   Issuance of Building Permit for the
             Metropolitan Building.                                 134

        2.   Issuance of Building Permits for the
             Regional Shopping Center.                              135

        3.   Conflict of Provisions.                                136

        4.   City Building Code.                                    136

             (a)  Fire Limits.                                      136

             (b)  Fire Separation.                                  137

             (c)  Inventory Buildings.                              137

        5.   Industrialized Construction Techniques.                138

        6.   Storm Water Retention and Control
             Amendment to City Subdivision Control
             Ordinance.                                             138

        7.   City Comprehensive Plan.                               139

        8.   Home Rule Powers.                                      140

        9.   Special Assessment and Taxation.                       141

       10.   Ordinances.                                            142

       11.   Alcoholic Beverage Licenses.                           142

       12.   City Ordinances.                                       145

       13.   Farms.                                                 149

Page

14. Licenses and Permits--Discretion of Mayor.                                    150

15. Fences.                                                                        150

16. Industrial Development and Pollution Control Revenue Bonds.                    151

VIII. PUBLIC IMPROVEMENTS.                                                         151

1. Dedication of Certain Public Improvements.                                     151

2. Storm Water Facilities.                                                        153

3. Public Open Space, Park and Recreation Areas.                                  154

4. Approval of Public Improvements.                                               155

5. Maintenance of Dedicated Public Improvements.                                  155

6. Easement Grants to the City.                                                   155

7. Municipal Service Easements.                                                   156

8. Easements.                                                                     156

9. General Easement Requirements.                                                 157

10. Cooperation by the City and the Developers of the District.                   158

IX. PUBLIC BUILDINGS, FIRE PROTECTION DISTRICTS AND CITY SERVICES                  159

1. Region I Fire Station.                                                         159

2. Temporary Fire Protection Facility.                                            163

3. Additional Fire Stations in the District.                                      166

4. Fire Station Sites.                                                            169

5. Public Works Maintenance Building Site.                                        169

6. Construction of Public Works Maintenance Building.                             170

7. Fire Protection Districts.                                                     173

8. City Services.                                                                 174

9. Payment for City Annexation Expenses.                                          180

|  |  | Page |
|---|---|---|
| X. | TERM | 181 |
| XI. | GENERAL PROVISIONS | 182 |
| | 1. General City Services. | 182 |
| | 2. Consent to the Establishment of the Planned Development District. | 183 |
| | 3. Exculpation. | 183 |
| | 4. Stop Orders. | 187 |
| | 5. Certificates of Occupancy. | 187 |
| | 6. All Action Taken. | 187 |
| | 7. Limitation on Liability. | 188 |
| | 8. Authority of Urban. | 191 |
| | 9. Assignment of Obligations. | 192 |
| | 10. Assignment and Waiver of Rights. | 194 |
| | 11. Annexation of Deleted Parcels. | 197 |
| | 12. Incorporation of Defined Terms. | 198 |
| | 13. Defaults. | 198 |
| | 14. Plan Description. | 199 |
| | 15. Enforcement. | 199 |
| | 16. Location of Sites and Properties and Rights-of-Way for Roads and Highways. | 199 |
| | 17. Notice. | 200 |
| XII. | CONDITIONS TO ANNEXATION | 201 |

<u>PRINCIPAL</u>

<u>ANNEXATION AGREEMENT</u>

This Agreement made and entered into this 27<u>th</u>
day of _____July_____, 1973, by and between the City of
Aurora, Illinois, a municipal corporation (hereinafter
called the "City"), the parties set forth on page 204
hereof as the "Record Owners of Region I" (hereinafter
called the "Region I Record Owners"), the parties set forth
on pages 205, 206 and 207 hereof as the "Record Owners of
Region II" (hereinafter called the "Region II Record Owners"),
Fox Valley Mall Venture (hereinafter called "Fox Valley"), a
Joint Venture of Urban Investment and Development Co., a
Delaware corporation (hereinafter called "Urban"), and Sears,
Roebuck and Co., a New York corporation (hereinafter called
"Sears"), Westbrook Venture (hereinafter called "Westbrook"),
a Joint Venture of Urban, Sears and Mafco, Inc., a Delaware
corporation, Henry Crown and Company (Not Incorporated), a
partnership (hereinafter called "Crown"), Exchange Building
Corporation, an Illinois corporation (hereinafter called
"Exchange"), and Metropolitan Structures, an Illinois limited
partnership (hereinafter called "Metropolitan") (Crown,
Exchange and Metropolitan are hereinafter referred to as
"Metropolitan Crown").


