or any of the obligations evidenced thereby, be secured to any extent by any collateral or security.

(iv)  Notwithstanding any of the provisions of this Section V, and particularly the provisions of Subsection 1(c), to the contrary, it is agreed that record owners of property which is annexed to the City after the Territory is annexed to the City shall not be required (unless the City in its sole discretion determines and so requires) as a condition to such annexation, or as an undertaking in the annexation agreement providing for such annexation, to execute any of the written guarantees provided for in this Subsection 4(h), for or with respect to any special assessment bonds which may be issued after the effective date of said future annexation; provided, that such record owners shall be required to make any and all payments of then existing or future special assessments assessed against such annexed property and to make the other payments and assume the other obligations provided for in Subsection 1(c) of this Section V, including, without limitation, the reimbursements and payments provided for in clauses (i) and (ii) of this Subsection 4(h) above and in clause (ii) of Subsection 4(k) of this Section V to be made by such record owners of such property annexed after the annexation date under this Agreement.

(v)  It is understood and agreed that to the extent of and in those instances where the respective developers shall have made the payments provided for under the provisions of Subsections (d) and (f) of this Subsection 4, the developers shall not be required to execute or deliver the guarantees provided for in this Subsection 4(h) as to any special assessment bonds issued in connection therewith or therefor.

(vi)  If the respective developers of Region I or Region II shall sell, convey or otherwise transfer all or any part of any property owned by them on the annexation date, the transferees who shall become the record owners from time to time of such property may, or may not, expressly and specifically assume some or all of the obligations of the respective developers as provided for and set forth above in clauses (i), (ii), (iii) and (iv) of this Subsection 4(h), and such transferees shall not be deemed to have assumed any of the obligations provided and set forth in clauses (i), (ii), (iii) and (iv) of this Subsection 4(h), except only to the extent, if any, of such express and specific assumption of such obligations by such transferees in the agreement, deed or other instrument effecting the sale, conveyance or other transfer to such transferees.  Such express and specific assumption by such transferees of such obligations shall not relieve the respective developers

from their said respective obligations, but the
respective developers shall be entitled to a
credit against (and repayment, if applicable,
with respect to) their said respective obligations,
to the extent and in the amount of all moneys at
any time and from time to time received by the
City from such transferees with respect to said
respective obligations or with respect to any
guarantees executed pursuant thereto.

(i)  <u>Estimated Total Net Costs of Certain Roads and
Readjustments</u>.

(i)  It is agreed that $1,2500,000 is the
aggregate of the estimated net costs of Phase III B
and Phase IV C of the Region I roads (described in
Part I of Exhibit D).

(ii)  The City agrees that the City shall pay
all of the total net costs of said Phase III B and
Phase IV C of the Region I roads.

(iii)  If, after the completion of the con-
struction of the said Phase III B and Phase IV C
of the Region I roads, it shall be determined that
the aggregate of the actual net costs of the said
Phase III B and Phase IV C of the Region I roads
shall have exceeded the said sum of $1,250,000 set

forth in clause (i) of this Subsection 4(i), the
developers of Region I shall pay to the City,
promptly after said determination, an amount equal
to sixty percent (60%) of said excess.  If, after
the completion of the construction of said Phase
III B and Phase IV C of the Region I roads, it
shall be determined that the aggregate of the
actual net costs of the said Phase III B and Phase
IV C of the Region I roads shall be less than the
said sum of $1,250,000 set forth in clause (i) of
this Subsection 4(i), the City shall pay to the
developers of Region I, promptly after said
determination, an amount equal to sixty percent
(60%) of the difference between the said sum of
$1,250,000 and the aggregate of the actual net
costs of the said Phases III B and IV C.

(j)  Developers' Election with Respect to Phases of
Region I Roads and of Region II Roads, Other than the
1973-1974 Phases.

