this Section IX, and at the interest rate
therein provided for, will be a legally
enforceable and binding obligation of the
City.  If such developers, in reliance on
a favorable opinion of counsel as required
by this clause (ii) of this Subsection 3(b),
shall have incurred costs and expenses pursuant
to this Subsection 3(b), but such an opinion
shall not be obtainable at the time when the
transfer and conveyance of such fire station,
equipment and site is required, the City
shall pay for and finance the purchase of
such fire station from such developers, if
such developers shall have constructed such
fire station or purchased such equipment,
or from such other entity which the developers
shall have caused to construct such fire
station and/or purchase such equipment, as
the case may be, at the full purchase price
provided for herein, by whatsoever means are
then available to the City, including, without
limitation, the issuance and sale of general
obligation bonds.  It is agreed that the
firm of Chapman and Cutler, 100 West Monroe
Street, Chicago, Illinois 60603, will be
satisfactory counsel for the purposes of
rendering the opinions provided for in this
Subsection (ii).

(iii)  The obligations of the developers of the District pursuant to this Subsection (b) shall be applicable to a maximum of two (2) fire stations.

4.  <u>Fire Station Sites</u>.  The developers of the District shall make sufficient fire station sites in the District available for purchase by the City to permit the City to construct the fire stations required by Sub-section (a) of Subsection 2 of this Section IX.  The location and size of such sites shall be as mutually agreed upon by the City and the developers of that Region of the District in which the fire station shall be located, and neither the agreement of such developers nor the agreement of the City as to the location and size of any such site shall be unreasonably withheld.  The purchase price for such sites shall be $7,500 per full acre and a proportional amount for any fraction of an acre included in the site.

5.  <u>Public Works Maintenance Building Site</u>.
The developers of the District shall make a site in the District, not to exceed five (5) contiguous acres in size, available for purchase by the City for use by the City for construction of a public works maintenance building and other uses related thereto.  Subject to the size limitation provided for herein, the location and size of such site shall be as mutually agreed upon by the City and the developers of that Region of the District in which the site shall be located, and neither the agreement

of such developers nor the agreement of the City as
to the location and size of any such site shall be unrea-
sonably withheld.  The entire site shall be purchased at
one time at a purchase price of $10,000 per full acre and
a proportional amount for any fraction of an acre.

      6.  Construction of Public Works Maintenance
Building.  Subject to the City's having met and performed
each and both of the conditions precedent set forth below in
Subsections (a) and (b) of this Subsection 6, and subject to
the provisions of Subsections (c) and (d) of this Subsection
6, at such time as the City shall require and desire to con-
struct a public works maintenance building (hereinafter called
the "maintenance building") in the District, the developers
of the Region in which the maintenance building is to be
located shall, at the City's request, construct, or cause
to be constructed, the maintenance building, and transfer
and convey, or cause to be transferred and conveyed, to
the City the maintenance building and the site on which
the maintenance building is located, in the same manner
and on the same terms and conditions which are set forth
with respect to the Region I Fire Station in Subsections
(b), (e) and (f) of Subsection 1 of this Section IX.

      (a)  It shall be a condition precedent to
      the obligations of such developers to perform the
      acts, or cause to be performed the acts, or to
      incur or cause to be incurred the costs and expenses,

pursuant to the above provisions of this Subsection
6, that the City shall (prior to the City's making
the request of the developers provided for above
in this Subsection 6) use its best efforts (y)
itself to construct or contract for the construction
of, or cause others than the developers to construct
or contract for the construction of, the maintenance
building, and (z) itself to finance, or cause others
than the developers to finance, the costs and
expenses of such construction and of the site, in
such manner and upon such terms (as may then be
legally available to the City) so that the interest
paid with respect to such financing will be exempt,
in whole or in part, from Federal income taxation.

