WKS/
11/24/93

PA400D097TXT5/PLAN1    **ORIGINAL**

CITY OF AURORA, ILLINOIS
ORDINANCE NO. 093-123
DATE OF PASSAGE December 7, 1993

AN ORDINANCE PROVIDING FOR THE EXECUTION OF
AN AMENDMENT AND RESTATEMENT OF THE PRINCIPAL ANNEXATION AGREEMENT
FOR REGION II OF FOX VALLEY EAST

WHEREAS, the City of Aurora has a population of more than 25,000 persons and is, therefore, a home rule unit under Subsection (a) of Section 6 of Article VII of the Illinois Constitution of 1970; and

WHEREAS, subject to said Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs for the protection of the public health, safety, morals and welfare; and

WHEREAS, a proposed Amendment and Restatement of the Principal Annexation Agreement (said 'Agreement') in the form of Exhibit "A", attached hereto and included herein by reference as if fully set forth, has been duly submitted to the Corporate Authorities of the City of Aurora with the request that all required hearings be held thereon, and requesting that certain territory therein described (Region II) be subject to the terms and conditions of said Agreement in accordance with law; and

WHEREAS, said Agreement replaces the Principal Annexation Agreement of Fox Valley East entered into on July 27, 1973, and authorized by Ordinance 4326, the expiration date of which was extended to December 31, 1993, by Ordinance 093-59, approved July 27, 1993; and

WHEREAS, the Aurora Planning Commission has held a public hearing on October 27, 1993, on the petition to enter into said Agreement and the zoning amendments therein provided after due publication of notice of hearing and has submitted a recommendation to the City Council of the City of Aurora to approve said Agreement subject to certain conditions; and

WHEREAS, the Corporate Authorities of the City of Aurora caused a notice to be prepared describing in general said Agreement and stating the time and place of a public hearing to consider said Agreement; and

WHEREAS, notice of such public hearing was duly published not less than 15 nor more than 30 days prior to the hearing, in a newspaper of general circulation in the City of Aurora; and

WHEREAS, the City Council held the second public hearing for said Agreement as specified in such notice on December 7, 1993; and

WHEREAS, all public hearings and other action required to be held or taken prior to the adoption and execution of said Agreement in order to make the same effective have been held or taken pursuant to notice as required by law and in accordance with all requirements of law; and

WHEREAS, said Agreement, in its present form, has been on file with the City Clerk of the City of Aurora for public inspection for at least one week; and

WHEREAS, the Corporate Authorities, after due investigation and consideration, and following the aforesaid public hearings, have determined into said Agreement will serve the public good and benefit the City of Aurora.

NOW, THEREFORE, BE IT ORDAINED by the City Council of the City of Aurora, Kane and DuPage Counties, Illinois, as follows:

<u>Section One</u>: That said City Council finds as fact all of the preamble recitals of this Ordinance.

<u>Section Two</u>: That the Mayor and City Council hereby find as fact all of the preambles contained in said Agreement in the form of Exhibit "A", attached hereto and included herein by reference as if fully set forth.

<u>Section Three</u>: That said Agreement is hereby approved and the Mayor of the City of Aurora is hereby authorized and directed to execute said Agreement on behalf of the City, and the City Clerk is hereby authorized and directed to attest the Mayor's signature and affix the corporate seal of the City thereto.

<u>Section Four</u>: That such number of duplicate originals of said Agreement may be executed as the Mayor shall determine.

<u>Section Five</u>: That this Ordinance shall be in full force and effect, and shall be controlling, upon its passage and approval.

PRESENTED to the City Council of the City of Aurora, Illinois on

_December 7, 1993_ .

PASSED AND APPROVED by the City council of the City of Aurora, on _December 7, 1993_ .

AYES _10_          NAYS _0_          NOT VOTING _0_

SIGNED by the Mayor of the City of Aurora, Illinois, on

_December 7, 1993_ .

ATTEST:

_Cheryl M. Vonhoff_
City Clerk Cheryl Vonhoff

_Mayor David L. Pierce_

This instrument prepared by:
Aurora Planning Division
44 E. Downer Place
Aurora, Illinois  60507

Case File Number: FVRII-93.400-Pa/R

**ORIGINAL**

for PD -184

## AMENDMENT AND RESTATEMENT

## OF

## THE PRINCIPAL ANNEXATION AGREEMENT

This Amendment and Restatement of the Principal Annexation Agreement (the "Agreement") made and entered into as of this 7th day of December, 1993, by and between the City of Aurora, Illinois, a municipal corporation (hereinafter called the "City"), and Aurora Venture, an Illinois limited partnership and successor to "Metropolitan Crown" (the "Developer").