<u>W I T N E S S E T H</u>


WHEREAS, the Region I Record Owners are the owners
of record of the real estate identified as Region I in Part

Two of Exhibit A, attached hereto and made a part hereof (said real estate being in the Plan Description and hereinafter called "Region I" and said Exhibit A being hereinafter called the "Plan Description"); and

WHEREAS, the Region II Record Owners are the owners of record of the real estate identified as Region II in Part Two of the Plan Description (said real estate being in the Plan Description and hereinafter called "Region II"); and

WHEREAS, the real estate described in Exhibit B, attached hereto and made a part hereof, is dedicated or used for street or highway purposes (said real estate being hereinafter called the "Highway Property"); and

WHEREAS, Region I and Region II, taken together, are in the Plan Description and hereinafter called the "District"; and

WHEREAS, in accordance with Subsection 14.7 and Section 15 of City Ordinance No. 3100 (hereinafter called the "Zoning Ordinance"), an application with the Plan Description has heretofore been filed with the City Clerk for a zoning amendment establishing the District as a planned development district and approving the Plan Description; and

WHEREAS, said application for the establishment of a planned development district was forwarded to the

City Plan Commission in accordance with the provisions of Subsection 14.7 and Section 15 of the Zoning Ordinance; and

WHEREAS, the City Plan Commission held public hearings on said application as required by the Zoning Ordinance and has submitted to the Corporate Authorities of the City (hereinafter called the "Corporate Authorities") findings of fact and a favorable recommendation with respect to such application; and

WHEREAS, Fox Valley and Westbrook are duly authorized to act for the record owners of Region I with respect to the planning and development of Region I; and

WHEREAS, Urban is duly authorized to act as the agent for Fox Valley and Westbrook with respect to all matters contemplated in this Agreement; and

WHEREAS, Metropolitan Crown are duly authorized to act for the record owners of Region II with respect to the planning and development of Region II; and

WHEREAS, Fox Valley, Westbrook and Metropolitan Crown are coordinating the planning and development of Region I and Region II; and

WHEREAS, this Annexation Agreement (hereinafter called "this Agreement") has been submitted to the City

-3-

and the Corporate Authorities with a request to hold a hearing thereon; and

WHEREAS, there has also been submitted to the City and the Corporate Authorities the following proposed annexation agreements (hereinafter called "Additional Annexation Agreements"), copies of which are in the custody of the City Clerk, with a request to hold hearings thereon:

(a)  Proposed agreement between the City and Elgin, Joliet & Eastern Railway Company providing for the annexation to the City of certain real estate described in Exhibit A to said agreement (said real estate being hereinafter called the "Elgin, Joliet & Eastern Property");

(b)  Proposed agreement between the City and Burlington Northern, Inc. providing for the annexation to the City of certain real estate described in Exhibit A to said agreement (said real estate being hereinafter called the "Burlington Northern Property"); and

(c)  Proposed agreement between the City and Commonwealth Edison Company providing for the annexation to the City of certain

-4-

real estate described in Exhibit A to said agree-
ment (said real estate being hereinafter called
the "Commonwealth Edison Property"); and

WHEREAS, this Agreement and each Additional Annexa-
tion Agreement provides that all of said annexation agreements
are to be executed concurrently, and that no property covered
by any of said agreements shall be annexed to the City unless
the properties covered by all of said agreements are by the
same ordinance or by separate ordinances concurrently adopted
annexed to the City; and