(i)  With respect to each phase or part of a
phase of each Region I road and of each Region II
road with respect to which the City itself or jointly
with another governmental authority is legally able
to finance all or a portion of the construction of
such phase or part by special assessment financing,
the City shall (after it has completed the final

detailed plans and specifications with respect to
such phase or part, but not more than ninety (90)
days and not less than sixty (60) days before the
City shall send any notices to any property owners
required for the first public hearing to be held
for the adoption of an ordinance authorizing the
construction of such phase or part by special
assessment financing) give written notice (which
notice is herein sometimes referred to as "Financing
Notice") to the respective developers of Region I
or Region II, as the case may be, which written
notice shall set forth (v) that the City has com-
pleted detailed plans and specifications for such
phase or part, (w) that the City is prepared to
take all required steps to institute and prosecute
a special assessment proceeding to finance the con-
struction of such phase or part, (x) a description
in reasonable detail of such phase or part, (y) an
estimate of the cost of such phase or part, and (z)
the City's ability and willingness, or inability or
unwillingness, to finance the construction of the
public benefit portion of such phase or part by a
method other than special assessment, i.e., by cash
payment to the contractor who is to construct and
build such part or phase.

    (ii)  To assist the City in planning and arrang-
ing for the most economical method of financing, but
without limiting any of the provisions of Subsection
4(c) of this Section V requiring the City to employ

and use special assessment financing, except in
those instances expressly and specifically other-
wise provided for in said Subsection 4(c), and
notwithstanding the use of special assessment
financing, it is agreed that with respect to any
phase or part of a phase of the Region I roads or
Region II roads (other than any of the 1973-1974
Phases), the respective developers of Region I or
Region II, as the case may be, shall have the right,
within thirty (30) days after the receipt of the
Financing Notice, to advise the City that such
respective developers desire or do not desire to
pay to the City in cash, as and when required for
each progress payment and the final payment of the
net cost of such phase or part, all or a portion of
that fraction of the private benefit portion of
each such payment equal to the fraction arrived at
by dividing (y) the amount of the private benefit
portion applicable to the property then owned by
such respective developers at the time of the
commencement of the construction of such phase or
part and benefited by such phase or part by (z)
the total amount of all of the private benefit
portion applicable to all of the property benefited
by such phase or part.

(iii)  Whether or not the developers shall
elect to make the cash payments provided for in
clause (ii) next above, it is agreed that as pro-

vided for in Subsection 4(c) of this Section V, the
City shall use and employ special assessment finan-
cing in all instances, except in those instances
expressly and specifically otherwise provided for
in said Subsection 4(c).

(iv)  Nothing in this Subsection 4(j) shall
be deemed to limit the right of the developers or
any transferees or other owners from prepaying
any special assessment liens that may be assessed
in any said special assessment proceedings.

(k)  <u>Spreading of Cost on Assessment Roll, as
Against Owned and Non-Owned Special Assessment Properties,
and Repayment of Advances in Connection Therewith</u>.

(i)  Notwithstanding any provisions of this
Section V, including, without limitation, the pro-
visions of Subsection 4(c) of this Section V, to the
contrary, it is agreed that in each special assessment
proceeding that is instituted in connection with or
relating to the financing of the construction of any
phase or part of any Region I road, or any phase or
part of any Region II road, where such road, phase
or part thereof will benefit to any extent any pro-
perty which is owned non-special assessment property
or non-owned non-special assessment property, the
Commissioner in said special assessment proceeding