   (b)  It shall be an additional condition pre-
cedent to the obligations of such developers to
perform the acts, or cause to be performed the
acts, or to incur or cause to be incurred the costs
and expenses pursuant to this Subsection 6, that
the said request of the City to the developers
with respect to the maintenance building provided
for above in this Subsection 6 shall be accompanied
with an opinion of counsel in form and substance,
and from counsel, satisfactory to such developers,
to the effect that the obligations of the City
to pay the purchase price for the maintenance
building and its site in the manner provided for

in Subsection (f) of Subsection 1 of this Section
IX, and at the interest rate therein provided for,
will be a legally enforceable and binding
obligation of the City.  If such developers,
in reliance on a favorable opinion of counsel
as required by this Subsection (b), shall have
incurred costs and expenses pursuant to this
Subsection 6, but such an opinion shall not
be obtainable at the time when the transfer
and conveyance of the maintenance building
and site is required, the City shall pay for
and finance the purchase of the maintenance
building from such developers, if such developers
shall have constructed the maintenance building,
or from such other entity which the developers
shall have caused to construct such maintenance
building, as the case may be, at the full purchase
price provided for herein, by whatever means are
then available to the City, including, without
limitation, the issuance and sale of general
obligation bonds.  It is agreed that the firm
of Chapman and Cutler, 100 West Monroe Street,
Chicago, Illinois 60603, will be satisfactory counsel
for the purposes of rendering the opinions provided
for in this Subsection (b).

(c)  The maximum amount of costs and expenses
which such developers shall be obliged to incur, or

cause to be incurred, for the construction of the
maintenance building shall be $75,000, and such
developers shall have no obligation to purchase, or
cause to be purchased, equipment for the maintenance
building.  Any amount required for the construction
of such maintenance building in excess of $75,000
shall be paid by the City.

(d)  The obligations of the developers of
the District pursuant to this Subsection 6 shall
be applicable to no more than one public works
maintenance building.

7.  <u>Fire Protection Districts</u>.  After annexation
of the Territory to the City, the City shall take such
action as may be appropriate to effectuate the discon-
nection of all properties included in the Territory from
the respective Fire Protection Districts in which such
properties may be located at the time of such annexation.
Such action shall include, but not be limited to:

(a)  Intervening and participating in any legal
action that may be brought to prevent such discon-
nection;

(b)  Entering into agreements to provide, at
such cost as may be required by the ordinances of the

City, fire protection to areas in any such Fire Pro-
tection District which cannot conveniently be protected
by such Fire Protection District as a result of such
annexation; and

(c)  Granting to any such Fire Protection
District the right to use City roads, streets and
water facilities to enable such Fire Protection
District to render fire protection to areas in such
Fire Protection District which cannot otherwise
conveniently be protected by such Fire Protection
District as a result of such annexation.

8.  City Services.

(a)  To reimburse the City for the City's
direct costs incurred in supplying certain City
services to the District during the beginning period
of the District's development, the developers of the
District shall, subject to the provisions of Sub-
sections (i), (ii) and (iii) of this Subsection
8(a), pay to the City for each calendar quarter
(three-month period) commencing with the calendar
quarter beginning October 1, 1973 and ending with
the last calendar quarter which falls within the
Payment Period (as such term is defined in Subsection
8(a)(iii) below) an amount estimated by the City to
be required to pay for the cost to the City during
such calendar quarter of the services described in
Subsection 8(a)(i) below.

(i)  The City costs which the payments provided for in this Subsection 8 are designed to cover (hereinafter called "Service Costs") and which shall be includable in the schedules of estimated Service Costs provided for in Subsection 8(c) below shall include direct costs attributable to the District for the provision of City services to the District, including by way of example, but not by way of limitation, police protection, fire protection, garbage collection and street and highway maintenance in or attributable to the District; provided, that Service Costs shall not include any allocation of general City overhead or administrative expenditures that might be attributable to the District.