## W I T N E S S E T H:

WHEREAS, Developer is the developer of certain real estate described in Part Two of the hereinafter defined Modification (the "Region") which is part of the Fox Valley East Planned Development District (the "District") which was initially established by the City in 1973 in accordance with Sections 14.7 and 15 of City Ordinance No. 3100 (the "Zoning Ordinance"); and

WHEREAS, the real estate then within the District, together with certain other real estate, was annexed to the City on August 1, 1973 pursuant to authority granted to the City by law and pursuant to the City's home rule powers set forth in Article VII, Section 6 of the Constitution of the State of Illinois, and subject to the terms set forth in the Principal Annexation

Agreement dated July 27, 1973, as subsequently amended, by and between the City, Developer's predecessor therein called "Metropolitan Crown" and others (the "Principal Agreement"); and

WHEREAS, under the Principal Agreement and the Zoning Ordinance, all real estate within the District was to be developed in accordance with the provisions of the Fox Valley East Planned Development District Plan Description (the "Plan Description") which was attached as Exhibit A to the Principal Agreement; and

WHEREAS, the term of the Principal Agreement, as extended by the parties to December 31, 1993, is about to expire, the Region has not yet been fully developed and a number of the provisions of the Principal Agreement, as described below, either have been fully performed or have been superseded and replaced by agreements subsequently entered into between the City and Developer, some of which have also been fully performed; and

WHEREAS, all duties and obligations with respect to the funding and constructing of Water Utilities for the Region pursuant to Section IV of the Principal Agreement and pursuant to that certain Water Agreement dated February 19, 1980, have been fully performed and discharged and neither the City nor the Developer has any further obligations or duties under said Section IV, such Water Agreement or City Resolution No. R90-381 setting forth the final actions to be taken to complete and terminate such Water Agreement; and

-2-

WHEREAS, pursuant to a separate agreement with Aurora Sanitary District (the "Sanitary District"), the District together with other real estate not subject to the Principal Agreement was annexed to the Sanitary District and a sewerage service system for such real estate has been completed, and therefore all of the City's obligations arising under Section VI of the Principal Agreement regarding a Sewerage Service System are null and void and of no further force and effect; and

WHEREAS, except for the Road and Highway Projects described in Section IV of this Agreement, all of the undertakings of the City and Developer with respect to the Road and Highway Program for the Region arising under Section V of the Principal Agreement with respect to the roads and highways listed on Parts II and III of Exhibit D to the Principal Agreement as last approved by the City on June 5, 1984, either:  have been completed or been deleted from the Program by mutual agreement of the City and Developer; or, in the case of County Line Road, are being undertaken by City and Developer pursuant to a separate County Line Road Agreement dated March 16, 1993; or, in the case of Eola Road south to East New York Street, are being undertaken and funded by another governmental body; and

WHEREAS, this Agreement is not intended to change, modify, supersede, replace or incorporate any of the agreements and undertakings contained in the County Line Road Agreement dated March 16, 1993; and

-3-

WHEREAS, this Agreement amends, restates, extends and updates the provisions of the Principal Agreement and supersedes and replaces the Principal Agreement, and has attached hereto as Exhibit "A" a Plan Description Modification which modifies certain provisions of the Plan Description with respect to certain portions of the Region described in Section I of Part One thereof (the "Modification"); and

WHEREAS, this Agreement, together with the Modification, has been submitted to the City and the Corporate Authorities with a request to take all required action and to hold any needed hearings thereon; and

WHEREAS, all terms defined in the Principal Agreement and exhibits thereto including the Plan Description shall have the same meaning when used in this Agreement unless another definition is expressly provided in this Agreement, e.g. the real estate which is referred to as "Region II" in the Principal Agreement is herein referred to as being included in the "Region"; and

WHEREAS, the term "Region", as used herein, includes Region II as described in the Principal Agreement and certain additional parcels of real estate which were subsequently annexed to the City pursuant to separate annexation agreements and which were in connection therewith zoned as part of the District and which are shown on the Updated Land Use Plans for the Region approved from time to time by the City; and

-4-

WHEREAS, the City and Corporate Authorities have agreed to hold any public hearings and take all other action required to be held or taken by this Agreement; and