WHEREAS, the Elgin, Joliet & Eastern Property,
the Burlington Northern Property, and the Commonwealth
Edison Property (said properties being hereinafter called
the "Additional Properties") and the Highway Property and
the District, taken together, are contiguous to the City
(said Additional Properties, Highway Property and District,
taken together, being hereinafter called the "Territory");
and

WHEREAS, the Corporate Authorities held a public
hearing upon this Agreement and a public hearing upon each
Additional Annexation Agreement; and

WHEREAS, the parties hereto desire that the
Territory be annexed to the City pursuant to authority
granted to the City by law, and pursuant to the City's
home rule powers set forth in Article VII, Section 6 of
the Constitution of the State of Illinois, and subject
to the terms set forth in this Agreement and in the
Additional Annexation Agreements; and

-5-

WHEREAS, pursuant to Subsection 14.7-12 of the Zoning Ordinance, Urban has submitted to the City Clerk, for approval by the City Plan Commission, Final Plans for the site on which the Regional Shopping Center will be located and the site on which the Metropolitan Life Insurance Company office building (hereinafter called the "Metropolitan Building") will be located and has requested that such Final Plans be considered and approved as Final Plats under the Subdivision Control Ordinance; and

WHEREAS, pursuant to the modification to Subsection 14.7-15 of the Zoning Ordinance provided for in Subsection IV A.44. of the Plan Description, Urban has requested the City Council to authorize and direct the issuance, promptly after annexation of the Territory to the City, of a Foundation Permit for the Regional Shopping Center and a Final Building Permit for the Metropolitan Building; and

WHEREAS, Urban has requested the City Council to vary the provisions of Section 43-11, Subsection 43-16(a) and Subsection 43-47(a) of City Ordinance No. 3446 (hereinafter called the "Subdivision Control Ordinance") to permit the issuance of a Foundation Permit for the Regional Shopping Center and a Final Building Permit for the Metropolitan Building promptly after annexation of the Territory to the City; and

WHEREAS, all public hearings and other action required to be held or taken prior to the adoption and execution of this Agreement and each Additional Annexation Agreement in order to make the same effective have been held or taken, including all hearings and action required in connection with amendments to and classifications, exceptions, variations, modifications and special uses

-6-

under the Zoning Ordinance and modifications and exceptions
from the Subdivision Control Ordinance, such public hearings
and other action having been held pursuant to notice as
required by law and in accordance with all requirements of
law prior to the adoption and execution of this Agreement;
and

WHEREAS, the Region I Record Owners and the
Region II Record Owners have signed a petition for annexa-
tion of the Territory to the City, which petition (herein-
after called the "Annexation Petition") has been signed
by Elgin, Joliet & Eastern Railway Company, Burlington
Northern, Inc. and Commonwealth Edison Company and by all
electors residing in the Territory and provides that all
conditions which are set forth in this Agreement as con-
ditions which must be satisfied prior to the adoption of
an ordinance annexing the Territory to the City must be
satisfied prior to the adoption of said ordinance; and

WHEREAS, the City has given appropriate notice to
each and every Fire Protection District or Public Library
District and every other district, all as provided for and
as required by Chapter 24, Article 7-1-1, Illinois Revised
Statutes (1972 Supp.); and

WHEREAS, the Region I Record Owners and the
Region II Record Owners have authorized and directed that
the Annexation Petition be filed with the City Clerk upon
the execution of this Agreement and each Additional
Annexation Agreement; and

WHEREAS, the development of the Territory, if within the corporate limits of the City, will be highly beneficial to the City in that said development will increase the tax base of the City; and

WHEREAS, the development of the Territory will provide for additional commercial uses within the corporate limits of the City and thereby provide for additional retailers' occupation tax revenues and other revenues to the City; and

WHEREAS, the development of the Territory in the manner set forth in this Agreement and in the manner set forth in the Additional Annexation Agreements will promote the sound planning and development of the City; and

WHEREAS, if the annexation of the Territory is accomplished, the City will extend its zoning, building, health and other municipal regulations and ordinances over the Territory, thereby protecting the City from possible undesirable or inharmonious use and development of unincorporated areas surrounding the City; and