shall be instructed and directed that when spreading
the special assessment roll covering the cost of
said road, phase or part thereof, he shall spread
the cost of such road, phase or part thereof in
accordance with the provisions of this Section V,
as to the owned special assessment properties, the
non-owned special assessment properties, the owned
non-special assessment properties and the non-
owned non-special assessment properties.  Prior to
the time that the special assessment roll is filed
in the special assessment proceeding, the assess-
ments against the non-special assessment properties
shall be eliminated from the roll, provided that
the Commissioner shall in writing advise the City
and the respective developers of Region I or Region
II, as the case may be, of each of the said assess-
ments so determined and so eliminated from the roll.
The estimate of cost shall be revised in the special
assessment proceeding to show that the amounts so
eliminated from the roll are receivable from other
sources.  The aggregate of all of the amounts so
assessed against the non-special assessment proper-
ties and so eliminated from the roll shall be advanced
in cash by the respective developers of Region I or
Region II (i.e., the developers of Region I as to a
phase or part of a phase of a Region I road, and the
developers of Region II as to a phase or part of
a phase of a Region II road) in accordance with the

provisions of Subsection 4(f)(i) of this Section V
as and when required to meet the private benefit
portion of the progress payments and final payment
of the net cost of the phase or part of a phase to
be constructed.  For example, if the total estimate
of net cost of a phase or part of a phase of a road,
including public and private benefit portions and
including the assessable and non-assessable properties,
were $1,000,000, and if the agreed percentages of
private benefit portion and public benefit portion
were sixty percent (60%) and forty percent (40%),
respectively, then the private benefit portion,
including non-assessable porperties, would be $600,000,
and the public benefit portion would be $400,000.
Assuming, in such case, that the said spread of the
private benefit portion against the non-assessable
properties aggregated $100,000, this $100,000 would
be eliminated from the roll filed with the Court,
leaving an estimated cost to be paid for by special
assessment of $900,000, of which $500,000 would be
assessed by the Court as private benefit and $400,000
as public benefit.  In accordance with Subsection 4(f)
(i) of this Section V, the $100,000 so eliminated
would be advanced by the respective developers to
make up their full sixty percent (60%) of the total
net cost of the phase or part of a phase of the road
to be constructed.

(ii)  It is agreed that if as a result of the elimination from the assessment roll the assessment against the non-assessable properties, as provided for in clause (i) next above, the record owners' share of the net cost assessed as private benefit in said special assessment proceeding against the assessable property, as finally confirmed by the Court, is less than the owners' share (private benefit) as described and provided for in Exhibit D with respect to the phase or part of the phase involved, the record owners shall not be required to pay to the City, as provided for in Subsection 4(b)(iii), such difference in the owners' share of the net cost; provided that the developers shall not by the provisions of this clause (ii) be deemed to be relieved of their obligation to advance in cash the aggregate amount so assessed against the non-assessable properties and eliminated from the roll as provided for in clause (i) next above.  It is further agreed that the provisions of this Sub-section 4(k), and particularly the provisions of clause (i) next above, are not intended to and shall not be deemed to, in any manner or to any extent, change or modify the agreement between the parties hereto as to the amount of the public benefit portion and the amount of the private benefit portion of each phase and each part of such phase of the Region I roads and of the Region II roads as set forth in Exhibit D.

(iii)  It is agreed that in connection with
future annexations to the City made after the date
of the annexation of the Territory to the City,
the City shall obtain, as an annexation condition
assumed by the record owners of such owned non-
assessable properties and of such non-owned non-
assessable properties to be annexed, and as an
undertaking in the annexation agreement providing
for such annexation, an agreement by such record
owners of such annexed properties that such record
owners will pay to the City the amount of the cost
as originally spread in said assessment roll prior
to the filing thereof and advanced by said developers
as provided for in clause (i) next above with respect
to such owned non-assessable properties and such
non-owned non-assessable properties plus interest
thereon at the prime rate from time to time charged
by The First National Bank of Chicago to its large
corporate borrowers plus one percent (1%) per annum,
computed from the respective dates that such assessed
cost shall have been so advanced and paid by the
said developers to the City.  The full amount so
recaptured and recovered from the said record owners
of the said annexed properties, including said
interest, shall be paid to the said respective
developers as and when received by the City.