(ii)  Regardless of the City's estimate of Service Costs for any calendar quarter during the Payment Period, the maximum payment which may be required from the developers of the District for any calendar quarter during the Payment Period shall be $150,000 until the aggregate maximum amount of required payments provided for in Subsection 8(a)(iii) below is reached; provided, that if a payment for any calendar quarter, based on the City's estimate of Service Costs for such calendar quarter, is less than such

maximum payment which may be required from such
developers for such calendar quarter, the amount
by which it is less (hereinafter in this Subsection
8(a) called the "credit") may be added to and
thereby increase the maximum payment which may
be required from such developers for any one or
more succeeding calendar quarters.  If the amount
of a credit is added to the maximum payment which
may be required from such developers for more
than one succeeding calendar quarter, the aggregate
of the amounts so added may not exceed the amount
of the credit.

   (iii)  The aggregate maximum amount of all
payments which the developers of the District
shall be required to make pursuant to this Sub-
section 8(a) shall be $750,000.  The amount, if
any, by which the total of all payments made to
the City pursuant to this Subsection 8(a) shall
have been less than $750,000 on the date on which
the Regional Shopping Center shall be open for busi-
ness (as such phrase is defined in Subsection 2 of
Section IV of this Agreement) shall be paid to
the City by the developers of the District promptly
after such opening date.  Upon payment of the aggre-
gate maximum amount of $750,000 pursuant to this
Subsection 8(a), all obligations of the developers
of the District under this Subsection 8(a) shall
terminate, whether or not the Regional Shopping

Center is then open for business.  The term "Payment Period" as used in this Subsection 8(a) shall be that period beginning with the date of annexation of the Territory to the City and terminating at the end of the calendar quarter during which the Regional Shopping Center shall open for business or the calendar quarter in which the total of all payments made by the developers of the District pursuant to this Subsection 8(a) shall have reached the aggregate maximum amount of $750,000, whichever first occurs.

(b)  If the Regional Shopping Center shall not be open for business (as such phrase is defined in Subsection 2 of Section IV of this Agreement) on or before January 1, 1975, the developers of the District shall, subject to the provisions of Subsections (i) and (ii) of this Subsection 8(b), loan to the City for each calendar quarter (three-month period) commencing with the first calendar quarter after January 1, 1975 for which the total payment made pursuant to Subsection 8(a) of this Section IX shall be less than $100,000 and ending with the calendar quarter during which the Regional Shopping Center shall open for business an amount estimated by the City to be required to pay for Service Costs during such calendar quarter.

(i)  Regardless of the City's estimate of Service Costs for any such calendar quarter, the

-177-

maximum amount which the developers of the District
may be required to loan to the City for any such
calendar quarter shall be the lesser of $100,000 or
the amount by which any payment made for such cal-
endar quarter pursuant to Subsection 8(a) of this
Section IX shall be less than $100,000 until the aggre-
gate maximum amount of loans provided for in Sub-
section 8(b)(ii) below is reached; provided that
if a loan for any such calendar quarter, based on
the City's estimate of Service Costs for such
calendar quarter, is less than such maximum loan
which may be required from such developers for
such calendar quarter, the amount by which it is
less (hereinafter for purposes of this Subsection
8(b) called the "credit") may be added to and thereby
increase the maximum loan which may be required
from such developers for any one or more succeeding
calendar quarters.  If the amount of a credit is
added to the maximum loan which may be required
from such developers for more than one succeeding
calendar quarter, the aggregate of the amounts so
added may not exceed the amount of the credit.

    (ii)  The aggregate maximum amount of all loans
which the developers of the District shall be re-
quired to make pursuant to this Subsection 8(b)
shall be $500,000, and upon the making of loans in
such maximum amount, all obligations of the de-
velopers of the District to make loans pursuant
to this Subsection 8(b) shall terminate; provided

however, that if the Regional Shopping Center shall
open for business prior to the making of such
maximum amount of loans, the developers of the
District shall have no further obligation to
make any loans in or for any calendar quarter
following the calendar quarter during which the
Regional Shopping Center shall open for business,
and from and after the end of the calendar
quarter in which the Regional Shopping Center
shall open for business, all obligations of the
developers of the District to make loans pur-
suant to this Subsection 8(b) shall terminate.