WHEREAS, the Corporate Authorities have determined that the further development of the Region in the manner set forth in this Agreement and the Modification will continue to promote the sound planning and development of the City and is in the best interests of the City.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter contained, the parties hereto agree as follows:

## I.

### THE AGREEMENT

The City and the Developer agree to do all things necessary or appropriate to carry out the terms of this Agreement and to aid and assist the other in carrying out the terms hereof, including the enactment of such resolutions and ordinances and such other action as may be necessary or desirable to enable the City to comply with the terms hereof.  It is the intent of the parties that the Principal Agreement is superseded and replaced by this Agreement, and that the provisions of this Agreement are intended to amend, restate, extend and update the provisions of the Principal Agreement.

II.

## 1993 UPDATED LAND USE PLAN; PLAN DESCRIPTION MODIFICATION

1.    The City shall adopt the 1993 Updated Land Use Plan for the Region in the form attached to this Agreement as Exhibit "B" (the "1993 Plan").

2.    The Plan Description shall be amended by the Modification so that (a) those portions of the Region which are a part of the hereinafter described Burlington Properties and designated on the 1993 Plan as "Residential Areas" therein and (b) those portions of the Region which are designated on the 1993 Plan as "Business Areas" and not covered by Final Plans and Final Plats approved heretofore by the City, shall be developed subject to the provisions, terms and conditions set forth in the Modification, including, without limitation, all of the modifications and exceptions from the Subdivision Control Ordinance that are set forth in the Modification.

3.    All portions of the hereinafter described Burlington Properties which are not designated on the 1993 Plan as "Residential Areas" and all other portions of the Region which heretofore have been covered by Preliminary Plans and Preliminary Plats, but not Final Planned and Final Platted, and which are not designated on the 1993 Plan as "Business Areas", shall be developed subject only to the provisions of the Plan Description, which provisions (for purposes of development of the aforesaid portions of the Region) cannot be modified by the City without the consent of Developer during the term of this Agreement.

4.    All portions of the Region which heretofore have been Final Planned and Final Platted shall continue to be subject to the provisions of the Plan Description which the City can modify so long as the City complies with the requirements of the Zoning Ordinance which govern, limit and control the rezoning of lands within a planned development district such as the District.

5.    All property in the Region shall be taken into account for purposes of determining the percentage limitations specified in Section II of Part One of the Modification.

### III.

### THE BURLINGTON PROPERTIES

Based upon land absorption studies obtained by the City and Developer, the City and Developer have determined, consistent with the percentage limitations set forth in the Modification that the portion of the Region commonly known as the Burlington Properties and which is legally described separately in Part Two of the Modification (the "Burlington Properties") shall be designated on the 1993 Plan as a predominately Residential Area rather than a Manufacturing Area.  It is further agreed that the foregoing change shall be incorporated on the City's Comprehensive Plan and also agreed that the future residential development of such portion of the Region be subject to the Modification.

IV.

## ROAD and HIGHWAY PROJECTS

1.   <u>Road and Highway Projects</u>.  City and Developer hereby
agree that the undertakings and obligations set forth below with
respect to the matters described in subsections a. through c.
below constitute all of the undertakings and obligations
remaining to be performed by the City and the Developer to
provide a network of arterial roads and highways for the Region
(the "Projects"):

   a.   <u>Projects South of Waubonsie Creek</u>.  There are 4
Projects related to segments of roadways located south of
Waubonsie Creek which remain to be completed.  These 4
include:  (i) extension of Eola Road south from Long Grove
Drive to Montgomery Road, (ii) reimbursement for already
acquired right-of-way for Eola Road through the Copenhagen
Subdivision, (iii) drainage improvements for a rural cross
section (comprised of storm sewers and appurtenances) for
the segment of Montgomery Road located between Eola Road and
the Kane County line, and (iv) drainage improvements for a
rural cross section (comprised of storm sewers and
appurtenances) for the segment of Eola Road located between
Montgomery Road and 87th Street.

   b.   <u>North Aurora Road/Indian Trail Road</u>.  Developer
shall pay 60% of the "net costs" to upgrade the segment of
North Aurora Road/Indian Trail Road extending between the
Kane County Line and the eastern boundary of the Region, to

-8-

an urban four-lane cross-section with landscaped median and parkways and with a traffic signal at the westerly intersection of Stonebridge Boulevard and Indian Trail Road. In connection therewith, Developer shall dedicate such portions of the Region owned by it or by its land trusts as are required for this Project.