WHEREAS, the Corporate Authorities have considered the annexation and development of the Territory, and have determined that the best interests of the City will be met if the Territory is annexed to the City and developed in accordance with the provisions of this

Agreement and in accordance with the provisions of the
Additional Annexation Agreements;

NOW, THEREFORE, in consideration of the fore-
going and of the mutual covenants hereinafter contained,
the parties hereto agree as follows:

## I.

### ANNEXATION

1. The parties respectively agree that they will,
upon the execution of this Agreement, but subject to the
conditions set forth in Section XII hereof, do all things
necessary or appropriate to cause the Territory to be
validly annexed to the City, including specifically the
enactment, without further public hearing, by the City
of an ordinance annexing all of the Territory to the City,
it being agreed that no action shall be taken by the City
to annex any part of the Territory to the City unless all
of the Territory is annexed to the City at the same time
and by the same ordinance or by separate ordinances con-
currently adopted.

2. The City agrees to do all things necessary
or appropriate to carry out the terms of this Agreement
and to aid and assist the other parties in carrying out
the terms hereof, including the enactment of such resolutions
and ordinances and such other action as may be necessary or

desirable to enable the City and the other parties to this Agreement to comply with the terms hereof.

## II.

### ZONING

Immediately after the passage of the ordinance annexing the Territory to the City, the Corporate Authorities shall, without further public hearing enact, in accordance with Subsection 14.7 of the Zoning Ordinance, an ordinance (a) approving the application for the establishment of the District as a planned development district and (b) amending the Zoning Ordinance classifying the District as a planned development district subject to all the provisions, terms and conditions set forth in the Plan Description, and amending the City Zoning Map by rezoning the District as a planned development district, and said District shall thereafter be subject to all of the provisions, terms and conditions set forth in this Agreement and in the Plan Description including, without limitation, all of the modifications and exceptions from the Zoning Ordinance and the Subdivision Control Ordinance that are set forth in the Plan Description.

## III.

### THE REGIONAL SHOPPING CENTER

The developers of Region I plan to construct in Region I a regional shopping center having a gross floor

-10-

area devoted to retail sales and service operations of not less than one million (1,000,000) square feet.  Such regional shopping center shall include a store operated by Marshall Field & Company and a store operated by Sears.  As used herein the term "Regional Shopping Center" shall mean a shopping center of such size and including such stores.

IV.

<u>WATER UTILITIES</u>

1.  <u>Phase I Water Facilities</u>.  Upon the annexation of the Territory to the City, the City shall do or cause to be done each and all of the following so as to meet and comply with the provisions of Subsection 1(e) of this Section IV:

(a)  For the purpose of providing funds for the acquisition and construction of the water utility facilities described by the general design data set forth in Part I of Exhibit C, attached hereto and made a part hereof, as Phase I Water Facilities, Stages 1 through 4, take all steps necessary to issue and use its best efforts to sell a series of its Waterworks and Sewerage Revenue Bonds, Series 1973 (hereinafter called the "Bonds"), as authorized by Ordinance No. 4271 adopted by the City Council of the City on October 24, 1972 (hereinafter called the "Bond Ordinance").  The Bonds to be so issued and sold shall be in the principal amount of $2,150,000 or such lesser principal amount as shall be

necessary to pay the cost of acquiring and con-
structing said water utility facilities ("Phase
I Water Facilities"), including capitalized
interest, financial advisory, legal and other
related fees and expenses;

(b)  Design, engineer and complete plans
and specifications for the Phase I Water
Facilities;

(c)  Acquire and obtain (by condemnation pro-
ceedings when and if necessary) all sites, subject
to the provisions of Subsection 15 of this Sec-
tion IV, easements and permits necessary for
the construction of the Phase I Water Facilities;

(d)  Publish, take bids, and award bids to
and contract with the lowest qualified bidders for
the construction of the component parts of the
Phase I Water Facilities; provided, that the award-
ing of all bids shall be made only with the approval
of the developers of the District, which approval
shall not be unreasonably withheld; and, provided
further, that if the developers of the District
shall not approve the awarding of the contract
for the Phase I Water Facilities to the lowest
qualified bidder, the City shall have the right
to reject all bids, and thereafter the City shall
republish for new bids, and award said bids and
contract in accordance with the provisions of
this Subsection (d);