(iv)  It is further agreed that in any said
special assessment proceedings the public and pri-
vate benefit portions with respect to a road, phase

or part thereof shall be spread and assessed as provided for in this Section V and in accordance with Subsection 4(b)(iii) of this Section V, and said provisions of this Section V and of said Subsection 4(b)(iii) shall apply to and govern with respect to the public and private benefit portions both as to owned special assessment properties, non-owned special assessment properties, owned non-special assessment properties.

(1)    <u>Bridges and Grade Separations</u>.

(i)  Without limiting the generality of Subsection 1(b) of this Section V, the City and the developers of Region I and of Region II shall cooperate and use their best efforts to obtain from the State, County and other governmental authorities, and from the railroads and other public utilities that may be affected, funds to pay and defray the cost of all bridges and grade separations required in connection with the Region I roads and Region II roads.

(ii)  The balance of the net cost of each such bridge and grade separation, after applying and deducting the amounts and funds received from the sources referred to in clause (i) next above, shall be divided (based upon good faith consideration of the facts and upon mutual agreement between the City

and the developers of Region I or Region II, as the case may be), between (y) the City, because of the public benefit that will accrue to the City from such bridge or grade separation and the road or phase connected therewith and served thereby, and (z) the private benefit therefrom to the respective developers and other record owners of property in and outside of Region I and Region II, as the case may be.

(iii)  Upon the determination of such public benefit and private benefit portions of the said net cost of such bridges or grade separations in accordance with the provisions of clause (ii) next above, it is agreed that the financing and payment of such public benefit portion and private benefit portion of the said net cost of said bridge and grade separations shall be made and borne as provided for in the foregoing provisions of this Subsection 4 of this Section V with respect to the Region I and Region II roads.

VI.

CITY OBLIGATIONS REGARDING
SEWERAGE SERVICE SYSTEM

1.  Provision of Sewerage Service System by Aurora Sanitary District.  The record owners of the Territory contemplate annexation of the Territory to The

Aurora Sanitary District (hereinafter called the "Sanitary District") pursuant to an agreement between the developers of the District and the Sanitary District, which agreement will obligate the Sanitary District to take all steps necessary to issue and use its best efforts to sell its sewer system revenue bonds (the "Sanitary District Bonds") in an amount sufficient to construct a sewerage service system to serve the Territory.

2.  <u>Inability of Sanitary District to Provide Sewerage Service System</u>.  If, within nine (9) months following annexation of the Territory to the City, the Sanitary District is unable for any reason to issue and sell the Sanitary District Bonds or otherwise fails to arrange for a sewerage service system to serve all or any part of the Territory in a manner satisfactory to the developers of the District, the developers of the District shall, at any time within such nine-month period or within thirty (30) days following the expiration thereof, notify the City of their inability to obtain from the Sanitary District a satisfactory sewerage service system to service all or any part of the Territory, which notice (hereinafter called the "Sanitary Sewer Notice") shall state the reason therefor.

3.  <u>Provision of Sewerage Service System by the City</u>.  Upon receipt of the Sanitary Sewer Notice, the City agrees that it shall provide for and construct a sewerage

service system, including, but not by way of limitation,
the preparation and completion of all the necessary engi-
neering plans and specifications for the construction and
installation of a sewerage service system, to serve all or
such part of the Territory as may be designated by the
developers of the District.  The plans and specifications
for said sewerage service system (hereinafter in this
Section VI called the "Project") shall be subject to the
approval of the developers of the District, which approval
shall not be unreasonably withheld, and shall comply with
all ordinances and regulations of the City and the Sanitary
District with respect to plans and specifications for sewer
construction.