(iii)  The aggregate amount of all loans
made by the developers of the District to the
City pursuant to this Subsection 8(b) shall be
repaid by the City in four (4) equal annual
installments (the first such installment to be
due and payable two (2) years after the date
on which the last of such loans shall have
been made) with interest at the rate of one
percent (1%) over the prime rate of interest
from time to time charged to large corporate
borrowers by The First National Bank of
Chicago from the date on which each such loan
shall have been made to the City; provided,
that any portion of such aggregate amount may
be prepaid by the City at any time without
penalty, and, provided further, that any por-
tion of such aggregate amount which is repaid

by the City within one year after the date on
which the last of such loans shall have been
made shall bear no interest.

(c)  At least thirty (30) days prior to the commence-
ment of the calendar quarter beginning October 1, 1973
and at least thirty (30) days prior to the commencement
of each calendar quarter thereafter until the termina-
tion of the obligations of the developers of the District
pursuant to Subsections 8(a) and 8(b) of this Section IX,
the City shall deliver to Urban (for the developers of
Region I) and to Metropolitan Crown (for the developers
of Region II) a written counterpart of a schedule of
its estimated Service Costs for such calendar quarter,
and the payment of or the loan for such estimated
Service Costs, as the case may be, or the maximum pay-
ment or maximum loan which may be required for such
calendar quarter, as the case may be, whichever is
the less, shall be made by the developers of the
District within ten (10) days after receipt of such
schedule; provided, that the schedule of estimated
Service Costs for the calendar quarter beginning
October 1, 1973 may include estimated or actual
Service Costs for the period between the date of annex-
ation of the Territory to the City and October 1, 1973.

9.  Payment for City Annexation Expenses.  The
developers of the District recognize that the City has
incurred substantial costs in connection with the prepara-
tion of this Agreement and matters related thereto, and to

reimburse the City for such costs, such developers agree
to pay $35,000 to the City within ten (10) days following
the annexation date.

X.

<u>TERM</u>

1.  The parties hereto agree that the term of
this Agreement shall be twenty (20) years.

2.  This Agreement is adopted pursuant to the pro-
visions of the Illinois Municipal Code; provided, however,
that any limitations in the Illinois Municipal Code in con-
flict with the provisions of this Agreement shall not be
applicable, and as to all such provisions, the City hereby
exercises its powers pursuant to the provisions of Article
VII, Section 6 of the Constitution of the State of Illinois.
Simultaneously with the annexation of the Territory, and
without further public hearings, the City agrees to adopt
such ordinances as may be necessary to effectuate the use
of its home rule powers, including amendments applicable
to the Local Improvement Act.  The City recognizes and agrees
that the entry into this Agreement, the annexation of
the Territory to the City and the zoning of the District
as a planned development district are upon the express re-
liance by the record owners and developers that the terms
and provisions of this Agreement shall be valid for a period
of twenty (20) years, and that the City will take no action
which will in any way be contrary to, or inconsistent with,
the terms and provisions of this Agreement.

3.   The City hereby recognizes and agrees that the development of the District as a planned development district and the enactment of the Zoning Amendment creating the District as a planned development district in accordance with the Plan Description shall constitute the District as a single unified land use, and that commencment of development within any part of the District shall constitute and be regarded as the use of the entire District as a planned development district in accordance with the Plan Description.  Except as provided for in this Agreement or in the Plan Description, no changes or amendments in the Zoning Ordinances which shall directly or indirectly adversely affect the use or development of the District as a planned development district in accordance with the Plan Description shall be of any effect, and the District and each and all parts thereof shall be recognized, for the purposes of any such change or amendment to the Zoning Ordinance, as a "prior non-conforming use".

XI.

GENERAL PROVISIONS

1.   General City Services.  From and after the annexation of the Territory to the City, the City shall from time to time provide, on a basis comparable to and not less favorable than that applicable to other areas of the City, all services for the Territory and the occu-pants and properties located therein of the same kind, character and quality; including, without limitation, public transportation, police protection, fire protection and the

collection and disposal of garbage and trash, which are at any such time provided for other areas of the City.