    c.   <u>Upgrading of Liberty Street</u>.  The upgrading of Liberty Street between Eola Road and Vaughn Road to a 39 foot back-to-back urban cross section (the "Upgrade") shall constitute a matter to be undertaken solely by the adjacent owners when they develop their lands adjacent to Liberty Street with 100% of the costs of the upgrade born by the adjacent owners.  In furtherance of the foregoing, Developer agrees, in connection with the development of the Burlington Properties, to upgrade the portions of Liberty Street adjacent thereto with an 80 foot right-of-way, and portions of the Burlington Property shall be dedicated therefor by the Developer to the extent required.  The final engineering for the Upgrade shall be prepared as part of the final engineering for the other public improvements that Developer shall furnish and install when the Burlington Properties are developed and subdivided.

    2.   <u>Financing the Projects South of Waubonsie Creek</u>.  At the City's election - which election shall be made on or before December 7, 1994 - Developer shall either:

a.   pay City the sum of $852,743.25 in three installments with the first installment of $275,000 due on January 2, 1995, the second installment of $275,000 due on January 2, 1996 and the third installment of $302,743.25 due on January 2, 1997; the foregoing payments by Developer constituting a full and complete discharge and satisfaction of all obligations Developer may have with respect to the Projects south of Waubonsie Creek; or

b.   act as project manager when the City undertakes the improvement and extension of Eola Road south from Route 34 to 87th Street (the "Eola Extension") on a cost plus 5% basis, with Developer paying the first $852,743.25 of the expenses to improve and extend that segment of Eola Road and the balance of the monies to be timely provided therefor by the City, so that Developer can continue to timely pay the Project contractors and suppliers, with the method of payments to be further determined by the parties, the foregoing actions by Developer constituting a full and complete discharge and satisfaction of all obligations Developer may have with respect to the Projects south of Waubonsie Creek.

In order to elect alternative b. above (have Developer act as project manager), City must determine that all necessary right-of-way will have been obtained and that the City will have sufficient monies to complete the Eola Extension, so that the Eola Extension can be commenced and completed on or before

-10-

December 31, 1997.  Once alternative b. has been elected, if due
to delays in obtaining right-of-way or in obtaining the balance
of the monies for the Eola Extension, if the Eola Extension has
not commenced by June 1, 1996 then, at Developer's option,
Developer may thereupon cancel City's election of alternative b.
above by tendering payment to the City of the sum of $852,743.25
in full and complete satisfaction and discharge of all
obligations Developer may have with respect to the Projects south
of  Waubonsie Creek.

3.   Financing of the North Aurora Road/Indian Trail Road
Project.  Prior to undertaking the Project described in Paragraph
1.b. of this Section IV, the City and Developer shall meet and
discuss the financing alternatives then available for that
Project, which alternatives may include Developer front funding
of 100% of the costs therefor subject to reimbursement of the
Developer by the City of the City's 40% share of the costs
therefor pursuant to the terms of a separate funding agreement
between the parties or the use of a special assessment financing.
The parties agree that the terms and provisions of any separate
funding agreement shall be substantially in the form of those
contained in the funding agreement dated May 1, 1990 pursuant to
which Developer, subject to reimbursement by the City, front-
funded the costs of constructing the arterial roadway which is
now known as McCoy Drive.  In the event that the parties agree
that special assessment financing is the form of financing to be
employed, the parties further agree that the provisions of

-11-

Section V of the Principal Agreement shall then be referenced herein and utilized for such special assessment financing.

4. <u>Acquisition of Right-of-Way</u>. Except for necessary right-of-way for the North Aurora Road/Indian Trail Road Project and for the Upgrade, which Developer owns directly or through one of its land trusts and hereby agrees to dedicate for use as right-of-way for those Projects, the City shall be responsible for acquiring all other required right-of-way for the Projects, including the Projects South of Waubonsie Creek either by purchase or by condemnation. To the extent that any right-of-way is purchased at a price in excess of its fair market value, only its fair market value shall be utilized for purposes of determining "net cost". For right-of-way acquired through condemnation, the price determined in the condemnation proceeding shall be considered fair market value for purposes herein.

5. <u>Recapture</u>. In connection with the future annexation of any lands which have benefitted from any previously completed phases of the Road and Highway Program described on Parts II and III of Exhibit D to the Principal Agreement for which Developer advanced or paid the share of "net costs" otherwise payable by the owner of any such lands, the City as a condition to such annexation shall require that reimbursement be made to Developer or may, in lieu of requiring reimbursement, pay such amounts to Developer. It is hereby agreed that recapture of the amounts so specified is due from the lands described on Exhibit "C" attached hereto.