(e)  Cause construction of the Phase I Water Facilities to be completed within fifteen (15) months after the date of approval by the City and the developers of the District of layout drawings, locations of tanks, wells, pumping stations and other necessary components of such Facilities; provided, that if there are delays beyond the reasonable control of the City occasioned by delays in the delivery of component parts for such Facilities, or if the developers of the District shall not approve the awarding of the contract to the lowest bidder and the City shall thereupon reject all bids, then, in either case, such fifteen-month period shall be extended for a period equal to the period of any such delays beyond such reasonable control of the City or the period required to republish, take bids and award bids as provided for in Subsection (d) next above, as the case may be; and

(f)  Allow temporary use of the component parts of the Phase I Water Facilities as they are completed to provide potable and fire protection water to users in the District on a temporary basis and to service the construction operations of the developers of the District as may be possible during the construction and completion of the Phase I Water Facilities; provided, that the City may charge such developers a water rate for the use and consumption of water on such temporary basis in accordance with existing City ordinances.

The term Phase I Water Facilities shall include all water storage and distribution facilities, real property, easements and appurtenances related to such facilities, as described in Part I of Exhibit C, provided, that if all of the Phase I Water Facilities cannot be constructed with the proceeds of the bonds to be issued and sold pursuant to Subsection (a) of this Subsection 1, Stages 4, 3 and 2 of the Phase I Water Facilities, in such inverse order, shall be deleted from such Facilities and any such deleted Stages shall be added to the Phase II Water Facilities described in Subsection 7 of this Section IV.

2.  <u>Guarantee</u>.  For the purpose of this Agreement, the date upon which the Regional Shopping Center shall be "open for business" shall be the date when both the Marshall Field & Company store and the Sears store included in the Regional Shopping Center shall be open for business; provided that such opening shall have been announced by appropriate advertising and publicity.  If the Phase I Water Facilities are completed in accordance with the provisions of this Agreement, and if the Regional Shopping Center is not open for business on or before January 1, 1977, the guarantors listed in Subsection 4 below shall, in the manner provided for in said Subsection 4, guarantee, and by executing this Agreement do so guarantee, that the Phase I Project Net Revenues (as defined in Subsection 3 below) received by the City will not be less than an amount in each calendar year, commencing with the calendar year beginning January 1, 1977, equal to one hundred thirty-five percent (135%) of the sum of the amounts, to the extent that such amounts represent

-14-

principal of and interest on the Bonds then outstanding, which are required to be deposited in such calendar year to the credit of the Bond and Interest Account in accordance with the provisions of Section 8(b) of the Bond Ordinance. Said principal and interest amounts are herein sometimes referred to as "Phase I Debt Service".

3. <u>Phase I Project Net Revenues</u>. For the purposes of the guarantee provided for in Subsection 2 above, the term "Phase I Project Net Revenues" shall mean that portion of the entire gross revenues of the City's combined waterworks and sewerage system required to be deposited in the Waterworks and Sewerage Fund of the City created under Section 7 of the Bond Ordinance which is collected from users of such system who are located in Region I, including any investment income attributable to such moneys and credited to said Waterworks and Sewerage Fund of the City in accordance with Section 8(f) of the Bond Ordinance, less that portion of the amounts deposited to the credit of the Operation and Maintenance Account pursuant to Section 8(a) of the Bond Ordinance, which portion is properly allocable to the actual cost of the operation and maintenance of the Phase I Water Facilities, as agreed between the City and the developers of the District.

Phase I Project Net Revenues shall be computed from year to year on a cumulative basis, and if in any year the Phase I Project Net Revenues collected by the City shall exceed the minimum amount required to obviate the need for any payment to the City in such year pursuant to the guarantee provided for in Subsection 2 above, such

-15-

excess shall be included in the computation of Phase I
Project Net Revenues in the next succeeding year or years
until such excess shall have been exhausted.