   4.  City Financing of Project.

   (a)  In order to finance the obligations of the
City set forth in Subsection 3 of this Section VI,
the City shall take all steps necessary to authorize,
by ordinance to be adopted by the City (hereinafter
called the "Junior Lien Sewer Bond Ordinance"), to
issue and use its best efforts to sell its Waterworks
and Sewerage Revenue Bonds (hereinafter called the
"Junior Lien Sewer Bonds") under and pursuant to the
provisions of Division 139 of Article 11 of the
Illinois Municipal Code (or any appropriate enabling
ordinance or ordinances which may have been en-
acted by the City in substitution for or in addition

to said Division 139 in exercise of the City's
home rule powers under Section 6 of Article
VII of the Constitution of the State of Illinois).
The Junior Lien Sewer Bonds to be so issued and
sold shall be in such aggregate principal amount
as shall be necessary to pay the cost of acquiring
and constructing the Project, including capital-
ized interest, financial advisory, legal and
other related fees and expenses, shall be junior
and subordinate in every respect to all bonds
from time to time issued pursuant to the Bond
Ordinance (as such term is defined in Subsection
1(a) of Section IV of this Agreement), shall be
on a parity with all bonds from time to time
sold pursuant to the Junior Lien Bond Ordinance
(as such term is defined in Subsection IV 7(a)
of this Agreement), and shall be secured by and
payable from the amounts from time to time on
deposit to the credit of the Surplus Revenue
Account created by Section 8 of the Bond Ordinance.
It shall be a condition to the obligation of the
City to authorize and to issue and use its best
efforts to sell the Junior Lien Sewer Bonds that
such Bonds be additionally secured by a guarantee
from persons or entities acceptable to the City
that the net revenues derived by the City
from the ownership and operation of the Project
will equal an agreed upon amount in excess of

the debt service requirements of the Junior
Lien Sewer Bonds.  Such guarantee and the
provisions for its termination shall be similar
in scope to the guarantee of water revenues to
secure the Junior Lien Bonds provided for in
Section IV of this Agreement, and shall provide
for a recoupment by the developers of all pay-
ments made under and with respect to such
guarantee, and shall provide for the inclusion
of special City connection fees and user charges
from Small Annexed Parcels (as defined in Sub-
section 9(b) of this Section VI) in the computation
of net revenues for purposes of the guarantee
described in this Subsection 4(a).

(b)  As part of, and in addition to, the City's
obligations under and pursuant to Subsections 3 and
4(a) of this Section VI, the City shall use its best
efforts to enter into, and, as a condition of the
City's and the developers' obligations under and
pursuant to Subsections 3 and 4(a) of this Section
VI, the City shall have entered into, an agreement
with the Sanitary District for the acceptance and
treatment of sewage from the Project, which agree-
ment, to the full extent permitted by the provisions
of the Bond Ordinance, shall provide for:

(i)  the annexation to the Sani-
tary District of the Territory or such

-125-

part thereof as will be served by the
Project;

(ii)  the abatement by the Sanitary Dis-
trict of connection fees and user charges for
the area serviced by the Project during the
period that any Junior Lien Sewer Bonds
are outstanding and until the City shall have
effected recoupment to the developers of pay-
ments made by the developers under any de-
velopers' guarantees of such Junior Lien
Sewer Bonds;

(iii)  the collection by the City,
during the period that any Junior Lien
Sewer Bonds are outstanding and until the
City shall have effected recoupment to
the developers of payments made under any
developers' guarantees thereof of special
City connection fees and user charges from
the area serviced by the Project, and the
use by the City of the revenues from such
Special City Sewer Charges, (x) to pay the
costs and expenses of the operation, main-
tenance, repair, reconstruction and replace-
ment of the Project, (y) to make all payments
and deposits required under the Junior Lien
Sewer Bond Ordinance if said Junior Lien

Sewer Bonds shall be issued by the City
and (z) to make all guarantee recoupment
payments provided for in the guarantee described
in Subsection 4(a)(i) above if said Junior Lien
Sewer Bonds shall be issued and sold by the
City;

    (iv)  the waiver or prepayment of con-
nection fees as one method, among others,
of recoupment of guarantee payments under
the guarantee described in Subsection 4(a)(i)
above;