2.  Consent to the Establishment of the Planned Development District.  The owners of record of the properties in the District, by executing this Agreement, consent to the establishment of the District as a planned development district pursuant to the provisions of Subsection 14.7 of the Zoning Ordinance in accordance with the terms of the Plan Description.

3.  Exculpation.

(a)  Except as expressly provided for in Subsections (b), (c) and (d) of this Subsection 3, except as expressly provided for in Section V of this Agreement, and except as expressly provided for in Subsection 16 of Section XI of this Agreement, the obligations and agreements set forth in this Agreement shall be binding upon the record owners, from time to time, of the real property located within the District, and shall be binding at all times upon the real property comprising the District.

(b)  Except as expressly provided for in this Agreement, only the persons and entities who are named parties hereto shall be liable under the provisions hereof.  No parent, subsidiary or stockholder of any corporate party hereto, and no disclosed or undisclosed principal of any party hereto, and no

trustee under any land trust (herein referred to as
"Trustee") shall be liable in the event of any
default under this Agreement or the Plan Description
and the same are hereby expressly released and
relieved from any and all personal liability or
responsibility in connection with such defaults.
With respect to any Trustee, comprising one of the
parties hereto, or, at any time one of the record
owners of the real property located within the
District, it is expressly agreed and understood
by and between the parties hereto, anything
herein to the contrary notwithstanding, that each
and all of the obligations and agreements in
this Agreement or in the Plan Description,
while made in form purporting to be the obli-
gations and agreements of the Trustee as a
party hereto, or as a record owner, from time
to time, of the real property located within
the District, are nevertheless, and each and every
one of them, made and intended not as obligations
and agreements of said Trustee or for the pur-
pose or with the intention of binding said
Trustee personally, and this Agreement is
executed and delivered by, and shall be binding
upon, said Trustee not in its own right, but
solely in the exercise of the powers conferred
upon it as such Trustee; and that any and all
of such obligations and agreements are intended
to be obligations and agreements of, and shall
be binding upon, the beneficiaries under said

land trusts or their successors in rights of
ownership and control of said land trusts, and
not said Trustee.

(c)  It is expressly agreed and understood
that, notwithstanding anything in this Agreement
to the contrary, the obligations and agreements
set forth in Subsection IV 2 of this Agreement
shall be solely the obligations and agreements
of the entities named in Subsection IV 4 of this
Agreement, the obligations and agreements set forth
in Subsection IV 8 shall be solely the obligations
and agreements of the persons or entities to be agreed
upon by the City and the developers of Region II
in accordance with Subsection IV 10 of this Agreement,
the obligations and agreements set forth in Subsection
V 4(h) shall be solely the obligations of the entities
named therein or otherwise acceptable to the City as
provided for in said Subsection V 4(h) and the obliga-
tions and agreements set forth in Subsection VI 4(a)
shall be solely the obligations and agreements of those
persons or entities acceptable to the City in accord-
ance with the provisions of said Subsection VI 4(a),
and none of the said guarantee obligations set forth
in Subsections IV 2, IV 8, V 4(h) and VI 4(a) shall be
binding upon the real property comprising the District.

(d)  It is expressly agreed and understood that
the respective obligations of the developers of the

District, or the developers of Region I or Region II
respectively, set forth in Subsections 1, 2, 3, 6 and
8 of Section IX of this Agreement, shall be solely the
obligations and agreements of the respective entities
referred to in said Subsections, and none of the said
obligations set forth in said Subsections shall be
binding upon the real property comprising the District.
If any of said developers shall sell, convey or other-
wise transfer all or any part of the real property in
the District owned on the date of annexation by such
developers, the transferees who shall become the record
owners from time to time of such real property may, or
may not, expressly and specifically assume some or all
of the obligations of the respective developers set
forth in said Subsections 1, 2, 3, 6 and 8 of Section
IX, and such transferees shall not be deemed to have
assumed any of the obligations, except only to the
extent, if any, of such express and specific assumption
of such obligations by such transferees in the agree-
ment, deed or other instrument effecting the sale,
conveyance or other transfer to such transferees. Such
express and specific assumption by such transferees of
such obligations shall not relieve the respective
developers from their respective obligations set forth
in said Subsections, but the respective developers
shall be entitled to a credit against their respective
obligations to the extent and in the amount of any
moneys at any time and from time to time received by
the City from such transferees, or other performance,

-186-

at any time and from time to time by such transferees, with respect to said respective obligations.