-12-

V.

## PROVISIONS RELATING TO CITY ORDINANCES

1.    Home Rule Powers.  The City agrees to adopt such ordinances as may be necessary or appropriate to effectuate the use of its home rule powers as provided for in Section 6 of Article VII of the Constitution of the State of Illinois in connection with this Agreement, and to effectuate this Agreement and to enact ordinances, or amend any of its ordinances, as may be necessary to carry out the agreements contained herein.

2.    City Ordinances.  All existing ordinances of the City consistent with, and not contrary to, this Agreement, the Plan Description or the Modification, to the extent that such ordinances have not been excepted, waived or modified by this Agreement, the Plan Description or the Modification, shall be applicable to the Region.  Any modification or amendment to such ordinances, or any newly enacted ordinances of the City, to the extent consistent with, and not contrary to, this Agreement, the Plan Description (to the extent of its applicability) or the Modification, shall be applicable to the Region.

VI.

## PUBLIC IMPROVEMENTS

1.    Dedication of Certain Public Improvements.  The City shall accept any remaining dedication of any part or all of the public improvements provided, constructed or installed in the Region including:

-13-

a.   All water utility mains, pipes and related facilities which constitute a part of the general water distribution system of the City excluding service lines;

b.   Except for those sanitary sewers and related facilities which upon completion are accepted for dedication by and dedicated to the Sanitary District, all sewers and related facilities which constitute a part of the general sanitary sewer system of the City; and

c.   Except for those roads and highways and road and highway improvements which upon completion are accepted for dedication by and dedicated to the Township, State, County or other governmental authority other than the City, all appropriate streets, roads and highways, including all associated properties, rights-of-way, road and highway lighting, traffic lights and controls, storm water drainage, curbs, gutters, sidewalks, landscaping and similar facilities;

provided, that to the extent that such public improvements are installed pursuant to the requirements of the Subdivision Control Ordinance, as from time to time amended by the Plan Description and Modification, such dedication shall be subject to compliance with the requirements of such Ordinance to the extent applicable. From and after the dedication of any such public improvements, such public improvements shall be maintained, reconstructed, repaired and replaced by the City; and all costs and expenses of operation, maintenance, repair, reconstructing and replacement of

-14-

such public improvements shall be the sole responsibility of the
City.

2.   <u>Storm Water Management</u>.

a.   Storm water retention and detention facilities
shall be constructed within all portions of the Region,
other than the Burlington Properties, in accordance with the
provisions of the Plan Description as supplemented and
clarified by letter agreement dated July 31, 1984 which is
attached hereto as Exhibit "D".

b.   Storm water retention and detention facilities
shall be constructed within the Burlington Properties with
reference to provisions of Paragraph (1) of Section V of
Part One of the Modification.

c.   If the Fox Valley Park District does not accept
the dedication of any part or all of the storm water
retention and detention facilities, including any land
relating thereto, in the Region, Developer shall establish
homeowner's or similar associations to own and maintain such
facilities; or alternatively, it may convey such facilities
to a not-for-profit corporation to own and maintain such
facilities, provided that in the determination of the city,
such corporation shall have reasonably sufficient financial
resources to undertake such obligations.

3.   <u>Public Open Space, Park and Recreation Areas</u>.   Land
reserved for public open space, park and recreation areas on a
Preliminary Plat approved by the City, which the Developer is

-15-

unable to dedicate to the Fox Valley Park District, shall, at the City's election, either be dedicated to the City for public open space, park and recreational purposes, and in such event, the City shall accept the dedication of such land and shall assume the responsibility for the care, maintenance and improvement (in such manner as the City shall determine) of such land for public open space, park and recreational purposes, or be utilized as private open space, park and recreation areas and credited fully against Developer's obligation to reserve land for such purposes, provided that agreements are made for the on-going maintenance of such lands for such purposes.  Land reserved for improved public open space, park and recreation areas pursuant to the City's Subdivision Control Ordinance shall be designed in accordance with the Design Standards of the Fox Valley Park District's Master Plan dated August 12, 1991, while natural wetlands and wooded areas shall remain in a natural condition in accordance with applicable federal wetland guidelines.