4.  <u>Liability of Guarantors</u>.  Urban, Sears and
Mafco, Inc. will be jointly and severally liable to the
City for the payment of any amounts payable to the City
under the guarantee provided for in Subsection 2 above.

5.  <u>Payments under the Guarantee</u>.  In each year
during which the Bonds shall be outstanding and the
guarantee described in Subsection 2 of this Section IV
shall be in effect, not more than sixty (60) days, nor
less than forty-five (45) days, prior to July 1 of each
such year, provided that any interest (other than capi-
talized interest) on the Bonds shall be payable on said
July 1 ("Interest Payment Date"), the City shall deliver
to each of the guarantors listed in Subsection 4 of this
Section IV a statement prepared and signed by the City
Treasurer showing the City's best reasonable estimate of
the Phase I Project Net Revenues, as defined, for the
six-month period ending on the day prior to the Interest
Payment Date.  To the extent that the projected Phase I
Project Net Revenues for the six-month period ending on the
day prior to the Interest Payment Date, as shown on said
statement, shall be less than one hundred percent (100%)
of the interest payable on said Interest Payment Date on
the Bonds then outstanding, plus fifty percent (50%) of the
principal due on the next occurring Principal Payment Date
(as defined below), such deficit shall be paid to the City
by the guarantors listed in Subsection 4 of this Section IV

-16-

within thirty (30) days after receipt of such statement.  Such payments are herein sometimes referred to as "Mid-year Phase I Guarantee Payments."

In each year during which the Bonds shall be outstanding and the guarantee described in Subsection 2 of this Section IV shall be in effect, not more than sixty (60) days, nor less than forty-five (45) days, prior to January 1 of the next succeeding year, provided that any principal or interest (other than capitalized interest) on the Bonds shall be payable on said January 1 ("Principal Payment Date"), the City shall deliver to each of the guarantors listed in Subsection 4 of this Section IV a statement prepared and signed by the City Treasurer showing the City's best reasonable estimate of the Phase I Project Net Revenues, as defined, for the twelve-month period ending on the day prior to the Principal Payment Date.  To the extent that projected Phase I Project Net Revenues for the twelve-month period ending on the day prior to the Principal Payment Date (which Revenues shall include any Mid-year Guarantee Payment for such year), as shown on said statement, shall be less than one hundred thirty-five percent (135%) of the Phase I Debt Service for said twelve-month period on the Bonds then outstanding, such deficit shall be paid to the City by the guarantors listed in Subsection 4 of this Section IV within thirty (30) days after receipt of such statement.  Such payments are herein sometimes referred to as "Year-End Phase I Guarantee Payments".

As promptly as practicable following the close of each calendar year the City will deliver to each of

-17-

the guarantors listed in Subsection 4 above a statement
certified by an independent public accounting firm show-
ing the Phase I Project Net Revenues, as defined, received
by the City in such calendar year (which Revenues shall
include the amount of any Mid-year Phase I Guarantee Pay-
ments for such year and the amount of any Year-End Phase I
Guarantee Payments for such year), and the amount, if any,
payable to the City pursuant to the guarantee provided for
in Subsection 2 above, or the amount, if any, by which,
as a result of Mid-year Phase I Guarantee Payments and
Year-End Guarantee Payments, Phase I Project Net Revenues
have exceeded one hundred thirty-five percent (135%) of
Phase I Debt Service.  Such guarantors shall pay the amount,
if any, so shown as payable to the City within thirty (30)
days following receipt of such certified statement;
or the City shall pay the amount, if any, so shown
as exceeding one hundred thirty-five percent (135%) of
Phase I Debt Service to the guarantors listed in Subsection
4 above at the time of the delivery of such statement by the
City to such guarantors.  Nothwithstanding the foregoing,
the guarantors shall have the right to employ a certified
public accountant or firm of independent certified public
accountants for the purposes of reviewing said certified
statement, including the computations supporting such
statement, which accountant or accountants shall have the
right to examine the books and records of the City in con-
nection with such review.  If the guarantors, based upon
such review, shall disagree with said certified statement
furnished by the City, the amount of any payment due to