    (v)  the payment to the Sanitary District
of all revenues from the Special City Sewer
Charges to the extent not required by the
City for the purposes set forth in clause
(iii) next above;

    (vi)  the termination of the Special City
Sewer Charges and the reinstatement in the area
serviced by the Project of the Sanitary Dis-
trict's connection fees and user charges no
higher than the lowest of such fees and charges
applicable to other areas of the City upon the
retirement of all Junior Lien Sewer Bonds and
the fulfillment of all guarantee recoupment
obligations of the City under the guarantee

described in Subsection 4(a)(i) above and
the acceptance by the Sanitary District of all
responsibility for costs and expenses for the
operation, maintenance, repair, reconstruction
and replacement of the Project; and

(vii)  the reservation of adequate
treatment plant capacity and sewer main
capacity by the Sanitary District to meet
the anticipated sewerage requirements of
that part of the Territory actually served
by the Project, subject to all requirements
of federal, state or local governmental bodies
having jurisdiction thereover.

5.  <u>Provision of Sewerage Service System Other
than By City</u>.  If the City shall be unable to enter into
the agreement described in Subsection 4(b) hereof, or if
the City shall for any reason fail, or be unable, to sell the
Junior Lien Sewer Bonds as provided for in Subsection 4(a)
hereof, the City shall in good faith negotiate with the
developers of the District and/or with any municipal
corporation or any public body or private utility company
capable of providing sewerage service to all or any part of
the Territory and use its best efforts to enter into an
agreement with the developers of the District, such munici-
pal corporation, public body, or private utility company
for the provision of sewerage service to all or such part
of the Territory as may be agreed upon by the developers
of the District.

6. <u>Disconnection Rights</u>.  If within one hundred and thirty (130) days following the delivery of the Sanitary Sewer Notice, the City shall have not performed its obligations under Subsections 3, 4 and 5 of this Section VI, or for any reason shall not have made arrangements for a sewerage service system to serve the Territory in a manner satisfactory to the developers of the District, then, in addition to other remedies that may be available to the developers, all of the record owners of the Territory may petition the City for disconnection of the Territory from the City pursuant to Section 7-3-4 of the Illinois Municipal Code or any similar successor statute, and, in such event, the City shall promptly adopt an ordinance which accomplishes such disconnection; provided, that it shall be a condition to the obligation of the City to adopt an ordinance accomplishing such disconnection that the requirements of Subsection (a) below or Subsection (b) below, at the election of the developers of the District, shall have been complied with.

(a)  The City shall have been reimbursed by the developers of the District for all of the City's direct and ascertainable costs and expenses incurred in connection with the performance of those provisions of this Agreement other than Section IV hereof and in carrying out those provisions of this Agreement other than said Section IV, and the guarantors listed in Subsection IV 4 hereof

shall have confirmed the effectiveness of their guarantee set forth in Subsection IV 2 hereof without regard to the date upon which the Regional Shopping Center shall become "open for business", as such term is used in said Subsection IV 2.

(b)  The developers of the District shall have made the reimbursements provided for in Subsection (a) above and, in addition, shall have made or provided for the following purchases, reimbursement payments and guarantees:

(i)  the purchase by the developers of the District, at the City's cost thereof, of all plans, drawings, engineering data and facilities (located within the Territory) theretofore purchased, constructed or contracted for by the City pursuant to the provisions of Section IV hereof;

(ii)  the reimbursement to the City by the developers of the District of all of the City's direct and ascertainable costs and expenses incurred in connection with the preparation and carrying out of the provisions of Section IV hereof, to the extent that such costs and expenses shall not have been paid by the purchases provided for in clause (i) above; and

(iii)  payments or guarantees which will permit the City to call or retire, at the earliest practicable date and at no net cost to the City (taking into consideration the purchase prices and reimbursements provided for in clauses (i) and (ii) above), any and all bonds theretofore issued and sold by the City pursuant to Section IV hereof.