4. <u>Stop Orders</u>. The City shall not issue any stop orders directing work stoppage on buildings or other parts of the development of any development phase of the District without setting forth the Section of the Code of Ordinances or Plan Description allegedly violated by the developer of such development phase, and such developer may forthwith proceed to correct such violations as may exist.

5. <u>Certificates of Occupancy</u>. The City shall issue certificates of occupancy within seven (7) days of application therefor or issue a letter of denial within said period of time informing the developer or person applying for the same specifically as to what corrections are necessary as a condition to the issuance of a certificate of occupancy and quoting the Section of the Code of Ordinances or the Plan Description relied upon by the City in its request for correction.

6. <u>All Action Taken</u>. The parties hereto agree that there has been taken all action required by law, including the holding of such public hearings as may be required, to bring about the amendments, exceptions and variances to the Zoning Ordinance, the Subdivision Control Ordinance and other related ordinances, and the adoption of

such other ordinance amendments, exceptions and variances, as may be necessary or proper in order to zone and classify the property to be annexed hereunder, so as to enable the same to be used and developed as contemplated herein and in the Plan Description and to enable the parties to execute this Agreement and fully carry out all the covenants, agreements, duties and obligations created and imposed by the terms and conditions hereof.

7. Limitation on Liability.

(a) The liability of Metropolitan (including any partnership, venture or other entity that succeeds to its interest) hereunder shall be limited solely to the assets or property, after deduction of liabilities to which such assets or property may be subject, of Metropolitan or such partnership, venture or other entity; provided, that a dissolution, liquidation or termination of Metropolitan, whether or not Metropolitan is reconstituted by substantially the same partners of Metropolitan, shall not discharge or limit the liability of Metropolitan hereunder, but in the event of dissolution, the liability of Metropolitan or its successor in interest shall be limited to, or enforceable against, only the assets or property, after deduction of liabilities to which such assets or property may be subject, of Metropolitan as of the date of such dissolution, and in such event of liquidation or termination, the liability of any distributee, including any general partner of Metropolitan,

-188-

shall be limited to the value, as of the date of such liquidation and distribution, of the assets or property, after deduction of liabilities to which such assets or property may be subject, of Metropolitan received by such distributee.  Subject to the foregoing provision relating to distributees, no partner of Metropolitan, or such partnership, venture or other entity, shall be personally liable in respect of any claim arising out of or related to this Agreement, and the deficit capital account of a partner in Metropolitan, or such partnership, venture or other entity, shall not be deemed an asset or property of Metropolitan, or such partnership, venture or other entity.

(b)  The liability of Crown (including any partnership, venture or other entity that succeeds to its interest) hereunder shall be limited solely to the assets or property, after deduction of liabilities to which any such assets or property may be subject, of Crown or such partnership, venture or other entity; provided, that a dissolution, liquidation or termination of Crown, whether or not Crown is reconstituted by substantially the same partners of Crown, shall not discharge or limit the liability of Crown hereunder, but in the event of dissolution, the liability of Crown or its successor in interest shall be limited to, or enforceable against, only the assets or property, after deduction of liabilities to which any such assets or property may be subject, of Crown as of the date of

such dissolution, and in such event of liquidation
or termination, the liability of any distributee,
including any partner of Crown, shall be limited to
the value, as of the date of such liquidation and
distribution, of the assets or property, after de-
duction of liabilities to which any such assets or
property may be subject, of Crown received by such
distributee.  Subject to the foregoing provision
relating to distributees, no partner of Crown, or
such partnership, venture or other entity, shall be
personally liable in respect of any claim arising
out of or related to this Agreement, and the deficit
capital account of a partner in Crown, or such partner-
ship, venture or other entity, shall not be deemed an
asset or property of Crown, or such partnership, venture
or other entity.