4.   _Easement Grants to the City_.  It shall be a condition to the City's obligation to accept dedication of any public improvement pursuant to this Section VI that the dedication of such improvement be accompanied by the grant of appropriate easements to permit the City to carry out its responsibilities with respect to such improvement, except that such easements which provide access for the purpose of maintenance and repair of such improvement may contain a provision, in such form as the City shall approve, reserving to Developer the right to locate

-16-

and relocate any such easement or to provide alternative methods
for the City to carry out its responsibilities with respect to
the maintenance and repair of such improvement, which approval
shall not be unreasonably denied.

5.   <u>Municipal Service Easements</u>.  Municipal service
easements shall be the granted to the City for the right of
access into, over and from all private streets, private drives,
parking areas and walks located in the Region for the purpose of
performing police and fire protection, garbage collection and
other municipal services.

6.   <u>Utility Easements</u>.  The City shall, upon the request of
the Developer, grant to Developer, to the Sanitary District, or
to utility companies designated by Developer, such construction
and maintenance utility easements under, over, across or through
property owned or controlled by the City as are necessary or
appropriate for the development of the Region in accordance with
the provisions of the Plan Description, the Modification, this
Agreement or any approved Preliminary or Final Plan in relation
thereto.  The City further agrees that in the event Developer is
unable to obtain utility easements over, under, across or through
property not owned by or under the City's control which may be
necessary or appropriate for the development of a portion of the
Region at a cost and on conditions reasonably acceptable to
Developer, the City will use, to the full extent permitted by
law, its statutory condemnation powers to secure such easements.
All costs and expenses incurred by the City in the condemnation

-17-

of such easements on behalf of Developer shall be reimbursed by
Developer.

7.   <u>General Easement Requirements</u>.  It shall be a condition
to the granting of any easement required to be granted pursuant
to this Agreement that the grantee shall agree that in the event
of any use of such easement for construction or maintenance of
the facility for which such easement was granted (a) the grantee
shall restore the property to the same condition as existed prior
to such construction or maintenance, and (b) the grantee shall
hold the grantor and his or its successors in interest harmless
from any claims for personal injury or property damage which
arise or result from the activities of the grantee in connection
with such construction or maintenance.

8.   <u>Cooperation by the City and the Developer</u>.

a.   With respect to applications, permits and
agreements from or with public bodies which are necessary or
appropriate to enable Developer and the City to carry out
the provisions of this Agreement, the City shall, upon
compliance by Developer with the City's reasonable
requirements therefor, execute and issue such permits as may
be required by the City, and, at the request of Developer
execute such applications and agreements which may be
required by any other public body and shall otherwise assist
in the procurement of any such permits and agreements.

b.   The City and Developer shall cooperate fully in
seeking Federal, State or County financial and other aid and

assistance required or useful for the construction or
improvement of property and facilities in the Region.

VII.

## PUBLIC WORKS MAINTENANCE BUILDING SITE

Developer shall make a site in the Region of approximately 5
contiguous acres in size, available for purchase by the City for
use by the City for construction of a public works maintenance
building and other uses related thereto.  Subject to the size
limitation provided for herein, the location and size of such
site shall be as mutually agreed upon by the City and Developer
no later than December 7, 2000.  The entire site shall be
purchased at one time at a purchase price of $25,000 per full
acre with a proportional amount for any fractional acres
contained in the site.  If the parties have been unable to agree
as to location and size of such site by that date, Developer – in
full satisfaction of its obligations – shall pay the City the sum
of $125,000.00 on or before February 7, 2001.

VIII.

## TERM

1.    The parties hereto agree that the term of this
Agreement shall be 10 years and that this Agreement shall be
deemed to provide an amendment and extension of the term for the
development contemplated by the Principal Agreement.

2.    This Agreement is adopted pursuant to the provisions of
the Illinois Municipal Code; provided, however, that any
limitations in the Illinois Municipal Code in conflict with the

-19-

provisions of this Agreement shall not be applicable (to the extent permitted by law), and as to all such provisions, the City hereby exercises its powers pursuant to the provisions of Article VII, Section 6 of the Constitution of the State of Illinois.  The City recognizes and agrees that entry into this Agreement is upon the express reliance by Developers that the terms and provisions of this Agreement shall be valid for a period of 10 years, and that the City will take no action which will in any way be contrary to, or inconsistent with, the terms and provisions of this Agreement.