7.  <u>Continued City Water Service to the Territory after Disconnection</u>.  From and after a disconnection upon compliance with the conditions set forth in Subsection 6(a) above, the terms and provisions of Section IV hereof shall remain in full force and effect and binding on the parties hereto, and the City shall be obligated at all times there-after to provide water service to the Territory and the occupants thereof on the same basis as water shall be provided, and at charges no higher than the lowest charge for the same level of water service to other users in the City.

8.  <u>Termination of Annexation Agreement Provisions upon Disconnection</u>.  Upon a disconnection after compliance with the conditions set forth in Subsection 6(a) of this Section VI, all terms and provisions of this Agreement other than those contained in Section IV and Subsection 7 of this Section VI shall terminate.  Upon a disconnection

after compliance with the conditions set forth in Subsection 6(b) of this Section VI, all terms and provisions of this Agreement shall terminate.

9.  <u>Future Annexations</u>.

(a)  After annexation of the Territory to the City, the City, subject to the provisions of Subsection (b) of this Subsection 9, shall require, as a condition to the annexation of any property which may be served in whole or in part by any part of the Project from the record owners of such annexed property, as a condition to any such annexation, that said record owners shall agree to assume the obligations of the guarantee provided for in Subsection 4 of this Section VI (if such guarantee becomes effective) in a proportion which bears a reasonable and equitable relationship to the service to be provided to such annexed property by the Project.  The assumption by such record owners of a proportionate share of the obligations of said guarantee shall not relieve the guarantors from their obligations thereunder, but said guarantors shall be entitled to credits against the amount of their guarantee obligations in the amounts of any moneys from time to time actually

received by the City from said record owners
as payments under said record owners' guarantee
obligations.  The developers of the District
may waive the obligation of the City under
this Subsection 9(a) with respect to any
annexation of property to the City.

(b)  If property to be annexed which
would otherwise be subject to the provisions
of Subsection (a) of this Subsection 9 shall
be less than forty (40) acres in size (herein
sometimes referred to as "Small Annexed Parcels"),
it shall not be a condition to the annexation of
such property that the record owners thereof agree
to assume any of the guarantee obligations provided
for in said Subsection (a); provided, that for
purposes of making such determination of size,
there shall be included all properties: (i) owned,
controlled or held, under common control with
others, by such record owners, or, if the record
owner of such property shall be a land trust,
there shall be included all properties owned,
controlled or held, under common control with
others, by the beneficiaries thereof, or, if the
record owner of such property shall be a nominee,
or if the beneficiary of such land trust shall be
a nominee, there shall be included all properties
owned, controlled or held, under common control

with others, by the principal of such nominee, and (ii) previously annexed to the City, from the date hereof to the date of such annexation by such record owners.

10.  <u>Prohibited Annexations</u>.  Until the expiration of the time period within which the developers of the District may obtain disconnection of the Territory from the City pursuant to the provisions of Subsection 6 of this Section VI, or the earlier written waiver of such disconnection rights by the developers of the District, the City shall not, without the consent of the developers of the District, annex to the City any property which would not remain con-tiguous to the City after disconnection of the Territory from the City.

VII.

<u>PROVISIONS RELATING TO
THE CITY BUILDING CODE
AND OTHER CITY ORDINANCES</u>

1.  <u>Issuance of Building Permit for the Metropolitan Building</u>.  The City shall use its best efforts to cause a Final Building Permit for construction of the Metropolitan Building to be issued within ten (10) working days after the date of submission to the Director of the Department of Inspections and Permits of the City (hereinafter called the "Director") of final building plans which are in accordance with all applicable City ordinances or within ten (10) working days after the annexation of the Territory to the City, whichever is the later.

-134-

2. <u>Issuance of Building Permits for the Regional Shopping Center</u>. Upon application to the Director, payment of applicable fees and presentation of required plans, drawings and other documents, the City shall issue the following permits for the Regional Shopping Center:

(a) The Foundation Permit shall be issued upon approval by the Director of detailed working plans of foundations only, certified by a licensed architect, within ten (10) working days after the annexation of the Territory to the City.