   (c)  Crown does hereby warrant and represent that
as of the date hereof the "net worth" of Crown is in
excess of $25 million.  (For the purposes hereof, the
"net worth of Crown" shall mean the fair market value
of the assets and property of Crown minus all liabilities
and obligations of Crown, said liabilities and obliga-
tions to be determined in accordance with generally
accepted accounting principles.)

      Crown does hereby agree with the City that at
all times during the term of this Agreement that it,
or any partnership, venture or other entity that may

succeed to it, will maintain a net worth (determined
as provided herein) of not less than $25 million;
provided, however, that such net worth requirement
shall, as agreed upon by Crown and the City from time
to time, be reduced as the obligations of the developers
of Region II set forth in this Agreement shall be
performed and complied with including, by way of
example but not by way of limitation, the obligations
of the developers of Region II under Sections IV, V
and VI hereof.

If at any time during the term hereof the
net worth of Crown, or of any partnership, venture or
entity that may succeed to it, (determined as provided
herein) shall be less than $25 million, and if at such
time a claim shall be asserted against Crown, based on
its obligations under and pursuant to this Agreement,
then, to the extent that such net worth shall be less
than $25 million, the partners of Crown, or of any partner-
ship, venture or entity that may succeed to it, shall be
personally liable with respect to such claim, provided
and to the extent that the assets and property of Crown,
or of any partnership, venture or entity that may succeed
to it, are unavailable and insufficient to meet the amount
of such claim.

8.  Authority of Urban.  The owners of record
of the properties in the District, by executing this
Agreement, confirm the authority of Urban to act in their

behalf with respect to all matters which require their consent or approval pursuant to the terms of this Agreement or pursuant to the terms of the Plan Description prior to the date of annexation of the Territory to the City; provided that such authority shall terminate as to the owners of record of Region II from and after the date of annexation of the Territory to the City, and further provided that any owner of record of property in Region I shall have the right to terminate such authority at any time by giving the City written notice of such termination.

9.  <u>Assignment of Obligations</u>.

(a)  Any guarantor listed in Subsection 4 of Section IV of this Agreement may assign its obligations under the guarantee provided for in Subsection 2 of said Section IV, any guarantor under Subsection 10 of Section IV of this Agreement may assign its obligations under the guarantee provided for in Subsection 8 of said Section IV, any guarantor under Subsection 4(h) of Section V of this Agreement may assign its obligations under the guarantee provided for under said Subsection 4(h), and any guarantor under Subsection 4(a) of Section VI may assign its obligations under the guarantee provided for in said Subsection 4(a), in each case to any corporation, partnership or other entity which acquires all or substantially all of the property and

assets of such guarantor by purchase, or by merger, consolidation or other method or methods of corporate reorganization, and upon such purchase, or such merger, consolidation or other method of corporate reorganization, such guarantor shall be released and relieved from its obligations under said respective guarantees; provided, that in the event of such an assignment by Crown under the provisions of this Subsection (a), Crown shall remain liable under its obligations so assigned by Crown, except to the extent that the corporation, partnership or other entity to which such assignment is made by Crown shall, in the reasonable discretion of the City, be financially acceptable to the City, in which case, upon the City's written confirmation of such acceptability, Crown shall be released and relieved from its obligations so assigned.

(b)  Except for the limitations with respect to the assignment of obligations under guarantees provided for in Subsection (a) of this Subsection 9, any party hereto may assign its obligations under this Agreement to any corporation, partnership or other entity which acquires all or substantially all of the property and assets of such party hereto by purchase, or by merger, consolidation or other method or methods of corporate reorganization, and upon such purchase, or such merger, consolidation or other method of corporate

reorganization, such party shall be released and relieved from its obligations hereunder.