3.    As provided for in this Agreement, and in the Plan Description or the Modification, as applicable, no changes or amendments in the Zoning Ordinance which shall directly or indirectly adversely affect the use or development of the Region shall be of any effect on the Region, and all parts of the Region shall be recognized, for the purposes of any such adverse change or amendment to the Zoning Ordinance, as a "prior non-conforming use".

IX.

GENERAL PROVISIONS

1.    Exculpation.  Except as expressly provided for in this Agreement, only the persons and entities who are named parties hereto shall be liable under the provisions hereof.  No partner of a party, parent of a partner corporation, subsidiary of a partner corporation or stockholder or officer thereof, and no disclosed or undisclosed principal of any party hereto, shall be

-20-

liable in the event of any default under this Agreement, the Plan
Description, as applicable, or Modification and the same are
hereby expressly released and relieved from any and all personal
liability or responsibility in connection with such defaults.

It is expressly agreed and understood that the
obligations of Developer set forth in this Agreement, shall be
solely the obligations and agreements of the Developer and none
of the development obligations set forth herein shall be binding
upon the real property comprising the Region other than the
obligation to dedicate right-of-way for North Aurora Road/Indian
Trail Road and Liberty Street which shall run with the applicable
portions of the Region owned by Developer or its land trusts (the
foregoing are herein called the "R-O-W Dedications").  If
Developer shall sell, convey or otherwise transfer all or any
part of the Region owned by Developer or its land trust, the
transferees shall not be deemed to have assumed any of the
obligations of the Developer other than the ROW Dedications and
only if the portion of the Region subject thereto is involved,
except only to the extent, if any, of such express and specific
assumption of such obligations by such transferees in the
agreement, deed or other instrument effecting the sale,
conveyance or other transfer to such transferees.  Such express
and specific assumption by such transferees of such obligations
shall not relieve Developer from its obligations.

2.    <u>Stop Orders</u>.  The City shall not issue any stop orders
directing work stoppage on buildings or on work underway in the

-21-

Region without setting forth the Section of the Code of
Ordinances, Plan Description or Modification allegedly violated
and the recipient of such orders shall forthwith proceed to
correct such violations as may exist.

3. <u>Certificates of Occupancy</u>. The City shall issue
certificates of occupancy within 10 business days of application
therefor or issue a letter of denial within said period of time
informing Developer or person applying for the same specifically
as to what corrections are necessary as a condition to the
issuance of a certificate of occupancy and quoting the Section of
the Code of Ordinances, the Plan Description or Modification
relied upon by the City in its request for correction.

4. <u>Liability of Developer</u>.

a. The liability of Developer (including any
partnership, venture or other entity that succeeds to its
interest) hereunder shall be limited solely to the assets or
property, after deduction of liabilities to which any such
assets or property may be subject, of Developer or such
successor partnership, venture or other entity; provided,
that a dissolution, liquidation or termination of Developer,
whether or not Developer is reconstituted by substantially
the same partners of Developer, shall not discharge or limit
the liability of Developer hereunder, but in the event of
dissolution, the liability of Developer or its successor in
interest shall be limited to, or enforceable against, only
the assets or property, after deduction of liabilities to

-22-

which any such assets or property may be subject, of Developer as of the date of such dissolution, and in such event of liquidation or termination, the liability of any distributee, including any partner of Developer, shall be limited to the value, as of the date of such liquidation and distribution, of the assets or property, after deduction of liabilities to which any such assets or property may be subject, or Developer received by such distributee.  Subject to the foregoing provision relating to distributees, no partner of Developer shall be personally liable in respect of any claim arising out of or related to this Agreement, and the deficit capital account of a partner in Developer, or such partnership, venture or other entity, shall not be deemed an asset or property of Developer or such successor partnership, venture or other entity.

b.    Developer does hereby represent that as of the date of this Agreement the "net worth" of Developer is in excess of $10 million.  (For the purposes hereof, the "net worth of Developer" shall mean the fair market value of the assets and property of Developer minus all liabilities and obligations of Developer, said liabilities and obligations to be determined in accordance with generally accepted accounting principals.)  Developer hereby agrees with the City that at all times during the term of this Agreement that it, or any successor partnership, venture or other entity, will maintain a net worth (determined as provided

-23-

herein) of not less than $10 million; provided, however, that such net worth requirement shall, from time to time, be reduced as the obligations of the Developer set forth in this Agreement shall be performed and satisfied.

c.    For so long as Developer meets the foregoing requirements and is not in default hereunder, Developer may in lieu of posting bonds, security or letters of credit as otherwise required by the Subdivision Control Ordinance as modified by the Plan Description and Modification continue to satisfy and discharge its obligations by continuing in full force the Blanket Letter of Credit in the amount of $200,000.00 heretofore posted with the City with the City as its beneficiary to secure Developer's construction and maintenance obligations with respect to Public Improvements installed by Developer within the Region pursuant to the Subdivision Control Ordinance as applicable to the Region.