(b) Provided the Foundation Permit described in Subsection (a) above has been issued, a Building Shell Permit shall be issued upon approval by the Director of detailed working plans of the superstructures of the Regional Shopping Center, certified by a licensed architect.

(c) A Final Building Permit shall be issued upon approval by the Director of complete working drawings and specifications for the construction of the Regional Shopping Center, certified by a licensed architect.

All plans, drawings, and other documents required to be submitted by the developer to obtain the permits provided for in this Subsection 2 shall be delivered to the Director not less than ten (10) working days prior to the date upon

which the developer seeks the permit to be issued in accordance with this Subsection 2. The City shall use its best efforts to cause each permit to be issued not more than ten (10) working days following the submission of the plans, drawings and other documents required to be submitted for such permit.

3. <u>Conflict of Provisions</u>. The provisions of Subsections 1 and 2 of this Section VII shall apply notwithstanding the provisions of Section 43-11, Subsection 43-16(a) and Subsection 43-47(a) of the Subdivision Control Ordinance.

4. <u>City Building Code</u>. After annexation of the Territory to the City, the Director and the City shall take all action necessary or required, including the adoption of amendments to the City Building Code (hereinafter called the "Building Code"), to interpret, modify and vary the provisions of the Building Code with respect to the District, as follows:

(a) <u>Fire Limits</u>. All Residential Areas, Manufacturing Areas and Restricted Manufacturing Areas of the District shall be classified as "Outside Fire Limits" for the purpose of applying the provisions of the Building Code, and any change in such classification shall be an amendment to or modification of the Building Code which shall not be applicable to the District unless such amendment or modification

shall be made applicable to the District in accordance
with the requirements of Subsection 12(b) of this
Section VII.

(b)  _Fire Separation_.  The City shall interpret
Article 3 of the BOCA Basic Building Code, Fifth
Edition, 1970, to provide that the fire separation
distances as required under Table 5 on Page 43 of
said Code and Section 309.2 on Page 53 of said Code
shall be defined as the distance between the exterior
face (exposing wall) of the building wall under con-
sideration and the nearest distance at which an adjacent
building may legally be constructed.

(c)  _Inventory Buildings_.  Any building constructed
in a Manufacturing Area or in a Restricted Manufacturing
Area which the developers of the Region of the District
in which such building is located shall notify the City
is being constructed for future sale or lease shall,
for purposes of Building Code Requirements, be classified
in "Use Group D Industrial" until such time as such
building shall be sold or leased.  At such time as such
building is sold or leased, such developers shall
notify the City of the specific use for which such
building was sold or leased, and, at that time, the
building shall be reclassified to its appropriate
Use Group; provided that no occupancy of such struc-
ture or building shall be permitted until an
occupancy permit shall have been issued by the City.

5.   <u>Industralized Construction Techniques</u>.   The
developers of the District and the City recognize:

(a)   the need for and the rapid development of
industrialized construction techniques, including com-
ponent and modular building systems;

(b)   the likelihood that industrialized construc-
tion techniques will become generally accepted and
used during the District's development period; and

(c)   that although the BOCA Basic Building Code
as adopted, modified and supplemented by the City pro-
vides for prefabricated construction and inspection at
the point of manufacture or fabrication, such provisions
may not provide for the proper use of industrialized
construction techniques.

Consequently, it is understood that the developers of the
District may, at any time and from time to time, submit for
consideration by the City amendments to the City's ordin-
ances to provide for and permit such industrialized con-
struction techniques and to establish performance-type
specifications, criteria and standards for the use thereof.

6.   <u>Storm Water Retention and Control Amendment
to City Subdivision Control Ordinance</u>.   After annexation of
the Territory to the City, the City, without further public

-138-