(c)  Except as specifically provided for in Sub-sections 9(a) and 9(b) of this Section XI, and except as provided for in Subsection 3 of this Section XI of this Agreement, and except as provided for in Section V of this Agreement, and party hereto may sell, transfer and assign all or part of its duties and obligations hereunder to any corporation, partnership or other entity; provided however, that such party so selling, transferring and assigning its duties and obligations hereunder shall remain liable and responsible for the performance and compliance with such duties and obligations except to the extent that such transferee or assignee shall, in the City's sole discretion, be financially acceptable to the City, in which event, upon receipt of the City's written confirmation of such acceptability, such party so selling, transferring or assigning shall be released and relieved from its obligations hereunder.

10.  <u>Assignment and Waiver of Rights</u>.

(a)  Except as otherwise provided in Section V of this Agreement, it is agreed that as a part of, and in connection with, any sale, conveyance or other transfer of any real property comprising

the District, the developers, or any other seller, grantor or other transferor (whether theretofore having acquired the property so transferred from the developers or others) shall have the right to assign and transfer all, or part of, such developers' or other seller's, grantor's or other transferor's rights hereunder, expressly and specifically enumerated and specified in the agreement, deed or other instrument effecting such sale, conveyance or other transfer; provided, that only to the extent, if any, that, such developers or other sellers, grantors or transferors shall expressly and specifically in the agreement, deed or other instrument effecting such sale, conveyance or other transfer, expressly and specifically enumerate and specify the rights so transferred and assigned, shall such rights be deemed so assigned and transferred, and to the extent that such rights are not expressly and specifically so enumerated and so specified, such rights shall be deemed retained by and remain in such developers, and such other sellers, grantors and transferors.

(b)  In the event of any such assignment or transfer of all or part of the rights of any developer or any other said seller, grantor or other transferor or assignor under Sections IV, V, VI, VII, VIII, IX or XI of this Agreement (where, after such assignment or transfer, the exercise of or waiver of any such

right or rights shall be in more than one entity,
and may therefore result in differences between the
holders of any such right or rights), each such
assignment and transfer shall be subject to and
provide for a method of resolving any differences
that may arise with respect to the exercise or waiver
of any such rights after such assignment or transfer.
By way of example and not by way of limitation, such
method may provide that in the event of any dif-
ferences between the holders of such right or
rights, such differences shall be resolved by a
majority in number of the holders of such rights or
by a majority in interest of the holders of such right
or rights to the end that there will be a method
available for the resolution of any such differences
that may arise between holders of any such right
or rights as to the exercise or waiver of such
rights.  Such method shall be subject to the approval
of the City, which approval shall not be unreasonably
withheld, and the City's approval of such a method shall
be deemed to apply and be effective with respect to the
use of the same or a similar method in the same or in
comparable assignment circumstances.  (By way of example
and not by way of limitation, if such a method has been
approved by the City with respect to a given assignment,
such approval shall be deemed to apply (i) to any
subsequent assignment or transfer of the same or
similar rights by the same assignor or transferror to

the same number or a fewer number of assignees
or transferees, or (ii) to any subsequent
reassignment or retransfer of the same or
similar rights by such assignee or transferee
to the same number or a fewer number of assignees
or transferees.)

    (c)  Except as otherwise provided in this
Agreement, the developers and the holder or holders
from time to time of right or rights described in
Subsection (b) of this Subsection 10 shall have the
right to waive, in whole or in part, any such right or
rights by written notice to the City; provided, that if
such right or rights shall be in or held by more than
one entity, then unless and until all of the entities
holding such right or rights join in such waiver, such
waiver shall be of no force or effect; and, provided
further, that if any such right or rights shall be in
or held by more than one entity, and if any differences
shall arise with respect to the waiver of any such
right or rights, such differences shall be resolved
by the method provided for in Subsection (b) of this
Subsection 10, and such waiver shall be effective
if exercised in accordance with the said method so
provided.

    11.  <u>Annexation of Deleted Parcels</u>.  Pursuant to
the provisions of Subsection V F. of the Plan Description,
one parcel of land has been deleted from the land originally