5.    Assignment of Obligations.

a.    Developer may assign its obligations under this Agreement to any corporation, partnership or other entity which acquires all or substantially all of the property and assets of such party hereto by merger, consolidation or other method or methods of reorganization, and upon such merger, consolidation or other method of reorganization, such party shall be released and relieved from its obligations hereunder.

-24-

b.    Except as specifically provided for above Developer may sell, transfer and assign all or part of its duties and obligations hereunder to any corporation, partnership or other entity; provided however, that the Developer shall remain liable and responsible for the performance and compliance with its obligations hereunder except to the extent that such transferee or assignee shall, in the City's sole discretion, be financially acceptable to the City, in which event, upon receipt of the City's written confirmation of such acceptability, Developer be released and relieved from its obligations hereunder.

6.    <u>Additional Real Estate</u>.  To the extent that Developer, either directly or through one of its land trusts which trust was a party to the Principal Agreement and which is the record owner of a portion of the Region, acquires any additional real estate which is contiguous to the Region, the City shall upon submission of petitions and in accordance with law take such action as may be desired to annex such real estate to the City, if not already annexed, and to rezone such additional real estate so that it may be developed together with the adjacent portions of the Region consistent with the Plan Description and Modification.

7.    <u>Approved Preliminary Plans and Plats</u>.  All previously approved Preliminary Plans and Plats for the Region shall remain effective until December 7, 2000, unless upon the application of the then current record owner of the applicable property, the City Council grants a further extension therefor.

-25-

8.   <u>Limitation on Number of Dwelling Units</u>.  The maximum permitted number of dwelling units in the Region will be 10,750.

9.   <u>Defaults</u>.  If either party to this Agreement shall fail to perform any of its obligations hereunder, and the other party shall give written notice of such default to the defaulting party and such defaulting party shall fail to cure such default with reasonable promptness after the receipt of such default notice, then, in addition to any and all other remedies that may be available, either in law or equity, the other party shall have the right (but not the obligation) to take such action as in its reasonable discretion and judgment shall be necessary to cure such default, and the defaulting party, in such event, hereby agrees to pay and reimburse the other party for all reasonable costs and expenses incurred by it in connection with action taken to cure such default plus interest at a rate equal to the prime rate of interest charged by The First National Bank of Chicago to large corporate borrowers plus 1% per annum.

10.   <u>Conflicts with Plan Description</u>.  To the extent that any part of the Plan Description shall be contrary to, or inconsistent with, this Agreement, the terms and provisions of this Agreement shall prevail and control.

11.   <u>Enforcement</u>.  Each of the parties hereto or their successors in interest or assigns, may by civil action, mandamus, or other proceeding enforce each and all of the terms, conditions and provisions hereof.

12.   <u>Notice</u>.  Any notice or demand hereunder from any party hereto to another party hereto shall be in writing and shall be

deemed duly served if mailed by prepaid registered or certified mail addressed as follows:

If to the City:

        City of Aurora
        44 East Downer
        Aurora, Illinois   60507
        Attn:  City Clerk

If to the Developer:

        Aurora Venture
        3600 Thayer Court
        Suite 100
        Aurora, Illinois   60504
        Attn:  Project Manager

with a copy to:

        Gould and Ratner
        222 North LaSalle Street
        Suite 800
        Chicago, Illinois   60601
        Attn:  V. Harding

or to such address as any party may from time to time designate by notice to the other parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

ATTEST:                         CITY OF AURORA, ILLINOIS,
                                a municipal corporation

_Cheryl M. Vonhoff_             _[signature]_
City Clerk                      Mayor


                                AURORA VENTURE, a limited partnership

                                By:  University Exchange Corporation,
                                     its general partner


                                     By: _____
                                         President

-27-

### INDEX OF EXHIBITS

Exhibit "A"        Plan Description Modification

Exhibit "B"        1993 Updated Land Use Plan

Exhibit "C"        Lands from Which Recapture is Due and
                   Recapture Amount

Exhibit "D"        Storm Water Management Letter Agreement dated
                   July 31, 1984